Avraham E. Aizenman (SBN 304663)
Email: eaizenman@reedsmith.com
REED SMITH LLP
355 South Grand Avenue
Suite 2900
Los Angeles, CA 90071-1514
Telephone: +1 213 457 8000
Facsimile: +1 213 457 8080

James Pistorino (SBN 226496)
Email: james@dparrishlaw.com
Parrish Law Offices
224 Lexington Dr.
Menlo Park, CA 94025
Telephone: (650) 400-0043

Attorneys for Plaintiff
Ronald Maddern

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD MADDERN,<br><br>          Plaintiff,<br><br>   vs.<br><br>LLOYD AUSTIN, in his capacity as Secretary of the United States Department of Defense,<br><br>          Defendant. | No.: _3:21-cv-01298-MMA-BLM___<br><br>**MOTION FOR DISCOVERY** |

Pursuant to this Court's Order of December 3, 2021, Plaintiff Staff Sergeant Ronald Maddern moves for discovery. On December 13, 2021, the parties met and conferred and agreement was not reached. Plaintiff seeks discovery related to *ex parte* contacts engaged in by the Secretary's counsel (Ms. Greer), the ALJ who issued the recommended decision below (Ms. Noel), and the final decision maker (Dr. Yale)/his office. That such contacts occurred is not disputed. What is unknown is their extent and content. That is the discovery sought.

## I.  BACKGROUND

### A.  Spinal Stenosis and Treatments

Spinal stenosis is a narrowing of the spaces between the vertebra that make up the spine. This leads to pressure on the spinal cord/nerves that run through the spine and this pressure can cause acute pain and weakness/inability to control the muscles of the body (particularly the legs). Spinal stenosis most commonly occurs in the lower portion of the back (*i.e.*, the lumbar region) that causes the debilitating pain and makes it very difficult/impossible to walk.[1]

There are several approaches to treating spinal stenosis. Milder cases may be treated with physical therapy, pain medications (up to and including opioid patches), steroid injections, and something called a "decompression procedure" where tiny portions of the spine are removed using needles to create space and relieve pressure. Each of these treatments (especially the opioid patches) has its own side effects.

More severe cases may be treated, where possible, using a procedure referred to as a "laminectomy." A laminectomy is conducted under general anesthesia and is occasioned by a significant loss of blood (possibly requiring transfusion). A large incision in made in the patient's back (3 inches x 2 inches) to access the region of interest. Various muscles are cut away and the back portion of the relevant vertebrae (*i.e.*, the lamina) is crushed and removed, thereby creating space and relieving some of

---

[1] No doubt the Court has seen people who are hunched over trying to use a walker with tennis balls on the legs. Those people are suffering from lumbar spinal stenosis and are in tremendous pain.

the pressure on the spinal column/nerves.[2]  After a laminectomy, a patient will spend the night in the hospital and there is a significant recovery period, including wound care.  As it involves crushing and removing the bone, a laminectomy is non-reversible.  Laminectomy may need to be done multiple times (to address each vertebrae), has a significant failure rate (~30-40% at three years), and the only further treatment available is a spinal fusion.  Given everything involved (anesthesiologist, surgeon, possible transfusion, hospital stay, etc.), laminectomys are expensive.

Because of its highly invasive nature, loss of blood, and the need for general anesthesia, some people suffering from stenosis are not candidates for a laminectomy.  This includes people also suffering from diabetes, various heart conditions, and blood disorders.  For these people, a laminectomy is not a safe option.

Both to address the shortcomings of a laminectomy and the group of people that cannot undergo one, an alternative mechanical approach has been developed.  This involves placing a mechanical device in the space between the vertebrae that keeps the vertebrae apart, pressure from being placed on the spine/nerves, and thereby relieves the condition.  This is referred to as an interspinal spacer.

An interspinal spacer in inserted under local anesthesia (thus, no anesthesiologist is required) in a procedure that takes less than an hour.  A small incision (about half an inch) is made and the device is inserted, thereby keeping the vertebrae apart and from putting pressure on the spine and relieving the condition.  There is no/minimal loss of blood and patient goes home right after the procedure.  There is a minimal recovery period and the procedure is reversible.  Thus, if the procedure should somehow fail, the device can be removed and a laminectomy performed if needed/appropriate.  Because there is less to the overall procedure, etc., using an interspinal spacer is less costly than a laminectomy.  Further, as stated above,

---

[2] The "lamina" are the bumpy parts you feel when you run your hand up and down your spine.

some people are not eligible for a laminectomy and an interspinal spacer is their only treatment option.

**B.     The Vertiflex Interspinal Spacer**

Vertiflex makes an interspinal spacer called "Superion."  This works like a toggle bolt the Court may have used to hang a picture on a wall.  In its folded form, the device can be inserted through a small incision into the space between vertebrae.  Once in place, the doctor uses a sort of ratchet to unfold the arms of the device that keep the vertebrae apart, relieves pressure, etc.  The device is FDA approved, is supported by multiple scientific studies (including a five-year study at the time of the hearing in this case), is demonstrated superior to a laminectomy in follow-up tracking, has been awarded a CPT level I code by the American Medical Association (indicating that the device is not experimental or investigational), and is a covered Medicare benefit.  At the time of the hearing below, Dr. Verdolin (appearing *pro bono*) testified that post-operative tracking reports showed that the Superion had a dramatically lower failure/complication rate than a laminectomy.

Because it is addressed in the papers, Plaintiff briefly discusses X-STOP.  X-STOP was a different interspinal spacer made by a different company.  Rather than having a patient lie on their stomach and coming straight in from the back as the Superion product does, the X-STOP attempted to access the space between the vertebrae by having the patient lie on their side.  Thus the presentation of the spine was totally different in the X-STOP procedure than in the Superion procedure.  Further, of course, the X-STOP product had a totally different design than the Superion product.  Ultimately, the X-STOP product was removed from the market because follow up studies showed that there was an unacceptable rate of failure at less than five years.  As indicated, studies demonstrate than the Superion product continues to perform excellently at more than five years.

**C.     Staff Sergeant Maddern**

Mr. Maddern is currently 73 years old and retired from the Army after a career serving in mostly overseas positions. Mr. Maddern developed a severe case of lumbar spinal stenosis and also suffers from other health conditions, including diabetes. Mr. Maddern's condition deteriorated until, ultimately, he was essentially wheelchair bound, home bound, socially isolated, and in constant, excruciating pain. Indeed, at the time of the procedures that are the subject of this case, Mr. Maddern had been essentially confined to a wheelchair for some 14 years. Throughout this time, attempts were made to treat Mr. Maddern's condition using numerous non-invasive procedures, including opioid patches which themselves are dangerous and have significant side effects. These approaches were not successful and Mr. Maddern remained in severe pain with his wife (Deborah) acting as his full-time caregiver. Because of his other medical conditions, a laminectomy could not be performed on Mr. Maddern safely.

In August 2017, Mr. Maddern had a first procedure to insert a Superion device between two of his vertebrae in a procedure that lasted around 15 minutes, using only local anesthesia and a very small incision. Immediately after the procedure, Mr. Maddern went home. Within two days, Mr. Maddern was up and walking around without the wheelchair he had been limited by for approximately 14 years. Over the course of the next several weeks, his condition continued to improve and he enjoyed increasing mobility and reduced pain.

In November 2017, Mr. Maddern returned for another Superion procedure to address pressure between two other vertebrae and provide even greater relief. These procedures dramatically alleviated Mr. Maddern's pain, enabled him to walk all but the longest distances without a wheelchair, and substantially reduced the need for medications to address back pain. Further, with his increased mobility and reduced pain, Mr. Maddern regained his independence and was no longer socially isolated. As of this submission, more than four years after the procedures, Mr. Maddern continues to enjoy these benefits and is pleased with his condition in this regard.

**D.     Procedure Below**

Mr. Maddern submitted claims for coverage of the procedures. Medicare covered 80% these claims, including for the Superior product. Consistent with statutory requirements, Medicare payment of these claims means that Medicare determined that the Superior product is not experimental or investigational, that it is safe and effective, and that it was medically reasonable and necessary to treat Mr. Maddern's condition.

Pursuant to the statutory scheme establishing TriCare, TriCare was to pick up the remaining 20% of the expenses. In direct contradiction of the findings of the FDA, AMA, and Medicare, TriCare rejected Mr. Maddern's claims on the grounds that the Superion product was "unproven." Mr. Maddern retained counsel and appealed, following the statutory/regulatory scheme.

Ultimately, the appeal was assigned to ALJ Nicole Noel. Mr. Maddern submitted a pre-hearing brief supported by numerous exhibits (FDA approval documents, peer-reviewed scientific papers, etc.). Counsel for the Secretary (Ms. Geer) did not submit a pre-hearing brief. Thereafter, a multi-hour hearing was held on August 22, 2019, before ALJ Noel. In addition to the other materials and the testimony of both Mr. and Mrs. Maddern, Dr. Michael Verdolin appeared *pro bono* to testify about a number of issues (*e.g.*, the Superion product, how it works, how it differs from a laminectomy and X-STOP, Mr. Maddern's condition, and how Dr. Verdolin treated it with the Superion product). The Secretary's counsel (Ms. Greer) did not submit any exhibits or present any witnesses. Thereafter, a transcript of the hearing was prepared.

On behalf of the Secretary, Ms. Greet submitted a post-hearing brief contending that coverage was excluded by a coverage manual provision that did not exist until more than a year after the procedures at issue and until after Mr. Maddern had submitted his claims. Mr. Maddern submitted a post-hearing brief on September 13, 2019. Mr. Maddern pointed out that the coverage provisions applicable when Mr.

Maddern had the procedures and submitted his claims had no such exclusion and that Mr. Maddern's showing was unrebutted. On September 16, 2019, ALJ Noel responded and noted that the record was closed.

### E. Communications and the Decisions Below

Pursuant to the relevant regulations, ALJ Noel was required to issue a recommended decision within 60 days of the closing of the record, including a written statement of the findings and a statement of the reasons for the recommended decision. *See* 32 C.F.R. § 199.10(d)(12). Given the closing of the record on September 16, 2019, pursuant to the regulations, a recommended decision was due by November 15, 2019.

When nothing had been received by early January 2020, counsel for Mr. Maddern wrote ALJ Noel (copying Ms. Geer) and inquired about its status. ALJ Noel responded to all parties that she intended to issue a decision by the end of January 2020 (*i.e.*, more than twice the time frame required by the regulations). *See* January 13, 2020, email chain.

When nothing had been received by June 2020, counsel for Mr. Maddern again inquired copying Ms. Greer. ALJ Noel responded by asking *Ms. Greer* for an update. To which, Plaintiff's counsel again asked ALJ Noel whether a decision had issued and requesting a copy. Ms. Greer subsequently responded stating that the Secretary had not issued a final decision. In response to yet another inquiry about when a recommended decision issued and requesting a copy, Ms. Greer responded with the false claim that: "Judge Noel issued her recommended decision within the 60 day window allowed by the Regulation." *See* June 23, 2020 email. Neither Ms. Greer nor ALJ Noel indicated when the recommended decision issued or provided a copy despite the repeated requests.

Pursuant to 32 C.F.R. 199.10(e)(1), a final decision should "normally" be issued within 90 days of the recommended decision.

Finally, when nothing had been received by May 11, 2021 (*i.e.*, 19 months after the hearing), Mr. Maddern's counsel sent an email only to Ms. Greer indicating his intention to file suit for a writ of mandamus and/or a final decision if a decision was not received from the Secretary by May 21, 2021.  Separately, Mr. Maddern's counsel sent an email to both ALJ Noel and Ms Greer again asking when the recommended decision issued, requesting a copy, and noting the extended delay.

Thereafter, on May 19, 2021, several email messages were exchanged.  First, ALJ Noel sent a message only to Plaintiff's counsel and contended that she issued a recommended decision in February 2020 and hoped that a decision would issue by the end of the month.  Plaintiff's counsel immediately responded by copying Ms. Greer. Thereafter, Plaintiff's counsel sent an email only to Ms. Greer indicating his intention to file suit if a decision was not received by April 21.  Ms. Greer then responded that a decision was being placed in the mail that very day.  Apparently concerned that a decision mailed would not meet the May 21, 2021, deadline, the decision maker (Dr. Yale) faxed a decision on May 20, 2021.

The final decision itself is four pages long and addressed only one of the two claims at issue (*i.e.*, only the August 10, 2017, claim and not the November 9, 2017, claim).  The decision failed to address any of the evidence offered by Plaintiff, contends that the lack of an exclusion of the Superion product was an administrative "defect" and a "loophole", and relies on precisely ZERO evidence to support its conclusion regarding the Superion product.  *See* Exhibit B at 4.  Indeed, as far as Plaintiff can tell, the final decision relies on the assertion that the X-STOP product is the same as the Superion product.[3]

In November 2021, some four months after the Complaint in this case was filed, the Secretary's counsel (Mr. Dorgan) provided a copy of ALJ Noel's recommended decision dated January 31, 2020.  *See* Exhibit A.  That is, nearly two years after it was

---

[3] Like contending that because a Yugo is a lemon car, a Honda Accord must be one as well.

issued and in contravention of the APA, Plaintiff first saw the recommendation that led to the ultimate decision denying Mr. Maddern's claim. The date on the decision put to the lie Ms. Greer's claim of May 19, 2021, that the decision was issued within 60 days of the September 16, 2019, closing of the record.

The recommended decision itself fails to address any of the evidence offered by Plaintiff, contends that the lack of an exclusion of the Superion product was an administrative "defect" and a "loophole", and relies on precisely ZERO evidence to support its conclusion regarding the Superion product. *See* Exhibit A at 8. Indeed, as far as Plaintiff can tell, relies on the assertion that the X-STOP product is the same as the Superion product. Thus, it appears that the "final" decision adopted the recommended decision without any analysis (while simultaneously failing to address one of the claims at issue).

If, consistent with the APA, Mr. Maddern had been provided with a copy of the recommendation prior to the decision by Dr. Yale, Mr. Maddern could have pointed out the multiple flaws. Instead, the decision was intentionally concealed from Mr. Maddern and his counsel for nearly two years and until after this suit was filed.

### F. Plaintiff's Proposed Amended Complaint

Since the filing of this case, Plaintiff has engaged in several efforts to resolve this matter without further litigation. Those efforts came to a conclusion in mid-November 2020, and a settlement was not achieved.

Consistent with that, in early December, Plaintiff moved to amend the Complaint to assert causes of action Plaintiff had hoped to avoid. Among these are causes of action related to the failure to provide a copy of the recommended decision, the *ex parte* contacts, and the lack of a neutral decision maker in considering Mr. Maddern's claims, including denial of due process under the Fifth Amendment of the United States Constitution. *See* Dkt. # 8 (Causes of Action VI-VIII). The Secretary opposes Plaintiff's motion on unknown grounds.

## II.   DISCUSSION

A.  **Discovery in APA Cases**

As most recently explained by the Supreme Court, in reviewing an agency decision, a court is "ordinarily limited" to evaluating the contemporaneous record. *See Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2573-74 (2019).  However, there are exceptions.  Indeed, even the "mental processes of the administrative decision makers" may be examined on a "strong showing of bad faith *or improper behavior*" and "may justify extra-record discovery." *Id*. at 2574 (emphasis added).

In a decision pre-dating *Dep't of Commerce*, the Ninth Circuit identified four "narrow" exceptions in which extra-record evidence (and therefore discovery) may be allowed.  These are: 1) if an admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision; 2) if the agency has relied on documents not in the record; 3) when supplementing the record is necessary to explain technical terms or complex subject matter; and 4) when plaintiffs make a strong showing agency bad faith. *See Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. U.S.D.A.*, 499 F.3d 1108, 1117 (9th Cir. 2007).

Respectfully, it is difficult to know what the Ninth Circuit meant by/the scope of "explained its decision", "documents not in the record" or "bad faith." Nevertheless, there are some areas where prior cases have allowed discovery and extra-record evidence to be considered.  Among these are "secret policies" affecting the decision (*see, e.g., Goodnight v. Shalala*, 837 F.Supp. 1564 (D. Utah 1993)), bias by the decision maker, and *ex parte* contacts with/by the decision makers (*see, e.g., Greene v. Babbit*, 943 F.Supp. 1278 (W.D. Wash. 1996)).

To be clear, Plaintiff does not contend that the mere unsupported assertion of any or all of these bases constitutes *carte blanche* for discovery.  Instead, Plaintiff merely contends that when there is a reasonable basis to believe that "bad faith"/"improper behavior" has occurred, discovery is warranted to determine whether, in fact, that has happened.  That discovery may bolster the plaintiff's claims

– 9 –
MOTION FOR DISCOVERY

or may provide assurance that nothing untoward occurred. In any event, the discovery itself engenders confidence in the process.

### B. *Ex Parte* Contacts Occurred in this Case

At this point, it is beyond dispute that *ex parte* contacts occurred in this case. Indeed, Plaintiff understands that the Secretary does not dispute that *ex parte* contacts occurred. That *ex parte* contacts occurred is evidenced in at least three ways.

#### 1. Information Ms. Greer Had That Plaintiff's Counsel Did Not Have

That Ms. Greer knew details of when a recommended decision issued by ALJ Noel and when a decision would issue/had issued by Dr. Yale, indicates that the substantive information of this case was provided by someone to Ms. Greer and not Mr. Maddern's counsel. For example, how, other than an *ex parte* contact, could Ms. Greer have known that ALJ Noel issued a recommended decision sometime before Plaintiff first saw it in November 2021 (i.e., after this suit was filed)? Likewise, how could Ms. Greer have known that a decision would issue from Dr. Yale on May 19, 2021, even before it issued an Plaintiff was provided a copy? Clearly, this only could have happened a result of *ex parte* contacts.

Further, these are merely the contacts that can be deduced from the events/discussions with counsel. What further *ex parte* contacts occurred and what their substance was is unknown.

#### 2. The Conduct of the Decision Maker

As detailed above, on May 11, 2021, Plaintiff's counsel sent an email only to Ms. Greer indicating Mr. Maddern's intention to file suit by May 21, 2021 if a decision was not received by that date. How, other than *ex parte* contacts, could this information have become known to Dr. Yale so that he could issue a decision on May 19, 2021? Clearly, *ex parte contacts* communicating this information to Dr. Yale/his office occurred. Indeed, Plaintiff understands that the Secretary does not dispute that *ex parte* contacts were occurring between Ms. Greer and Dr. Yale/his office.

#### 3. ALJ Noel Engaged in *Ex Parte* Contact

As indicated above, ALJ Noel engaged in multiple *ex parte* contacts with Plaintiff's counsel. On May 19, 2021, ALJ Noel responded to Plaintiff's tender inquires about *ex parte* contacts by responding only to Plaintiff's counsel. ALJ Noel sent an email only to Plaintiff's counsel asserting her hope that a decision would issue by the end of the month. In response to this *ex parte* contact by ALJ Noel, Plaintiff's counsel immediately forwarded a copy to Ms. Greer.

Having engaged in *ex parte* contact with Plaintiff's counsel, it is reasonable to suspect that ALJ Noel engaged in *ex parte* contacts with Ms. Greer and/or the decision maker.

## C. Discovery is Warranted

As an initial matter, the Supreme Court has indicated that discovery may be appropriate where either "bad faith" *or* "improper behavior" is alleged/has occurred. *See Dep't of Commerce*, 139 S.Ct. at 2574. Thus, any effort to limit discovery of extra-record evidence to only instances of "bad faith" would contradict the Supreme Court and be improper. That said, Plaintiff alleges *both* that there is bad faith and that improper conduct occurred.

### 1. The Secretary Has Engaged in "Bad Faith" Conduct

To be clear, Plaintiff contends that the Secretary's conduct in this matter constitutes "bad faith", both substantively and procedurally. What constitutes "bad faith" is highly dependent on the facts and circumstances. As associated with the Equal Access to Justice Act (EAJA) (28 U.S.C. § 2142), in *Ibrahim*, the Ninth Circuit conducted a comprehensive review of paragraph (b) ("bad faith") fees. *See Ibrahim v. U.S.D.H.S.*, 912 F.3d 1147 (9th Cir. 2019). As explained, a "finding of bad faith is warranted where an attorney [or party] knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent." *Id*. To make a bad faith determination, the court must review the totality of the government's conduct. *Id*. at 1181. "However, it is unnecessary to find that every

aspect of a case is litigated by a party in bad faith in order to find bad faith by that party." *Id*.

For example, in *Brown v. Sullivan*, 916 F.2d 492 (9th Cir. 1990) the "cumulative effect" of the Social Security Appeals Council's failures (including delay associated therewith) constituted bad faith and an award of fees at market rates. *Id.* at 496. A "frivolous" argument is one that is "groundless" or "obviously wrong." *See Rodriguez v. U.S.*, 542 F.3d 704, 710 (9th Cir. 2008). An argument is "groundless" if it is "destitute of foundation, authority, or support; having no real cause or reason; unfounded." *Id*.

At issue in this case are two claims (dated August 10 and November 8, 2017) related to insertion of Superion devices in Plaintiff's spine that treated a spinal condition and allowed Plaintiff to walk after being in a wheelchair for some 14 years.

Substantively, Plaintiff contends that the decisions at issue are in "bad faith" in that they are "groundless", "obviously wrong", and/or "frivolous." ALJ Noel's recommendation, which failed to address any of the evidence put on by Plaintiff, was concealed from Plaintiff for nearly two years until after the filing of this suit (in violation of the applicable provisions of the APA) is founded on an alleged administrative "defect" and "loophole" and the idea that the X-STOP product and the Superion product are the same devices. Dr. Yale's final decision suffers from the same defects but also adds the failure to address one of the two claims in this case. If these decisions do not constitute "bad faith"/"frivolousness", Plaintiff's counsel does not know what would.

Procedurally, Plaintiff contends the Secretary has also engaged in bad faith. Putting aside the bad faith/frivolous nature of the recommended decision and the decision itself, the demonstrated contempt displayed for the statutory/regulatory deadlines evidences bad faith. There simply can be no justification for the delay in this case.

Moreover, since the filing of this case, the Secretary has engaged in bad faith conduct. This case was filed in July 2021. *See* Dkt. #1. Since that date, the Secretary has failed to produce a copy of the administrative record and none has been produced to date. Indeed, through November 2021, the Secretary contended that he required through mid-December 2021, *i.e.*, more than five months after the Complaint was filed, to even produce the administrative record. In and of itself, this delay is evidence of bad faith.

**2. The Secretary Has Engaged in "Improper Behavior"**

As detailed above, there is more than a reasonable basis to believe that improper behavior occurred in this case. Of course, *ex parte* contacts are precluded by the APA (*e.g.*, 5 U.S.C. §§ 554 and 557) and the Due Process Clause of the Fifth Amendment of the United States Constitution requires an impartial/neutral decision maker. *See also* Plaintiff's proposed Amended Complaint, Dkt. #8.

As alleged by the Plaintiff, the multiple *ex parte* contacts were improper and in violation of these provisions.

In addition, the content of/timing of Dr. Yale's final decision indicates that it was not the product of a neutral decision maker. Instead, the lack of substance, failure to address all the claims, and timing of the decision (particularly faxing it to meet the May 21, 2021, deadline), indicate that the decision was issued in an attempt to shield the agency from liability/ward off litigation rather than an impartial consideration of by a neutral decision maker of Mr. Maddern's claims.

At the discovery stage, Plaintiff need only have a reasonable basis to believe that these conclusions may be true in order for discovery to proceed. In this case, there is clearly such a basis.

**D.   The Discovery Requested is Warranted**

Plaintiff seeks both written discovery and depositions.

As to written discovery, on information and belief, Plaintiff understands that various communications between Ms. Greer, ALJ Noel, and Dr. Yale/his office were conducted by email. Plaintiff seeks production of these documents.

In addition, Plaintiff understands that there were multiple telephone conversations between Ms. Greer and the relevant individuals. Accordingly, Plaintiff seeks the depositions of Ms. Greer, ALJ Noel, and Dr. Yale/his office and anyone else Ms. Greer/ALJ Noel had communications with about this matter.

Plaintiff intends to follow the evidence wherever it may lead. That path may be short (*e.g.*, there was nothing substantive other than the emails) or it may be long. Regardless, Plaintiff intends, and justice requires, getting to the bottom of this matter.

### III.   CONCLUSION

For the reasons set forth above, discovery in this case should be allowed.

DATED:  December 29, 2021            Respectfully submitted,

REED SMITH LLP

By: s/ Avraham E. Aizenman
Avraham E. Aizenman
Attorneys for Plaintiff, Ronald Maddern
Email:   jlwood@reedsmith.com

By: s/ James C. Pistorino
James C. Pistorino
Attorneys for Plaintiff, Ronald Maddern
Email:   james@dparrishlaw.com

*Attorneys for Plaintiff*