**From:** Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
**Sent:** Wednesday, August 7, 2019 1:26 PM
**To:** James Pistorino; Debbie Parrish; Greer, Leslie B CIV DHA CLAIMS (USA)
**Subject:** Notice of Hearing DHA Task No. 19-01
**Attachments:** Notice of Hearing DHA Task No. 19-01.pdf

All:

Please see the attached Notice of Hearing, containing the date, time, and location of the hearing. The notice also includes additional information pertinent to logistics and the submission of evidence. The DOHA Hearing Office will also issue this notice as required by office procedures. The purpose of this notice is to give the parties as much time as possible to comply with the evidentiary deadlines set forth in the notice.

Do not hesitate to contact me if you have any questions.

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals
Fax: 703.696.1831



**DEPARTMENT OF DEFENSE**
**DEFENSE OFFICE OF HEARINGS AND APPEALS**
**PO BOX 3627**
**ARLINGTON, VIRGINIA 22203**

| | |
|---|---|
| **Appeal of** | |
| **Ronald E. Maddern**<br>**A TRICARE for Life Beneficiary** | **Formal Review No. AH190164** |
| | **TASK ORDER NO. 19-01** |
| **ISSUE: 233, Unproven Care** | |

## NOTICE OF HEARING

August 1, 2019

Pursuant to the written request by Mr. Ronald E. Maddern, a TRICARE for Life Beneficiary, I will conduct a hearing for the Defense Health Agency (DHA), under the provisions of 32 C.F.R. § 199.10, on: **Thursday, August 22, 2019, at 1:30 p.m., Pacific Standard Time.** The parties shall appear as follows:

**The Hearing Officer and Appellant's Counsel shall appear in person at:**

U.S. Attorney's Office for the Southern District of California
880 Front Street
6th Floor Reception
Room 28, Suite 6293
San Diego, CA 92101-8893
POC: U.S. Attorney's Office Main Number, (619) 557-5610

**DHA Counsel shall appear by telephone from:**
DHA Headquarters, (303) 676-3786

### Issue Presented

Whether the Vertiflex Superion Interlaminar/Interspinous Process Stabilization Device (Superion Interspinous Spacer) procedure provided to the Beneficiary was medically necessary, appropriate, or otherwise met TRICARE criteria as a proven procedure.

## Procedural Matters

The Beneficiary's party shall report to the hearing location at least one hour before the hearing to allow time to complete the security screening process. If any problems arise, please contact U.S. Attorney's Office Main Number, (619) 557-5610, for assistance.

The Hearing Officer will initiate the telephone call to the DHA attorney and any witness(es) who will appear by telephone.

## Evidentiary Matters

The Beneficiary has indicated that in addition to his own testimony, he will offer the testimony of at least three witnesses. The Beneficiary's wife, Deborah A. Maddern, and the clinician, Dr. Michael H. Verdolin, will appear in person. The device expert shall appear by telephone.

DHA does not anticipate calling any witnesses.

The parties shall provide the Hearing Officer and the opposing party a final witness list (including any experts with accompanying curricula vitae) by **Wednesday, August 14, 2019,** indicating if the witness will appear in-person or by telephone. If the witness is appearing by telephone, the party shall provide the witness's contact telephone number.

The parties shall also provide the Hearing Officer and the opposing party any additional documentary evidence that the parties intend to introduce into evidence by **Wednesday, August 14, 2019.**

//signed//

Nichole Noel
Administrative Judge
noeln@osdgc.osd.mil
(703) 696-3258

cc: James Pistorino, Esq., for Beneficiary

Debra Parrish, Esq., for Beneficiary

Leslie B. Greer, Esq. Attorney, DHA, Office of General Counsel

Ms. Mary Wright, Appeals and Hearings Assistant (by email), DHA Appeals, Hearing and Claims Collection Division

Erin Hogan, DOHA Chief Administrative Judge

**Hong, Mary C.**

| | |
|---|---|
| **From:** | James Pistorino <IMCEAEX-_O=S14_OU=EXCHANGE+20ADMINISTRATIVE+20GROUP+20+28FYDIBOHF23SPDLT+29_CN=RECIPIENTS_CN=D9AFAA2CF4164E8F957F428CB7570ED0-JAMES+40DPARRISHLAW+2ECO@namprd22.prod.outlook.com> |
| **Sent:** | Wednesday, August 14, 2019 4:06 PM |
| **To:** | Noel, Nichole Ms. DoD OGC; Debbie Parrish; Greer, Leslie B CIV DHA CLAIMS (USA) |
| **Subject:** | RE: Notice of Hearing DHA Task No. 19-01 |
| **Attachments:** | 05-Superion-ISS-4-year-results_-Nunley_August2017_WorldNeurosurgery.pdf; 2019_08_14_15_56_53.pdf; CV_MHV 08032017 (002).pdf; Hartman_Granville_Jacobson_2019 (002).pdf; Nunley PD et al 5-year Data_2017.pdf; Nunley_2018_ISP decomp reduction opioid analgesia in LSS pts_J Pain Res_2018 (002).pdf; P140004A.pdf; P140004B.pdf; Superion ISS 3 year results_ Patel_Oct2015 JournalPainResearch.pdf; Superion_Interspinous_Process_Spacer_2-yr data_SPINE_3-2015 Patel.pdf; The MIST Guidelines for Lumbar Spinal Stenosis.pdf |

Dear Judge Noel,

Pursuant to this Notice/Order, attached, please find a pre-hearing statement as well as a number of exhibits to go with it.

Please let me know if you have any questions, comments, or difficulty receiving this transmission.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Wednesday, August 7, 2019 1:26 PM
To: James Pistorino <james@dparrishlaw.com>; Debbie Parrish <debbie@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Subject: Notice of Hearing DHA Task No. 19-01

All:

Please see the attached Notice of Hearing, containing the date, time, and location of the hearing. The notice also includes additional information pertinent to logistics and the submission of evidence. The DOHA Hearing Office will also issue this notice as required by office procedures. The purpose of this notice is to give the parties as much time as possible to comply with the evidentiary deadlines set forth in the notice.

Do not hesitate to contact me if you have any questions.

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals
Fax: 703.696.1831

Case 3:21-cv-01298-MMA-BLM Document 12-2 Filed 12/30/21 PageID.351 Page 5 of 239

# Superion Interspinous Spacer Treatment of Moderate Spinal Stenosis: 4-Year Results

*Pierce D. Nunley[1], Vikas V. Patel[2], Douglas G. Orndorff[3], William F. Lavelle[4], Jon E. Block[5], Fred H. Geisler[6]*

OBJECTIVE: **To determine 4-year clinical outcomes in patients with moderate lumbar spinal stenosis treated with minimally invasive stand-alone interspinous process decompression using the Superion device.**

METHODS: **The 4-year Superion data were extracted from a randomized, controlled Food and Drug Administration investigational device exemption trial. Patients with intermittent neurogenic claudication relieved with back flexion who failed at least 6 months of nonsurgical management were enrolled. Outcomes included Zurich Claudication Questionnaire (ZCQ) symptom severity (ss), physical function (pf) and patient satisfaction (ps) subdomains, leg and back pain visual analog scale (VAS), and Oswestry Disability Index (ODI). At 4-year follow-up, 89 of the 122 patients (73%) provided complete clinical outcome evaluations.**

RESULTS: **At 4 years after index procedure, 75 of 89 patients with Superion (84.3%) demonstrated clinical success on at least 2 of 3 ZCQ domains. Individual component responder rates were 83% (74/89), 79% (70/89), and 87% (77/89) for ZCQss, ZCQpf, and ZCQps; 78% (67/86) and 66% (57/86) for leg and back pain VAS; and 62% (55/89) for ODI. Patients with Superion also demonstrated percentage improvements over baseline of 41%, 40%, 73%, 69%, and 61% for ZCQss, ZCQpf, leg pain VAS, back pain VAS, and ODI. Within-group effect sizes all were classified as very large (>1.0): 1.49, 1.65, 1.42, 1.12, and 1.46 for ZCQss, ZCQpf, leg pain VAS, back pain VAS, and ODI.**

CONCLUSIONS: **Minimally invasive implantation of the Superion device provides long-term, durable relief of symptoms of intermittent neurogenic claudication for patients with moderate lumbar spinal stenosis.**

## INTRODUCTION

Lumbar spinal stenosis is an increasingly common disorder affecting the aging population with patients experiencing reduced mobility and chronic leg and back pain.[1] Decompressive laminectomy is considered the gold standard surgical treatment when conservative options are exhausted.[2] Direct surgical decompression of the neural structures with laminectomy has been shown to offer superior clinical benefit compared with continued nonoperative care[3]; however, the procedure is not without risks. For example, laminectomy is routinely performed under general anesthesia. Although anesthesia-related morbidity and mortality are rare, the incidence of adverse events is markedly higher among the oldest age groups.[4] In studies that directly compared general anesthesia with monitored anesthesia care for the same surgical procedure, mortality was greater and perioperative complications were consistently worse with general anesthesia.[5-7]

As an alternative, interspinous process decompression is a minimally invasive procedure that builds on the concept that back extension is a seminal factor in the causative chain that instigates neurogenic claudication, the cardinal symptom of lumbar spinal stenosis. This procedure involves the implantation of a stand-alone interspinous spacer that functions by serving as a lumbar

**Key words**
- Decompression
- Interspinous spacer
- Lumbar spinal stenosis
- Neurogenic claudication
- Superion

**Abbreviations and Acronyms**
**FDA**: Food and Drug Administration
**ODI**: Oswestry Disability Index
**pf**: Physical function
**ps**: Patient satisfaction
**ss**: Symptom severity
**VAS**: Visual analog scale
**ZCQ**: Zurich Claudication Questionnaire

*From the [1]Spine Institute of Louisiana, Shreveport, Louisiana; [2]The Spine Center, University of Colorado Hospital, Denver, Colorado; [3]Spine Colorado, Mercy Regional Hospital, Durango, Colorado; [4]Upstate Bone and Joint Center, East Syracuse, New York; [5]Private practice, San Francisco, California; and [6]Private practice, Chicago, Illinois, USA*

*To whom correspondence should be addressed: Jon E. Block, Ph.D.*
*[E-mail: jb@drjonblock.com]*

*Citation: World Neurosurg. (2017) 104:279-283.*
*http://dx.doi.org/10.1016/j.wneu.2017.04.163*

*Journal homepage: www.WORLDNEUROSURGERY.org*

*Available online: www.sciencedirect.com*

*1878-8750/$ - see front matter © 2017 Elsevier Inc. All rights reserved.*

Exh C - Page 22

Downloaded for Anonymous User (n/a) at Anne Arundel Medical Center - JCon from ClinicalKey.com by Elsevier on August 08, 2017.
For personal use only. No other uses without permission. Copyright ©2017. Elsevier Inc. All rights reserved.

vertebral joint extension blocker to prevent compression of neural elements in extension. The spacer blocks the extension motion without exposure or removal of tissue adjacent to the dura mater or exiting nerves. The implantation procedure does not cause substantial alterations or disruptions to the spinal anatomy adjacent to neural structures. Specifically, the epidural space is not surgically exposed during spacer insertion, whereas laminectomy decompression directly opens the epidural space. The surgical exposure of the epidural space puts the dura mater at risk of injury, and it is known to routinely produce epidural scar, adhesions, and tethering around the dural sac and exiting nerve roots, which can cause symptomatic problems.[8,9]

The Superion is the second "stand-alone" interspinous spacer approved by the U.S. Food and Drug Administration (FDA) and the only device currently available on the U.S. market. The Superion is the only spacer to receive approval from the Centers for Medicare and Medicaid Services for use in surgical procedures in ambulatory surgery centers under monitored care anesthesia. This article reports the 4-year clinical outcomes from the Superion arm of a multicenter, randomized controlled FDA investigational device exemption noninferiority trial of interspinous spacer treatment for moderate lumbar spinal stenosis.

## MATERIALS AND METHODS

This study was approved by the institutional review board at each participating site, and patients provided written informed consent before any study-related procedures were performed. The trial was prospectively registered at ClinicalTrials.gov (ClinicalTrials.gov Identifier NCT00692276). The 4-year Superion clinical outcomes were extracted from an FDA investigational device exemption trial comparing 2 interspinous spacers: Superion (Vertiflex, Inc., Carlsbad, California, USA) and X-STOP (Medtronic, Minneapolis, Minnesota, USA). The study methodology, including eligibility criteria, randomization methods, sample size estimates, outcome measures, and statistical analyses, has been detailed previously.[10,11] Briefly, this investigational device exemption trial evaluated the use of interspinous process decompression in the treatment of subjects ≥45 years old with moderate symptoms of intermittent neurogenic claudication secondary to a confirmed diagnosis of moderate degenerative lumbar spinal stenosis at 1 or 2 contiguous levels from L1 to L5. Patients were treated between June 2008 and December 2011 at 31 investigational sites. The randomized study group comprised 391 subjects, including 190 Superion subjects and 201 X-STOP control subjects.

The comparative postoperative findings of the Superion and X-STOP spacers have been reported previously at 6 months,[12] 2 years,[11] and 3 years.[13] The 2-year clinical outcomes establishing noninferiority provided the basis for FDA regulatory approval for the Superion on May 20, 2015.[10] Concurrently in 2015, the X-STOP was withdrawn from commercial distribution in the United States. Owing to this lack of physician and patient availability, we restricted our current analysis to report only the Superion arm of the trial at the 4-year follow-up interval.

The Superion is indicated to treat skeletally mature patients experiencing pain, numbness, or cramping in the legs (intermittent neurogenic claudication) secondary to a diagnosis of moderate degenerative lumbar spinal stenosis, with or without grade 1 spondylolisthesis, confirmed by x-ray, magnetic resonance imaging, or computed tomography evidence of thickened ligamentum flavum, narrowed lateral recess, or central canal or foraminal narrowing. The Superion is indicated for patients with impaired physical function who experience relief in flexion from symptoms of leg, buttock, or groin pain, numbness, or cramping, with or without back pain, and who have undergone at least 6 months of nonoperative treatment.[14] The Superion may be implanted at 1 or 2 adjacent lumbar levels in patients in whom treatment is indicated at no more than 2 levels, from L1 to L5.

For this intended use, moderate degenerative lumbar spinal stenosis is defined as follows:

- 25%–50% reduction in the central canal and/or nerve root canal (subarticular, neuroforaminal) compared with the adjacent levels on radiographic studies, with radiographic confirmation of any one of the following:
  - Evidence of thecal sac and/or cauda equina compression
  - Evidence of nerve root impingement (displacement or compression) by either osseous or nonosseous elements
  - Evidence of hypertrophic facets with canal encroachment
- And associated with the following clinical signs:
  - Moderately impaired physical function (pf) defined as a score of ≥2.0 on the Zurich Claudication Questionnaire (ZCQ)
  - Ability to sit for 50 minutes without pain and to walk ≥50 feet

Of the 190 patients randomly assigned to receive treatment with Superion, 144 (75.8%) were free from reoperation, revision, or supplemental fixation at their index level at 4 years. Within the group of 46 patients requiring reoperation, 41 patients (89%) had the Superion device explanted. The remaining 159 patients (83.7%) were free from epidural steroid injections or nerve block procedures at 4 years. Of 190 patients, 128 (67.4%) were free from reoperation or steroid injection at 4-year follow-up. There were 6 patient deaths, leaving 122 patients with the Superion intact, with no intervening procedures, and actively participating in the postmarket period of this study. At the 4-year follow-up, 89 of the 122 patients (73%) provided complete clinical outcome evaluations, including the ZCQ, leg and back pain severity by visual analog scale (VAS), and the Oswestry Disability Index (ODI). These patients provide the basis for this report.

Responder rates for each outcome were calculated based on a priori definitions of the minimal clinically important difference: ≥0.5-point change for ZCQ symptom severity (ss) and pf, ≤2.5 points for ZCQ patient satisfaction (ps), ≥20 mm for pain VAS, and ≥15 percentage points for ODI. Additionally, improvement in each outcome measure at 4 years compared with preoperative values was assessed graphically and by computing the percentage improvement.

To gauge the practical clinical significance, we also computed the within-group (i.e., Superion arm only) effect size at the 4-year postoperative interval compared with baseline for each clinical outcome separately using the Cohen formula and thresholds.[15,16] The effect size is computed as the standardized

Downloaded for Anonymous User (n/a) at Anne Arundel Medical Center - JCon from ClinicalKey.com by Elsevier on August 08, 2017.
For personal use only. No other uses without permission. Copyright ©2017. Elsevier Inc. All rights reserved.



**Figure 1.** Time course of results for each subdomain of the Zurich Claudication Questionnaire (ZCQ): symptom severity (ss), physical function (pf), and patient satisfaction (ps). Results reported as mean (95% confidence interval).

**Figure 3.** Time course results for Oswestry Disability Index. Results reported as mean (95% confidence interval).

difference between 2 means or, simply put, the mean score (preoperative) − mean score (follow-up)/SD of the change. Effect sizes are typically reported in the range from 0.0 (no effect) to >1.0 (very large effects) with the following thresholds: 0.2 (small effect), 0.5 (medium effect), 0.8 (large effect), >1.0 (very large effect). The effect size calculation provides some normalization for baseline and distribution imbalances.

## RESULTS

At 4 years after the index procedure, 75 of 89 patients (84.3%) demonstrated clinical success on at least 2 of 3 ZCQ domains. The corresponding individual component responder rates were 83% (74 of 89), 79% (70 of 89), and 87% (77 of 89) for ZCQss, ZCQpf, and ZCQps; 78% (67 of 86) and 66% (57 of 86) for leg and back pain VAS; and 62% (55 of 89) for ODI. Consistently large improvements were also realized at each annual follow-up interval compared with baseline for the ZCQ (Figure 1), leg and back pain VAS (Figure 2), and ODI (Figure 3). Patients with Superion demonstrated percentage improvements over baseline of 41%, 40%, 73%, 69%, and 61% for ZCQss, ZCQpf, leg pain VAS, back pain VAS, and ODI (all $P < 0.001$) (Figure 4). Within-group effect sizes all were classified as very large (i.e., >1.0): 1.49, 1.65, 1.42, 1.12, and 1.46 for ZCQss, ZCQpf, leg pain VAS, back pain VAS, and ODI (all $P < 0.0001$) (Figure 5).

Long-term clinical follow-up information was also provided by 11 additional patients with Superion who had an intervening epidural steroid injection. Including the results of these patients did not measurably affect the overall clinical findings. For example, the responder rates were 82% (82 of 100), 77% (77 of 100), and 85% (85 of 100) for ZCQss, ZCQpf, and ZCQps. Similarly, responder rates were 77% (75 of 97) for leg pain VAS, 67% (65 of 97) for back pain VAS, and 61% (61 of 100) for ODI.

**Figure 2.** Time course of results for leg and back pain severity. Results reported as mean (95% confidence interval). VAS, visual analog scale.

## DISCUSSION

The clinical improvements achieved with Superion treatment reported here corroborate published results after 3 years of follow-up[13] and extend the durability to 4 years postoperatively.

**Figure 4.** Percentage improvement for each outcome at 4 years compared with preoperative levels. All changes were statistically significant ($P < 0.001$). ZCQ, Zurich Claudication Questionnaire; ss, symptom severity; pf, physical function; VAS, visual analog scale; ODI, Oswestry Disability Index.

Downloaded for Anonymous User (n/a) at Anne Arundel Medical Center - JCon from ClinicalKey.com by Elsevier on August 08, 2017.
For personal use only. No other uses without permission. Copyright ©2017. Elsevier Inc. All rights reserved.



**Figure 5.** Within-group effect sizes for each outcome at 4 years. All effect sizes exceeded the very large threshold and were highly statistically significant ($P < 0.0001$). ZCQ, Zurich Claudication Questionnaire; ss, symptom severity; pf, physical function; VAS, visual analog scale; ODI, Oswestry Disability Index.

For every outcome, within-group effect sizes at 4 years were >1.0, representing very large effect sizes that were all highly statistically significant.

Approximately one quarter of patients randomly assigned to Superion treatment underwent a reoperation within the 4-year duration of this study. This reoperation rate is intermediate between recently published results from 2 randomized controlled trials of decompressive laminectomy.[17,18] Over a follow-up interval similar to the present study, Forsth et al.[17] reported that 21% of patients underwent revision surgery after decompressive laminectomy in a Swedish trial, whereas Ghogawala et al.[18] observed a reoperation rate of 34% in a U.S. trial.

Although a freedom from reoperation rate of approximately 76% with Superion compares favorably with direct surgical decompression, the revision procedure itself is notably different between these treatments, with laminectomy requiring wide surgical exposure, dissection of extensive scar tissue with significant blood loss and operative risks, and conversion to fusion necessitating bone grafting and insertion of instrumentation. Alternatively, removal of the Superion can be accomplished with minimal tissue disruption and low surgical risk before conversion to a laminectomy. Thus, the Superion device, with its avoidance of epidural exposure, allows the patient to consider a wider choice of potential reoperations and their timing.

At 4-year follow-up, the patients with Superion are now several years subsequent to achieving the primary FDA trial endpoint at 2 years. Consequently, maintaining compulsory patient adherence to annual outcome reporting becomes increasingly challenging, particularly among individuals who continue to do well clinically. That said, including data from 11 patients who had an intervening epidural steroid injection, we captured complete 4-year clinical outcomes in 100 of 190 Superion-treated patients. In contrast, in the X-STOP pivotal FDA trial, Zucherman et al.[19] reported a 93% (93 of 100) follow-up rate at the 2-year primary trial endpoint. However, by 4 years postoperatively, patient-reported outcomes were published for only 18 patients (18%).[20]

## CONCLUSIONS

Interspinous spacers fill a distinct gap in the continuum of care for patients with moderate degenerative lumbar spinal stenosis. These patients have exhausted conservative care but may be inappropriate candidates for or unwilling to undergo surgical decompressive laminectomy. Because spacers such as the Superion are implanted in a minimally invasive fashion with relatively minor anatomic disruption, they can be easily removed and converted to a laminectomy if symptoms reemerge. Systematic reviews have found similar clinical benefit provided by both spacers and laminectomy,[21-23] giving patients a minimally invasive option without compromising symptom relief.

## ACKNOWLEDGMENTS

The authors thank Greg Maislin for data management support and for conducting all statistical analyses and Terry Meredith for providing graphical assistance.

Downloaded for Anonymous User (n/a) at Anne Arundel Medical Center - JCon from ClinicalKey.com by Elsevier on August 08, 2017.
For personal use only. No other uses without permission. Copyright ©2017. Elsevier Inc. All rights reserved.

## REFERENCES

1. Katz JN, Harris MB. Clinical practice. Lumbar spinal stenosis. *N Engl J Med*. 2008;358:818-825.

2. Overdevest GM, Jacobs W, Vleggeert-Lankamp C, Thome C, Gunzburg R, Peul W. Effectiveness of posterior decompression techniques compared with conventional laminectomy for lumbar stenosis. *Cochrane Database Syst Rev*. 2015:CD010036.

3. Weinstein JN, Tosteson TD, Lurie JD, Tosteson AN, Blood E, Hanscom B, et al. Surgical versus nonsurgical therapy for lumbar spinal stenosis. *N Engl J Med*. 2008;358:794-810.

4. Li G, Warner M, Lang BH, Huang L, Sun LS. Epidemiology of anesthesia-related mortality in the United States, 1999-2005. *Anesthesiology*. 2009; 110:759-765.

5. Edwards MS, Andrews JS, Edwards AF, Ghanami RJ, Corriere MA, Goodney PP, et al. Results of endovascular aortic aneurysm repair with general, regional, and local/monitored anesthesia care in the American College of Surgeons National Surgical Quality Improvement Program database. *J Vasc Surg*. 2011;54:1273-1282.

6. John S, Thebo U, Gomes J, Saqqur M, Farag E, Xu J, et al. Intra-arterial therapy for acute ischemic stroke under general anesthesia versus monitored anesthesia care. *Cerebrovasc Dis*. 2014;38:262-267.

7. Vu MM, Galiano RD, Souza JM, Du Qin C, Kim JY. A multi-institutional, propensity-score-matched comparison of post-operative outcomes between general anesthesia and monitored anesthesia care with intravenous sedation in umbilical hernia repair. *Hernia*. 2016;20:517-525.

8. Fransen P. Prevention of scar tissue formation in spinal surgery: state of the art and review of the literature. *J Neurosurg Sci*. 2011;55:277-281.

9. Jamison DE, Hsu E, Cohen SP. Epidural adhesiolysis: an evidence-based review. *J Neurosurg Sci*. 2014;58:65-76.

10. Patel VV, Whang PG, Haley TR, Bradley WD, Nunley PD, Davis RP, et al. Superion interspinous process spacer for intermittent neurogenic claudication secondary to moderate lumbar spinal stenosis: two-year results from a randomized controlled FDA-IDE pivotal trial. *Spine (Phila Pa 1976)*. 2015;40:275-282.

11. Patel VV, Whang PG, Haley TR, Bradley WD, Nunley PD, Miller LE, et al. Two-year clinical outcomes of a multicenter randomized controlled trial comparing two interspinous spacers for treatment of moderate lumbar spinal stenosis. *BMC Musculoskelet Disord*. 2014;15:221.

12. Miller LE, Block JE. Interspinous spacer implant in patients with lumbar spinal stenosis: preliminary results of a multicenter, randomized, controlled trial. *Pain Res Treat*. 2012;2012:823509.

13. Patel VV, Nunley PD, Whang PG, Haley TR, Bradley WD, Davis RP, et al. Superion(®) InterSpinous Spacer for treatment of moderate degenerative lumbar spinal stenosis: durable three-year results of a randomized controlled trial. *J Pain Res*. 2015;8:657-662.

14. Tomkins-Lane C, Melloh M, Lurie J, Smuck M, Battié MC, Freeman B, et al. ISSLS prize winner: consensus on the clinical diagnosis of lumbar spinal stenosis: results of an International Delphi Study. *Spine (Phila Pa 1976)*. 2016;41:1239-1246.

15. Kazis LE, Anderson JJ, Meenan RF. Effect sizes for interpreting changes in health status. *Med Care*. 1989;27(3 suppl):S178-S189.

16. Sullivan GM, Feinn R. Using effect size—or why the P value is not enough. *J Grad Med Educ*. 2012;4: 279-282.

17. Forsth P, Olafsson G, Carlsson T, Frost A, Borgstrom F, Fritzell P, et al. A randomized, controlled trial of fusion surgery for lumbar spinal stenosis. *N Engl J Med*. 2016;374:1413-1423.

18. Ghogawala Z, Dziura J, Butler WE, Dai F, Terrin N, Magge SN, et al. Laminectomy plus fusion versus laminectomy alone for lumbar spondylolisthesis. *N Engl J Med*. 2016;374: 1424-1434.

19. Zucherman JF, Hsu KY, Hartjen CA, Mehalic TF, Implicito DA, Martin MJ, et al. A multicenter, prospective, randomized trial evaluating the X STOP interspinous process decompression system for the treatment of neurogenic intermittent claudication: two-year follow-up results. *Spine (Phila Pa 1976)*. 2005;30:1351-1358.

20. Kondrashov DG, Hannibal M, Hsu KY, Zucherman JF. Interspinous process decompression with the X-STOP device for lumbar spinal stenosis: a 4-year follow-up study. *J Spinal Disord Tech*. 2006;19:323-327.

21. Lauryssen C, Jackson RJ, Baron JM, Tallarico RA, Lavelle WF, Deutsch H, et al. Stand-alone interspinous spacer versus decompressive laminectomy for treatment of lumbar spinal stenosis. *Expert Rev Med Devices*. 2015;12:763-769.

22. Machado GC, Ferreira PH, Harris IA, Pinheiro MB, Koes BW, van Tulder M, et al. Effectiveness of surgery for lumbar spinal stenosis: a systematic review and meta-analysis. *PLoS One*. 2015;10:e0122800.

23. Wu AM, Zhou Y, Li QL, Wu XL, Jin YL, Luo P, et al. Interspinous spacer versus traditional decompressive surgery for lumbar spinal stenosis: a systematic review and meta-analysis. *PLoS One*. 2014;9:e97142.

*Conflict of interest statement: This study was supported by Vertiflex, Inc. (Carlsbad, California, USA).*

*Received 8 February 2017; accepted 26 April 2017*

*Citation: World Neurosurg. (2017) 104:279-283.*
*http://dx.doi.org/10.1016/j.wneu.2017.04.163*

*Journal homepage: **www.WORLDNEUROSURGERY.org***

*Available online: **www.sciencedirect.com***

*1878-8750/$ - see front matter* *© 2017 Elsevier Inc. All rights reserved.*

**SUBMIT YOUR MANUSCRIPT**

**http://ees.elsevier.com/worldneurosurgery/**

**Full Science Citation Index in MEDLINE® - No charge to authors for color printing**

Downloaded for Anonymous User (n/a) at Anne Arundel Medical Center - JCon from ClinicalKey.com by Elsevier on August 08, 2017.
For personal use only. No other uses without permission. Copyright ©2017. Elsevier Inc. All rights reserved.

August 14, 2019


Administrative Law Judge
Nichole Noel
Department of Defense
Defense Office of Hearings and Appeals
PO Box 3627
Arlington, VA  22203

      *Re:*    *Appeal of Ronald E. Maddern*
              *A TRICARE for Life Beneficiary*
              *Issue: 233, Unproven Care*
              *Formal Review No. AH190164*


Dear Judge Noel,

      Pursuant to the August 1, 2019 Notice of Hearing, Appellant Ronald E. Maddern, files the attached evidentiary materials for consideration.  These materials include:

1) the *Curriculum Vitae* of Dr. Michael Verdolin;
2) Food and Drug Administration, Pre-Market Approval PMA P140004 for Superion dated June 3, 2015;
3) *V. Patel, et al.*, "Superion Interspinous Process Spacer for Intermittent Neurogenic Claudication Secondary to Moderate Lumbar Stenosis", Spine 49(5): 2015  275-82;
4) *V. Patel, et al.*, "Superion Interspinous Process Spacer for Treatment of Moderate Degenerative Lumbar Spinal Stenosis:  Durable Three-Year Results of a Randomized Controlled Trial", Journal of Pain Research, 8, 2015  657-62;
5) *P. Nunley, et al.*, "Superion Interspinous Spacer Treatment of Moderate Spinal Stenosis: 4-Year Results", World Neurosurgery, 104: 2017  279-83.
6) *P. Nunley, et al.*, "Five-year Durability of Stand-Alone Interspinous Process Decompression for Lumbar Spinal Stenosis", Clinical Intervention in Aging, September 2017: 12 1409-1417;
7) *P. Nunley, et al.*, "Interspinous Process Decompression Is Associated with a Reduction in Opioid Analgesia in Patients with Lumbar Spinal Stenosis", Journal of Pain Research, 2018:11  2943-2948;
8) *J. Hartman, et al.*, "The Use of Vertiflex Interspinous Spacer Device in Patients With Lumbar Spinal Stenosis and Concurrent Medical Comorbiditites", Cureus, August 12, 2019;
9) *T. Deer, et al.*, "The MIST guidelines: the lumbar stenosis consensus study group guidelines for minimally invasive spine treatment", Pain Pract. 2019, 18L250-274.

Each of the papers reported above, appeared in peer-reviewed journals.

**DISCUSSION**

In addition to the evidentiary materials, Mr. Maddern offers the following comments to facilitate consideration of the issues at the August 22, 2019 hearing.

**Regulations:**

Respectfully, Mr. Maddern believes that it would be helpful to keep a few fundamental principles in mind. First, pursuant to 32 C.F.R. § 199.4(a)(1)(i):

> Subject to all applicable definitions, conditions, limitations, or exclusions specified in this part, the CHAMPUS Basic Program will pay for medically or psychologically necessary services and supplies required in the diagnosis and treatment of illness or injury, including maternity care and well-baby care. Benefits include specified medical services and supplies provided to eligible beneficiaries from authorized civilian sources such as hospitals, other authorized institutional providers, physicians, other authorized individual professional providers, and professional ambulance service, prescription drugs, authorized medical supplies, and rental or purchase of durable medical equipment.

Thus, under the terms of the applicable regulations, coverage for medically necessary services/supplies required to treat an illness or injury is presumed unless there is some exclusion or limitation.

Some of the exclusions or limitations are set forth in 32 C.F.R. § 199.4(g), which provides in relevant part:

> In addition to any definitions, requirements, conditions, or limitations enumerated and described in other sections of this part, the following specifically are excluded from the Basic Program:
>
> (15) Unproven drugs, devices, and medical treatments or procedures. By law, CHAMPUS can only cost-share medically necessary supplies and services. Any drug, device, or medical treatment or procedure, the safety and efficacy of which have not been established, as described in this paragraph (g)(15), is unproved and cannot be cost-shared by CHAMPUS except as authorized under paragraph 199.4(e)(26) of this part.
>
> (i) A drug, device, or medical treatment or procedure is unproven:
>
> (A) If the drug or device cannot be lawfully marketed without the approval or clearance of the United States Food and Drug Administration (FDA) and approval or clearance for marketing has not been given at the time the drug or device is furnished to the patient.
>
> (B) If a medical device (as defined by 21 U.S.C. 321(h)) with an Investigational Device Exemption (IDE) approved by the Food and Drug Administration is categorized by the FDA as experimental/investigational (FDA Category A).

(C) Unless reliable evidence shows that any medical treatment or procedure has been the subject of well-controlled studies of clinically meaningful endpoints, which have determined its maximum tolerated dose, its toxicity, its safety, and its efficacy as compared with standard means of treatment or diagnosis. (See the definition of reliable evidence in § 199.2 of this part for the procedures used in determining if a medical treatment or procedure is unproven.)

*.*.*

With regard to "reliable evidence", 32 C.F.R. § 199.2 provides:

(1) As used in § 199.4(g)(15), the term reliable evidence means only:

(i) Well controlled studies of clinically meaningful endpoints, published in refereed medical literature.

(ii) Published formal technology assessments.

(iii) The published reports of national professional medical associations.

(iv) Published national medical policy organization positions; and

(v) The published reports of national expert opinion organizations.

(2) The hierarchy of reliable evidence of proven medical effectiveness, established by (1) through (5) of this paragraph, is the order of the relative weight to be given to any particular source. With respect to clinical studies, only those reports and articles containing scientifically valid data and published in the refereed medical and scientific literature shall be considered as meeting the requirements of reliable evidence. Specifically not included in the meaning of reliable evidence are reports, articles, or statements by providers or groups of providers containing only abstracts, anecdotal evidence or personal professional opinions. Also not included in the meaning of reliable evidence is the fact that a provider or a number of providers have elected to adopt a drug, device, or medical treatment or procedure as their personal treatment or procedure of choice or standard of practice.

With regard to "clinically meaningful end-points, 32 C.F.R. § 199.2 provides:

As used the definition of reliable evidence in this paragraph (b) and § 199.4(g)(15), the term clinically meaningful endpoints means objectively measurable outcomes of clinical interventions or other medical procedures, expressed in terms of survival, severity of illness or condition, extent of adverse side effects, diagnostic capability, or other effect on bodily functions directly associated with such results.

With these regulations as a background, it is clear that Mr. Maddern's claim should be covered pursuant to the regulations.

**Mr. Maddern's Claim Should Be Covered:**

As indicated, treatment should be covered unless the safety and effectiveness is "unproven." Here, it is hard to fathom how anyone could come to the conclusion that the safety and effectiveness of the Superion product/treatment is unproven. First, the safety and efficacy of the product/treatment was approved by the FDA as reflected in the Pre-Market Approval. From this fact alone, the only relevant question for this Court is answered. That is, the product/treatment is not "unproven." Instead, it is proven. Pursuant to 32 C.F.R. § 199.4(a)(1)(i), Mr. Maddern's claim should be covered.

Second, to the extent that the Court wishes to even go down the factors of "reliable evidence", the FDA Pre-Market Approval itself would appear to meet, at least, § 199.2(1)(ii), (iv) or (v) depending on how the FDA itself is considered. Further, the 2, 3, 4 and 5-year studies all appeared in peer-reviewed journals and had clinically meaningful end-points as defined. As reported in the papers, each of the studies was "well controlled." Indeed, there is no evidence otherwise. To the extent that there is any scientific criticism of the studies reported in the papers, that does not address whether the studies themselves were "well controlled", just that different or further studies are sought.

Overall, the base question for the Court is not whether one approach or the other is better, is cheaper, etc. The base question is whether the Superior product is proven safe and effective, especially when no other treatment option is available.

Here, especially in light of the fact that no other treatment option was available to Mr. Maddern, the Superion product is proven safe and effective.

**General Comments Regarding Technology Review/December 7, 2018 Decision:**

Included in the papers is a Technology Review (Exhibit 14) on which the December 7, 2018 Decision (Exhibit 16) was based. Respectfully, there are a number of infirmities in the review and thus the decision on which it depends.

Remarkably, neither the review nor the Decision considered the five year follow up study of users of the Superion product. *P. Nunley, et al.*, "Five-year Durability of Stand-Alone Interspinous Process Decompression for Lumbar Spinal Stenosis", Clinical Intervention in Aging, September 2017: 12 1409-1417. Though that paper was published approximately one year before the review was completed and it is understood that the reviewers had the paper in their possession, the review is silent with respect to it. As shown in the paper, *e.g.*, five years after surgery, 84% of the patients demonstrated clinical success on at least two of three ZCQ domains. Leg and back pain success rates were 80% and 65% respectively. Further, 75% of patients were free from reoperation, revision, or supplemental fixation at their index level. As noted above, the five-year paper appeared in a peer-reviewed journal.

Indeed, the paper goes to the heart of the review and Decision's criticisms regarding "long term follow ups"/"long term durability." *See, e.g.*, Decision at 5-6. Because both the review and the Decision simply ignored the evidence bearing on their criticism, their conclusions are not well founded.

Second, while the Decision makes much of a comment regarding laminectomy being the "gold standard" for dealing with stenosis (by some measures), of course, that is only the case when a laminectomy is an option. Here, as indicated by Dr. Verdolin, a laminectomy was not an option for Mr. Maddern. Thus, the Decision erred when it sought to compare the option of the Superion product/treatment to the non-existent laminectomy alternative. *See* Decision at 4. Indeed, the review made the same mistake. *See* Exhibit 14 at 9.

Third, when discussing the 2, 3, and 4-year results papers (Exhibit 14 at 9-10), the funding of the studies and the author's relationship to Vertiflex apparently affected the reviewer's conclusions regarding the papers. Of course, neither funding nor authorship appear anywhere as factors in the "reliable evidence" hierarchy of § 199.2. Indeed, the elimination of potential bias is one reason for peer-review. There is no evidence of any kind that the peer-review process was tainted in anyway and these comments appear to be little more than baseless attacks on the authors. Likewise, there is no evidence of tainting of the FDA approval process. More broadly, of course, an extremely large amount of research is funded by industry which drives the rapid technological development in medicine in the United States. That this is so does not reflect negatively on the resulting research.

Fourth, the review is replete with comments and conclusions regarding the X-Stop device formerly marketed by Medtronic. While interesting, of course, the only issue is whether the Superion product is safe and effective.

Fifth, cost appears to have been a factor in the review/Decision (otherwise, why mention it). Of course, that is not a proper consideration.

Overall, the reviewers and the Decision appear to have lost sight of the basic inquiry. That is, is the Superion product/treatment proven safe and effective for treating Mr. Maddern, especially when a laminectomy is not an option? Clearly, the answer to that question is a resounding "yes."

**Real World Analogy:**

A simple real-world analogy may assist consideration. Suppose the Court's vehicle had a hole in a tire causing a flat. There are two ways of fixing the car: 1) get a whole new tire; or 2) patch the old tire.

**Whole New Tire:** Some would call this the "gold standard" of a fix. While it has its benefits, there are also risks/drawbacks. First, it is much more invasive because you have to remove the tire from the car and rim, rebalance it, etc. Second, because it is so much more invasive, replacing the tire takes more time. Third, there is a greater chance of complications (uneven tread wear, misalignment, etc.) because the new tire will not match the other tires on the car. Indeed, that is one reason why a mechanic would typically suggest replacing all the tires (or at least two) at the same time, thereby increasing the cost/time of the fix. Finally, of course, of the two methods, it is much more expensive than a patch.

**Patch Old Tire:** This approach also has benefits and risks/drawbacks. It less invasive because the tire can be fixed while still on the car and rim, e.g. So, overall, there are fewer

complications and the process is faster. That is not to say that there are no risks. The patch could come loose. However, when applied by a mechanic with years of training and experience, the patch is very unlikely to do so. Nevertheless, perhaps the biggest benefit of the patch approach is when a matching, new tire is not available. In that case, the only option to fix the car is a patch. Finally, of course, it is much less expensive than a whole new tire.

Despite their differences, both approaches have at least one common feature. They are both approved by the Federal Highway Administration/DOT as being safe and effective ways of repairing a flat. Which approach a car owner might choose would depend on: 1) the availability of a new tire to start with; 2) what risks the car owner is willing to take; 3) how much time the car owner has for the repair; and 4) how much the car owner is willing to spend. When no new tire is available, the decision is an easy one.

Likewise in the present case. A laminectomy is a much more invasive procedure than IPD. Being more invasive, there is a greater risk of complications. One such complication is increased opioid use. As shown in "Interspinous Process Decompression", use of the Superion product resulted in significantly less reported opioid use as compared to a laminectomy. Further, the invasive nature of laminectomy means that many people will not be able to undergo the procedure because of other factors (*e.g.*, respiratory issues, compromised immune system).

While some might consider a laminectomy (*i.e.*, an invasive surgery) the "gold standard" for treating lumbar spinal stenosis, interspinous process decompression (IPD) using a spacer (*i.e.*, the Superion product) placed laparoscopically is also an available treatment option. As with the new tire/patch decision, the first question in deciding which approach to take would be: is a laminectomy even an option? In the present case, because of other complications, a laminectomy was not an option for Mr. Maddern. Thus, his options were to either be wheelchair bound or have the procedure to insert the Superion spacer.

As detailed above, both a laminectomy and IPD using the Superion product are proven safe and effective. However, only the Superion option was available for Mr. Maddern.

## CONCLUSION

For the reasons set forth above, coverage of Mr. Maddern's procedure should be approved consistent with the regulations.

Respectfully submitted,

James Pistorino

**CURRICULUM VITAE**

DATE: 3 August 2017

**Personal Data**:
Michael Henry Verdolin, MD
Birth Place: 12 July 1969 – Summit NJ, USA
Married, wife and two children.
Personal cell Phone Number: 619-213-6665
Personal E-mail: mverdolin@att.net

**Work Address**:
Pain Consultants of San Diego
Medical Director
7051 Alvarado Road, Suite 101
La Mesa, CA 91942

Business: 619-625-1144
Fax: 619-872-3968
Business E-Mail: mverdolin@gmail.com

**Education**:
Undergraduate Degree: Biology, BA Florida Atlantic University, Boca Raton FL 1988-1992

Postgraduate Degree: Doctor of Medicine, MD University of Miami School of Medicine, Miami FL 1992-1996

**Postgraduate Training**:

**Internship**: Internal Medicine, National Naval Medical Center Bethesda, MD, July 1996- July 1997
**Residency**: Anesthesiology, National Capital Consortium Program, National Naval Medical Center and Walter Reed Army Medical Center, Washington DC, July 1997-July 2000
**Fellowship**: Interventional Pain Management, Walter Reed Army Medical Center, Washington, DC
July 2003-July 2004

**Board Certification (Specialty/Dates):**
Original Diplomate, American Board of Anesthesiology- April 27, 2001 – Dec 31, 2011
Recertification (MOC)Diplomate, American Board of Anesthesiology- Dec 31, 2021
Original Diplomate, American Board of Anesthesiology- Certification in Pain Management September 11, 2004 – December 31, 2014
Recertification (MOC) Diplomate, American Board of Anesthesiology- Certification in Pain Management, American Board of Anesthesiology – December 31, 2024

Certification, American Board of Interventional Pain Physicians, Competency in Fluoroscopic Examination and Interpretation, September 17, 2006, Expires: December 31, 2016

**Licensure and Certification:**
California A92149, expires 7/2019, DEA # BV9337684 expires 5/2020
California Fluoroscopy Supervisor and Operator Permit RHC00164148
Expires 1/2018 Personal NPI: 1477525657 CAQH: 11689359

**Academic and Adjunct Appointments**:

Clinical Faculty, Pain Management Teaching Services, Internal Medicine Residency, Scripps Mercy Hospital, Mercy Clinic, San Diego, CA 1 July 2007- current.

Designated and Appointed, Medical Expert Reviewer, State of California, Active, Feb 2007 – current.

Adjunct Assistant Professor of Anesthesiology, Department of Anesthesiology, Uniformed University of the Health Sciences, Bethesda, MD, 7 April 2006 – current.

**Civilian Work History/Military Assignment History**:

**Medical Director, Pain Consultants of San Diego, October 2015- Current.**

**Founder, CEO, President**, Verdolin Medico-Legal Consulting, Inc., January 2015 – current.

**Previous Job Title**: Medical Director, Synovation Medical Group, San Diego Region, January 2014- October 2015.

**Founder, CEO, President**, Verdolin Pain Specialists, Inc. June 2011 – December 2014.

**Founder, CEO, President**, San Diego Pain and Cardiac Study Group, LLC. June 2010 – December 2014.

**Founder, CEO, President**, Pain Control Associates of San Diego, July 2007 – December 2011.

**Military Assignement History:**

Job Title: Director, Interventional Pain Center; Assistant Director Regional Anesthesia Service; Assistant Professor of Anesthesiology
Duty Location: Naval Medical Center San Diego, CA
Dates: January 2006- June 2007.

Job Title: Interventional Pain Management Specialist and Staff Anesthesiologist;
Assistant Director Acute & Chronic Pain Management Service, Clinical Instructor of
Anesthesiology
Duty Location Naval Medical Center San Diego, San Diego, CA
Dates of Assignment: August 2004 – July 2007.
Job Title: Fellow, Interventional Pain Management
Duty Location: Walter Reed Army Medical Center, Washington DC
Date of Assignment: July 2003 – July 2004.

Job Title: Clinical Instructor of Anesthesiology
Duty Location: NNMC Bethesda, Bethesda, MD
Date of Assignment: September 2001 – June 2003

Job Title: Staff Anesthesiologist, Department Head, Department of Anesthesiology
Duty Location: Keflavik, Iceland
Dates of Assignment: August 2000- September 2001

**US Military Deployments:**

Operation Iraqi Freedom, Northern Arabian Gulf, USNS Comfort, Feb –May 2003
Operation Baltic Challenge, Baltic Sea, USNS Comfort, June – July 2002

**Personal Military and Other Awards:**
Eagle Scout, 1986 Navy and Marine Corps Achievement Medal, 2001 Navy and Marine
Corps Commendation Medal, 2002, 2004 Army commendation Medal, 2004 Global War
on Terrorism, Expeditionary, 2003

**Other Employment**

Southern California Kaiser Permanente Medical Group, Interventional Pain Management
Specialists, Full Hospital Privileges, Per Diem,  San Diego, CA, August 2005- July 2007

**Industry Consulting**

Consultant, Neuromodulation therapies, Medtronic Corporation, July 2013 – Current.
Global Advisory Board, multiple, ongoing.

Consultant, Neuromodulation therapies, Nalu Corporation, May 2016 – Current.

Consultant, Neuromodulation therapies, Nevro, June 2015 – May 2017.

Consultant, Kyphoplasty and Vertebral Augmentation, Carefusion Corporation, October
2013 – 2015.

Consultant, Regional Anesthesia, Ultrasound Guidance, Sonosite Corporation, May 2007-2015.

Promotional Speaker, Pfizer, Independent Contractor, May 2006- 2015

Consultant, Minimally Invasive Lumbar Decompression, Vertos Corporation, March 2010 – 2014.

Consultant, Spinal Cord Stimulator Implantation, Indications and Surgical Procedure, St Jude Neuromodulation,  April 2007 – 2013

**Medico-Legal Consulting:**

Medico-legal consulting; Nor-Cal Mutual – Medical Malpractice Consultation

Medico-legal consulting; Medical Board of California, Expert Reviewer

Extensive deposition and trial experience – providing expert opinion for both plaintiff and defendant. Trial Testimony History: Available on Request

**Professional Societies and Position**:

American Society of Interventional Pain Physicians, Active Membership

California Society of Interventional Pain Physicians, Active Membership

North American Neuromodulation Society, Member, 2007-current

San Diego County Medical Society 2007 – current, Board of Directors, San Diego County Medical Society, South Bay Geographic Representative, 2009- April 2017.

California Medical Association, Active Membership, 2007 - 2017

California Medical Association, House of Delegates, voting representative, District 1, San Diego County, 2009 – April 2017

**Presentations and Guest Lecturer:**
**Grand Rounds:**
National Naval Medical Center, Department of Anesthesia, 2001 – 2003, Walter Reed Army Med Ctr., Department of Gynecology, 2003 Navy Medical Center San Diego, Department of Emergency Med, 2004 North Island Medical Clinic, Department of Medicine, 2004 – 2005 Johns Hopkins University, Department of Pain Management, 2005 Miramar Naval Medical Clinic, Department of Medicine, 2005-2006 Naval Medical

Center San Diego, Department of Anesthesia, 2004-2006 Naval Medical Center San Diego, Department of Otolaryngology, 2006 10th Annual Meeting of the Minds, San Diego Mental Health Assn, Oct 2006 Naval Medical Center San Diego, Annual Spine Symposium, March 2007
Scripps Mercy Hospital San Diego, annual, 2008- current.
Scripps Memorial Hospital, La Jolla, 2014, 2015.
Sharp Chula Vista, 2017

**Scientific Meetings and CME:**
6th Annual Interventional Pain Management Course, Asst Director, 2005 1st Annual US Navy & UCSD Regional Anesthesia Course, Co-director and cofounder, 2005 2nd Annual US Navy & UCSD Regional Anesthesia Course, Co-director, 2006 3rd Annual US Navy & UCSD Regional Anesthesia Course, Instructor, 2007. Instructor, Society for Pain Practice Management, Ultrasound and Pain Management, Quarterly Meetings, July 2010 – 2015.
Society for Pain Practice Management, Ultrasound lectures and proctoring, CME accredited course, July 2009 – 2015,  Bi-annually.

**Publications/Textbook Chapters/Research**:

Guest Reviewer: Pain Medicine, Official Journal of the American Academy of Pain Medicine

Elliott TB, Ledney GD, Harding RA, Henderson PL, Gerstenberg HM, Rotruck JR, Verdolin MH, Stile CM, Krieger AG. Mixed-field neutrons and gamma photons induce different changes in ileal bacteria and correlated sepsis in mice. **Int J Radiat Biol.** 1995 Sep;68(3):311-20.

Verdolin MH; Toth AS; Schroeder R. Bilateral lower extremity compartment syndromes following prolonged surgery in the low lithotomy position with serial compression stockings. **Anesthesiology** 2000 Apr;92(4):1189-91

Cohen SP. Verdolin MH. Chang AS. Kurihara C. Morlando BJ. Mao J. The intravenous ketamine test predicts subsequent response to an oral dextromethorphan treatment regimen in fibromyalgia patients. **Journal of Pain** 7(6): 391-8, 2006 June.

Verdolin, MH, Stedje-Larsen ET, Hickey. Ten Consecutive Cases of Complex Regional Pain Syndrome of Less Than 12 Months Duration in US Military members Treated With Spinal Cord Stimulation. **Anesthesia and Analgesia** 2007; 104:1557-1560

Dragovich A, Weber T, Wenzell D, Verdolin MH, Cohen SP. Neuromodulation in Patients Deployed to War Zones. **Anesthesia and Analgesia** 2009; 109:245-8

Raso, LJ, et al Use of a newly developed delivery device for percutaneous introduction of multiple lead configurations for spinal cord stimulation. **Neuromodulation**. 2014 Jul;17(5):465-71.

Verdolin, MH, Response to ethics forum: Low dose targeted drug approaches need highlighting and consideration. **Pain Med** 2015 Jan;16(1):19-20.

Deer, T, Verdolin MH, Pope J, **Atlas of Implantable Therapies for Pain Management**; Chapters 22-24 Placing, Securing, and Tunneling of Intrathecal Catheters. Springer; 2nd ed 2015 Edition.

Hamza M, Doleys DM, Saleh IA, Medvedovsky A, Verdolin MH, Hamza M. A Prospective, Randomized, Single-Blinded, Head-to-Head Long-Term Outcome Study, Comparing Intrathecal (IT) Boluses With Continuous Infusion Trialing Techniques Prior to Implantation of Drug Delivery Systems (DDS) for the Treatment of Severe Intractable Chronic Nonmalignant Pain. **Neuromodulation**. 2015 Oct;18(7):636-48

MiDAS ENCORE: Randomized Controlled Clinical Trial Report of 6-Month Results. Staats PS, Benyamin RM; MiDAS ENCORE Investigators. **Pain Physician.** 2016 Feb;19(2):25-38.

**FDA Approved/IRB Approved Research**

Principal Investigator: **Treatment of Symptomatic Lumbar Internal Disc Disruption (IDD) With the Biostat® System**, Spinal Restorations Inc. NCT01011816

Principal Investigator: Post Marketing Analysis of Effectiveness of Spinal Cord Stimulation, St Jude Corporation.

Principal Investigator: MIDAS ECO-1, Vertos Medical Inc.

Principal Investigator: **The MIDAS ENCORE study**, Vertos Medical Inc., NCT02093520

Principal Investigator: **Safety and Efficacy Study of Rexlemestrocel-L in Subjects With Chronic Discogenic Lumbar Back Pain (MSB-DR003) Safety and Efficacy Study of Rexlemestrocel-L in Subjects With Chronic Discogenic Lumbar Back Pain (MSB-DR003),** Mesoblast, Ltd**.** NCT02412735. Ended July 2015.

Prinicipal Investigator: Biotronik Benefit 01 – Biotronik Corporation.

Principal Investigator: OPTIONS – HD, Medtronic Corporation.

References: Available on Request

Cureus

Open Access Original Article

DOI: 10.7759/cureus.5374

# The Use of Vertiflex® Interspinous Spacer Device in Patients With Lumbar Spinal Stenosis and Concurrent Medical Comorbidities

Jason Hartman [1] , Michelle Granville [2] , Robert E. Jacobson [2]

1. Pain Medicine, Larkin Community Hospital, Miami, USA 2. Neurological Surgery, University of Miami Hospital, Miami, USA

**Corresponding author:** Michelle Granville, mgranville@hotmail.com

Disclosures can be found in Additional Information at the end of the article

## Abstract

The use of the Vertiflex® interspinous spacer is a recent minimal invasive procedure useful in the treatment of lumbar spinal stenosis (LSS). It is used mostly by interventional pain physicians who can also perform the minimally invasive lumbar decompression (MILD procedure). Previously when a patient had clinical symptomatic neurogenic claudication (NC) and radiologic findings of lumbar stenosis and had failed conservative treatment, the options were decompressive laminectomy, laminectomy with pedicle fixation at one or more levels or laminotomy combined with interlaminar stabilization (Coflex® implant). These procedures were performed by neurosurgeons and orthopedic spine surgeons. However, the majority of patients with LSS are elderly and have multiple comorbidities that can make open spinal surgery, even when limited to one level, an anesthesia risk as well as vulnerable to the risk associated with hospitalization and recovery after spine surgery. The minimally invasive approaches to interspinous stabilization make it possible to treat localized symptomatic stenosis in a broader group of patients that do not want or cannot, have general anesthesia or extensive lumbar surgery, especially in the prone position. This article examines the use of the Vertiflex® implant in an elderly population with significant comorbidities that underwent successful outpatient implantation at one or two levels. In addition, it serves to familiarize spine surgeons about the possibility of using more minimal approaches to treat LSS.

**Categories:** Pain Management, Radiology, Neurosurgery
**Keywords:** vertiflex interspinous implants, lumbar spinal stenosis, neurogenic claudication, coflex interlaminar implant, lateral recess stenosis, lumbar degenerative spondylolisthesis

**Received** 07/31/2019
**Review began** 08/07/2019
**Review ended** 08/08/2019
**Published** 08/12/2019

© **Copyright** 2019
Hartman et al. This is an open access article distributed under the terms of the Creative Commons Attribution License CC-BY 3.0., which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.

## Introduction

The use of the minimally invasive Vertiflex® (Vertiflex Inc., Carlsbad, USA) interspinous spacer for the treatment of symptomatic lumbar spinal stenosis (LSS) provides another surgical option in the treatment of neurogenic claudication. Studies have shown the use of the Vertiflex® implant to be effective in both short term and five-year follow-up studies in relieving neurogenic claudication for localized symptomatic LSS [1]. Similar to other minimally invasive techniques it has specific advantages over more open spinal surgical procedures, including shorter procedure time, the possibility to be performed under local anesthesia, minimal or no muscle disruption or blood loss and less risks of nerve damage or cerebrospinal fluid leaks [2]. In this paper, we review its use as an option for more elderly patients and those

**How to cite this article**
Hartman J, Granville M, Jacobson R E (August 12, 2019) The Use of Vertiflex® Interspinous Spacer Device in Patients With Lumbar Spinal Stenosis and Concurrent Medical Comorbidities. Cureus 11(8): e5374. DOI 10.7759/cureus.5374

with medical issues and comorbidities that would preclude the use of both general anesthesia and more open and extensive surgical procedures such as laminectomy with pedicle screw fixation and Coflex® interlaminar implants (Paradigm Spine, New York, USA) after limited decompressive laminotomy but where the patients have significant functional restriction secondary to worsening symptoms of neurogenic claudication. In this paper, a group of Vertiflex patients was analyzed from a larger group of patients that were treated within the same neurosurgical practice that was able to perform the entire range of open and minimally invasive procedures for LSS. Patients were selected for implantation of the Vertiflex® based on a combination of patient symptoms, localized radiologic findings, patient preference or comorbidities that were regarded as contraindication to more extensive open procedures.

## Materials And Methods

Patient charts from a single neurosurgical practice that underwent various surgical procedures for symptomatic lumbar stenosis, including multilevel laminectomy with or without pedicle screw fixation, as well as Coflex® and Vertiflex® implantation were retrospectively reviewed. This review then looked at the comorbidities of the Vertiflex patients.

After correlating history, physical exam and radiologic studies, the risk factors reviewed were the patient's age, body mass index (BMI), smoking status, diabetes, cardiac and pulmonary disease, anti-coagulant use, and osteoporosis.

All patients had an evaluation of the clinical and functional severity of their low back pain and neurogenic claudication was then assessed using the pain Visual Analogue Scale (VAS), Oswestry Disability Index (ODI), and Zurich Claudication Questionnaire (ZCQ). Thirteen patients underwent Vertiflex® for symptoms of intermittent neurogenic claudication, including pain, discomfort, heaviness, cramping or numbness that radiates to the buttock, thigh and lower leg after walking for a certain distance. Detailed diagnostic imaging evaluation was performed including lumbar x-rays, with flexion and extension and sagittal and axial image evaluations with both MRI and CT scans.

Based on the accepted criteria for using the Vertiflex® implant, including symptomatic neurogenic claudication (NC) with radiologic confirmed LSS of 50% or less confined to one or two levels, Vertiflex® was used because of anesthesia concerns and/or significant restrictions secondary to comorbidities [1].

## Results

Over 24 months a total of 86 patients underwent various surgical treatments of symptomatic neurogenic claudication for lumbar spinal stenosis. The most common level was L4-5 and the most associated radiologic condition was degenerative stenosis with grade 1 spondylolisthesis. Seventy-three patients underwent open surgery. Forty-five had either laminectomy alone or with pedicle screw fixation, 20 at one level, usually L4-5 and 25 at two or more levels. Limited laminotomy combined with Coflex® implantation at one or two levels was performed in 28 patients, 20 at one level and eight at two levels. Of the remaining 13 Vertiflex patients, eleven patients had single-level implants, nine at L4-5 and two at L3-4. Ten of the 13 had grade 1 spondylolisthesis, mostly at L4-5. Two patients had two-level implants. All patients had surgery performed under local anesthesia with light sedation, in ambulatory surgery and were discharged home the same day. There were no postoperative wound infections or hematomas. One patient persisted with severe claudication and underwent decompressive laminectomy with pedicle fixation for L4-5 stenosis and degenerative spondylolisthesis. In contrast, patients undergoing pedicle screw fixation were all performed under general anesthesia with an average hospital stay of 2.8 days. There were no wound infections or hematomas but six of the 45 open cases had delayed cerebrospinal fluid (CSF) leaks requiring

drainage and prolonged hospitalization and two had repeat surgery to seal the leak. Six developed urinary retention requiring catheterization. Two developed thrombophlebitis. Of the 28 Coflex patients, 15, all one level, were done under general anesthesia by one surgeon, all staying in the hospital for an average of 1.4 days. Eleven had a Coflex® at one or two levels by another surgeon under local anesthesia with sedation in an ambulatory surgery setting and discharged home. Of the 13 outpatient Coflex patients five had two-level implants and eight - one-level. One patient that had an L4-5 Coflex®, 20 months later, had a Vertiflex® implant performed at the adjacent L3-4 level under local anesthesia.

The Vertiflex patients had a Zurich Claudication Index (ZCQ) score that ranged from 54.7% to 75.5%, similar to the other patients' groups subjected to open surgery, indicating that there was a significant effect on the patient's quality of life.

The medical/anesthesia risk factors included in this assessment were the patient's age, BMI, smoking status, diabetes, cardiac and pulmonary disease, anti-coagulant use, and osteoporosis. In our 13 patients we found that the mean age was 75.46 years old, ranging from 55 to 91 years, with five being 79 or older. The average age of open surgery was similar however there were more patients over 80 years of age in the Vertiflex group. The mean BMI was 30.31 and five patients, had a BMI of 35 or 38%, compared to the open surgical group where very few patients (less than 10%) had a BMI over 35. Thirty-one percent of our patients were either current smokers or previous smokers. When looking at their medical history, 46% were controlled diabetics on medication, 69% had cardiac history and 46% had a history of either asthma or chronic obstructive pulmonary disease (COPD) and 23% had a history of osteoporosis with a prior osteoporotic spinal compression fracture. Only 16% of these patients were on anti-coagulant medications that had to be stopped before the procedure (Table *1*).

| Age | BMI | Smoker | Cardiac | Pulmonary | Diabetes | Anticoagulants | Osteoporosis | Vertiflex Levels |
|---|---|---|---|---|---|---|---|---|
| 91 | 25 | No | No | Asthma | No | No | No | L3-4 |
| 71 | 35.24 | No | HTN | Asthma | Yes: type 2 | No | No | L4-5 |
| 80 | 29.81 | No | Chronic A-fib, HTN | COPD | Yes: type 2 | Yes: ASA, Xarelto | No | L4-5 |
| 67 | 36.05 | Former | HTN | No | Yes: type 2 | No | No | L4-5 |
| 71 | 37.28 | No | HTN | No | No | No | No | L3-4 |
| 73 | 36.92 | Former | HTN, aortic atherosclerosis | No | Yes with diabetic neuropathy | No | No | L4-5 |
| 87 | 31.04 | Former | HTN | No | Yes: type 2 | ASA | Yes: hx of fracture | L4-5 |
| 77 | 24.03 | No | No | Asthma | No | No | Yes: hx of fracture | L4-5 |
| 79 | 28.07 | No | HTN | No | No | No | No | L3-4, L4-5 |
| 79 | 18.89 | Yes | No | No | No | No | Yes: hx of fracture | L4-5 |
| 55 | 39.27 | No | HTN | Asthma | Yes type 2 | No | No | L2-3, L3-4 |
| 76 | 29.52 | No | HTN | COPD | No | No | No | L4-5 |
| 75 | 23.56 | No | No | No | No | No | No | L4-5 |

**TABLE 1: Table of comorbidities**

Table showing age, BMI (basic metabolic index), smoking status, cardiac morbidity, pulmonary morbidity, diabetes, anticoagulant use and other comorbidities

HTN: Hypertension

ASA: Aspirin

A-fib: Atrial Fibrillation

COPD: Chronic Obstructive Pulmonary Disease

HX: History

## Discussion

Lumbar spinal stenosis (LSS) is a progressive narrowing of the spinal canal, commonly due to either facet and ligamentous hypertrophy and is often associated with degenerative spondylolisthesis, most commonly at L4-5 [1]. Although many patients are found with radiologic stenosis with no or minimal symptoms, the hallmark symptom is progressive neurogenic claudication relieved by sitting and worsening with standing and walking. Stenosis is radiologically identified most commonly at L4-5 but also can be seen at L3-4 level or multiple levels but without significant motion with flexion and extension films. A common finding on both MRI and CT scan of the lumbar spine in patients with LSS is posterior "crowding" of the spinal canal secondary to hypertrophy and inward buckling of the ligamentum flavum which is worsened with extension [1, 3]. Stenosis is often not a single plane pathology so it is critical to understand that narrowing not only affects the axial area but overall spinal canal volume over the entire length of the stenosis. It is important to evaluate and compare the volume changes between the bone and ligaments and the dural sac over multiple slices on MRI and CT scans [3]. Pain and functional evaluation include VAS and ODI as well as functional testing such as ZCQ scale and distance walking. Symptomatic neurogenic claudication typically shows the ZCQ scores should be worse than the scores for back pain and disability reflected in lower VAS and ODI scores. Relief with sitting and worsening with standing and walking is a classic presentation. Detailed imaging evaluation with an assessment of the severity of neurogenic claudication symptoms is a critical step in determining the procedure that is most appropriate for the patient. Determining if the stenosis is localized to one or two spinal segments or more multilevel and diffuse is important as well as establishing if the spondylolisthesis is mild (5-7 mm or less) if there is motion on flexion and extension films and if the stenosis involves less than 50% of the spinal canal and due to ligamentous hypertrophy rather than bone overgrowth. All these radiologic criteria combined with clinical complaints and ZCQ and ODI scores contribute to the decision regarding surgical options [1, 3-4].

Surgery for spinal stenosis was the fastest-growing type of lumbar surgery in the United States from 1980-2000 and while from 2002-2007 surgical rates overall declined, complex fusion procedures increased 15 fold, from 1.3 to 19.9 per 100,000 beneficiaries [5-6]. With LSS being the most common reason for patients older than 65 years old to have spinal surgery, the assessment of comorbidities, along with the radiographic evaluation of the anatomic severity and degree of neurogenic claudication symptoms, is essential in the decision making as to which procedure is most appropriate for the patient. It is well established that the greater the invasiveness of a procedure the greater the risk of intra-operative complications due to more extensive dissection, decortication of bone, longer operative time, anesthesia risks and possible placement of implants and potential neural damage or cerebrospinal fluid leaks [5-8]. Furthermore, studies confirm that fusion is associated with greater complications and postoperative mortality than decompression alone [6-7]. Extensive lumbar surgical procedures can also carry the consequences of increased healthcare use from longer hospital stays, skilled nursing facility use and revision surgery [8].

Many patients respond to physical therapy and localized facet and epidural blocks, but ultimately patients with worsening neurogenic claudication need to consider surgery. While many options exist for these patients including open surgical procedures such as pedicle screw fixation (PSF) and interbody fusion to a less extensive midline and partial lateral recess decompression with Coflex® midline interlaminar stabilization device combined with the use of the Vertiflex® interspinous spacer for the treatment of LSS offers a minimally invasive, percutaneous option for patients that are at an increased anesthesia and surgical risk due to comorbidities such as increased age, diabetes, cardio-pulmonary pathology, obesity or high body-mass index (BMI), liver and kidney disease and cortico-steroid use to name a few [6-7]. Risk factors for immediate postoperative complications in spine surgeries are multi-factorial. Increased patient age and contaminated or infected wounds were identified as independent predictors of mortality. Increased patient age, cardiac disease, pre-operative neurologic

abnormalities, prior wound infection, corticosteroid use, history of sepsis, American Society of Anesthesiologists (ASA) classification of >II, and prolonged operative times were independent predictors for the development of one or more complications [8, 2]. In one study of complex spinal procedures major medical complications were reported in 3.1% of patients overall, and wound complications in 1.2%. Mortality was 0.4% within 30 days of discharge [5].

In some patients a combination of comorbidities can exclude more invasive complex procedures entirely, while others can be associated with relative risk factors and it is up to the individual physician and his medical and anesthesia team to assess these factors. Shorter surgical time and minimal incisions allow the use of local anesthesia with or without mild sedation rather than general anesthesia. Although diabetes mellitus (DM) is not a contraindication for more aggressive surgery, patients with diabetes have a significantly higher incidence of chronic kidney disease (CKD), hypertension (HTN), cardiovascular disease (CVD), cerebrovascular disease (CbVD) poorer wound healing than non-DM patients and the prevalence ratio of DM in patients with LSS was 24.3% [9-10]. DM and DM with pathologic sequelae are closely associated with postoperative surgical site infection, leading to a worse prognosis. One study reported that DM is the most important predictor of surgical site infection after lumbar spinal surgery and surgical management of LSS demonstrated a rate of side effects ranging from 10% to 24% in surgical cases [9-10]. With this information, we can extrapolate that while the percutaneous use of Vertiflex® is not immune to these complications due to DM it may be a superior choice in the right patient due to shorter intra-operative time and decreased tissue disruption. The actual timing of surgery, the patient's comorbidities such as age, diabetes, obesity, pulmonary limitations and effects on intra-operative positioning, use of anticoagulants, significant osteoporosis - all play a factor in pre- and perioperative decisions, as well as the choice of anesthesia type and type of surgery [2, 10].

Indications for the Vertiflex® implant include patients suffering from pain, numbness, and/or cramping in the legs (neurogenic intermittent claudication) secondary to a diagnosis of moderate lumbar spinal stenosis, with or without grade 1 spondylolisthesis, confirmed by X-ray, MRI and/or CT evidence of thickened ligamentum flavum, narrowed lateral recess, and/or central canal narrowing [11-12]. The Vertiflex® Interspinous Spacer is indicated for those patients with impaired physical function who experience relief in flexion from symptoms of leg/buttock/groin pain, with or without back pain, who have undergone at least six months of non-operative treatment. The Superion® Interspinous Spacer may be implanted at one or two adjacent lumbar levels in patients in whom operative treatment is indicated at no more than two levels, from L1 to L5 [12]. Contraindications to Vertiflex® are instability of the lumbar spine, e.g., isthmic spondylolisthesis or degenerative spondylolisthesis greater than grade 1, an ankylosed segment at the affected level(s), fracture of the spinous process, pars interarticularis, or laminae (unilateral or bilateral), scoliosis (Cobb angle >10 degrees), cauda equina syndrome, diagnosis of severe osteoporosis, defined as bone mineral density in the spine or hip that is more than -2.5 S.D. below the mean of adult normals, active systemic infection, or infection localized to the site of implantation, prior fusion or decompression procedure at the index level and morbid obesity defined as a body mass index (BMI) greater than 40 [1, 10-12]. Using a minimal percutaneous procedure, like the Vertiflex® implant allows stabilization with mild distraction (Figure *1* and 2).

**FIGURE 1: Sequential intra-operative images of insertion of 12 mm Vertiflex® implant for L4-5 stenosis and grade 1 spondylolisthesis. All positions are confirmed both in lateral and anterior-posterior views.**

A: Insertion of interspinous biconcave curved dissector (solid white arrow) making path through interspinous ligament.

B: The outer dilator cannula (solid white arrow) after insertion over the dissector and the dissector has been removed.

C: The "sizer" (solid black arrow) passed down and just distal to the dilator tube (solid white arrow) is partially opened to determine the size of implant ranging from 10 to 16 mm.

D: The Vertiflex® implant (dashed black arrow) passed just distal to the cannula in a closed position just before starting to "deploy" in the interspinous space. The Vertiflex® is extended just distal to the insertion tube to allow "wings" to open on both sides of the superior and inferior spinous processes.

E: 12 mm Vertiflex® implant fully opened (dashed black arrow) along the interspinous space but still attached to insertion device (solid white arrow).

F: Vertiflex® in the L4-5 interspinous space after it is separated from the handle. The wings are deployed (dashed black arrows) and the interspinous body can be seen (dashed white arrow).

**FIGURE 2: Skin issue of 15 mm for insertion of L4-5 Vertiflex® interspinous implant**

A: Midline skin incision of 15 mm with no paraspinal dissection to insert the interspinous device.

B: 12 mm implant centered over L4-5 interspinous space. Both "deployed" wings superiorly and inferiorly are around the mid spinous processes.

Another major factor in procedure selection is the surgeon's personal experience, familiarity with interpreting MRI and CT for spinal stenosis, preferences and familiarity with the different procedures [13-14]. Generally the procedures including decompression alone may be sufficient when there is not significant instability or only low grade spondylolisthesis, especially in an elderly, relatively inactive patient. Pedicle screw fixation (PSF) and interbody fusion are used with wider decompression, decompression involving the facet joints or if there is clear instability and movement with flexion and extension radiographs. However, using pedicle screws in elderly osetoporotic patients may have risk of screw loosening as well as dural tears from adherence of the chronic ligamemtous hypertrophy to the dura [5, 8] Another option is limited midline and partial lateral recess decompression combined with interlaminar stabilization using a Coflex® interlaminar device and the Vertiflex® without decompression (Figure 3).

**FIGURE 3: Postoperative radiographs of different L4-5 stenosis cases showing relative size difference between pedicle screws, Coflex® interlaminar and Vertiflex® interspinous implants. The photographs were kept to similar size so the size of the different systems can be compared.**

A: Lateral postoperative radiograph of one level L4-5 pedicle screw fixation (solid white arrows) with bilateral decompression, medial facetectomy and foraminotomy with interbody grafts (solid black arrow).

B: Lateral radiograph of one-level Coflex® implant (solid black arrows) at L4-5.

C: Lateral radiograph after L4-5 one-level Veriflex® implant (solid white arrow).

D: Anterior-posterior radiograph showing L4 and L5 pedicle screws and rods and two interbody implants in the L4-5 interspace (solid black arrows).

E: Anterior-posterior view of L4-5 Coflex® in after interlaminar decompression positioned between the two spinous processes at L4-5 (solid black arrow).

F: Anterior-posterior view of Vertiflex® interspinous device (solid white arrow) placed percutaneously.

Different physician specialties have evaluated and treated LSS using different procedures, so it is possible that the selection of a procedure may be often influenced by the preference and specialty of the surgeon, usually a neurosurgeon or orthopedic spine surgeon, rather than clear differences in outcomes. In fact, there are no comparable studies comparing the different procedures when performed by the same surgical groups. During the different FDA approval processes for each device, often many years apart, Coflex® was compared to laminectomy and pedicle screw fixation, while Vertiflex® was compared to other interspinous devices. The more minimal procedures suggest that even the smallest incremental improvement in overall canal area without wide decompression can be effective in providing symptomatic relief in elderly patients [13, 15]. In the experienced hands, minimally invasive lumbar decompression and tubular decompression using various size tubes and instruments to resect the hypertrophied ligament or facet bone without interspinous distraction or stabilization of the spinal segment can also relieve symptomatic neurogenic claudication. The specialty and experience of the physician evaluating the patient plays a large role in the type of procedure recommended or performed [3, 11]. With the introduction and training of interventional pain physicians to evaluate and also perform minimal procedures for stenosis such as radiofrequency ablation, MILD decompression and Vertiflex® interspinous stabilization, it may be valuable to establish an algorithm to help determine the best procedure based on different clinical and radiologic stages of severity of LSS [1, 11, 14-15]. Interventional pain specialists include radiologists, interventional pain physicians and anesthesiologists, many of whom may not be totally familiar with the nuances of clinical and radiologic evaluation of patients with lumbar spinal stenosis and neurogenic claudication. It is equally important they be aware of the various other surgical options offered since there can be a bias in the type of procedure offered to the patient based on the physicians' ability and options. The converse is also true in that neurosurgeons and orthopedic spine surgeons may not be familiar with the more minimal procedures, so they only consider more extensive surgical procedures in patients that could achieve good to excellent relief of their neurogenic claudication with a much simpler procedure. This is especially the case in advanced aged patients who have medical comorbidities that increase the intra-operative and postoperative risks. Considering less invasive procedures will broaden their ability to offer these procedures especially in patients with significant comorbidities or other reasons to offer more minimal approaches that with a proper selection have similar short and long-term outcomes.

# Conclusions

Deciding on the timing and the appropriate surgical treatment option for a patient with symptomatic LSS and neurogenic claudication is determined by many factors. These include radiologic evaluation of the levels and severity of the stenosis, the extent of the clinical symptoms and if they totally resolve with positional changes, such as sitting compared to standing and walking. This article looks at the role of medical comorbidities that may make larger open surgery and general anesthesia higher risk or even contraindicated. The treating physician's specialty and experience with different procedures must also be considered as well as the age, anesthesia risk and comorbidities such as obesity, diabetes and cardio-pulmonary restrictions which may make the option of procedures such as MILD or Vertiflex® reasonable. On the other hand, physicians only trained to perform more minimal procedures must also be able to recognize when the patient is better suited for a more extensive surgical decompression with or without stabilization.

# Additional Information

## Disclosures

**Human subjects:** Consent was obtained by all participants in this study. **Animal subjects:** All

authors have confirmed that this study did not involve animal subjects or tissue. **Conflicts of interest:** In compliance with the ICMJE uniform disclosure form, all authors declare the following: **Payment/services info:** All authors have declared that no financial support was received from any organization for the submitted work. **Financial relationships:** All authors have declared that they have no financial relationships at present or within the previous three years with any organizations that might have an interest in the submitted work. **Other relationships:** All authors have declared that there are no other relationships or activities that could appear to have influenced the submitted work.

# References

1. Deer T, Grider J, Pope J, et al.: The MIST guidelines: the lumbar stenosis consensus study group guidelines for minimally invasive spine treatment. Pain Pract. 2019, 18:250-274. 10.1111/papr.12744
2. ASA Physical Status Classification System . (2014). Accessed: October 2014: https://www.asahq.org/standards-and-guidelines/asa-physical-status-classification-system.
3. Hartman J, Granville M, Jacobson R: Radiologic evaluation of lumbar spinal stenosis: the integration of sagittal and axial views in decision making for minimally invasive surgical procedures. Cureus. 2019, 11:e4268. 10.7759/cureus.4268
4. Lang G, Vicari M, Siller A, et al.: Preoperative assessment of neural elements in lumbar spinal stenosis by upright magnetic resonance imaging: an implication for routine practice?. Cureus. 2018, 10:e2440. 10.7759/cureus.2440
5. Deyo RA, Mirza SK, Martin BI, Kreuter W, Goodman DC, Jarvik JG: Trends, major medical complications, and charges associated with surgery for lumbar spinal stenosis in older adults. JAMA. 2010, 303:1259-1265. 10.1001/jama.2010.338
6. Raad M, Donaldson CJ, El Dafrawy MH, et al.: Trends in isolated lumbar spinal stenosis surgery among working US adults aged 40-64 years, 2010-2014. J Neurosurg Spine. 2018, 29:169-175. 10.3171/2018.1.SPINE17964
7. Kim DY, Lee SH, Chung S, Lee HY: Comparison of multifidus muscle atrophy and trunk extension muscle strength: percutaneous versus open pedicle screw fixation. Spine. 2005, 30:123-129. 10.1097/01.brs.0000148999.21492.53
8. Imada A, Huynh T, Drazin D: Minimally invasive versus open laminectomy/discectomy, transforaminal lumbar, and posterior lumbar interbody fusions: a systematic review. Cureus. 2017, 9:e1488. 10.7759/cureus.1488
9. Lee CK, Choi SK, Shin DA, Yi S, Ha Y, Kim KN, Kim I: Influence of diabetes mellitus on patients with lumbar spinal stenosis: A nationwide population-based study. PLoS One. 2019, 14:e0213858. Accessed: March 15, 2019: 10.1371/journal.pone.0213858
10. Schoenfeld AJ, Ochoa LM, Bader JO, Belmont PJ Jr : Risk factors for immediate postoperative complications and mortality following spine surgery: a study of 3475 patients from the national surgical quality improvement program. J Bone Joint Surg. 2011, 93:1577-1582. 10.2106/JBJS.J.01048
11. Gala RJ, Russo GS, Whang PG: Interspinous implants to treat spinal stenosis . Curr Rev Musculoskelet Med. 2017, 10:182-188. 10.1007/s12178-017-9413-8
12. VertiFlex®, Incorporated: instructions for use SUPERION® Interspinous spacer . (2015). Accessed: June, 2019: https://www.accessdata.fda.gov/cdrh_docs/pdf14/P140004D.pdf.
13. Patel V, Whang P, Haley T, et al.: Superion interspinous process spacer for intermittent neurogenic claudication secondary to moderate lumbar spinal stenosis: two-year results from a randomized controlled FDA-IDE pivotal trial. Spine. 2015, 40:275-282. 10.1097/BRS.0000000000000735
14. Parker SL, Anderson LH, Nelson T, Patel VV: Cost-effectiveness of three treatment strategies for lumbar spinal stenosis: conservative care, laminectomy, and the Superion interspinous spacer. Int J Spine Surg. 2015, 9:28. 10.14444/2028
15. Miao J, Wang S, Park WM, et al.: Segmental spinal canal volume in patients with degenerative spondylolisthesis. Spine J. 2013, 13:706-712. 10.1016/j.spinee.2013.02.017

Clinical Interventions in Aging

Dovepress
open access to scientific and medical research

Open Access Full Text Article

ORIGINAL RESEARCH

# Five-year durability of stand-alone interspinous process decompression for lumbar spinal stenosis

This article was published in the following Dove Press journal:
Clinical Interventions in Aging
6 September 2017
Number of times this article has been viewed

Pierce D Nunley[1]
Vikas V Patel[2]
Douglas G Orndorff[3]
William F Lavelle[4]
Jon E Block[5]
Fred H Geisler[6]

[1]Spine Institute of Louisiana, Shreveport, LA, [2]The Spine Center, University of Colorado Hospital, Denver, CO, [3]Spine Colorado, Mercy Regional Hospital, Durango, CO, [4]Upstate Bone and Joint Center, East Syracuse, NY, [5]Independent Consultant, San Francisco, CA, [6]Independent Consultant, Chicago, IL, USA

**Background:** Lumbar spinal stenosis is the most common indication for spine surgery in older adults. Interspinous process decompression (IPD) using a stand-alone spacer that functions as an extension blocker offers a minimally invasive treatment option for intermittent neurogenic claudication associated with spinal stenosis.

**Methods:** This study evaluated the 5-year clinical outcomes for IPD (Superion®) from a randomized controlled US Food and Drug Administration (FDA) noninferiority trial. Outcomes included Zurich Claudication Questionnaire (ZCQ) symptom severity (ss), physical function (pf), and patient satisfaction (ps) subdomains, leg and back pain visual analog scale (VAS), and Oswestry Disability Index (ODI).

**Results:** At 5 years, 84% of patients (74 of 88) demonstrated clinical success on at least two of three ZCQ domains. Individual ZCQ domain success rates were 75% (66 of 88), 81% (71 of 88), and 90% (79 of 88) for ZCQss, ZCQpf, and ZCQps, respectively. Leg and back pain success rates were 80% (68 of 85) and 65% (55 of 85), respectively, and the success rate for ODI was 65% (57 of 88). Percentage improvements over baseline were 42%, 39%, 75%, 66%, and 58% for ZCQss, ZCQpf, leg and back pain VAS, and ODI, respectively (all $P<0.001$). Within-group effect sizes were classified as very large for four of five clinical outcomes (ie, $>1.0$; all $P<0.0001$). Seventy-five percent of IPD patients were free from reoperation, revision, or supplemental fixation at their index level at 5 years.

**Conclusion:** After 5 years of follow-up, IPD with a stand-alone spacer provides sustained clinical benefit.

**Keywords:** interspinous spacer, lumbar spinal stenosis, Superion, neurogenic claudication, decompression

## Introduction

Within 10 years, it is estimated that 64 million older adults will be afflicted with lumbar spinal stenosis, making it the most common indication for spine surgery in individuals older than 65 years.[1,2] This expanding population of patients requires a greater range of treatment options throughout the continuum of care, particularly in the elderly who may not be appropriate candidates for open surgical procedures with the associated risks of general anesthesia.[3] Interspinous process decompression (IPD) is a minimally invasive procedure that can be performed under monitored anesthesia care in an ambulatory surgery center and has been shown to provide comparable clinical performance to decompressive laminectomy for management of symptoms of spinal stenosis.[4,5]

Neurogenic claudication is the cardinal clinical feature of lumbar spinal stenosis, as it limits patients' walking ability and causes a major impact on their quality of life.[6] Intermittent neurogenic claudication is defined as unilateral or bilateral radicular pain

Correspondence: Jon E Block
2210 Jackson Street, Ste 401,
San Francisco, CA 94115, USA
Tel +1 415 775 7947
Fax +1 415 928 0765
Email jb@drjonblock.com

submit your manuscript | www.dovepress.com
Dovepress
http://dx.doi.org/10.2147/CIA.S143503

© 2017 Nunley et al. This work is published and licensed by Dove Medical Press Limited. The full terms of this license are available at https://www.dovepress.com/terms.php and incorporate the Creative Commons Attribution – Non Commercial (unported, v3.0) License (http://creativecommons.org/licenses/by-nc/3.0/). By accessing the work you hereby accept the Terms. Non-commercial uses of the work are permitted without any further permission from Dove Medical Press Limited, provided the work is properly attributed. For permission for commercial use of this work, please see paragraphs 4.2 and 5 of our Terms (https://www.dovepress.com/terms.php).

during walking or standing that is relieved by sitting down or flexing the lumbar spine.[7] Stenotic arthritic degeneration of the lumbar spine causes bony and ligamentous compression of neural structures axially and laterally. Indeed, constriction and impingement of nerves traversing the lateral recess and exiting the foraminal aperture are highly contributory to the most pronounced and aggravating radicular symptoms of stenosis.[8]

IPD employs a stand-alone spacer that functions as an extension blocker to minimize the extent of compression of neural elements, particularly in the lateral recess and foramina.[9] Importantly, insertion of the spacer is performed percutaneously without surgical removal of tissue adjacent to the dura or exiting nerves. There is only one Food and Drug Administration (FDA)-approved stand-alone spacer commercially available in the USA. Herein, we provide the 5-year clinical outcomes for patients with moderate lumbar spinal stenosis treated with this IPD device.

## Materials and methods

Clinical outcomes at the 5-year follow-up interval were obtained from the Superion® (VertiFlex, Inc., Carlsbad, CA, USA) treatment arm of a randomized controlled FDA noninferiority trial comparing two interspinous spacers. Methodological details of the study have been published previously.[10,11] This multicenter trial evaluated the use of stand-alone IPD in the treatment of subjects aged 45 or older with moderate symptoms of intermittent neurogenic claudication, secondary to a diagnosis of moderate degenerative lumbar spinal stenosis at one or two contiguous levels from L1 to L5. Three hundred ninety-one subjects met the trial eligibility criteria and were randomized to treatment. The comparative effectiveness of these two spacers and the FDA-approved indications for use for IPD have been reported previously.[12] The current 5-year analysis was restricted exclusively to the Superion arm of the trial.

This trial complied with all US regulatory requirements and was approved by the Institutional Review Board at each participating site (Table S1), and patients provided written informed consent before any study-related procedures were performed. The trial was prospectively registered at ClinicalTrials.gov (NCT00692276).

At the 5-year follow-up interval, 127 patients were free from reoperation (n=48) and/or epidural steroid injection (n=33), and there were 6 deaths, leaving 121 (64%) spacer patients actively participating in the post-market period of this study. Eighty-eight of 121 active spacer patients (73%) provided complete 5-year clinical outcome assessments by the Zurich Claudication Questionnaire (ZCQ), leg and back pain severity by visual analog scale (VAS), and the Oswestry Disability Index (ODI).

Clinical outcome data were analyzed in several ways. Success rates were calculated based on a priori definitions of the minimal clinically important difference: ≥0.5-point change for ZCQ symptom severity (ss) and physical function (pf), ≤2.5 points for ZCQ patient satisfaction (ps), ≥20 mm for pain VAS, and ≥15% points for ODI. Additionally, we computed the percentage improvement in each outcome measure at 5 years compared to preoperative values and displayed these results graphically.

The within-group effect sizes at the 5-year postoperative interval were computed and compared to baseline for each clinical outcome separately using Cohen's formula and thresholds.[13,14] Effect sizes were reported in the range from 0.0 (no effect) to >1.0 (very large effects) with the following thresholds: 0.2 (small effect), 0.5 (medium effect), 0.8 (large effect), and >1.0 (very large effect).

## Results

Five years after the index procedure, 74 of 88 patients (84%) demonstrated clinical success on at least two of three ZCQ domains. The success rates for the individual ZCQ domains were 75% (66 of 88), 81% (71 of 88), and 90% (79 of 88) for ZCQss, ZCQpf, and ZCQps, respectively. For leg and back pain VAS, the success rates were 80% (68 of 85) and 65% (55 of 85), respectively, and the rate was 65% (57 of 88) for ODI.

There was substantial improvement at each annual follow-up interval compared to baseline for the ZCQ (Figure 1), leg and back pain VAS (Figure 2), and ODI (Figure 3). Spacer patients demonstrated percentage improvements over baseline

**Figure 1** Time course of results for each subdomain of the ZCQ: ss, pf, ps.
**Note:** Results reported as mean (95% CI).
**Abbreviations:** pf, physical function; ps, patient satisfaction; ss, symptom severity; ZCQ, Zurich Claudication Questionnaire.



**Figure 2** Time course of results for leg and back pain severity by VAS.
**Note:** Results reported as mean (95% CI).
**Abbreviation:** VAS, visual analog scale.

**Figure 4** Percentage improvement for each outcome at 5 years compared to preoperative levels.
**Note:** All changes were statistically significant ($P<0.001$).
**Abbreviations:** ODI, Oswestry Disability Index; pf, physical function; ss, symptom severity; VAS, visual analog scale; ZCQ, Zurich Claudication Questionnaire.

of 42%, 39%, 75%, 66%, and 58% for ZCQss, ZCQpf, leg and back pain VAS, and ODI, respectively (all $P<0.001$), as shown in Figure 4. Within-group effect sizes were classified as very large for four of five clinical outcomes (ie, $>1.0$): 1.35, 1.40, 1.32, 0.97, and 1.37 for ZCQss, ZCQpf, leg and back pain VAS, and ODI, respectively (all $P<0.0001$), as shown in Figure 5.

Of the 190 patients randomized to receive treatment, 142 (75%) were free from reoperation, revision, or supplemental fixation at their index level at 5 years. Notably, there was a discernible trend toward decreasing risk of reoperation over time with the majority of revisions occurring during the initial 2 years of observation with annual percentage increments as follows: 27 (14.2%), 11 (5.8%), 3 (1.6%), 6 (3.2%), and 1 (0.5%) during years 1, 2, 3, 4, and 5, respectively.

## Discussion

It has been estimated that ~40% of patients with lumbar spinal stenosis become refractory to conservative care and will ultimately require decompression surgery within 10 years to manage persistently worsening symptoms.[15] Moreover, while laminectomy effectively decompresses the offended neural elements providing symptom relief, it can destabilize the spine, eventually leading to re-emergence of symptoms requiring reoperation with instrumented fusion. A recent randomized controlled trial reported that one-third of laminectomy patients required reoperation with fusion within 4 years.[16] This rate of reoperation rate after laminectomy is comparable to a 28% rate reported from a large Washington state administrative database.[17] Treatment of recalcitrant symptoms of neurogenic claudication with an interspinous spacer may significantly delay or obviate completely the need for decompressive laminectomy as well as the downstream risk of revision surgery with instrumented fusion.

This is the first report to document the long-term clinical durability of stand-alone interspinous spacer decompression for lumbar spinal stenosis through 5 years of monitored follow-up. For the 75% of spacer patients who have remained free of reoperation with an intact implant, the clinical results

**Figure 3** Time course results for the Oswestry Disability Index.
**Note:** Results reported as mean (95% CI).

**Figure 5** Within-group effect sizes for each outcome at 5 years.
**Note:** Effect sizes for four of five outcomes exceeded the very large threshold and all effect sizes were highly statistically significant ($P<0.0001$).
**Abbreviations:** ODI, Oswestry Disability Index; pf, physical function; ss, symptom severity; VAS, visual analog scale; ZCQ, Zurich Claudication Questionnaire.

continue to be impressive, with almost 85% of patients achieving success on at least two of three ZCQ domains. Leg pain symptom amelioration remains most notable with an average improvement of 75% at 5 years over preoperative values. This suggests that the spacer continues to offer sufficient indirect decompression of neural structures in the lateral recesses and foramina to suppress claudicant and radicular symptoms.

Thirty-eight of 48 (79%) spacer patients underwent reoperation within the initial 2 years of postoperative observation. Of the remaining 10 reoperations, only 1 occurred during the fifth year of observation, suggesting a decreasing risk of revision surgery with time. This implies that patients who demonstrate early clinical improvement with spacer implantation will maintain that benefit over time. Clinical failures after spacer treatment can be identified early in the postoperative time course and these patients can be offered other surgical options. In contrast, reoperation rates after laminectomy tend to increase with time.[16] Consequently, early clinical success may not be sustained in the long term, as outcomes eventually deteriorate due to the untoward effects of laminectomy-induced spinal instability, necessitating a complex instrumented fusion procedure to provide stabilization.

Because the IPD implantation procedure is performed in a minimally invasive fashion and causes only minor anatomic disruption, the full range of surgical options remains available if a revision becomes necessary to manage re-emergence of symptoms. Thus, with simplicity of the operative procedure, rapid patient recovery, low surgical risk of complications, and long-term clinical durability, IPD remains a viable treatment option for stenosis patients.

## Conclusion

After 5 years of postoperative follow-up, IPD with a stand-alone spacer provides sustained clinical benefit. Its use is indicated for patients with intermittent neurogenic claudication associated with moderate lumbar spinal stenosis.

## Acknowledgments

The authors wish to thank Greg Maislin for data management support and for conducting all statistical analyses. Graphical support was provided by Terry Meredith. Financial support for this work was provided by VertiFlex, Inc. (Carlsbad, CA, USA).

## Author contributions

All authors contributed toward data analysis, drafting and critically revising the paper and agree to be accountable for all aspects of the work.

## Disclosure

JB is an independent advisor to VertiFlex. The authors report no other conflicts of interest in this work.

## References

1. Deyo RA. Treatment of lumbar spinal stenosis: a balancing act. *Spine J*. 2010;10(7):625–627.
2. Deyo RA, Mirza SK, Martin BI, Kreuter W, Goodman DC, Jarvik JG. Trends, major medical complications, and charges associated with surgery for lumbar spinal stenosis in older adults. *JAMA*. 2010; 303(13):1259–1265.
3. Li G, Warner M, Lang BH, Huang L, Sun LS. Epidemiology of anesthesia-related mortality in the United States, 1999–2005. *Anesthesiology*. 2009;110(4):759–765.
4. Lauryssen C, Jackson RJ, Baron JM, et al. Stand-alone interspinous spacer versus decompressive laminectomy for treatment of lumbar spinal stenosis. *Expert Rev Med Devices*. 2015;12(6):763–769.
5. Nunley PD, Shamie AN, Blumenthal SL, Orndorff D, Block JE, Geisler FH. Interspinous process decompression: expanding treatment options for lumbar spinal stenosis. *Biomed Res Int*. 2016;2016:3267307.
6. Genevay S, Atlas SJ. Lumbar spinal stenosis. *Best Pract Res Clin Rheumatol*. 2010;24(2):253–265.
7. Katz JN, Harris MB. Clinical practice. Lumbar spinal stenosis. *N Engl J Med*. 2008;358(8):818–825.
8. Jenis LG, An HS. Spine update. Lumbar foraminal stenosis. *Spine (Phila Pa 1976)*. 2000;25(3):389–394.
9. Loguidice V, Bini W, Shabat S, Miller LE, Block JE. Rationale, design and clinical performance of the superion® Interspinous Spacer: a minimally invasive implant for treatment of lumbar spinal stenosis. *Expert Rev Med Devices*. 2011;8(4):419–426.
10. Patel VV, Whang PG, Haley TR, et al. Superion interspinous process spacer for intermittent neurogenic claudication secondary to moderate lumbar spinal stenosis: two-year results from a randomized controlled FDA-IDE pivotal trial. *Spine (Phila Pa 1976)*. 2015;40(5):275–282.
11. Patel VV, Whang PG, Haley TR, et al. Two-year clinical outcomes of a multicenter randomized controlled trial comparing two interspinous spacers for treatment of moderate lumbar spinal stenosis. *BMC Musculoskelet Disord*. 2014;15:221.
12. Patel VV, Nunley PD, Whang PG, et al. Superion(®) InterSpinous Spacer for treatment of moderate degenerative lumbar spinal stenosis: durable three-year results of a randomized controlled trial. *J Pain Res*. 2015;8:657–662.
13. Kazis LE, Anderson JJ, Meenan RF. Effect sizes for interpreting changes in health status. *Med Care*. 1989;27(3 Suppl):S178–S189.
14. Sullivan GM, Feinn R. Using effect size-or why the P value is not enough. *J Grad Med Educ*. 2012;4(3):279–282.
15. Atlas SJ, Keller RB, Wu YA, Deyo RA, Singer DE. Long-term outcomes of surgical and nonsurgical management of lumbar spinal stenosis: 8 to 10 year results from the maine lumbar spine study. *Spine (Phila Pa 1976)*. 2005;30(8):936–943.
16. Ghogawala Z, Dziura J, Butler WE, et al. Laminectomy plus fusion versus laminectomy alone for lumbar spondylolisthesis. *N Engl J Med*. 2016;374(15):1424–1434.
17. Martin BI, Mirza SK, Comstock BA, Gray DT, Kreuter W, Deyo RA. Reoperation rates following lumbar spine surgery and the influence of spinal fusion procedures. *Spine (Phila Pa 1976)*. 2007;32(3): 382–387.

# Supplementary material

**Table S1** Site list of institutional review board (IRB) information

| **Investigators/investigational sites** | | | | |
|---|---|---|---|---|
| **Site** | **Doctor** | **IRB site approved address** | **IRB address** | **IRB Chairman** |
| 01 | Pierce Nunley, MD 318-629-5555 (Site inactive) | Spine Institute of Louisiana 1500 Line Avenue, Suite 200 Shreveport, LA 71101<br>*Specialist Hospital of Shreveport 1500 Line Avenue, Suite 206 Shreveport, LA 71101 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Viveca Burnette 800-562-4789 |
| 02 | Robert Jackson, MD 949-588-5800 (Site inactive) | Orange County Neurosurgical Associates 23961 Calle de la Magdalena, Suite 504 Laguna Hills, CA 92563<br>*Saddleback Memorial Medical Center 24451 Health Center Drive Laguna Hills, CA 92563 | Office of Research Administration Van Camp Center 2625 Pasadena Ave Long Beach, CA 90806<br>MHS Research Council-Mailing Address 2801 Atlantic Avenue Long Beach, CA 90806 | Edward Quilligan, MD 562-933-9574 |
| 04 | Warren Yu, MD 202-498-2105 (Site inactive) | George Washington University 2150 Pennsylvania Avenue, NW Suite 7-416 Washington, DC 20037 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Paul Newton 800-562-4789 |
| 08 | Vikas Patel, MD 720-848-1980 (Site inactive) | Anschutz Outpatient Pavilion 1635 North Ursula Street MS F722, Box 6510 Aurora, CO 80045<br>*University of Colorado Hospital Anschutz Medical Campus 12605 East 16th Avenue Aurora, CO 80045<br>Lone Tree Health Center 9548 Park Meadows Drive Lone Tree, CO 80124 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Viveca Burnette 800-562-4789 |
| 10 | Vito Loguidice, MD 610-252-1600 (Site inactive) | Coordinated Health Inc., 3100 Emrick Blvd., Bethlehem, PA 18020<br>Orthopedic Associates of Greater Lehigh Valley 755 Memorial Parkway Phillipsburg, NJ 08865 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Currien MacDonald 800-562-4789 |
| | | *Warren Hospital 185 Roseberry Street Phillipsburg, NJ 08865 | Warren Hospital IRB 185 Roseberry Street Phillipsburg, NJ 08865 (IRB inactive) | Dr Frank Gilly 908-859-6700 inactive |
| 11 | Richard Ozuna, MD 978-818-6350 (Site inactive) | Sports Medicine North One Orthopedics Drive, 2nd Floor Peabody, MA 01960<br>*Orthopedic Surgical Center of the North Shore One Orthopedics Drive Peabody, MA 01960 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Viveca Burnette 800-562-4789 |
| 13 | Richard Tallarico, MD 315-464-8622 (Site inactive) | Upstate Bone and Joint Center 6620 Fly Road, Suite 200 East Syracuse, NY 13057<br>SUNY University of New York 750 East Adams Street, Syracuse, NY 13210-2375<br>*Upstate Orthopedics Ambulatory Surgery Center 6620 Fly Road, Suite 300 Syracuse, NY 13057 | SUNY University of New York Institutional Review Board Office 750 East Adams Street, Syracuse, NY 13210-2375 | Stephen L Graziano, MD 315-464-4317 |
| 14 | Ralph Liebelt, MD 919-220-5255 (Site inactive) | Triangle Orthopedics Associates, PA 120 William Penn Plaza Durham, NC 27704<br>*Granville Medical Center 1010 College Street Oxford, NC 27565<br>North Carolina Specialty Hospital 3916 Ben Franklin Blvd., Durham, NC 27704<br>Triangle Orthopedic Associates, PA 103 Professional Park Drive Oxford, NC 27565 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Viveca Burnette 800-562-4789 |
| 15 | Thomas Haley, DO 610-275-7013 (Site inactive) | Performance Spine and Sports Physicians, PC 1603 East High Street, Suite C Pottstown, PA 19464<br>2 Lawnton Road, East Norriton, PA 19401 | Pottstown Memorial Medical Center IRB 1600 East High Street, Pottstown, PA 19464 | James T Guille, MD 610-327-7000 Main contact below |

*(Continued)*

**Table S1** (*Continued*)

| Investigators/investigational sites | | | | |
|---|---|---|---|---|
| **Site** | **Doctor** | **IRB site approved address** | **IRB address** | **IRB Chairman** |
| | | *Pottstown Memorial Medical 1600 East High Street, Pottstown, PA 19464 | | Courtney Clemente IRB Coordinator 610-327-7000 |
| 17 | Michael Hisey, MD 940-382-2204 (Current; Site inactive)<br>William Bradley, MD 972-608-5000 (Previous) | Texas Back Institute 2817 South Mayhill Road, Suite 100 Denton, TX 76208<br>*Texas Back Institute, Plano 6020 West Parker Road, Suite 200 Plano, TX 75093<br>Texas Back Institute, Rockwall 1005 West Ralph Hall Parkway, Suite 227 Rockwall, TX 75032<br>Texas Back Institute 400 West Arbrook Arlington, TX 76014<br>Texas Back Institute, Mansfield 2800 East Broad Street, Suite 522 Mansfield, TX 76063<br>Texas Health Center for Diagnostics and Surgery 6020 West Parker Road, Plano, TX 75093 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Currien MacDonald 800-562-4789 |
| 18 | Scott Kitchel, MD 541-284-0530 (Site inactive) | NeuroSpine Institute, LLC 74-B Centennial Loop, Suite 300 Eugene, OR 97401<br>*NeuroSpine Institute, LLC 74-B Centennial Loop, Suite 100 Eugene, OR 97401<br>NorthWest NeuroSpine Institute 74-B Centennial Loop, Suite 200 Eugene, OR 97401 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Viveca Burnette 800-562-4789 |
| 19 | Carl Lauryssen, MD 310-358-2490 (Site inactive) | Neurosurgical Spine Institute 8201 Beverly Hills Blvd., Suite 405 Los Angeles, CA 90048<br>*Olympia Medical Center 5900 West Olympic Boulevard Los Angeles, CA 90036 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Lucille Broberg 800-562-4789 |
| 20 | Jeffery Roh, MD 206-302-0702 (Site inactive) | ProOrtho 901 Boren Avenue, Suite 900 Seattle, WA 98104<br>ProOrtho 12333 NE 130th Lane, Suite 400 Kirkland, WA 98104<br>Evergreen Medical Center 12040 Northeast 128th Street, Kirkland, WA 98034<br>*Orthopedics Intl. Ambulatory Surgery Center 600 Broadway, Suite 460 Seattle, WA 98122 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Currien MacDonald 800-562-4789 |
| 23 | Reginald Davis, MD 443-849-4270 (Site inactive) | Greater Baltimore Neurosurgical Associates Physicians Pavilion North 6535 N Charles Street, Suite 600 Baltimore, MD 21204<br>*Greater Baltimore Medical Center Institutional Review Board 6701 North Charles Street Baltimore, MD 21704 | Greater Baltimore Medical Center Institutional Review Board 6701 North Charles Street, Baltimore, MD 21704 | Philip Levin, MD 443-849-2379 |
| 24 | Bernard Guiot, MD 720-638-7500 (Site inactive) | Neurosurgery One 7780 S Broadway, Suite 350 Littleton, CO 80122<br>*Porter, Littleton, and Parker Adventist Hospital 2525 South Downing Street, Denver, CO 80210 | Porter, Littleton, and Parker Adventist Hospital Joint IRB 2525 South Downing Street, Denver, CO 80210 | Nathaniel Hibbs, DO 303-778-2554 |
| 26 | Kevin Shrock, MD 954-764-8033 (Site inactive) | Shrock Orthopedic Research, LLC 1414 Southeast 3rd Avenue Ft. Lauderdale, FL 33316<br>Behnam Myers, DO 3850 Sheridan Street Hollywood, FL 33021 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Paul Newton 800-562-4789 |

(*Continued*)

**Table S1** (*Continued*)

| Investigators/investigational sites | | | | |
|---|---|---|---|---|
| **Site** | **Doctor** | **IRB site approved address** | **IRB address** | **IRB Chairman** |
| | | Anthony Hall, MD 1222 South University Drive Plantation, FL 33324<br>*University Hospital and Medical Center 7201 North University Drive Tamarac, FL 33321 | | |
| 27 | Guy Lee, MD 215-588-1510 (Site inactive) | Abington Orthopedic Specialists, PC Rothman Institute (current) 2400 Maryland Road, Suite 20 Willow Grove, PA 19090<br>*Abington Memorial Hospital 1200 Old York Road, Abington, PA 19001-3788 | Abington Memorial Hospital IRB 1200 Old York Road, Abington, PA 19001-3788 | Chris Christensen III, DO. 215-481-7467 |
| 28 | David Wiles, MD 423-232-8301 (Site inactive) | *East Tennessee Brain & Spine Center 701 Med Tech Parkway, Suite 300 Johnson City, TN 37604 | East Tennessee State University VA Office for the Protection of Human Research Box 70565 Johnson City, TN 37614 | George Youngbery, MD 423-439-6053 |
| 29 | Edward Dohring, MD 602-953-9500 (Current; Site inactive)<br>Daniel Lieberman, MD 602-256-2525 (Previous) | The Spine Institute of Arizona 9735 North 90th Place Scottsdale, AZ 85258<br>Arizona Center for Neurosurgery 3300 N. Central Avenue, Suite 2550 Phoenix, AZ 85020<br>Ali Araghi, DO The CORE Institute-North Phoenix 18444 North 25th Ave, Suite 210 Phoenix, AZ 85023<br>CORE Institute 14520 West Granite Valley Drive Sun City West, AZ 85375<br>*Surgical Specialty Hospital of Arizona 6501 North 19th Avenue Phoenix, AZ 85015 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Viveca Burnnette 800-562-4789 |
| 30 | George Rappard, MD 232-913-4718 (Site inactive) | Brain and Spine Institute 6200 Wilshire Blvd., Suite 806 Los Angeles, CA 90048<br>*California Spine Institute 1001 Newbury Road Newbury Park, CA 91320<br>Glendale Adventist Medical Center 1509 Wilson Terrace Glendale, CA 91206<br>*Olympia Medical Center 5900 West Olympic Blvd., Los Angeles, CA 90036 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Viveca Burnette 800-562-4789 |
| 31 | Harold Hess, MD 913-491-3344 (Site inactive) | Johnson County Spine 8575 West 110th Street, Suite 205 Overland Park, KS 66210<br>*Menorah Medical Center 119th and Nall Overland Park, KS 66204 | Patient Advocacy Council, Inc. 601 Bel Air Blvd., Suite 315 Mobile, AL 36606 251-479-5472 | James V Roberts, Jr Attorney at Law Ph 251-479-5472 |
| 32 | Peter Whang, MD 203-785-7132 (Site inactive) | Yale University Yale Physicians Building PO Box 208071 New Haven, CT 06520-8047<br>*Yale University 800 Howard Avenue New Haven, CT 06520-8071<br>48 Wellington Road, Milford, CT 06471 | Human Investigational Committee 55 College Street, New Haven, CT 06510 | Maurice Mahoney, MD, JD 230-785-4688 |
| 33 | Douglas Orndorff, MD 970-882-9500 (Site inactive) | Durango Orthopedic Associates, PC Spine Colorado 1 Mercado Street, Suite 200 Durango, CO 81301<br>*Mercy Regional Medical Center 1010 Three Springs Blvd., Durango, CO 81301 | Mercy Regional Medical Center 1010 Three Springs Blvd, Durango, CO 81301 | John AK Boyd, MD |
| 34 | Mark Hollmann, MD 386-734-3710 (Site inactive) | Florida Research Associates, PA 740 West Plymouth Avenue Deland, FL 32720<br>Florida Orthopaedic Associates, PA 1053 Medical Center Drive, Suite 101 Orange City, FL 32763 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Viveca Burnette 800-562-4789 |

(*Continued*)

**Table S1** *(Continued)*

| Site | Doctor | IRB site approved address | IRB address | IRB Chairman |
|---|---|---|---|---|
| | | *Florida Hospital Fish Memorial 1053 Medical Center Drive Orange City, FL 32763 | | |
| 35 | Jeffery Baron, MD 520-784-60276 (Site inactive) | Tucson Orthopaedic Institute, PC 5301 East Grant Road, Tucson, AZ 85712 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Viveca Burnette 800-562-4789 |
| | | *Tucson Medical Center 5301 East Grant Road Tucson, AZ 85712 | TMC Human Research Committee (IRB) 5301 East Grant Road, Tucson, AZ 85712 | Carlos A Flores, MD 520-324-5512 inactive |
| 36 | Harel Deutsch, MD 312-942-6644 (Site inactive) | RUSH University Medical Center University Neurosurgery 1725 West Harrison, Suite 970 Chicago, IL 60612 | RUSH University Medical Center Research and Clinical Trials Administration 1653 West Congress Parkway Chicago, IL 60612-3833 | Allen Korenblit, MD, CIP 312-942-5498 |
| | | *RUSH University Medical Center 1653 West Congress Parkway, Chicago, IL 60612 | | |
| 37 | Kenneth Kopacz, MD 973-226-2725 (Site inactive) | Spine Care and Rehabilitation, Inc. 556 Eagle Rock Avenue Roseland, NJ 07068 | Department of Medical Education St Barnabas Medical Center 94 Old Short Hills Road, Livingston, NJ 07039 | Gregory J Rokosz, DO, JD 973-322-5048 |
| | | *St Barnabas Medical Center 94 Old Short Hills Road, Livingston, NJ 07039 | | |
| 38 | Richard Salib, MD 952-814-6600 (Site inactive) | Institute for Low Back and Neck Care 3001 Metro Drive, Suite 330 Bloomington, MN 55425 | Schulman Associates, IRB 4445 Lake Forest Drive, Suite 300 Cincinnati, OH 45242 | Julie Blasingim 513-761-4100 |
| | | *Allina Health System 800 East 28th Street Minneapolis, MN 55407 | Allina Hospital & Clinics IRB 2925 Chicago Avenue Minneapolis, MN 55440 | Yvonne Rumsey 612-262-4927 inactive |
| 39 | Raphael Davis, MD 631-444-7925 (Site inactive) | *SUNY Stony Brook HSC 12-80 Neurosurgery Stony Brook, NY 11794-8122 | CORIHS Stony Brook University Stony Brook, NY 11794B Stony | Prof Harold Carlson 631-632-9036 |
| 40 | Casey O'Donnell, DO 401-490-7530 (Site inactive) | New England Center for Clinical Research, Inc. 1681 Cranston Street, Suite C Cranston, RI 02920 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Theodore Schultz 800-562-4789 |
| | | *Our Lady of Fatima Hospital 200 High Service Avenue North Providence, RI 02919 | | |
| 41 | Timothy Deer, MD 304-347-6120 (Site inactive) | The Center for Pain Relief, Inc. 400 Court Street, Suite 100 Charleston, WV 25301 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Lucille Broberg 800-562-4789 |
| | | *Saint Francis Hospital 333 Laidley Street Charleston, WV 25301 | | |
| 42 | Robert Wailes, MD 760-941-2600 (Site inactive) | Pacific Pain Medicine Consultants 3998 Vista Way, Suite 106 Oceanside, CA 92056 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Viveca Burnette 800-562-4789 |
| | | *Pacific Surgery Center 3998 Vista Way Oceanside, CA 92056 | | |
| 43 | John Regan, MD 310-881-3730 (Site inactive) | Spine Group of Beverly Hills 8929 Wilshire Blvd., Suite 302 Beverly Hills, CA 90211 | Western Institutional Review Board (WIRB) 1019 39th Avenue, SE Suite 120 Puyallup, WA 98374-2115 | Viveca Burnette 800-562-4789 |
| | | *Olympia Medical Center 5900 West Olympic Blvd., Los Angeles, CA 90036 | | |

Investigators/investigational sites

**Notes:** Primary treatment site, *denotes a secondary clinical site.

Clinical Interventions in Aging

Dovepress

**Publish your work in this journal**

Clinical Interventions in Aging is an international, peer-reviewed journal focusing on evidence-based reports on the value or lack thereof of treatments intended to prevent or delay the onset of maladaptive correlates of aging in human beings. This journal is indexed on PubMed Central, MedLine, CAS, Scopus and the Elsevier Bibliographic databases. The manuscript management system is completely online and includes a very quick and fair peer-review system, which is all easy to use. Visit http://www.dovepress.com/testimonials.php to read real quotes from published authors.

**Submit your manuscript here:** http://www.dovepress.com/clinical-interventions-in-aging-journal

Journal of Pain Research

Dovepress
open access to scientific and medical research

Open Access Full Text Article

CLINICAL TRIAL REPORT

# Interspinous process decompression is associated with a reduction in opioid analgesia in patients with lumbar spinal stenosis

This article was published in the following Dove Press journal:
Journal of Pain Research

Pierce D Nunley[1]
Timothy R Deer[2]
Ramsin M Benyamin[3]
Peter S Staats[4]
Jon E Block[5]

[1]Spine Institute of Louisiana, Shreveport, LA 71101, USA; [2]Center for Pain Relief, Charleston, WV 25301, USA; [3]Millennium Pain Center, Bloomington, IL 61704, USA; [4]National Spine and Pain Centers, Rockville, MD 20852, USA; [5]Jon Block, San Francisco, CA 94115, USA

**Background:** Lumbar spinal stenosis (LSS) causes significant pain and functional impairment, and medical management has increasingly included the prescription of opioid-based analgesics. Interspinous process decompression (IPD) provides a minimally-invasive treatment option for LSS.

**Methods:** This study estimated the type, dosage, and duration of opioid medications through 5 years of follow-up after IPD with the Superion Indirect Decompression System (Vertiflex Inc., Carlsbad, CA USA). Data were obtained from the Superion-treatment arm of a randomized controlled noninferiority trial. The prevalence of subjects using opiates was determined at baseline through 60 months. Primary analysis included all 190 patients randomized to receive the Superion device. In a subgroup of 98 subjects, we determined opioid-medication prevalence among subjects with a history of opioid use.

**Results:** At baseline, almost 50% (94 of 190) of subjects were using opioid medication. Thereafter, there was a sharp decrease in opioid-medication prevalence from 25.2% (41 of 163) at 12 months to 13.3% (20 of 150) at 24 months to 7.5% (8 of 107) at 60 months. Between baseline and 5 years, there was an 85% decrease in the proportion of subjects using opioids. A similar pattern was also observed among subjects with a history of opiates prior to entering the trial.

**Conclusion:** Stand-alone IPD is associated with a marked decrease in the need for opioid medications to manage symptoms related to LSS. In light of the current opiate epidemic, such alternatives as IPD may provide effective pain relief in patients with LSS without the need for opioid therapy.

**Keywords:** interspinous spacer, Superion, lumbar spinal stenosis, opioids, neurogenic claudication, indirect decompression

## Introduction

Lumbar spinal stenosis (LSS) is a common degenerative condition that causes significant pain, disability, functional impairment, and diminished quality of life.[1–5] The clinical feature most commonly attributed to LSS is neurogenic claudication that involves leg symptoms encompassing the buttocks, groin, and anterior thigh, as well as radiating pain down the posterior aspect of the leg to the feet.[3,6] The discomfort associated with LSS is often described as a cramping or burning feeling. Symptoms of neurogenic claudication can be distributed unilaterally or bilaterally, and the patient may suffer concomitant back pain, although leg pain and discomfort are usually more bothersome.[7]

A distinguishing clinical attribute of neurogenic claudication is its relationship to the patient's posture, where lumbar extension increases and flexion decreases pain onset and severity. Symptoms progressively worsen when standing or walking, and are relieved

Correspondence: Jon E Block
Jon Block,
2210 Jackson Street, Suite 401,
San Francisco, CA 94115, USA
Tel +1 415 775 7947
Email jb@drjonblock.com

submit your manuscript | www.dovepress.com
Dovepress
http://dx.doi.org/10.2147/JPR.S182322

© 2018 Nunley et al. This work is published and licensed by Dove Medical Press Limited. The full terms of this license are available at https://www.dovepress.com/terms.php and incorporate the Creative Commons Attribution – Non Commercial (unported, v3.0) License (http://creativecommons.org/licenses/by-nc/3.0/). By accessing the work you hereby accept the Terms. Non-commercial uses of the work are permitted without any further permission from Dove Medical Press Limited, provided the work is properly attributed. For permission for commercial use of this work, please see paragraphs 4.2 and 5 of our Terms (https://www.dovepress.com/terms.php).

Journal of Pain Research downloaded from https://www.dovepress.com/ by 73.164.111.158 on 20-Nov-2018
For personal use only.

Journal of Pain Research downloaded from https://www.dovepress.com/ by 73.164.111.158 on 20-Nov-2018
For personal use only.

by sitting and bending forward. In addition to the cardinal clinical feature of neurogenic claudication, patients often complain of symptoms that are more radicular in nature, with sharp lower-extremity pain. Leg pain is described as severe and radicular in distribution, and almost always presents with postural aggravation during lumbar extension.[6,8] LSS is the most common indication for spine surgery in older adults.

Conservative medical management of chronic spinal pain disorders, including LSS, has increasingly included the prescription of opioid-based analgesics.[9–11] This recommendation has been based on the belief that these medications can relieve pain and improve function and quality of life in selected patients.[12] In fact, opiates have become the most commonly prescribed class of drug for back pain, based on insurance-claim data.[13] Additionally, it has been estimated that more than half of regular opioid users report back pain as a primary complaint.[14]

Unfortunately, despite initial enthusiasm for opioid therapy, it has only recently been demonstrated that opioid analgesics offer little clinical benefit by way of pain reduction or functional improvement in patients with chronic musculoskeletal pain, including LSS.[15–20] Moreover, the odds of an opioid-related adverse event are three times that compared to placebo among older adults with musculoskeletal pain.[20] Specifically, Markman et al[19] failed to demonstrate any clinical benefit of opiates in older patients experiencing neurogenic claudication secondary to LSS.

Based on emerging evidence raising concerns over the ineffectiveness and possible hazards of opioid medications in the treatment of chronic low-back and leg pain, the British National Institute for Health and Care Excellence updated their recommendation for the assessment and management of low-back pain and sciatica.[21] They concluded, "Do not offer opioids for managing low back pain". Consequently, there is an urgent need to reverse the trend in opioid prescribing being a primary strategy for patients with LSS.

There is a growing body of published literature to support the safety and effectiveness of interspinous process decompression (IPD) with stand-alone interspinous spacers in the treatment of moderate LSS.[22,23] Spacers provide immediate symptom amelioration by serving as a spinal extension blocker to prevent the repetitive compression of neurovascular elements during back extension that is the primary source of LSS symptoms. Clinical follow-up from a US Food and Drug Administration (FDA) investigational device exemption (IDE) randomized controlled trial of the Superion device extends to 5 years of published findings.[24] Durable and clinically significant improvements have been demonstrated following spacer implantation in condition-specific impairment, leg- and back-pain severity, functional disability, and health-related quality of life. The degree of clinical improvement achieved with spacers appears to be strikingly similar to the improvement achieved with decompressive laminectomy, long considered the "gold standard" for surgical treatment of LSS.[25]

Owing to the magnitude, stability, and longevity of clinical benefit observed among LSS patients treated with IPD, we have undertaken additional analyses of ancillary variables in our IDE trial that may have a direct impact on health care utilization. This report examines and characterizes the opioid-medication-usage patterns among patients treated with stand-alone IPD through 5 years of postoperative follow-up.

## Methods

Type, dosage, and duration of opioid medications through 5 years of postoperative follow-up were obtained from the Superion Indirect Decompression system (Vertiflex Inc., Carlsbad, CA, USA) treatment arm of a randomized controlled FDA IDE noninferiority trial comparing two interspinous spacers. Medication-prescribing history was documented and validated via electronic data-capture methods for all treated patients during their enrollment and participation as study subjects.

This multicenter trial evaluated the use of stand-alone IPD in the treatment of subjects aged 45 years or older with moderate symptoms of intermittent neurogenic claudication, secondary to a diagnosis of moderate degenerative LSS at one or two contiguous levels from L1 to L5. A total of 391 subjects met the trial-eligibility criteria and were randomized to treatment. The Superion was approved by the FDA in 2015 for commercial distribution based on the 2-year primary end-point analysis.[23] Additionally, condition-specific clinical outcomes have been reported through 5 years of follow-up.[24,26,27] Inasmuch as the control device (X-Stop IPD; Medtronic, Minneapolis, MN, USA) is no longer commercially available, the current opioid-medication analysis was restricted exclusively to the Superion arm of the trial.

This IDE trial complied with all US regulatory requirements and was approved by the institutional review board at each participating site, and patients provided written informed consent before any study-related procedures were performed. The trial was conducted in accordance with the Declaration of Helsinki and prospectively registered at ClinicalTrials.gov (NCT00692276).

Based on opioid-medication start date and duration of use, the prevalence of subjects using opiates was clas-

Journal of Pain Research downloaded from https://www.dovepress.com/ by 73.164.111.158 on 20-Nov-2018
For personal use only.

sified by postoperative follow-up in the same intervals as other previously reported clinical outcomes from this trial (ie, baseline, 6 weeks, and 3, 6, 12, 18, 24, 36, 48, and 60 months). Previous (ie, prestudy) opioid-medication use prior to a subject's enrollment in the trial was also captured based on entrance-eligibility interviews that queried medication history for LSS.

Our primary analysis included all 190 patients randomized to receive the Superion device to determine opioid-medication prevalence. At each follow-up, medication-usage data were provided only for subjects free of reoperation or revision at the index surgical level. Sample sizes were 190 (baseline), 181 (6 weeks), 173 (3 months), 174 (6 months), 163 (12 months), 150 (18 months), 150 (24 months), 125 (36 months), 106 (48 months), and 107 (60 months). A second subgroup analysis was also undertaken after excluding all subjects that had initiated opiates after surgery (n=92). In the remaining subgroup of 98 subjects, we determined opioid-medication prevalence in the same manner among subjects with a history of opioid use for LSS. Sample sizes in this subgroup were 98 (baseline), 90 (6 weeks), 87 (3 months), 87 (6 months), 84 (12 months), 74 (18 months), 79 (24 months), 66 (36 months), 54 (48 months), and 55 (60 months).

## Results

Table 1 provides opioid-medication types and frequency of use among all study subjects through 60 months of clinical follow-up.

Among all study subjects, there was a marked year-on-year decrease in the proportion of patients prescribed opioid medications to manage LSS symptoms after Superion implantation (Figure 1). At baseline, almost 50% (94 of 190) of subjects were using opioid medication, with a spike in opioid use (64.1%, 116 of 181) at the 6-week follow-up interval. After this early postoperative interval, there was a sharp diminution in opioid-medication prevalence from 25.2% (41 of 163) at 12 months to 13.3% (20 of 150) at 24 months to 7.5% (8 of 107) at 60 months. Overall, between baseline and 5 years, there was an 85% decrease in the proportion of subjects using opioids.

A similar pattern of decreased opioid-medication usage was also observed among the subgroup of subjects with a history of opiates at trial entry (Figure 2). At enrollment, 67.3% (66 of 98) reported prior opioid usage to manage LSS symptoms. By week 6, usage had dropped to 48.9% (44 of 90). Opioid-medication prevalence was 27.4% (23 of 84) at 12 months, 15.2% (12 of 79) at 24 months, and 9.1% (5 of 55) at 60 months. In this subgroup, between baseline and 5 years, there was an 82% decrease in the proportion of subjects using opioids.

**Table 1** Type and frequency of opioid medication usage

| Medication name | n (%) |
|---|---|
| Buprenorphine | 4 (1.27) |
| Codeine | 10 (3.17) |
| Dextropropoxyphene | 1 (0.32) |
| Fentanyl | 2 (0.63) |
| Hydrocodone | 94 (29.84) |
| Hydromorphone | 37 (11.75) |
| Methadone | 5 (1.59) |
| Morphine | 7 (2.22) |
| Oxycodone | 95 (30.16) |
| Oxymorphone | 3 (0.95) |
| Tapentadol | 1 (0.32) |
| Tramadol | 56 (17.78) |

**Note:** Data obtained from 190 Superion subjects prescribed multiple medication types (n=315).

## Discussion

It has recently been reported in patients aged ≥65 years with a new-back-pain visit that those filling two or more opioid prescriptions within 90 days of the visit had similar back-related outcomes, but an increased likelihood of filling opioid prescriptions 18–24 months later, compared with matched patients who did not fill early opioid prescriptions.[28] This finding suggests a dangerous opioid recidivism and underscores the need to reverse the trend in opioid-prescribing patterns among older patients with musculoskeletal pain syndromes, including LSS.

The large multicenter Spine Patient Outcome Research Trial (SPORT) trial of LSS reported opioid-usage prevalence of 27% at baseline prior to laminectomy.[29] In our IDE trial, we found that ~35% of patients randomized to receive Superion had a history of opioid use at enrollment in the study (Figure 1). We also noted that study subjects were perfunctorily prescribed opiates in the immediate postoperative period, raising the prevalence to 64% within 6 weeks of surgery.

However, after the early postsurgical period, we identified a marked diminution in the prevalence of opioid usage, dropping to 25% at 12 months and 13% by 24 months. These results compare favorably with opioid-prevalence estimates associated with other interventions for LSS. For example, in a randomized trial of repeated epidural steroid injections for LSS, Friedly et al[30] reported baseline opioid-usage prevalence of 38% and 12-month prevalence of 41%, confirming and extending previous research demonstrating lack of long-

**Figure 1** Opioid-medication prevalence (%) by follow-up interval for all study subjects (n=190).
**Note:** Sample sizes were 190 (prestudy, baseline), 181 (week 6), 173 (month 3), 174 (month 6), 163 (month 12), 150 (month 18), 150 (month 24), 125 (month 36), 106 (month 48), and 107 (month 60).

**Figure 2** Opioid-medication prevalence (%) by follow-up interval for study subjects with opioid history (n=98).
**Note:** Sample sizes in this subgroup were 98 (prestudy, baseline), 90 (week 6), 87 (month 3), 87 (month 6), 84 (month 12), 74 (month 18), 79 (month 24), 66 (month 36), 54 (month 48), and 55 (month 60).

Journal of Pain Research downloaded from https://www.dovepress.com/ by 73.164.111.158 on 20-Nov-2018
For personal use only.

term effectiveness for epidural steroid injections for treating chronic LSS symptoms.[31,32]

Our results are also somewhat better than those realized after decompressive laminectomy. In a randomized controlled IDE trial, Schmidt et al[33] reported prestudy opioid-usage prevalence of 31%, spiking postsurgically to 67%, then decreasing to 19% at 12 months, and 23% by 24 months following laminectomy. In our trial, the prevalence of opioid usage continued to drop precipitously to 7.5% by 60 months. It is unknown whether postlaminectomy patients enjoy a similarly rapid decrease in opioid usage with longer-term follow-up. However, if laminectomy-associated instability ensues and symptoms reemerge, revision to fusion may be necessary, requiring reestablishment of opiate therapy.

Many patients expect spine surgery to eliminate the need for opioids. Indeed, prior to lumbar fusion surgery, over 90% of patients surveyed considered continued dependence on opioids neither an expected nor acceptable outcome.[34] In a retrospective cohort study of 2,492 patients having lumbar fusion surgery for degenerative conditions, including LSS, Deyo et al[35] found that more patients received long-term opioids postoperatively (n=1,094) than preoperatively (n=1,045). Additionally, opioid-naïve patients had a substantial risk of initiating long-term use.

Increasing utilization of opioid medications as part of a treatment regime to manage chronic pain has been associated with drug misuse, complications, and fatal overdoses.[36] This problem is even more acute in older adults, who are more susceptible to the adverse effects of opioids, such as disorientation, syncope, and falls.[37] We found that stand-alone IPD in older patients with LSS substantially reduced the need for opioid medication through 5 years of postoperative follow-up. This finding mirrors a similarly notable reduction in need for reoperation or revision following IPD. We previously reported that 75% (142 of 190) of IPD subjects were free of reoperation at their index level through 5 years of follow-up.[24] Importantly, among the 48 spacer subjects that had a reoperation, 38 (79%) subjects underwent their reoperation within the initial 24 months of follow-up. Only a single reoperation occurred during the fifth year of observation, suggesting a continuously decreasing risk of revision surgery with time. The compilation of results from this IDE trial demonstrates long-term durable improvements in condition-specific pain and functional outcomes, as well as marked reductions in the need for opioid medication and revision surgery with IPD through 5 years of follow-up.

This study has several limitations. In the absence of a nonsurgical control, we were unable to estimate the

Journal of Pain Research downloaded from https://www.dovepress.com/ by 73.164.111.158 on 20-Nov-2018
For personal use only.

comparative natural history of opioid usage among LSS patients treated conservatively. Although medication prescribing was captured on a compulsory basis for all study subjects, the trial was not designed to evaluate opioid usage as a primary or secondary outcome. As an ancillary variable, data collection methods lacked a standardized methodology to quantify opioid usage. Consequently, our post hoc analysis was constrained to prevalence estimates within specified postoperative follow-up intervals and limited only to those patients who remained implanted with the study device and who were free of a reoperation at the index surgical level.

## Conclusion

Stand-alone IPD is associated with a marked and sustained decrease in the need for opioid medications to manage symptoms related to LSS. This finding extends previous results showing long-term sustained clinical improvements, a reduction in symptoms of neurogenic claudication, and a decreasing requirement for revision surgery in this population.

## Data sharing statement

Requests for data sharing can be made by contacting the corresponding author. Individual participant data that underlie the results reported in this article will be made available (after deidentification) from 9 to 36 months after article publication. Data sharing will be limited to investigators whose proposed use of the data has been approved by an independent review committee identified for this purpose.

## Acknowledgments

The authors wish to thank Bob Hachadoorian for data-management support and conducting all statistical analyses. Graphic support was provided by Terry Meredith. Financial support for this work was provided by Vertiflex Inc. (Carlsbad, CA, USA).

## Author contributions

All authors contributed to data analysis, drafting and revising the article, gave final approval of the version to be published, and agree to be accountable for all aspects of the work.

## Disclosure

JEB is an independent advisor to Vertiflex Inc. and was remunerated for assistance in manuscript development. The other authors report no conflicts of interest in this work.

## References

1. Arbit E, Pannullo S. Lumbar stenosis: a clinical review. *Clin Orthop Relat Res*. 2001;384(384):137–143.
2. Benoist M. The natural history of lumbar degenerative spinal stenosis. *Joint Bone Spine*. 2002;69(5):450–457.
3. Binder DK, Schmidt MH, Weinstein PR. Lumbar spinal stenosis. *Semin Neurol*. 2002;22(2):157–166.
4. Chad DA. Lumbar spinal stenosis. *Neurol Clin*. 2007;25(2):407–418.
5. Conway J, Tomkins CC, Haig AJ. Walking assessment in people with lumbar spinal stenosis: capacity, performance, and self-report measures. *Spine J*. 2011;11(9):816–823.
6. Genevay S, Atlas SJ, Lumbar spinal stenosis. *Best Pract Res Clin Rheumatol*. 2010;24(2):253–265.
7. Lee SY, Kim TH, Oh JK, Lee SJ, Park MS. Lumbar stenosis: a recent update by review of literature. *Asian Spine J*. 2015;9(5):818–828.
8. Lurie J, Tomkins-Lane C. Management of lumbar spinal stenosis. *BMJ*. 2016;352:h6234.
9. American Geriatrics Society Panel on Pharmacological Management of Persistent Pain in Older Persons. Pharmacological management of persistent pain in older persons. *J Am Geriatr Soc*. 2009;57(8):1331–1346.
10. Chou R, Fanciullo GJ, Fine PG, et al. Clinical guidelines for the use of chronic opioid therapy in chronic noncancer pain. *J Pain*. 2009;10(2):113–130.
11. Dowell D, Haegerich TM, Chou R. CDC guideline for prescribing opioids for chronic pain–United States, 2016. *JAMA*. 2016;315(15):1624–1645.
12. Ballantyne JC, Mao J. Opioid therapy for chronic pain. *N Engl J Med*. 2003;349(20):1943–1953.
13. Ivanova JI, Birnbaum HG, Schiller M, Kantor E, Johnstone BM, Swindle RW. Real-world practice patterns, health-care utilization, and costs in patients with low back pain: the long road to guideline-concordant care. *Spine J*. 2011;11(7):622–632.
14. Hudson TJ, Edlund MJ, Steffick DE, Tripathi SP, Sullivan MD. Epidemiology of regular prescribed opioid use: results from a national, population-based survey. *J Pain Symptom Manage*. 2008;36(3):280–288.
15. Abdel Shaheed C, Maher CG, Williams KA, Day R, McLachlan AJ. Efficacy, Tolerability, and dose-dependent effects of opioid analgesics for low back pain: a systematic review and meta-analysis. *JAMA Intern Med*. 2016;176(7):958–968.
16. Chaparro LE, Furlan AD, Deshpande A, Mailis-Gagnon A, Atlas S, Turk DC. Opioids compared with placebo or other treatments for chronic low back pain: an update of the Cochrane review. *Spine*. 2014;39(7):556–563.
17. Chou R, Deyo R, Friedly J, et al. Systemic pharmacologic therapies for low back pain: a systematic review for an American College of Physicians Clinical Practice Guideline. *Ann Intern Med*. 2017;166(7):480–492.
18. Krebs EE, Gravely A, Nugent S, et al. Effect of opioid vs nonopioid medications on pain-related function in patients with chronic back pain or hip or knee osteoarthritis pain: the SPACE randomized clinical trial. *JAMA*. 2018;319(9):872–882.
19. Markman JD, Gewandter JS, Frazer ME, et al. A randomized, double-blind, placebo-controlled crossover trial of oxymorphone hydrochloride and propoxyphene/acetaminophen combination for the treatment of neurogenic claudication associated with lumbar spinal stenosis. *Spine*. 2015;40(10):684–691.
20. Megale RZ, Deveza LA, Blyth FM, et al. efficacy and safety of oral and transdermal opioid analgesics for musculoskeletal pain in older adults: a systematic review of randomized, placebo-controlled trials. *J Pain*. 2018;19(5):475.e471–e475.
21. Bernstein IA, Malik Q, Carville S, Ward S. Low back pain and sciatica: summary of NICE guidance. *BMJ*. 2017;356:i6748.
22. Nunley PD, Shamie AN, Blumenthal SL, Orndorff D, Block JE, Geisler FH. Interspinous process decompression: expanding treatment options for lumbar spinal stenosis. *Biomed Res Int*. 2016;2016:3267307.

23. Patel VV, Whang PG, Haley TR, et al. Superion interspinous process spacer for intermittent neurogenic claudication secondary to moderate lumbar spinal stenosis: two-year results from a randomized controlled FDA-IDE pivotal trial. *Spine*. 2015;40(5):275–282.
24. Nunley PD, Patel VV, Orndorff DG, Lavelle WF, Block JE, Geisler FH. Five-year durability of stand-alone interspinous process decompression for lumbar spinal stenosis. *Clin Interv Aging*. 2017;12:1409–1417.
25. Lauryssen C, Jackson RJ, Baron JM, et al. Stand-alone interspinous spacer versus decompressive laminectomy for treatment of lumbar spinal stenosis. *Expert Rev Med Devices*. 2015;12(6):763–769.
26. Nunley PD, Patel VV, Orndorff DG, Lavelle WF, Block JE, Geisler FH. Superion interspinous spacer treatment of moderate spinal stenosis: 4-year results. *World Neurosurg*. 2017;104:279–283.
27. Patel VV, Nunley PD, Whang PG, et al. Superion® InterSpinous Spacer for treatment of moderate degenerative lumbar spinal stenosis: durable three-year results of a randomized controlled trial. *J Pain Res*. 2015;8:657–662.
28. Gold LS, Hansen RN, Avins AL, et al. Associations of early opioid use with patient-reported outcomes and health care utilization among older adults with low back pain. *Clin J Pain*. 2018;34(4):297–305.
29. Weinstein JN, Tosteson TD, Lurie JD, et al. Surgical versus nonoperative treatment for lumbar spinal stenosis four-year results of the Spine Patient Outcomes Research Trial. *Spine*. 2010;35(14):1329–1338.
30. Friedly JL, Comstock BA, Turner JA, et al. Long-term effects of repeated injections of local anesthetic with or without corticosteroid for lumbar spinal stenosis: a randomized trial. *Arch Phys Med Rehabil*. 2017;98(8):1499–1507.
31. Andersson GB. Epidural glucocorticoid injections in patients with lumbar spinal stenosis. *N Engl J Med*. 2014;371(1):75–76.
32. Friedly JL, Comstock BA, Turner JA, et al. A randomized trial of epidural glucocorticoid injections for spinal stenosis. *N Engl J Med*. 2014;371(1):11–21.
33. Schmidt S, Franke J, Rauschmann M, Adelt D, Bonsanto MM, Sola S. Prospective, randomized, multicenter study with 2-year follow-up to compare the performance of decompression with and without interlaminar stabilization. *J Neurosurg Spine*. 2018;28(4):406–415.
34. Carragee EJ, Cheng I. Minimum acceptable outcomes after lumbar spinal fusion. *Spine J*. 2010;10(4):313–320.
35. Deyo RA, Hallvik SE, Hildebran C, et al. Use of prescription opioids before and after an operation for chronic pain (lumbar fusion surgery). *Pain*. 2018;159(6):1147–1154.
36. Okie S. A flood of opioids, a rising tide of deaths. *N Engl J Med*. 2010;363(21):1981–1985.
37. Deyo RA, von Korff M, Duhrkoop D. Opioids for low back pain. *BMJ*. 2015;350:g6380.

Journal of Pain Research downloaded from https://www.dovepress.com/ by 73.164.111.158 on 20-Nov-2018
For personal use only.

**Journal of Pain Research**

**Dovepress**

## Publish your work in this journal

The Journal of Pain Research is an international, peer reviewed, open access, online journal that welcomes laboratory and clinical findings in the fields of pain research and the prevention and management of pain. Original research, reviews, symposium reports, hypothesis formation and commentaries are all considered for publication. The manuscript management system is completely online and includes a very quick and fair peer-review system, which is all easy to use. Visit http://www.dovepress.com/testimonials.php to read real quotes from published authors.

**Submit your manuscript here:** https://www.dovepress.com/journal-of-pain-research-journal



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Public Health Service

Food and Drug Administration
10903 New Hampshire Avenue
Document Control Center – WO66-G609
Silver Spring, MD  20993-0002

June 3, 2015

VertiFlex®, Incorporated
Mr. Steve Reitzler
Vice President, Clinical & Regulatory Affairs
1351 Calle Avanzado, Suite 100
San Clemente, California 92673

Re:  P140004
    Trade/Device Name:  Superion® InterSpinous Spacer (ISS)
    Filed:  March 31, 2014
    Amended:   April 16, May 28, June 5, October 6, December 1 and December 12, 2014;
                 January 20 and January 22, 2015
    Product Code:  NQO

Dear Mr. Reitzler:

This letter corrects our Approval Order letter of May 20, 2015.

The Center for Devices and Radiological Health (CDRH) of the Food and Drug Administration (FDA) has completed its review of your premarket approval application (PMA) for the Superion InterSpinous Spacer (ISS). This device is indicated to treat skeletally mature patients suffering from pain, numbness, and/or cramping in the legs (neurogenic intermittent claudication) secondary to a diagnosis of moderate degenerative lumbar spinal stenosis, with or without Grade 1 spondylolisthesis, confirmed by X-ray, MRI and/or CT evidence of thickened ligamentum flavum, narrowed lateral recess, and/or central canal or foraminal narrowing. The Superion® ISS is indicated for those patients with impaired physical function who experience relief in flexion from symptoms of leg/buttock/groin pain, numbness, and/or cramping, with or without back pain, and who have undergone at least 6 months of non-operative treatment. The Superion® ISS may be implanted at one or two adjacent lumbar levels in patients in whom treatment is indicated at no more than two levels, from L1 to L5. For this intended use, moderate degenerative lumbar spinal stenosis was defined as follows:

- 25% to 50% reduction in the central canal and/or nerve root canal (subarticular, neuroforaminal) compared to the adjacent levels on radiographic studies, with radiographic confirmation of any one of the following:

  - Evidence of thecal sac and/or cauda equina compression

  - Evidence of nerve root impingement (displacement or compression) by either osseous or non-osseous elements

  - Evidence of hypertrophic facets with canal encroachment

- AND associated with the following clinical signs:
  - o Presents with moderately impaired Physical Function (PF) defined as a score of ≥ 2.0 of the Zurich Claudication Questionnaire (ZCQ)
  - o Ability to sit for 50 minutes without pain and to walk 50 feet or more.

We are pleased to inform you that the PMA is approved. You may begin commercial distribution of the device in accordance with the conditions of approval described below.

The sale and distribution of this device are restricted to prescription use in accordance with 21 CFR 801.109 and under section 515(d)(1)(B)(ii) of the Federal Food, Drug, and Cosmetic Act (the act). The device is further restricted under section 515(d)(1)(B)(ii) of the act insofar as the labeling must specify the specific training or experience practitioners need in order to use the device. FDA has determined that these restrictions on sale and distribution are necessary to provide reasonable assurance of the safety and effectiveness of the device. Your device is therefore a restricted device subject to the requirements in sections 502(q) and (r) of the act, in addition to the many other FDA requirements governing the manufacture, distribution, and marketing of devices.

Expiration dating for this device has been established and approved at 5 years. This is to advise you that the protocol you used to establish this expiration dating is considered an approved protocol for the purpose of extending the expiration dating as provided by 21 CFR 814.39(a)(7).

Continued approval of this PMA is contingent upon the submission of periodic reports, required under 21 CFR 814.84, at intervals of one year (unless otherwise specified) from the date of approval of the original PMA. Two copies of this report, identified as "Annual Report" and bearing the applicable PMA reference number, should be submitted to the address below. The Annual Report should indicate the beginning and ending date of the period covered by the report and should include the information required by 21 CFR 814.84. This is a reminder that as of September 24, 2014, class III devices are subject to certain provisions of the final UDI rule. These provisions include the requirement to provide a UDI on the device label and packages (21 CFR 801.20), format dates on the device label in accordance with 21 CFR 801.18, and submit data to the Global Unique Device Identification Database (GUDID) (21 CFR 830 Subpart E). Additionally, 21 CFR 814.84 (b)(4) requires PMA annual reports submitted after September 24, 2014, to identify each device identifier currently in use for the subject device, and the device identifiers for devices that have been discontinued since the previous periodic report.

It is not necessary to identify any device identifier discontinued prior to December 23, 2013. For more information on these requirements, please see the UDI website, http://www.fda.gov/udi.

In addition to the above, and in order to provide continued reasonable assurance of the safety and effectiveness of the device, the Annual Report must include, separately for each model number (if applicable), the number of devices sold and distributed during the reporting period, including those distributed to distributors. The distribution data will serve as a denominator and provide necessary context for FDA to ascertain the frequency and prevalence of adverse events, as FDA evaluates the continued safety and effectiveness of the device.

In addition to the Annual Report requirements, you must provide the following data in post-approval study (PAS) reports for each PAS listed below, every 6 months during the first 2 years of these studies and annually thereafter. Two (2) copies of each report, identified as an "ODE Lead PMA Post-Approval Study Report" or "OSB Lead PMA Post-Approval Study Report" in accordance with how the study is identified below and bearing the applicable PMA reference number, should be submitted to the address below.

1. ODE Lead PMA Post-Approval Study – "Superion® Post-Approval Clinical Evaluation and Review (SPACER)": The Office of Device Evaluation (ODE) will have the lead for this clinical study, which was initiated prior to device approval. The "Superion® Post-Approval Clinical Evaluation and Review (SPACER)" is described as follows:

   Based on the study plan received on May 1, 2015, you must perform a 60-month PAS to evaluate the longer term safety and effectiveness of the Superion® ISS as compared to the X-STOP® Interspinous Process Decompression (IPD®) System ("X-STOP® IPD®") by following all patients from the pivotal investigational device exemption (IDE) study G070118 with device survival to 24 months (137 Superion® ISS and 144 X-STOP® IPD® randomized patients had not died or terminally failed as of the 24-month visit) annually through 60 months at 25 study sites. Thus, the post-approval study duration is approximately 36 months, as all patients have reached 24 months prior to the start of this study.

   At each annual (±3 month) visit, you will collect the following data: Zurich Claudication Questionnaire (ZCQ); neurological status as determined by physical exam; radiographic information; maintenance of distraction; all adverse events regardless of cause; incidence of epidural injections regardless of the cause and spinal level injected; incidence of analgesic narcotics usage; reoperations, revisions, removals or supplemental fixation at the index levels; SF-12 Short Form Health Survey, Version 2; VertiFlex® Patient Satisfaction Survey; Visual Analog Scale (VAS); Oswestry Disability Index (ODI), return to work and to activities of daily living and rehabilitation utilization. In addition, you will report information on the length of hospital stay, operative time, estimated blood loss, and type of anesthesia.
   Radiographic information collected will include: standing anteroposterior and lateral lumbar radiographs, range of motion on lateral standing flexion/extension films (at implanted and adjacent level(s)), radiolucency, device displacement or migration, and radiographic

observations such as incidence of total and per patient spinous process fractures or heterotopic ossification. Adverse events will be evaluated by the Medical Monitor. Data will be evaluated for safety endpoints by an independent Clinical Events Committee (CEC).

The primary hypothesis of this extended follow-up post approval study is that performance of the Superion™ ISS remains clinically non-inferior to X-STOP® IPD® at 60 months post-surgery using the same non-inferiority margin ($\delta$=-0.10) as was used at 24 months. An individual subject will be considered a success if they meet all of the following conditions at the 60-month follow-up:

Clinically significant improvement in outcomes compared to baseline, as determined by meeting the following:

- At least two of three domains of the Zurich Claudication Questionnaire (ZCQ)
  - Improvement in physical function by ≥ 0.5 points
  - Improvement in symptom severity by ≥ 0.5 points
  - "Satisfied" or "somewhat satisfied" as defined by a score of ≤ 2.5 points on the patient satisfaction domain
- No re-operations, revisions, removals or supplemental fixation at the index level(s)
- No major implant- or procedure-related complications:
  - No dislodgement, migration, or deformation
  - No new or persistent worsened neurological deficit at the index level
  - No spinous process fractures
  - No deep infection, death, or other permanent device attributed disability
- No clinically significant confounding treatments:
  - No epidural injections or nerve block procedures at index level, spinal cord stimulators or rhizotomies

The secondary study objective is to demonstrate the superiority of Superion® ISS to X-STOP® IPD® in effectively treating moderately impaired LSS patients as measured by 60 months postoperative overall success rates.

FDA will expect at least 85% follow-up at the 60-month time point to provide sufficient data to evaluate safety and effectiveness and sensitivity analysis to address missing data.

2. OSB Lead PMA Post-Approval Study - "Superion® New Enrollment Study": The Office of Surveillance and Biometrics (OSB) will have the lead for studies initiated after device approval. The "Superion® New Enrollment Study" is described as follows:

You will recruit 358 subjects to ensure that at minimum 304 (152 per treatment group) patients will be followed through 60-months. Nine clinical visits will occur at the following intervals: screening (< 4 weeks before surgery), surgery, 6 weeks (±2 weeks), 6 months (±2 months), 12 months (±2 months), 24 months (±2 months), and annually (±4 months) thereafter through 60 months of follow-up. At each post-operative visit, you will collect the following data: ZCQ; neurological status as determined by physical exam; radiographic information; all adverse events regardless of cause; incidence of epidural injections regardless of the cause and spinal level injected; incidence of analgesic narcotics usage; reoperations, revisions , removals or supplemental fixation at the index levels; Patient Satisfaction Survey; VAS; ODI, return to work and to activities of daily living and rehabilitation utilization. In addition, you will collect information on the length of hospital stay, operative time, estimated blood loss, and type of anesthesia.

The imaging data will be collected during screening (< 4 weeks before surgery) and during all post-operative visits via x-rays in the following positions: anteroposterior, lateral, flexion and extension. In addition, standing anteroposterior and lateral lumbar radiographs will be taken at time of discharge of index surgery. Computed tomography (CT) imaging will be captured in lieu of x-rays at 24 months for all patients, pending individual IRB approval, in the Superion® cohort. CT imaging may be performed in lieu of x-rays for Superion® patients at 60 months per surgeon discretion. CT imaging will be utilized to observe spinous process fractures.

- The primary objective of this study is to demonstrate that the composite clinical success (CCS) of Superion® device performance will be non-inferior (δ=-0.125) to decompression at 60 months. The CCS is defined as following:
  - A clinically significant improvement in at least two of the three domains of the ZCQ
  - No reoperations, revisions, removals, or supplemental fixation at the index level(s)
  - No ≥2 injections or series of injections for the treated level, or nerve block procedures performed to treat spinal stenosis for the index level(s), or a single injection within 12 months of the 60-month endpoint.

A secondary endpoint with alternative CSS for the primary objective will also be evaluated at 60 months where CSS is defined as above with the exception of point number three where success will be defined as:

- No injections or series of injections at any level at any time.

Be advised that the failure to conduct any such study in compliance with the good clinical laboratory practices in 21 CFR part 58 (if a non-clinical study subject to part 58) or the institutional review board regulations in 21 CFR part 56 and the informed consent regulations in 21 CFR part 50 (if a clinical study involving human subjects) may be grounds for FDA withdrawal of approval of the PMA. In addition, the results from any post approval study should be included in the labeling as these data become available. Any updated labeling must be submitted to FDA in the form of a PMA Supplement. For more information on post-approval studies, see the FDA guidance document entitled, "Procedures for Handling Post-Approval Studies Imposed by PMA Order" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm070974.htm).

Within 30 days of your receipt of this letter, you must submit a PMA supplement that includes complete protocols of your post-approval studies described above. Your PMA supplements should be clearly labeled as an "ODE Lead PMA Post-Approval Study Report" or "OSB Lead PMA Post-Approval Study Report" as noted above and submitted in triplicate to the address below. Please reference the PMA number above to facilitate processing. If there are multiple protocols being finalized after PMA approval, please submit each protocol as a separate PMA supplement.

Before making any change affecting the safety or effectiveness of the device, you must submit a PMA supplement or an alternate submission (30-day notice) in accordance with 21 CFR 814.39. All PMA supplements and alternate submissions (30-day notice) must comply with the applicable requirements in 21 CFR 814.39. For more information, please refer to the FDA guidance document entitled, "Modifications to Devices Subject to Premarket Approval (PMA) - The PMA Supplement Decision-Making Process" (http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/GuidanceDocuments/ucm089274.htm).

You are reminded that many FDA requirements govern the manufacture, distribution, and marketing of devices. For example, in accordance with the Medical Device Reporting (MDR) regulation, 21 CFR 803.50 and 21 CFR 803.52, you are required to report adverse events for this device. Manufacturers of medical devices, including in vitro diagnostic devices, are required to report to FDA no later than 30 calendar days after the day they receive or otherwise becomes aware of information, from any source, that reasonably suggests that one of their marketed devices:

1. May have caused or contributed to a death or serious injury; or

2. Has malfunctioned and such device or similar device marketed by the manufacturer would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.

Additional information on MDR, including how, when, and where to report, is available at http://www.fda.gov/MedicalDevices/Safety/ReportaProblem/default.htm

In accordance with the recall requirements specified in 21 CFR 806.10, you are required to submit a written report to FDA of any correction or removal of this device initiated by you to: (1) reduce a risk to health posed by the device; or (2) remedy a violation of the act caused by the device which may present a risk to health, with certain exceptions specified in 21 CFR 806.10(a)(2). Additional information on recalls is available at http://www.fda.gov/Safety/Recalls/IndustryGuidance/default.htm

CDRH does not evaluate information related to contract liability warranties. We remind you; however, that device labeling must be truthful and not misleading. CDRH will notify the public of its decision to approve your PMA by making available, among other information, a summary of the safety and effectiveness data upon which the approval is based. The information can be found on the FDA CDRH Internet HomePage located at http://www.fda.gov/MedicalDevices/ProductsandMedicalProcedures/DeviceApprovalsandClearances/PMAApprovals/default.htm. Written requests for this information can also be made to the Food and Drug Administration, Dockets Management Branch, (HFA-305), 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852. The written request should include the PMA number or docket number. Within 30 days from the date that this information is placed on the Internet, any interested person may seek review of this decision by submitting a petition for review under section 515(g) of the act and requesting either a hearing or review by an independent advisory committee. FDA may, for good cause, extend this 30-day filing period.

Failure to comply with any post-approval requirement constitutes a ground for withdrawal of approval of a PMA. The introduction or delivery for introduction into interstate commerce of a device that is not in compliance with its conditions of approval is a violation of law.

You are reminded that, as soon as possible and before commercial distribution of your device, you must submit an amendment to this PMA submission with copies of all approved labeling in final printed form. Final printed labeling that is identical to the labeling approved in draft form will not routinely be reviewed by FDA staff when accompanied by a cover letter stating that the final printed labeling is identical to the labeling approved in draft form. If the final printed labeling is not identical, any changes from the final draft labeling should be highlighted and explained in the amendment.

All required documents should be submitted in 6 copies, unless otherwise specified, to the address below and should reference the above PMA number to facilitate processing.

U.S. Food and Drug Administration
Center for Devices and Radiological Health
PMA Document Control Center - WO66-G609
10903 New Hampshire Avenue
Silver Spring, MD 20993-0002

If you have any questions concerning this approval order, please contact Zane W. Wyatt, Ph.D. at 301-796-5650 or zane.wyatt@fda.hhs.gov.

Sincerely yours,

Lori A. Wiggins -S

for
Mark N. Melkerson
Director
Division of Orthopedic Devices
Office of Device Evaluation
Center for Devices and
Radiological Health

# SUMMARY OF SAFETY & EFFECTIVENESS DATA (SSED)

## I. GENERAL INFORMATION

| | |
|---|---|
| Device Generic Name: | Prosthesis, Spinous Process Spacer/Plate |
| Device Trade Name: | Superion® InterSpinous Spacer (ISS) |
| Device Product Code: | NQO |
| Applicant's Name and Address: | VertiFlex®, Incorporated<br>1351 Calle Avanzado, Suite 100<br>San Clemente, CA 92673 |
| Date(s) of Panel Recommendation: | February 20, 2015 |
| Premarket Approval Application (PMA) Number: | P140004 |
| Date of FDA Notice of Approval: | May 20, 2015 |

## II. INDICATIONS FOR USE

The Superion® InterSpinous Spacer (ISS) is indicated to treat skeletally mature patients suffering from pain, numbness, and/or cramping in the legs (neurogenic intermittent claudication) secondary to a diagnosis of moderate degenerative lumbar spinal stenosis, with or without Grade 1 spondylolisthesis, confirmed by X-ray, MRI and/or CT evidence of thickened ligamentum flavum, narrowed lateral recess, and/or central canal or foraminal narrowing. The Superion® ISS is indicated for those patients with impaired physical function who experience relief in flexion from symptoms of leg/buttock/groin pain, numbness, and/or cramping, with or without back pain, and who have undergone at least 6 months of non-operative treatment. The Superion® ISS may be implanted at one or two adjacent lumbar levels in patients in whom treatment is indicated at no more than two levels, from L1 to L5.

For this intended use, moderate degenerative lumbar spinal stenosis was defined as follows:

- 25% to 50% reduction in the central canal and/or nerve root canal (subarticular, neuroforaminal) compared to the adjacent levels on radiographic studies, with radiographic confirmation of any one of the following:
    - Evidence of thecal sac and/or cauda equina compression
    - Evidence of nerve root impingement (displacement or compression) by either osseous or non-osseous elements
    - Evidence of hypertrophic facets with canal encroachment
- AND associated with the following clinical signs:
    - Presents with moderately impaired Physical Function (PF) defined as a score of ≥ 2.0 of the Zurich Claudication Questionnaire (ZCQ)
    - Ability to sit for 50 minutes without pain and to walk 50 feet or more.

## III. CONTRAINDICATIONS

The Superion® ISS is contraindicated in patients with:

- an allergy to titanium or titanium alloy;
- spinal anatomy or disease that would prevent implantation of the device or cause the device to be unstable *in situ*, such as:
  - instability of the lumbar spine, e.g., isthmic spondylolisthesis or degenerative spondylolisthesis greater than grade 1 (on a scale of 1 to 4);
  - an ankylosed segment at the affected level(s);
  - fracture of the spinous process, pars interarticularis, or laminae (unilateral or bilateral);
  - scoliosis (Cobb angle >10 degrees);
- *Cauda equina* syndrome defined as neural compression causing neurogenic bladder or bowel dysfunction;
- diagnosis of severe osteoporosis, defined as bone mineral density (from DEXA scan or equivalent method) in the spine or hip that is more than 2.5 S.D. below the mean of adult normals;
- active systemic infection, or infection localized to the site of implantation;
- prior fusion or decompression procedure at the index level;
- morbid obesity defined as a body mass index (BMI) greater than 40.

## IV. WARNINGS AND PRECAUTIONS

The warnings and precautions can be found in the Superion® ISS labeling.

## V. DEVICE DESCRIPTION

The Superion® ISS is a one-piece implant that requires no assembly *in situ*. It consists of an implant body, within which resides the actuation mechanism, and two Cam Lobes, or “wings” which – when deployed – rotate away from the axis of the implant body to encompass the lateral aspects of the superior and inferior spinous processes (see Figure 1).



**Figure 1: Superion® device in spine model**

The Superion® ISS is composed entirely of titanium alloy (Ti6Al-4V ELI conforming to ASTM F136) The Superion® ISS is intended to be implanted via minimally-invasive surgical methods using a set of proprietary accessory instruments provided by VertiFlex® expressly for use with the Superion® ISS device. Together, the implants and manual instruments form a complete system for implantation of the Superion® ISS.

To accommodate variations in patient anatomy, Superion® ISS implants are available in five (5) sizes, ranging from 8mm to 16mm in 2mm increments, each of which is color-coded and laser-etched to indicate implant size. The size selection determines the amount of "spacing" between the two adjacent spinous processes. Implant size is determined by the distance between the bottom of the "saddle" of each of the Cam Lobes, which represents the point at which the adjacent spinous processes would rest within a deployed implant.

## VI.  ALTERNATIVE PRACTICES AND PROCEDURES

Non-surgical alternatives include non-steroidal anti-inflammatory drugs (NSAIDs), analgesics, oral and epidural steroids, rest, exercise, physical therapy, and bracing. Surgical alternatives to the Superion® ISS vary, depending upon the severity of the stenosis, the contribution of back pain, and the presence of instability, among other factors, and can include various direct decompressive procedures (e.g. laminectomy, laminotomy, hemilaminotomy, foraminotomy, etc.), other FDA-approved interspinous distraction devices, direct decompression with non-fusion posterior stabilization devices, and decompression with posterolateral fusion with pedicle screw instrumentation. Each alternative has its own advantages and disadvantages. A patient should discuss these alternatives with his or her physician to select the option that best meets their clinical condition, lifestyle and expectations.

## VII.  MARKETING HISTORY

The Superion® ISS has been marketed outside of the United States since 2007, and has not been withdrawn from marketing for any reason. The Superion® ISS is marketed in: Germany, Israel, Italy, Mexico, Netherlands, South Africa, Spain and the United Kingdom.

## VIII.  POTENTIAL ADVERSE EFFECTS OF THE DEVICE ON HEALTH

Below is a list of potential adverse effects (e.g., complications) associated with use of the Superion® ISS. This listing was derived from results of the Superion® ISS clinical trial conducted under Investigational Device Exemption (IDE) #G070118, approved device labeling for other interspinous devices, and published clinical literature. It includes (1) those adverse effects potentially associated with any surgical procedure; (2) those potentially associated with lumbar spine surgery; (3) those potentially associated with lumbar spinal implants, and in particular with interspinous process implants; and (4) those potentially associated with the Superion® ISS in particular. In some instances, additional surgery may be required to correct adverse effects.

1.  Risks associated with any surgical procedure include: anesthetic medication reactions; blood loss, blood vessel damage, phlebitis or hematoma; blood transfusion which may cause circulatory collapse, blood incompatibility, kidney damage, hepatitis or infection with HIV; myocardial infarction or circulatory problems; deep vein thrombosis, pulmonary embolism or thrombus formation in other vessels; stroke; fever or infection; pneumonia; injury to muscle, soft tissue or nerves; wound swelling, drainage or delayed healing; discomfort and rehabilitation associated with recovery from surgery; inability to perform certain tasks, such as lifting or exercise; and death.

2.  Risks associated with lumbar spine surgery include: damage to nerve roots or the spinal cord causing partial or complete sensory or motor loss (paralysis); loss of bladder and/or bowel functions; dural leaks (tears in the tissue surrounding and protecting the spinal cord); instruments used during surgery may break or malfunction which may cause damage to the operative site or adjacent structures; fracture, damage or remodeling of adjacent anatomy, including bony structures or soft tissues during or after surgery; new or worsened back or leg pain; and surgery at the incorrect location or level.

3.  Risks associated with lumbar spine implants and associated instruments include: sensitivity or allergy to the implant material; failure of the device/procedure to improve symptoms and/or function; pain and discomfort associated with the operative site or presence of implants; implant malposition or incorrect orientation; spinous process fracture; production of wear debris which may damage surrounding soft tissues including muscle or nerve; formation of scar tissue at implant site; migration or dislodgement of the implant from the original position so that it becomes ineffective or causes damage to adjacent bone or soft tissues including nerves; loosening, fatigue, deformation, breakage or disassembly of the implant, which may require another operation to remove the implant and may require another method treatment.

4. Risks specifically associated with the Superion® ISS include deformation, breakage or disassembly of the implant, and spinous process fracture.

For the specific adverse events that occurred in the clinical study of the Superion® ISS, please see Section X below.

## IX. SUMMARY OF PRECLINICAL STUDIES

A variety of non-clinical tests were conducted to characterize the performance of the Superion® ISS. These tests as are listed below and summarized in Table 1 and Table 2:

**A. Laboratory Studies**
- Static Axial Compression
- Static Torsion
- Dynamic Axial Compression
- Dynamic Torsion
- Implant Deployment Under Load
- Static Torsion After Repeated Deployment Under Load
- Quantification and Characterization of Wear Debris
- Kinematic and Kinetic Behavior in Human Cadaver Spines
- Role of Supraspinous Ligament in Biomechanical Stability
- Effects of Implant on Canal and Foraminal Dimensions

**B. Additional Studies**
- Sterilization, Shelf-Life and Packaging
- Biocompatibility
- MRI Compatibility

**A. Laboratory Studies**

**Table 1: Laboratory Studies on Superion® ISS**

| Test | Purpose | Method | Acceptance Criteria | Results |
|---|---|---|---|---|
| Static Axial Compression | To evaluate the performance of the Superion® ISS under static axial compressive loading, under worst-case conditions. | Six (6) samples of the largest (16mm) and smallest (8mm) implant were tested in accordance with methods specified by ASTM F1717 | Maximum compressive strength must exceed maximum expected *in vivo* spinous process failure load (320N).[1] | Mean yield load was >8,900 N (8mm) and >8,100 N (16mm). These results suggest that the device can resist compressive loads that exceed the anticipated physiologic failure load (320N) in the lumbar spine. |

**Table 1: Laboratory Studies on Superion® ISS**

| Test | Purpose | Method | Acceptance Criteria | Results |
|---|---|---|---|---|
| Static Torsion Testing | To evaluate the performance of the Superion® ISS under static torsional loading, under worst-case conditions. | Six (6) samples of the largest (16mm) and smallest (8mm) implant were tested in accordance with methods specified by ASTM F1717 | Maximum torsional strength must exceed maximum expected *in vivo* spinous process failure load (320N).[1] | Mean yield torque was >30.6 N-m (8mm) and >15 N-m (16mm). These results suggest that the device can resist torsional loads that exceed the anticipated physiologic failure load (320N) in the lumbar spine. |
| Dynamic Axial Compression | To evaluate the performance of the Superion® ISS under dynamic axial compressive loading, under worst-case conditions. | Six (6) samples of the largest (16mm) and smallest (8mm) implant were tested in accordance with methods specified by ASTM F1717 | Maximum dynamic runout load to 10 million cycles must exceed maximum expected *in vivo* spinous process failure load (320N).[1] | Dynamic runout load to 10 million cycles for both 8mm and 16mm implant sizes was 1,750 N. These results suggest that the device can resist dynamic compressive loads that exceed the anticipated physiologic failure load (320N) in the lumbar spine. |
| Dynamic Torsion | To evaluate the performance of the Superion® ISS under dynamic torsional loading, under worst-case conditions. | Six (6) samples of the largest (16mm) and smallest (8mm) implant were tested in accordance with methods specified by ASTM F1717 | Maximum dynamic runout torsion to 10 million cycles must exceed maximum expected *in vivo* spinous process failure load (320N).[1] | Dynamic runout load to 10 million cycles was ±2.5 N-m (8mm) and ±3 N-m (16mm). These results suggest that the device can resist dynamic torsional loads that exceed the anticipated physiologic failure load (320N) in the lumbar spine. |
| Implant Deployment Under Load | To evaluate the ability of the Superion® ISS to be deployed under axial load | Five (5) implants were deployed under constant resisting axial loads of 250, 300, and 350 N. | Implants must deploy without damage or functional failure under axial load exceeding failure strength of the spinous processes (320N).[1] | All implants deployed without failure under axial loads of 250, 300, and 350 N. These results suggest that the device can adequately deploy in the presence of loads that exceed the strength of the spinous processes and anticipated physiologic loads in the lumbar spine. |

**Table 1: Laboratory Studies on Superion® ISS**

| Test | Purpose | Method | Acceptance Criteria | Results |
|---|---|---|---|---|
| Static Torsion Testing After Repeated Deployment Under Load | To evaluate the torsional strength of the Superion® ISS after repeated deployment under resisting axial load. | Five (5) 16mm implants were deployed five (5) times each under constant resisting axial load of 300 N, and tested in accordance with methods specified by ASTM F1717 | Maximum torsional strength must not be adversely affected by loaded deployment. Test is for characterization only; no acceptance criteria were identified. | Mean yield torque was 18 N-m. These results suggest that the device is not adversely affected after repeated deployment. |
| Quantification and Characterization of Wear Debris | To quantify and characterize any wear debris generated from the Superion® ISS during dynamic axial compression testing. | Wear debris generated from 10 million cycle runout samples of size 8mm and size 16mm implants was quantified and characterized in accordance with ASTM F1714. | Types and total volumetric amounts of wear debris must be of a type and amount similar to other legally marketed spinal devices (10 – 12mg). | Total titanium debris amounted to 0.022 mg (8mm) and 0.017 mg (16mm), well below 10-12mg deemed acceptable in scientific literature, and also lower than wear debris volumes seen in previously cleared/approved spinal devices. |
| Kinematic and Kinetic Behavior in Human Cadaver Spines | Kinematic and kinetic behavior of the Superion® ISS, including range of motion and intradiscal pressures, were characterized in human lumbar spine specimens. | Six (6) lumbar spine specimens (L1 to S1) were tested. The S1 segment was fixed, and a follower load was used to apply compressive preloads up to 400N at the L1 segment. Spine specimens were preconditioned by cycling in each plane (flexion, extension, lateral bending, and rotation) to a maximum bending moment of 7.5N. Implants (undersized, nominal, and oversized) were placed at 1 and 2 levels. Motion of the L1, L2, L3, L4, and L5 vertebrae were then measured, relative to the sacrum, using an optoelectronic motion measurement system, and intradiscal pressures were measured by transducers placed at the implanted and adjacent levels. | Demonstration of normal flexion, rotational, and lateral bending ranges of motion, and restriction of extension. This test was used to generate benchmark physiologic data and there was no acceptance criteria identified. | Angular displacement was reduced in extension in all configurations, with little or no impact upon rotation or lateral bending. These results suggest that the device has no detrimental impact to the kinematics of the functional spinal unit(s). |

**Table 1: Laboratory Studies on Superion® ISS**

| Test | Purpose | Method | Acceptance Criteria | Results |
|---|---|---|---|---|
| Role of Supraspinous Ligament in Biomechanical Stability | To determine if unintended disruption of the supraspinous ligament (SSL) impacts segmental stability after placement of the Superion® ISS. | Three (3) lumbar spine specimens (L1 to S1) were dissected into three (3) L2-L3 motion segments and three (3) L4-L5 segments. The caudal vertebral body of each was fixed in a kinematic profile apparatus, and the cephalad body was left free to move. A 400N preload was applied, and segments were tested intact, with the SSL dilated and a spacer placed, with the SSL 50% transected and a spacer placed, with the SSL 100% transected with a spacer placed, and with the SSL 100% transected but with no spacer placed. Segments were tested to a maximum bending moment of 10N-m in flexion, extension, rotation, and lateral bending.<br><br>In each test case, motion of the segment was measured, relative to the fixed body, using an optoelectronic motion measurement system. | The Superion® implant must provide segmental stability to a segment having a disrupted SSL equal to or greater than that of an intact segment. This test was used to generate benchmark bending moment data and there was no acceptance criteria identified. | Bending moments of all implanted specimens were 100% to 135% greater in extension than for an intact specimen, and 60% to 75% greater in flexion. There was no difference in bending moments between the 50% or 100% transected SSL segments, and the intact SSL segments. |
| Effects of Implant on Canal and Foraminal Dimensions | To quantify the effects of spacer implantation upon canal and foraminal dimensions. | Seven (7) human cadaveric lumbar spine segments were dissected into individual motion segments, seven (7) each of L2-L3 and L4-L5 segments. Each was placed in a frame, with the caudal end fixed, and the cephalad end free to move, to a maximum of 10° flexion and 5° extension. Using CT imaging, key dimensions were measured in neutral, flexion and extension, including canal area, subarticular diameter, ligamentum flavum thickness, and foraminal height, width, and area.<br><br>Measurements were acquired on the intact specimens, on the same specimens after implantation of a spacer, and on the implanted specimens after 60,000 cycles of coupled 15° flexion-extension under 400N axial preload. | To establish that placement of a Superion® spacer increases canal and foraminal dimensions in extension, and reduces ligamentum flavum thickness. This test was used to generate benchmark characterization data and there was no acceptance criteria identified. | These results confirmed that central canal area and foraminal dimensions increased in extension, with little change in neutral or flexion. Ligamentum flavum thickness decreased in extension, neutral and flexion. |

[1]White A., Panjabi, M., *Clinical Biomechanics of the Spine*, J.B. Lippincott, Philadelphia. 2nd Edition.

## B. Additional Studies

**Table 2: Additional Studies on Superion® ISS**

| Test | Method and Results |
|---|---|
| Sterilization, Shelf-Life and Packaging | The Superion® ISS is provided in a sterile package ready for use. The Superion® ISS is sterilized using a gamma irradiation dose of 25 kGy to substantiate a sterility assurance level (SAL) of $10^{-6}$. Sterilization validation according to ISO 11137, Sterilization of Health Care Products, Parts 1 and 2 was conducted to confirm that the sterility of the implant is achieved, and is maintained by a sterile barrier package. Sterilization validation according to ISO 11137, Sterilization of Health Care Products, Part 1 was conducted to confirm that the recommended sterilization cycle provides sterility of the manual instruments. Shelf life and packaging validation studies, including packaging seal and integrity, accelerated aging, and real-time aging testing, were conducted to demonstrate that the device packaging can maintain a sterile barrier, with a shelf life of 5 years. |
| Biocompatibility | The Superion® ISS is manufactured from titanium alloy (Ti-6Al-4V ELI) conforming to ASTM F136. This material has a long history of use in medical implants with no significant biocompatibility issues, as shown in the literature. |
| MRI Compatibility | Non-clinical testing has demonstrated that the Superion® ISS is MR Conditional. The preclinical tests included assessments of magnetic field interaction (translational attraction, migration, and torque), radiofrequency heating, and artifact measurements. All tests conducted were for characterization and labeling purposes and acceptance criteria were not established. The Superion® ISS can be scanned safely at 1.5T or 3.0T under conditions which are identified in the device labeling. |

# X. SUMMARY OF CLINICAL STUDY

The applicant performed a clinical study to determine a reasonable assurance of safety and effectiveness of the Superion® ISS for the treatment of moderate degenerative lumbar spinal stenosis in the US under IDE #G070118. Data from this clinical study were the basis of the PMA approval decision. A summary of the clinical study is presented below.

## A. Study Design

Patients were treated between June 2008 and December 2011. The database for this PMA reflected data collected through July 7, 2014 and included 470 patients. There were 31 investigational sites.

The study was a prospective, multi-center, single-blinded, randomized controlled clinical trial comparing the Superion® ISS to a control group consisting of the X-STOP® IPD®, a legally marketed alternative with similar indications for use. The study evaluated use of the Superion® ISS in the treatment of subjects aged 45 or older suffering from moderate symptoms of neurogenic intermittent claudication, secondary to a confirmed diagnosis of moderate degenerative lumbar spinal stenosis (LSS) at one or two contiguous levels from L1 to L5, i.e., from the L1-L2 level to the L4-L5 level. A maximum of 35 investigative sites in the U.S. and up to 10 sites outside the U.S. were approved to enroll subjects into the trial using a 1:1 randomization assignment and an adaptively selected sample size ranging from 250 to 350 subjects (125-175 enrolled into each group) using a Bayesian adaptive

design. Up to an additional 50 subjects (25 per group) could be enrolled to allow for loss to follow-up. In addition, prior to initiating the randomized trial, clinical sites were permitted to enroll up to 2 non-randomized subjects to receive the Superion® ISS. A maximum of 70 such additional Superion® ISS "training" cases were built into the protocol. Thus, a maximum of 470 subjects were approved to be enrolled into the study. If the study requirements outlined in the Statistical Analysis Plan were met prior to enrolling 470 subjects, the study enrollment could be stopped and the PMA application could subsequently be submitted early. An investigative site was defined as a facility or facilities in the same general geographic location if they are under the control of a local Institutional Review Board (IRB).

All adverse events (device-related or not) were monitored over the course of the study and radiographic assessments were reviewed by an independent core laboratory. Overall success was determined by data collected during the initial 24 months of follow-up. All device-related adverse events, major procedure-related, and adjacent-level-related adverse events and therapeutic failures reported by the clinical investigators were independently adjudicated (for adverse event code, severity and relationship to the device and/or procedure) by a Clinical Events Committee (CEC) composed of three independent spine surgeons. In addition, adverse events reported as having unknown or undetermined relationships to the device by the clinical investigators were to be adjudicated by the CEC.

After implantation of the Superion® ISS or the X-STOP® IPD® device, each investigator provided a postoperative care regimen individualized to the specific needs of each subject. The regimen included but was not limited to: medications, a corset or brace, acupuncture, traction, physical therapy, chiropractic treatment, use of a TENS unit, and massage therapy.

Subjects were required to complete a VAS questionnaire to evaluate pain status at discharge following the index procedure. At each follow-up visit, subjects were interviewed to determine if they had experienced adverse events (AEs) since the previous follow-up visit. A neurological assessment was performed for all subjects at baseline and at all follow-up visits. All subjects were required to complete the Zurich Claudication Questionnaire (ZCQ), Oswestry Disability Index (ODI), Visual Analog Scale (VAS), SF-12 and the VertiFlex Superion® Patient Satisfaction questionnaires to evaluate disability, function, pain, quality of life, and satisfaction at each follow-up visit.

This clinical study was designed as a Bayesian adaptive trial with a minimum of 250 evaluable subjects and a maximum of 350 evaluable subjects, with an additional adjustment for loss-to-follow-up of 15%. The final sample size in the randomized mITT population consisted of 190 Superion® ISS and 201 X-STOP® IPD® control subjects (391 total subjects). The primary hypothesis of this randomized controlled trial was that the clinical performance of the Superion® ISS is non-inferior to the clinical performance achieved with the active control. The study endpoint was the rate of overall subject success at 24 months. A subject was considered a success if they were a success on each of the four individual primary outcome criteria. The hypotheses tested for this primary study endpoint are as follows: $H_0$: Superion® ISS overall success rate is inferior (Superion® ISS rate – Control rate < -Δ); $H_A$: Superion® ISS overall success rate is non-inferior (Superion® ISS rate – Control rate ≥ -Δ).

A Bayesian approach was used to test for non-inferiority. If the posterior probability of the alternative hypothesis was at least 95.8%, using non-informative uniform (Beta[1,1]) priors for each success rate then the claim of non-inferiority would be made. The choice of non-inferiority margin, Δ (i.e., delta)

was 10% for the overall subject success rate. The value of 0.958 was selected to control the type I error of this design (type 1 error less than 0.05).

An adaptive sample size approach was used to allow for modifications based on interim results, with a maximum of 350 evaluable subjects and a minimum of 250 subjects. The operating characteristics of the adaptive design demonstrate 86.3% power when the Superion® ISS group was superior to the X-STOP® IPD® control group by 5% and 73.6% power when the advantage is 2.5%. In these calculations, the X-STOP® IPD® was assumed to have a 65% success rate.

1. Clinical Inclusion and Exclusion Criteria

Enrollment in the Superion® ISS study was limited to subjects who met the following inclusion criteria:

1. Male or female subjects ≥ 45 years of age.
2. Persistent leg/buttock/groin pain, with or without back pain, that is relieved by flexion activities (example: sitting or bending over a shopping cart)
3. Subjects who have been symptomatic and undergoing conservative care treatment for at least 6 months.
4. Diagnosis of degenerative spinal stenosis of the lumbar spine, defined as the narrowing of the midline sagittal spinal canal (central) and/or narrowing between the facet superior articulating process (SAP), the posterior vertebral margin (lateral recess), and the nerve root canal (foraminal).
5. Radiographic confirmation of at least moderate spinal stenosis which narrows the central, lateral, or foraminal spinal canal at one or two contiguous levels from L1-L5. Moderate spinal stenosis is defined as 25% to 50% reduction in lateral/central foramen compared to the adjacent levels, with radiographic confirmation of any one of the following:
    a. Evidence of thecal sac and/or cauda equina compression
    b. Evidence of nerve root impingement (displacement or compression) by either osseous or non-osseous elements
    c. Evidence of hypertrophic facets with canal encroachment

Note: All imaging studies used to confirm LSS were completed within 3 months prior to enrollment. Radiographic (imaging) confirmation of LSS included MRI and/or CT. In the case of a transitional L5/L6 segment with a sufficiently prominent L6 spinous process, these subjects were included by a deviation request from the applicant.

6. Must present with moderately impaired Physical Function (PF) defined as a score of ≥ 2.0 of the Zurich Claudication Questionnaire (ZCQ)
7. Must be able to sit for 50 minutes without pain and to walk 50 feet or more
8. Subjects who are able to give voluntary, written informed consent to participate in this clinical investigation and from whom consent has been obtained
9. Subjects, who, in the opinion of the Clinical Investigator, are able to understand this clinical investigation, cooperate with the investigational procedures and are willing to return for all the required post-treatment follow-ups.

Subjects were not permitted to enroll in the Superion® ISS study if they met any of the following exclusion criteria:

1. Axial back pain only
2. Fixed motor deficit
3. Diagnosis of lumbar spinal stenosis which requires any direct neural decompression or surgical intervention other than those required to implant the control or investigational device
4. Unremitting pain in any spinal position
5. Significant peripheral neuropathy or acute denervation secondary to radiculopathy
6. Lumbar spinal stenosis at more than two levels determined pre-operatively to require surgical intervention
7. Significant instability of the lumbar spine as defined by ≥ 3mm translation or ≥ 5° angulation
8. Sustained pathologic fractures of the vertebrae or multiple fractures of the vertebrae and/or hips
9. Spondylolisthesis or degenerative spondylolisthesis greater than grade 1 (on a scale of 1-4)
10. Spondylolysis (pars fracture)
11. Degenerative lumbar scoliosis with a Cobb angle of > 10° at treatment level
12. Osteopenia or osteoporosis. To confirm eligibility, at the Clinical Investigator's discretion, the following subjects may have a DEXA scan performed:
    - Women 65 or older
    - Postmenopausal women < age 65
    - Subjects with major risk factors for or diagnosed with osteoporosis or osteopenia
        i. If DEXA is required, exclusion is defined as a DEXA bone density measurement T score ≤ -2.5
13. Morbid obesity, defined as Body Mass Index (BMI) greater than $40kg/m^2$
14. Insulin-dependent diabetes mellitus
15. Significant peripheral vascular disease (diminished dorsalis pedis or tibial pulses)
16. Prior surgery of the lumbar spine
17. Cauda equina syndrome (defined as neural compression causing neurogenic bowel or bladder dysfunction)
18. Infection in the disc or spine, past or present
19. Evidence of active (systemic or local) infection at time of surgery
20. Active systemic disease such as AIDS, HIV, hepatitis, etc.
21. Paget's disease at involved segment or metastasis to the vertebra, osteomalacia, or other metabolic bone disease
22. Currently undergoing immunosuppressive therapy or long-term steroid use
23. Known allergy to titanium or titanium alloys
24. Tumor in the spine or a malignant tumor except for basal cell carcinoma
25. Known or suspected history of alcohol and/or drug abuse
26. Prisoner or transient
27. Life expectancy less than two years
28. Angina, active rheumatoid arthritis, or any other systemic disease that would affect the subject's welfare or outcome of the clinical investigation
29. Any significant mental illness (e.g., major depression, schizophrenia, bipolar disorder, etc.) that could impair the consent process or ability to complete subject self-report questionnaires
30. Involved in pending litigation of the spine or worker's compensation related to the back

31. Enrolled in the treatment phase of another drug or device clinical investigation (currently or within past 30 days)
32. Congenital defect of the spine
33. Pregnant or lactating

2. Follow-Up Schedule

All subjects were scheduled to return for follow-up examinations at 6 weeks (± 2 weeks), 3 months (± 2 weeks), 6 months (± 1 month), 12 months (± 2 months), 18 months (± 2 months), 24 months (± 2 months) post-treatment and annually thereafter to collect data for the primary evaluation of safety and effectiveness.

The evaluations performed in relation to the index procedure pre-operatively, as well as the assessments performed which were used to assess the endpoints post-operatively, are shown in Table 3. Adverse events were recorded at all visits.

**Table 3: Follow-Up Visit Schedule**

| | **Screening-Baseline** | **Surgical Treatment** | **Discharge (±0-7 days)** | **6-week (±2 weeks)** | **3-month (±2 weeks)** | **6-month (±1 month)** | **12-month (±2 months)** | **18-month (±2 months)** | **24-month[c] (±2 months)** |
|---|---|---|---|---|---|---|---|---|---|
| **Study Visit Window** | | Day 0 | 0-7 days | 4-8 weeks | 10-14 weeks | 5-7 months | 10-14 months | 16-20 months | 22-26 months |
| Signed Informed Consent | X | | | | | | | | |
| Demographic Information | X | | | | | | | | |
| Complete History & Physical | X | | | | | | | | |
| Randomization | X | | | | | | | | |
| Standing AP & Lateral Lumbar Spine X-rays | X[a] | | X | X | X | X | X | X | X |
| Flexion / Extension Lateral Lumbar Spine X-rays | X[a] | | | X | X | X | X | X | X |
| Lumbar Spine MRI/CT Scan | X[a] | | | | | | | | |
| DEXA Scan[b] | As needed | | | | | | | | |
| SF-12 –Health Survey (v2) | X | | | X | X | X | X | X | X |
| Zurich Claudication Questionnaire (ZCQ) | X | | | X | X | X | X | X | X |
| Oswestry Disability Index (v2) | X | | | X | X | X | X | X | X |
| Neurological Status | X | | X | X | X | X | X | X | X |
| Visual Analogue Scale | X | | X | X | X | X | X | X | X |
| VertiFlex® Patient Satisfaction Questionnaire | | | | X | X | X | X | X | X |
| Assess Adverse Events | | X | X | X | X | X | X | X | X |

[a]Lumbar spine x-rays and MRI/CT taken within 3 months of enrollment can be used to confirm eligibility.

[b]In order to confirm eligibility, at the Investigator's discretion, subjects previously diagnosed with osteoporosis, osteopenia, osteomalacia, female subjects over the age of 65, and post-menopausal female subjects under the age of 65 with any of the risk factors for osteoporosis, will have DEXA scans performed prior to study entry.

[c]Subjects may be required to return for additional follow-up visits annually (±2 months) for up to ten (10) years, or until Applicant notifies Investigator of study conclusion at an earlier time.

3. Clinical Endpoints

The effectiveness of the Superion® ISS was assessed using a composite definition of study success as compared to the X-STOP® IPD® control group.

The safety of the Superion® ISS was assessed by comparison to the X-STOP® IPD® control group with respect to the nature and frequency of adverse events (overall and in terms of seriousness and relationship to the implant), secondary surgical procedures as well as maintenance or improvement in neurological status.

The primary endpoint of the investigation was individual patient success, which required the patient to meet all of the following criteria at 24 months:

- Clinically significant improvement in outcomes compared to baseline, as determined by meeting the criterion for at least two of three domains of ZCQ
  - $\geq$ 0.5 point improvement in physical function
  - $\geq$ 0.5 point improvement in symptom severity
  - score of $\leq$ 2.5 points on patient satisfaction domain
- No reoperations, removals, revisions, or supplemental fixation at the index level(s)
- No major implant or procedure-related complications
  - no dislodgement, migration, or deformation
  - no new or persistent worsened neurological deficit at the index level
  - no spinous process fractures
  - no deep infection, death, or other permanent device attributed disability
- No clinically significant confounding treatments:
  - no epidural injections, nerve block procedures at index level, spinal cord stimulators or rhizotomies

B. Accountability of PMA Cohort

At the time of database lock (July 7, 2014), of 391 per protocol patients (190 Superion® ISS and 201 X-STOP® IPD®) enrolled in the PMA study. Overall, 94.6% (183 Superion® ISS and 187 X-STOP® IPD®) of patients enrolled in the study were available for analysis at the study completion (24-month post-operative visit). The Superion® ISS cohort had a follow-up rate of 97.3% and the X-STOP® IPD® cohort had a follow-up rate of 94.9% through 24 months.

The primary analysis cohort for this study was the Modified Intent-to-Treat Cohort, defined as:

*Modified Intent-to-treat patient population (mITT)*: The mITT patient population will include all patients randomized and having an anesthesia start time, where patients will be classified by the group in which they are randomized. Subjects with an anesthesia start time, but that do not receive a device, or receive the wrong device, will be failures.

Confirmatory analysis was performed in the Per Protocol Cohort, defined as:

*Per protocol (PP) Population*: The PP patient population will include all subjects with 24-month follow-up data and no major protocol deviations and subjects that failed before 24 months.

Patient accounting and follow-up (Table 4), a patient accounting tree (Figure 2), and a summary of patient and data accounting at 24 months (Table 5) are provided below.

**Table 4: Patient Accounting and Follow-up Compliance Table for Superion® ISS and X-STOP® IPD® mITT Analysis Sets**

| Date of data transfer 07/07/2014 | Pre-op | | Week 6 | | Month 3 | | Month 6 | | Month 12 | | Month 18 | | Month 24 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | I[1] | C[2] | I | C | I | C | I | C | I | C | I | C | I | C |
| (1)  Theoretical follow-up | 190 | 201 | 190 | 201 | 190 | 201 | 190 | 201 | 190 | 201 | 190 | 201 | 190 | 201 |
| (2)  Cumulative deaths | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 2 | 2 | 2 | 3 | 2 | 5 |
| (3)  Cumulative Revisions, Reoperations, and Injections | 0 | 0 | 3 | 3 | 8 | 11 | 20 | 19 | 40 | 32 | 46 | 48 | 51 | 53 |
| (4)  Not Yet Overdue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (5)  Deaths + term failures among theoretical due | 0 | 0 | 3 | 3 | 9 | 11 | 21 | 19 | 42 | 34 | 48 | 51 | 53 | 57 |
| (6)  Expected due for clinical visit | 190 | 201 | 187 | 198 | 181 | 190 | 169 | 182 | 148 | 167 | 142 | 150 | 137 | 144 |
| (7)  Failures among theoretical due | 0 | 0 | 3 | 3 | 8 | 11 | 20 | 19 | 40 | 32 | 46 | 48 | 51 | 53 |
| (8)  Expected due + failures among theoretical due | 190 | 201 | 190 | 201 | 189 | 201 | 189 | 201 | 188 | 199 | 188 | 198 | 188 | 197 |
| **All Evaluated Accounting (Actual) Among Expected Due Procedures** | | | | | | | | | | | | | | |
| (9)  # of procedures with any clinical data in interval | 190 | 201 | 182 | 193 | 171 | 182 | 164 | 177 | 145 | 162 | 132 | 137 | 131 | 133 |
| (10) All Evaluated Visit Compliance (%) | 100% | 100% | 97.3% | 97.0% | 94.5% | 95.8% | 97.0% | 97.3% | 98.0% | 97.0% | 93.0% | 91.3% | 95.6% | 92.4% |
| (11) XCQ Responder status determined | 190 | 201 | 181 | 183 | 171 | 182 | 164 | 177 | 145 | 162 | 132 | 137 | 131 | 133 |
| (12) Radiographic evaluation | 184 | 194 | 175 | 178 | 165 | 187 | 170 | 182 | 162 | 175 | 147 | 161 | 145 | 150 |
| (13) Composite clinical success | 190 | 201 | 184 | 196 | 179 | 193 | 184 | 197 | 185 | 195 | 179 | 187 | 183 | 187 |
| (14) Actual % Follow-up for CCS | 100% | 100% | 96.8% | 97.5% | 94.5% | 95.8% | 97.0% | 97.3% | 98.0% | 97.0% | 93.0% | 91.3% | 97.3% | 94.9% |
| **Within Window Accounting (Actual) Among Expected Due** | | | | | | | | | | | | | | |
| | I | C | I | C | I | C | I | C | I | C | I | C | I | C |
| (15) ZCQ Responder status determined | 190 | 201 | 168 | 179 | 169 | 180 | 152 | 167 | 111 | 122 | 129 | 131 | 115 | 113 |
| (16) Radiographic evaluation | 184 | 194 | 162 | 162 | 162 | 186 | 154 | 169 | 123 | 131 | 138 | 152 | 127 | 128 |
| (17) Composite clinical success | 190 | 201 | 171 | 182 | 177 | 191 | 172 | 186 | 151 | 154 | 175 | 179 | 166 | 166 |
| (18) Actual % Follow-up for CCS | 100% | 100% | 89.8% | 90.4% | 93.4% | 94.7% | 89.9% | 91.8% | 75.0% | 73.1% | 90.8% | 87.3% | 88.3% | 84.3% |

I[1] = Superion® ISS, C[2] = X-STOP® IPD®

The patient accounting tree for the Superion® ISS IDE is depicted below in Figure 2.

*There were no subjects with misallocations of randomization, meaning all subjects received the device to which they were randomized. As such, the mITT cohort is identical to the "As-Treated" patient cohort.

**Figure 2: Patient Accounting Tree**

Of the 51 post-consent screen failures, there were 2 subjects in the training group and 49 that were randomized for the pivotal cohort that did not proceed to treatment. The 49 post-consent screen failures included 28 in the Superion® ISS arm and 21 in the X-STOP® IPD® arm. The subjects that were post-consent screen failures were blinded to treatment group to mitigate bias.

Subjects were expected due at 24 months if they had not terminally failed due to death or clinical failure defined as reoperation, revision or additional treatment. Data were missing for 7 Superion® ISS and 14 X-STOP® IPD® subjects at 24 months.

**Table 5: 24 Month Data Accounting for Superion® ISS IDE**

| Parameter | Superion® ISS | X-STOP® IPD® |
|---|---|---|
| Randomized or Assigned to Training | 248 | 222 |
| Withdrawn Prior to Treatment | 30 | 21 |
| Training Patients | 28 | 0 |
| Subjects Treated (mITT) | 190 | 201 |
| Composite Clinical Success Responders | 183 | 187 |
| Deaths + Clinical Failures Among Implanted[1] | 53 | 57 |
| Expected (mITT) | 137 | 144 |
| ZCQ | 131 | 133 |
| VAS Leg and Back Pain | 131 | 133 |
| ODI | 131 | 133 |
| SF-12 | 128 | 133 |
| Neurological Evaluation | 150 | 157 |
| Radiographic Evaluation | 145 | 150 |
| Patient Satisfaction Evaluation | 152 | 157 |

[1]Patients with reoperations, revisions, and epidural steroid injection

C. Study Population Demographics and Baseline Parameters

The demographics of the study population are typical for a lumbar interspinous spacer study performed in the US. Baseline demographic information and operative variables are presented in Table 6, Table 7, and Table 8.

**Table 2: Summary of Baseline and Demographic Categorical Variables Superion® ISS and X-STOP® IPD® Control mITT Analysis Sets**

| | Superion® ISS | | X-STOP® IPD® | |
|---|---|---|---|---|
| | N | % | N | % |
| **Number of subjects** | 190 | - | 201 | - |
| **Males** | 110 | 57.9 | 129 | 64.2 |
| **Females** | 80 | 42.1 | 72 | 35.8 |
| **Race** | N | % | N | % |
| White | 177 | 93.2 | 196 | 97.5 |
| Asian | 0 | 0.0 | 1 | 0.5 |
| African American | 8 | 4.2 | 1 | 0.5 |
| American Indian or Alaska Native | 0 | 0.0 | 0 | 0.0 |
| Native Hawaiian or Other Pacific Islander | 0 | 0.0 | 1 | 0.5 |
| Other | 5 | 2.6 | 2 | 1.0 |
| **Ethnicity** | N | % | N | % |
| Hispanic or Latino | 5 | 2.6 | 11 | 5.5 |
| Not Hispanic or Latino | 185 | 97.4 | 190 | 94.5 |
| **Use of nicotine products** | N | % | N | % |
| No | 89 | 46.8 | 101 | 50.2 |
| Current Use | 24 | 12.6 | 24 | 11.9 |
| Previous Use | 77 | 40.5 | 76 | 37.8 |

Statistical analysis of baseline demographics did not show any significant differences between subjects randomized into the Superion® ISS group compared to those randomized into the X-STOP® IPD® control group.

**Table 3: Summary of Baseline and Demographic Continuous Variables Superion® ISS and X-STOP® IPD® mITT Analysis Set**

| | Superion® ISS | | | X-STOP® IPD® | | |
|---|---|---|---|---|---|---|
| **Demographics – All** | **N** | **Mean** | **SD** | **N** | **Mean** | **SD** |
| Age at surgery (yrs) | 190 | 66.9 | 9.4 | 201 | 66.2 | 10.2 |
| Height (inches) | 190 | 67.2 | 4.2 | 201 | 67.9 | 3.8 |
| Weight (lbs) | 190 | 189.7 | 36.5 | 201 | 195.8 | 36.9 |
| BMI ($k/m^2$) | 190 | 29.5 | 4.6 | 201 | 29.7 | 4.6 |
| **Demographics – Male** | **N** | **Mean** | **SD** | **N** | **Mean** | **SD** |
| Age at surgery (yrs) | 110 | 68.0 | 9.0 | 129 | 66.4 | 10.2 |
| Height (inches) | 110 | 69.9 | 2.6 | 129 | 70.0 | 2.8 |
| Weight (lbs) | 110 | 204.9 | 32.6 | 129 | 207.2 | 32.0 |
| BMI ($k/m^2$) | 110 | 29.5 | 4.3 | 129 | 29.7 | 4.0 |
| **Demographic – Female** | **N** | **Mean** | **SD** | **N** | **Mean** | **SD** |
| Age at surgery (yrs) | 80 | 65.3 | 9.7 | 72 | 65.8 | 10.3 |
| Height (inches) | 80 | 63.4 | 2.8 | 72 | 64.2 | 2.5 |
| Weight (lbs) | 80 | 168.8 | 31.0 | 72 | 175.4 | 36.3 |
| BMI ($k/m^2$) | 80 | 29.5 | 5.0 | 72 | 29.8 | 5.4 |
| **Baseline Functional Status** | **N** | **Mean** | **SD** | **N** | **Mean** | **SD** |
| Oswestry (ODI) | 190 | 39.1 | 13.4 | 201 | 39.9 | 11.6 |
| Zurich Claudication Qx Severity | 190 | 3.33 | 0.64 | 201 | 3.37 | 0.61 |
| Zurich Claudication Qx Physical | 190 | 2.63 | 0.43 | 201 | 2.72 | 0.43 |
| SF-12 PCS (Physical) | 189 | 29.4 | 8.1 | 201 | 28.5 | 6.9 |
| SF-12 MCS (Mental Health) | 189 | 50.0 | 12.7 | 201 | 48.9 | 12.2 |
| VAS Back pain | 190 | 55.4 | 27.9 | 201 | 55.1 | 27.4 |
| VAS Leg pain (right leg) | 190 | 55.0 | 31.3 | 201 | 52.9 | 32.5 |
| VAS Leg pain (left leg) | 190 | 49.6 | 31.8 | 201 | 50.8 | 31.7 |

Descriptive comparisons of device group mean differences at baseline, device group differences over time, and change from baseline over time were facilitated using Cohen's standardized effect size. While there were small statistical differences in Race and ZCQ – Physical Function baseline parameters, it was determined that these differences were not clinically important for the investigational and control groups.

**Table 4: Operative Variables and Types of Stenosis Superion® ISS and X-STOP® IPD® mITT Analysis Set**

| | Superion® ISS | | X-STOP® IPD® | |
|---|---|---|---|---|
| | **n** | **%** | **n** | **%** |
| **Number of Subjects Treated** | 189 | 99.5 | 199 | 99.0 |
| **Subjects Attempted / Not Implanted** | 1 | 8.4 | 2 | 3.7 |
| **Number of Levels Treated** | n | % | n | % |
| 1 | 99 | 52.4 | 99 | 49.7 |
| 2 | 90 | 47.6 | 100 | 50.3 |
| **Stenosis Type** | n | % | n | % |
| Central Only | 66 | 34.7 | 60 | 29.9 |
| Lateral Only | 16 | 8.4 | 15 | 7.5 |
| Central and Lateral Stenosis | 100 | 52.6 | 118 | 58.7 |
| Foraminal Stenosis | 8 | 4.2 | 8 | 4.0 |

Baseline differences in operative covariates such as treated levels or stenosis type did not have an overall impact on the clinical success of subjects receiving either Superion® ISS or X-STOP® IPD®.

D. Safety and Effectiveness Results

1. Safety Results

The analysis of safety was based on the mITT cohort of 391 subjects (190 Superion® ISS subjects and 201 X-STOP® IPD® subjects) available for the 24 month evaluation. When making an assessment of safety, an Adverse Event (AE) was considered as: any undesired clinical response or complication experienced by a subject. All operative and postoperative AEs, whether device-related or not, were recorded on the AE Case Report Forms. Safety outcomes were determined by evaluating the type, frequency, seriousness, and relationship to device of AEs through the 24-month time point for all subjects. AEs were categorized as device-related, procedure-related, adjacent-level-related, or systemic.

AE Device/Procedure-Relatedness

The clinical investigator, on the basis of his or her clinical judgment and the following definitions, determined the severity and relationship of the AE to the device and/or procedure:

- Not related: The AE is clearly not related
- Unknown/Undetermined: The AE is unknown or undetermined to be related
- Related: The AE is clearly related
- Device-related: The AE is related to the Study device or the control device
- Procedure-related: The AE is related to the procedure to implant the investigational or control device.

AE Severity

The severity of an AE was categorized as mild, moderate or severe. Severity was determined by the clinical investigator, using the following definitions:

- Mild: The AE is transient or causes mild discomfort. There usually is no intervention/therapy required and the AE does not interfere with the subject's normal activities.

- Moderate: The AE causes some limitation in activity and some assistance may be needed. There is no or minimal medical intervention/therapy required.
- Severe: The AE causes marked limitation in activity. The subject's usual daily activity is interrupted. The subject may require medical intervention/therapy, hospitalization is possible.

Serious AEs

The AE was regarded as a Serious Adverse Event (SAE) if the injury or illness:

- Results in death
- Is life-threatening,
- Results in or prolongs hospitalization
- Results in permanent impairment of a body function or permanent damage to a body structure, or
- Necessitates medical or surgical intervention to preclude permanent impairment of a body function or permanent damage to a body structure.

Serious Adverse Device Effect

A Serious Adverse Device Effect (SADE) is a device-related adverse event that has resulted in any of the consequences characteristic of a serious AE or that might have led to any of these consequences if suitable action had not been taken or intervention had not been made.

Unanticipated Adverse Device Effect

An Unanticipated Adverse Device Effect (UADE) is any serious adverse effect on health or safety, any life-threatening problem or death caused by, or associated with a device, if that effect, problem, or death was not previously identified in nature, severity, or degree of incidence in the risks identified for the investigational or control device; or any other unanticipated serious problem associated with a device that relates to the rights, safety, or welfare of subjects.

Role of the CEC

Adverse events were evaluated by the Medical Monitor. Data were evaluated for safety endpoints by an independent CEC. The CEC had predetermined stopping rules, one of which was greater than 10% postoperative observation of *in situ* study device unlocking with full or partial collapse of the cam lobes at annual review. The first stopping review occurred after a minimum of 30 subjects in the study group had been accrued. This observation was monitored annually throughout the study. Additionally, all device-related events, major procedure-related, and adjacent level-related events and therapeutic failures reported by the clinical investigators were adjudicated by the independent CEC. In addition, events reported as having unknown or undetermined relationships to the device by the clinical investigators were to be adjudicated by the CEC.

The key safety outcomes for this study are presented below in Table 9 through Table 30.

## Adverse Effects that Occurred in the PMA Clinical Study

Overall Adverse Events

A summary of the total number of adverse events, adverse events related to the device or procedure, serious adverse events, and serious adverse events that were related to the device or procedure is shown below in Table 9.

The safety profile of the Superion® ISS device is similar to the X-STOP® IPD® device when considering adverse event incidence. The overall incidence of any adverse event (Superion® ISS: 94.7% vs. X-STOP® IPD®: 91.5%), device-related adverse events (Superion® ISS: 11.6% vs. X-STOP® IPD®: 7.5%), procedure-related adverse events (Superion® ISS: 14.2% vs. X-STOP® IPD®: 15.9%), serious adverse events (Superion® ISS: 46.3% vs. X-STOP® IPD®: 45.8%), and device- or procedure-related serious adverse events (Superion® ISS: 21.1% vs. X-STOP® IPD®: 23.4%) were similar between both groups. No device-related or procedure-related deaths were reported during follow-up in either the Superion® ISS or X-STOP® IPD® control groups.

**Table 5: Comparisons of Summary Adverse Event Rates between Superion® ISS and X-STOP® IPD® mITT Analysis Sets at 24 Months**

| | Superion® ISS (N=190) | | X-STOP® IPD® (N=201) | | I vs. C[1] | | |
|---|---|---|---|---|---|---|---|
| | **n** | **%** | **n** | **%** | **Diff** | **LB** | **UB** |
| Any adverse event (per patient) | 180 | 94.7 | 184 | 91.5 | -3.2 | -13.1 | 6.8 |
| Any device- related AE | 22 | 11.6 | 15 | 7.5 | -4.1 | -14.0 | 5.8 |
| Any procedure- related AE | 27 | 14.2 | 32 | 15.9 | 1.7 | -8.2 | 11.6 |
| Any serious AE | 88 | 46.3 | 92 | 45.8 | -0.5 | -10.5 | 9.4 |
| Serious AE that is either device- or procedure-related | 16 | 8.4 | 19 | 9.5 | 1.0 | -8.9 | 10.9 |
| Deaths | 6 | 3.2 | 5 | 2.5 | -0.7 | -10.6 | 9.3 |

**Notes:**
[1] Exact 95% confidence interval for the group difference. Diff signifies difference between percentages of groups. LB signifies lower bound of 95% confidence interval. UB signifies upper bound of 95% confidence interval.

As described above, during the clinical study, adverse events were classified as device-related or procedure-related, not device-related or procedure-related, or as having an "unknown/undetermined" relationship. At FDA's request, an additional analysis was performed that grouped adverse events with an "unknown/undetermined" assessment for device and procedure relation with those events deemed to have a definite device or procedure relation as a "worst case" assessment. These results are presented below in Table 10.

**Table 6: Worst Case Comparisons of Summary Adverse Event Rates between Superion® ISS and X-STOP® IPD® mITT Analysis Sets with Unknown/Undetermined Events Grouped with Related Events at 24 Months**

| | Superion® ISS (N=190) | | X-STOP® IPD® (N=201) | | I vs. C[1] | | |
|---|---|---|---|---|---|---|---|
| | n | % | n | % | Diff | LB | UB |
| Any adverse event (per patient) | 180 | 94.7 | 184 | 91.5 | -3.2 | -13.1 | 6.8 |
| Any device -related AE[2] | 73 | 38.4 | 79 | 39.3 | 0.9 | -9.0 | 10.8 |
| Any procedure-related AE[2] | 72 | 37.9 | 99 | 49.3 | 11.4 | 1.4 | 21.1 |
| Any serious AE | 88 | 46.3 | 92 | 45.8 | -0.5 | -10.5 | 9.4 |
| Serious AE that is either device-or procedure-related | 40 | 21.1 | 47 | 23.4 | 2.3 | -7.6 | 12.2 |
| Deaths | 6 | 3.2 | 5 | 2.5 | -0.7 | -10.6 | 9.3 |

**Notes:**
[1] Exact 95% confidence interval for the group difference.
[2] Includes "Yes" and "Unknown/Undetermined" relationships

Specific adverse events are listed in alphabetical order according to adverse event categories in Table 11. Adverse event rates are based on the number of subjects having at least one occurrence of an adverse event, and divided by the number of subjects in that treatment group. Events per subject are based on the number of adverse events, divided by the total number of subjects in each cohort. Subjects experiencing adverse events in more than one category are represented in each category in which they experienced an adverse event. Regarding specific adverse events, the most common adverse events observed in the Superion® ISS group and X-STOP® IPD® group were Pain - Back, Pain - Leg, Pain - Buttock & Groin, Spinal stenosis symptoms at index level, and Spinous process fracture.

As shown in the detailed overall adverse event table (Table 11), pain-related adverse events were distributed differently between the Superion® ISS and X-STOP® IPD® groups. X-STOP® IPD® patients were more likely to have Pain - Back or Pain - Leg adverse events, while Superion® ISS patients were more likely to have Pain – Buttock & Groin adverse events. Overall, X-STOP® IPD® patients were more likely to have a back, leg, buttock, or groin adverse event compared with Superion® ISS patients. In addition, X-STOP® IPD® patients were more likely to have events related to soft tissue damage or fever. In contrast, Superion® ISS patients were more likely to have an adverse event related to spinous process fracture. In general, there were no clinically important differences in either treatment group, aside from spinous process fracture and device migration/dislodgement, which will be discussed later.

**Table 7: Specific Adverse Events in Superion® ISS IDE up to 24 months (mITT cohort)**

| | Superion® ISS (I) (N=190) | | | X-STOP® IPD® (C) (N=201) | | | I vs C[1] | | |
|---|---|---|---|---|---|---|---|---|---|
| Adverse Event Type | No. of Events | No. of Pts. | % of Pts. | No. of Events | No. of Pts. | % of Pts. | Diff | LB | UB |
| Abdominal pain | 1 | 1 | 0.5 | 0 | 0 | 0 | -0.5 | -10.4 | 9.4 |
| Accidental injury | 20 | 15 | 7.9 | 22 | 19 | 9.5 | 1.6 | -8.4 | 11.4 |

**Table 7: Specific Adverse Events in Superion® ISS IDE up to 24 months (mITT cohort)**

| | Superion® ISS (I) (N=190) | | | X-STOP® IPD® (C) (N=201) | | | I vs C[1] | | |
|---|---|---|---|---|---|---|---|---|---|
| **Adverse Event Type** | **No. of Events** | **No. of Pts.** | **% of Pts.** | **No. of Events** | **No. of Pts.** | **% of Pts.** | **Diff** | **LB** | **UB** |
| Adjacent level DDD | 1 | 1 | 0.5 | 1 | 1 | 0.5 | 0 | -9.9 | 9.9 |
| Adjacent level stenosis | 1 | 1 | 0.5 | 4 | 2 | 1 | 0.5 | -9.4 | 10.4 |
| Allergic reaction | 4 | 4 | 2.1 | 6 | 6 | 3 | 0.9 | -9 | 10.8 |
| Anemia | 4 | 3 | 1.6 | 1 | 1 | 0.5 | -1.1 | -11 | 8.8 |
| Angina | 3 | 3 | 1.6 | 0 | 0 | 0 | -1.6 | -11.5 | 8.3 |
| Bronchitis | 2 | 2 | 1.1 | 6 | 5 | 2.5 | 1.4 | -8.5 | 11.3 |
| Cancer/Neoplasm | 13 | 11 | 5.8 | 14 | 13 | 6.5 | 0.7 | -9.3 | 10.6 |
| Cardiovascular | 25 | 20 | 10.5 | 20 | 16 | 8 | -2.6 | -12.5 | 7.4 |
| Cerebrovascular accident (CVA) | 2 | 2 | 1.1 | 1 | 1 | 0.5 | -0.6 | -10.5 | 9.4 |
| Chronic obstructive pulmonary disease (COPD) | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . |
| Coronary episode, ischemic | 3 | 2 | 1.1 | 5 | 2 | 1 | -0.1 | -10 | 9.9 |
| Deep infection at the operative site | 0 | 0 | 0 | 3 | 2 | 1 | 1 | -8.9 | 10.9 |
| Deep vein thrombosis | 2 | 2 | 1.1 | 1 | 1 | 0.5 | -0.6 | -10.5 | 9.4 |
| Dental | 0 | 0 | 0 | 2 | 2 | 1 | 1 | -8.9 | 10.9 |
| Device breakage | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Device breakage preventing device placement | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . |
| Device deformation preventing device placement | 1 | 1 | 0.5 | 0 | 0 | 0 | -0.5 | -10.4 | 9.4 |
| Device dislodgement | 1 | 1 | 0.5 | 2 | 2 | 1 | 0.5 | -9.4 | 10.4 |
| Device migration | 1 | 1 | 0.5 | 8 | 7 | 3.5 | 3 | -7 | 12.9 |
| Device subsidence | 4 | 4 | 2.1 | 0 | 0 | 0 | -2.1 | -12 | 7.8 |
| Diabetes mellitus | 0 | 0 | 0 | 2 | 2 | 1 | 1 | -8.9 | 10.9 |
| Diabetes mellitus inadequate control | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Dizziness | 5 | 5 | 2.6 | 0 | 0 | 0 | -2.6 | -12.5 | 7.3 |
| Dural leaks | 6 | 6 | 3.2 | 3 | 3 | 1.5 | -1.7 | -11.6 | 8.3 |
| Dyspnea | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Edema | 2 | 2 | 1.1 | 4 | 4 | 2 | 0.9 | -9 | 10.8 |
| EENT | 2 | 2 | 1.1 | 0 | 0 | 0 | -1.1 | -11 | 8.9 |
| Endocrine/Metabolic | 11 | 11 | 5.8 | 13 | 11 | 5.5 | -0.3 | -10.2 | 9.6 |
| Facet cyst | 4 | 3 | 1.6 | 0 | 0 | 0 | -1.6 | -11.5 | 8.3 |
| Fever | 0 | 0 | 0 | 4 | 4 | 2 | 2 | -7.9 | 11.9 |
| Gallstones | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Gastroesophageal reflux disease (GERD) | 1 | 1 | 0.5 | 0 | 0 | 0 | -0.5 | -10.4 | 9.4 |
| Gastrointestinal | 9 | 7 | 3.7 | 10 | 9 | 4.5 | 0.8 | -9.1 | 10.7 |
| Gastrointestinal (GI) bleed | 2 | 2 | 1.1 | 1 | 1 | 0.5 | -0.6 | -10.5 | 9.4 |
| Genitourinary | 25 | 22 | 11.6 | 17 | 17 | 8.5 | -3.1 | -13 | 6.8 |
| Headache | 1 | 1 | 0.5 | 5 | 5 | 2.5 | 2 | -7.9 | 11.9 |
| Hematologic | 0 | 0 | 0 | 2 | 2 | 1 | 1 | -8.9 | 10.9 |
| Hematoma | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Immune | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Infection* | 15 | 14 | 7.4 | 17 | 16 | 8 | 0.6 | -9.3 | 10.5 |
| Instruments breakage or malfunction preventing device placement | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . |
| Loss of bladder control | 0 | 0 | 0 | 2 | 2 | 1 | 1 | -8.9 | 10.9 |

**Table 7: Specific Adverse Events in Superion® ISS IDE up to 24 months (mITT cohort)**

| | Superion® ISS (I) (N=190) | | | X-STOP® IPD® (C) (N=201) | | | I vs C[1] | | |
|---|---|---|---|---|---|---|---|---|---|
| **Adverse Event Type** | **No. of Events** | **No. of Pts.** | **% of Pts.** | **No. of Events** | **No. of Pts.** | **% of Pts.** | **Diff** | **LB** | **UB** |
| Loss of bowel control | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . |
| Multi-level DDD | 1 | 1 | 0.5 | 0 | 0 | 0 | -0.5 | -10.4 | 9.4 |
| Muscle damage | 1 | 1 | 0.5 | 1 | 1 | 0.5 | 0 | -9.9 | 9.9 |
| Musculoskeletal** | 108 | 78 | 41.1 | 100 | 70 | 34.8 | -6.2 | -16.1 | 3.7 |
| Myocardial infarction | 5 | 5 | 2.6 | 3 | 3 | 1.5 | -1.1 | -11 | 8.8 |
| Nausea | 0 | 0 | 0 | 4 | 4 | 2 | 2 | -7.9 | 11.9 |
| Nerve root damage | 0 | 0 | 0 | 0 | 0 | 0 | . | . | . |
| Neurological disorder | 27 | 22 | 11.6 | 13 | 13 | 6.5 | -5.1 | -15 | 4.8 |
| Ophthalmic | 10 | 8 | 4.2 | 6 | 6 | 3 | -1.2 | -11.1 | 8.7 |
| Osteolysis | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Other, specify*** | 15 | 14 | 7.4 | 10 | 5 | 2.5 | -4.9 | -14.8 | 5.1 |
| Pain – Back | 56 | 50 | 26.3 | 71 | 66 | 32.8 | 6.5 | -3.4 | 16.4 |
| Pain – Back & Buttock | 1 | 1 | 0.5 | 0 | 0 | 0 | -0.5 | -10.4 | 9.4 |
| Pain – Back & Hip | 1 | 1 | 0.5 | 0 | 0 | 0 | -0.5 | -10.4 | 9.4 |
| Pain – Buttock | 1 | 1 | 0.5 | 2 | 2 | 1 | 0.5 | -9.4 | 10.4 |
| Pain – Buttock & Groin | 23 | 21 | 11.1 | 13 | 13 | 6.5 | -4.6 | -14.5 | 5.3 |
| Pain – Hip | 2 | 2 | 1.1 | 3 | 3 | 1.5 | 0.4 | -9.5 | 10.4 |
| Pain – Leg | 41 | 37 | 19.5 | 54 | 47 | 23.4 | 3.9 | -6 | 13.8 |
| Peripheral Vascular Disorder | 0 | 0 | 0 | 3 | 3 | 1.5 | 1.5 | -8.4 | 11.4 |
| Pneumonia | 5 | 4 | 2.1 | 5 | 5 | 2.5 | 0.4 | -9.5 | 10.3 |
| Presence of osteophyte formation associated with severe disc or facet degeneration | 1 | 1 | 0.5 | 1 | 1 | 0.5 | 0 | -9.9 | 9.9 |
| Progression of underlying disease | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Psychiatric/Substance abuse | 1 | 1 | 0.5 | 4 | 4 | 2 | 1.5 | -8.4 | 11.4 |
| Pulmonary edema | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Pulmonary embolism | 1 | 1 | 0.5 | 0 | 0 | 0 | -0.5 | -10.4 | 9.4 |
| Renal failure | 3 | 3 | 1.6 | 1 | 1 | 0.5 | -1.1 | -11 | 8.8 |
| Renal insufficiency | 2 | 2 | 1.1 | 2 | 2 | 1 | -0.1 | -10 | 9.9 |
| Respiratory disorder | 4 | 3 | 1.6 | 4 | 4 | 2 | 0.4 | -9.5 | 10.3 |
| Respiratory distress | 2 | 2 | 1.1 | 0 | 0 | 0 | -1.1 | -11 | 8.9 |
| Respiratory infection | 0 | 0 | 0 | 2 | 2 | 1 | 1 | -8.9 | 10.9 |
| Rheumatoid arthritis | 1 | 1 | 0.5 | 0 | 0 | 0 | -0.5 | -10.4 | 9.4 |
| Sensory loss | 3 | 2 | 1.1 | 4 | 4 | 2 | 0.9 | -9 | 10.8 |
| Shortness of breath | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Skin and subcutaneous tissue | 2 | 2 | 1.1 | 10 | 8 | 4 | 2.9 | -7 | 12.8 |
| Soft tissue damage | 1 | 1 | 0.5 | 7 | 7 | 3.5 | 3 | -7 | 12.9 |
| Spinal stenosis symptoms at index level | 37 | 35 | 18.4 | 38 | 34 | 16.9 | -1.5 | -11.4 | 8.4 |
| Spinous process fracture | 24 | 22 | 11.6 | 14 | 13 | 6.5 | -5.1 | -15 | 4.8 |
| Stroke | 1 | 1 | 0.5 | 1 | 1 | 0.5 | 0 | -9.9 | 9.9 |
| Syncope | 0 | 0 | 0 | 2 | 2 | 1 | 1 | -8.9 | 10.9 |
| Transient ischemic attack (TIA) | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Urinary tract infection | 8 | 7 | 3.7 | 6 | 6 | 3 | -0.7 | -10.6 | 9.2 |
| Vertebral compression fractures | 1 | 1 | 0.5 | 3 | 3 | 1.5 | 1 | -8.9 | 10.9 |
| Wound dehiscence or delayed healing | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Wound drainage | 1 | 1 | 0.5 | 4 | 4 | 2 | 1.5 | -8.4 | 11.4 |

[1] Exact 95% confidence interval for the group difference.

*Infection AEs are defined as: including superficial infections and seroma at the surgical site, as well as infections at remote sites (e.g., sinus or throat infection)
**Musculoskeletal AEs are defined as: including weakness, cramping, joint pain, joint surgery or replacement, and other disorders in non-lumbar spinal tissues
***Other adverse events includes events not fitting a specific existing adverse event category, including insomnia, psychological disorder, weight loss, general weakness, ganglion cyst, and drug withdrawal.

Table 12 provides the actual counts of specific events by time of onset. Most adverse events were evenly distributed throughout the course of the study up to 24 months. The exception is the occurrence of spinous process fracture. The majority of these fractures occurred within the first 6 months post-operatively in both cohorts. No other clinically important trends in adverse event occurrence were demonstrated by the data.

**Table 12: Counts of Specific Adverse Events by Time of Occurrence up to 24 Months (mITT cohort)**

| | Day of Surgery | | Immed. Post-Op to Month 3 (Day 1-90) | | >Mo. 3 to Mo. 6 (Day 91-180) | | >Mo. 6 to Mo. 12 (Day 181-365) | | >Mo. 12 to Mo. 24 (Day 365-730) | | Post Month 24 (Day >730) | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | I[1] | C[2] | I | C | I | C | I | C | I | C | I | C | I | C |
| Abdominal pain | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **1** | 0 | **0** | 0 | **1** | **0** |
| Accidental Injury | **1** | 0 | **2** | 5 | **1** | 2 | **7** | 5 | **6** | 8 | **2** | 2 | **19** | **22** |
| Adjacent Level DDD | **0** | 0 | **0** | 0 | **1** | 0 | **0** | 1 | **0** | 0 | **0** | 0 | **1** | 1 |
| Adjacent Level Stenosis | **0** | 0 | **0** | 3 | **0** | 0 | **0** | 1 | **0** | 0 | **1** | 0 | **1** | 4 |
| Allergic reaction | **0** | 1 | **1** | 1 | **0** | 1 | **1** | 2 | **2** | 1 | **0** | 0 | **4** | **6** |
| Anemia | **0** | 0 | **3** | 0 | **0** | 0 | **1** | 0 | **0** | 1 | **0** | 0 | **4** | **1** |
| Angina | **0** | 0 | **1** | 0 | **1** | 0 | **1** | 0 | **0** | 0 | **0** | 0 | **3** | **0** |
| Bronchitis | **0** | 0 | **0** | 2 | **0** | 1 | **0** | 2 | **2** | 1 | **0** | 0 | **2** | **6** |
| Cancer/Neoplasm | **0** | 0 | **2** | 2 | **2** | 2 | **3** | 5 | **4** | 4 | **2** | 1 | **13** | 14 |
| Cardiovascular | **1** | 0 | **2** | 2 | **5** | 3 | **3** | 0 | **12** | 10 | **2** | 5 | **25** | 20 |
| Cerebrovascular accident (CVA) | **0** | 0 | **0** | 0 | **0** | 1 | **0** | 0 | **1** | 0 | **1** | 0 | **2** | **1** |
| Chronic obstructive pulmonary disease (COPD) | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | **0** |
| Coronary episode, ischemic | **0** | 0 | **1** | 4 | **1** | 0 | **0** | 0 | **1** | 1 | **0** | 0 | **3** | **5** |
| Deep infection at the operative site | **0** | 0 | **0** | 2 | **0** | 1 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | **3** |
| Deep vein thrombosis | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 1 | **0** | 0 | **2** | 0 | **2** | **1** |
| Dental | **0** | 0 | **0** | 2 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 2 |
| Device breakage | **0** | 1 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 1 |
| Device breakage preventing device placement | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | **0** |
| Device deformation preventing device placement | **1** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **1** | **0** |
| Device dislodgement | **0** | 0 | **1** | 1 | **0** | 1 | **0** | 0 | **0** | 0 | **0** | 0 | **1** | 2 |
| Device erosion | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 |
| Device migration | **0** | 0 | **1** | 4 | **0** | 2 | **0** | 0 | **0** | 2 | **0** | 0 | **1** | 8 |
| Device subsidence | **0** | 0 | **0** | 0 | **3** | 0 | **1** | 0 | **0** | 0 | **0** | 0 | **4** | 0 |
| Dextroscoliosis | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 |
| Diabetes mellitus | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 1 | **0** | 1 | **0** | 0 | **0** | **2** |
| Diabetes mellitus inadequate | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 1 | **0** | 0 | **0** | **1** |

**Table 12: Counts of Specific Adverse Events by Time of Occurrence up to 24 Months (mITT cohort)**

| | Day of Surgery | | Immed. Post-Op to Month 3 (Day 1-90) | | >Mo. 3 to Mo. 6 (Day 91-180) | | >Mo. 6 to Mo. 12 (Day 181-365) | | >Mo. 12 to Mo. 24 (Day 365-730) | | Post Month 24 (Day >730) | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | I[1] | C[2] | I | C | I | C | I | C | I | C | I | C | I | C |
| control | | | | | | | | | | | | | | |
| Disc bulge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Dizziness | 0 | 0 | 3 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 5 | 0 |
| Dural leaks | 2 | 0 | 0 | 0 | 0 | 1 | 2 | 0 | 2 | 1 | 0 | 1 | 6 | 3 |
| Dyspnea | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Edema | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 2 | 4 |
| EENT | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 0 |
| Endocrine/Metabolic | 0 | 3 | 2 | 2 | 1 | 2 | 3 | 1 | 2 | 4 | 3 | 1 | 11 | 13 |
| Facet cyst | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 4 | 0 |
| Fever | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 4 |
| Gallstones | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 |
| Gastroesophageal reflux disease (GERD) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 |
| Gastrointestinal | 0 | 0 | 1 | 2 | 1 | 2 | 2 | 2 | 1 | 2 | 4 | 2 | 9 | 10 |
| Gastrointestinal (GI) bleed | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 2 | 1 |
| Genitourinary | 6 | 1 | 9 | 7 | 2 | 2 | 4 | 2 | 3 | 3 | 1 | 2 | 25 | 17 |
| Headache | 0 | 0 | 1 | 3 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 1 | 5 |
| Hematologic | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 |
| Hematoma | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Immune | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| Infection* | 0 | 0 | 4 | 4 | 3 | 2 | 5 | 3 | 3 | 6 | 0 | 2 | 15 | 17 |
| Instruments breakage or malfunction preventing device placement | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loss of bladder control | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 2 |
| Loss of bowel control | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Multi-level DDD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| Muscle damage | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 1 | 1 |
| Musculoskeletal** | 1 | 0 | 29 | 24 | 12 | 13 | 20 | 12 | 32 | 38 | 14 | 13 | 108 | 100 |
| Myocardial Infarction | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 2 | 1 | 1 | 1 | 0 | 5 | 3 |
| Nausea | 0 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 4 |
| Nerve root damage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Neurological disorder | 0 | 2 | 6 | 3 | 2 | 1 | 6 | 2 | 10 | 4 | 3 | 1 | 27 | 13 |
| Ophthalmic | 2 | 0 | 3 | 0 | 0 | 0 | 3 | 2 | 1 | 4 | 1 | 0 | 10 | 6 |
| Osteolysis | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 1 |
| Other*** | 0 | 2 | 4 | 3 | 1 | 0 | 3 | 3 | 6 | 2 | 1 | 0 | 15 | 10 |
| Pain – Back | 0 | 1 | 14 | 23 | 12 | 7 | 8 | 19 | 14 | 15 | 8 | 6 | 56 | 71 |
| Pain - Back & Buttock | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 0 |
| Pain – Back & Hip | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 |
| Pain - Back & Leg | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pain - Buttock | 0 | 0 | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 1 | 2 |
| Pain - Buttock & Groin | 0 | 0 | 7 | 5 | 2 | 2 | 4 | 3 | 8 | 2 | 2 | 0 | 23 | 12 |
| Pain - Buttocks and Hip | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

**Table 12: Counts of Specific Adverse Events by Time of Occurrence up to 24 Months (mITT cohort)**

| | Day of Surgery | | Immed. Post-Op to Month 3 (Day 1-90) | | >Mo. 3 to Mo. 6 (Day 91-180) | | >Mo. 6 to Mo. 12 (Day 181-365) | | >Mo. 12 to Mo. 24 (Day 365-730) | | Post Month 24 (Day >730) | | Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **I[1]** | **C[2]** | **I** | **C** | **I** | **C** | **I** | **C** | **I** | **C** | **I** | **C** | **I** | **C** |
| Pain - Hip | **0** | 0 | **1** | 2 | **0** | 0 | **0** | 0 | **0** | 1 | **1** | 0 | **2** | 3 |
| Pain – Leg | **1** | 0 | **12** | 17 | **6** | 10 | **7** | 13 | **12** | 10 | **2** | 4 | **40** | **54** |
| Peripheral Vascular Disorder | **0** | 0 | **0** | 0 | **0** | 1 | **0** | 1 | **0** | 1 | **0** | 0 | **0** | 3 |
| Pneumonia | **0** | 0 | **0** | 0 | **1** | 1 | **1** | 1 | **2** | 2 | **1** | 1 | **5** | **5** |
| Presence of osteophyte formation associated with severe disc or facet degeneration | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **1** | 0 | **0** | 1 | **1** | **1** |
| Progression of underlying disease | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 1 | **0** | 0 | **0** | 1 |
| Psychiatric/Substance abuse | **0** | 0 | **0** | 1 | **0** | 1 | **1** | 0 | **0** | 1 | **0** | 1 | **1** | 4 |
| Pulmonary edema | **0** | 1 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | **1** |
| Pulmonary embolism | **0** | 0 | **1** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **1** | **0** |
| Renal failure | **0** | 0 | **0** | 0 | **1** | 0 | **0** | 0 | **2** | 1 | **0** | 0 | **3** | **1** |
| Renal insufficiency | **0** | 0 | **0** | 1 | **0** | 0 | **1** | 0 | **0** | 1 | **1** | 0 | **2** | **2** |
| Respiratory disorder | **0** | 3 | **0** | 0 | **0** | 1 | **0** | 0 | **2** | 0 | **2** | 0 | **4** | **4** |
| Respiratory distress | **0** | 0 | **0** | 0 | **0** | 0 | **1** | 0 | **1** | 0 | **0** | 0 | **2** | **0** |
| Respiratory infection | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 1 | **0** | 1 | **0** | **2** |
| Rheumatoid arthritis | **0** | 0 | **0** | 0 | **1** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **1** | **0** |
| Sensory loss | **0** | 0 | **1** | 2 | **1** | 0 | **1** | 1 | **0** | 1 | **0** | 0 | **3** | **4** |
| Shortness of breath | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 1 | **0** | 0 | **0** | **1** |
| Skin and subcutaneous tissue | **0** | 0 | **1** | 4 | **0** | 2 | **0** | 0 | **0** | 4 | **1** | 0 | **2** | 10 |
| Soft tissue damage | **0** | 0 | **0** | 0 | **0** | 2 | **0** | 1 | **1** | 2 | **0** | 2 | **1** | **7** |
| Spinal stenosis symptoms associated with non-index condition | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 |
| Spinal stenosis symptoms at index level | **0** | 0 | **10** | 10 | **8** | 5 | **12** | 7 | **4** | 12 | **3** | 4 | **37** | **38** |
| Spinous process fracture | **4** | 2 | **13** | 9 | **3** | 1 | **2** | 1 | **1** | 1 | **1** | 0 | **24** | **14** |
| Stroke | **0** | 0 | **0** | 0 | **0** | 1 | **0** | 0 | **1** | 0 | **0** | 0 | **1** | **1** |
| Syncope | **0** | 0 | **0** | 2 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | **2** |
| Synovial cyst | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 |
| Transient ischemic attack (TIA) | **0** | 0 | **0** | 1 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | **1** |
| Urinary tract infection | **1** | 1 | **3** | 1 | **3** | 0 | **1** | 1 | **0** | 3 | **0** | 0 | **8** | **6** |
| Vertebral compression fractures | **0** | 0 | **0** | 1 | **0** | 0 | **1** | 0 | **0** | 1 | **0** | 1 | **1** | **3** |
| Wound dehiscence or delayed healing | **0** | 0 | **0** | 1 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | 0 | **0** | **1** |
| Wound drainage | **0** | 0 | **0** | 3 | **0** | 1 | **0** | 0 | **1** | 0 | **0** | 0 | **1** | **4** |

I[1] = Superion® ISS, C[2] = X-STOP® IPD®

*Infection AEs are defined as: including superficial infections and seroma at the surgical site, as well as infections at remote sites (e.g., sinus or throat infection)

**Musculoskeletal AEs are defined as: including weakness, cramping, joint pain, joint surgery or replacement, and other disorders in non-lumbar spinal tissues

***Other adverse events includes events not fitting a specific existing adverse event category, including insomnia, psychological disorder, weight loss, general weakness, ganglion cyst, and drug withdrawal.

Device-Related Adverse Events

The most frequent device-related adverse events were spinous process fractures, as noted in Table 13 below, which occurred in 7.9% of Superion® ISS patients and 2.5% of X-STOP® IPD® patients. There were no large numerical differences in the number of device-related adverse events, with the exception of Deep infection at the operative site, Device dislodgement, Device migration, Device subsidence, Spinal stenosis symptoms at index level, and Spinous process fractures. However, given the low incidences of the aforementioned device-related adverse events, it is difficult to draw conclusions regarding the clinical importance of these differences.

**Table 13: Specific Device-Related Adverse Events in Superion® ISS IDE up to 24 months (mITT cohort)**

| | Superion® ISS (N=190) | | | X-STOP® IPD® (N=201) | | |
|---|---|---|---|---|---|---|
| **Adverse Event Type** | **No. of Events** | **No. of Pts.** | **% of Pts.** | **No. of Events** | **No. of Pts.** | **% of Pts.** |
| Deep infection at the operative site | 0 | 0 | 0.0 | 2 | 1 | 0.5 |
| Device breakage | 0 | 0 | 0.0 | 1 | 1 | 0.5 |
| Device deformation preventing device placement | 1 | 1 | 0.5 | 0 | 0 | 0.0 |
| Device dislodgement | 1 | 1 | 0.5 | 2 | 2 | 1.0 |
| Device migration | 1 | 1 | 0.5 | 5 | 5 | 2.5 |
| Device subsidence | 4 | 4 | 2.1 | 0 | 0 | 0.0 |
| Dural leaks | 1 | 1 | 0.5 | 0 | 0 | 0.0 |
| Loss of bowel control | 0 | 0 | 0.0 | 1 | 1 | 0.5 |
| Pain - Back | 1 | 1 | 0.5 | 0 | 0 | 0.0 |
| Pain - Leg | 1 | 1 | 0.5 | 0 | 0 | 0.0 |
| Spinal stenosis symptoms at index level | 0 | 0 | 0.0 | 3 | 3 | 1.5 |
| Spinous process fracture | 16 | 15 | 7.9 | 5 | 5 | 2.5 |

Procedure-Related Adverse Events

The most frequent procedure-related adverse events, as noted in Table 14 below, were spinous process fractures, which occurred in 7.9% of Superion® ISS patients and 2.5% of X-STOP® IPD® patients. There were no large numerical differences in the number of procedure-related adverse events, with the exception of Deep infection at the operative site, Device migration, Device subsidence, Dural leaks, Spinal stenosis symptoms at index level, Spinous process fracture and Wound drainage. However, given the low incidences of the aforementioned procedure-related adverse events, it is difficult to draw conclusions regarding the clinical importance of these differences.

**Table 14: Specific Procedure- Related Adverse Events in Superion® ISS IDE up to 24 months (mITT cohort)**

| | Superion® ISS (N=190) | | | X-STOP® IPD® (N=201) | | |
|---|---|---|---|---|---|---|
| **Adverse Event Type** | **No. of Events** | **No. of Pts.** | **% of Pts.** | **No. of Events** | **No. of Pts.** | **% of Pts.** |
| Coronary episode, ischemic | 0 | 0 | 0.0 | 4 | 1 | 0.5 |
| Deep infection at the operative site | 0 | 0 | 0.0 | 3 | 2 | 1.0 |
| Device deformation preventing device placement | 1 | 1 | 0.5 | 0 | 0 | 0.0 |
| Device dislodgement | 1 | 1 | 0.5 | 1 | 1 | 0.5 |
| Device migration | 1 | 1 | 0.5 | 4 | 4 | 2.0 |
| Device subsidence | 2 | 2 | 1.1 | 0 | 0 | 0.0 |
| Dural leaks | 3 | 3 | 1.6 | 0 | 0 | 0.0 |
| Fever | 0 | 0 | 0.0 | 1 | 1 | 0.5 |
| Genitourinary | 1 | 1 | 0.5 | 2 | 2 | 1.0 |
| Hematoma | 0 | 0 | 0.0 | 1 | 1 | 0.5 |
| Infection* | 2 | 2 | 1.1 | 2 | 1 | 0.5 |
| Nausea | 0 | 0 | 0.0 | 1 | 1 | 0.5 |
| Neurological disorder | 0 | 0 | 0.0 | 1 | 1 | 0.5 |
| Pain – Back | 1 | 1 | 0.5 | 1 | 1 | 0.5 |
| Pain – Leg | 1 | 1 | 0.5 | 0 | 0 | 0.0 |
| Skin and subcutaneous tissue | 0 | 0 | 0.0 | 2 | 2 | 1.0 |
| Spinal stenosis symptoms at index level | 0 | 0 | 0.0 | 3 | 3 | 1.5 |
| Spinous process fracture | 18 | 17 | 8.9 | 7 | 7 | 3.5 |
| Wound drainage | 0 | 0 | 0.0 | 4 | 4 | 2.0 |

*Infection AEs are defined as: including superficial infections and seroma at the surgical site, as well as infections at remote sites (e.g., sinus or throat infection).

As noted in Tables 13 and 14 above, the adverse events as determined by the CEC demonstrated that the Superion® ISS patients experienced more device-related adverse events (Superion® ISS, 11.6%; X-STOP® IPD®, 7.5%), while X-STOP® IPD® patients experienced more procedure-related adverse events (Superion® ISS, 14.2%; X-STOP® IPD®, 15.9%).

Specific Adverse Events with More than a 2% Difference Between Treatment Groups

For additional clarity, specific adverse events where the difference between Superion® ISS and X-STOP® IPD® were more than 2% are shown in Table 15.

**Table 15: Specific Adverse Events in Superion® IDE with > 2% Difference**

| | Superion® ISS (N=190) | | | X-STOP® IPD® (N=201) | | |
|---|---|---|---|---|---|---|
| **Adverse Event Type** | **No. of Events** | **No. of Pts.** | **% of Pts.** | **No. of Events** | **No. of Pts.** | **% of Pts.** |
| Cardiovascular | 25 | 20 | 10.5 | 20 | 16 | 8.0 |
| Device migration | 1 | 1 | 0.5 | 8 | 7 | 3.5 |
| Device subsidence | 4 | 4 | 2.1 | 0 | 0 | 0.0 |
| Dizziness | 5 | 5 | 2.6 | 0 | 0 | 0.0 |
| Genitourinary | 25 | 22 | 11.6 | 17 | 17 | 8.5 |
| Musculoskeletal* | 108 | 78 | 41.1 | 100 | 70 | 34.8 |
| Neurological disorder | 27 | 22 | 11.6 | 13 | 13 | 6.5 |
| Other** | 15 | 14 | 7.4 | 10 | 5 | 2.5 |
| Pain – Back | 56 | 50 | 26.3 | 71 | 66 | 32.8 |
| Pain – Buttock & Groin | 23 | 21 | 11.1 | 12 | 12 | 6.5 |
| Pain – Leg | 40 | 37 | 19.5 | 54 | 47 | 23.4 |
| Skin and subcutaneous tissue | 2 | 2 | 1.1 | 10 | 8 | 4.0 |
| Soft tissue damage | 1 | 1 | 0.5 | 7 | 7 | 3.5 |
| Spinous process fracture | 24 | 22 | 11.6 | 14 | 13 | 6.5 |

*Musculoskeletal AEs are defined as: including weakness, cramping, joint pain, joint surgery or replacement, and other disorders in non-lumbar spinal tissues
**Other adverse events includes events not fitting a specific existing adverse event category, including insomnia, psychological disorder, weight loss, general weakness, ganglion cyst, and drug withdrawal.

Serious Adverse Events

Serious adverse events occurred in 46.3% (88/190) of Superion® ISS patients compared with 45.8% (92/201) of X-STOP® IPD patients. A listing of the specific serious adverse events which occurred during this study is shown in Table 16 below.

**Table 16: Specific Serious Adverse Events in Superion® ISS IDE up to 24 months (mITT cohort)**

| | Superion® (I) (N=190) | | | X-STOP® IPD® (C) (N=201) | | | I vs C[1] | | |
|---|---|---|---|---|---|---|---|---|---|
| **Adverse Event Type** | **No. of Events** | **No. of Pts.** | **% of Pts.** | **No. of Events** | **No. of Pts.** | **% of Pts.** | **Diff** | **LB** | **UB** |
| | | | | | | | | | |
| Abdominal pain | 1 | 1 | 0.5 | 0 | 0 | 0 | -0.5 | -10.4 | 9.4 |
| Accidental injury | 4 | 3 | 1.6 | 4 | 4 | 2 | 0.4 | -9.5 | 10.3 |
| Adjacent level DDD | 1 | 1 | 0.5 | 1 | 1 | 0.5 | 0 | -9.9 | 9.9 |
| Adjacent level stenosis | 0 | 0 | 0 | 3 | 2 | 1 | 1 | -8.9 | 10.9 |
| Allergic reaction | 1 | 1 | 0.5 | 1 | 1 | 0.5 | 0 | -9.9 | 9.9 |
| Anemia | 3 | 2 | 1.1 | 0 | 0 | 0 | -1.1 | -11 | 8.9 |
| Angina | 1 | 1 | 0.5 | 0 | 0 | 0 | -0.5 | -10.4 | 9.4 |
| Cancer/Neoplasm | 8 | 7 | 3.7 | 6 | 6 | 3 | -0.7 | -10.6 | 9.2 |
| Cardiovascular | 11 | 8 | 4.2 | 9 | 7 | 3.5 | -0.7 | -10.6 | 9.2 |
| Cerebrovascular accident (CVA) | 2 | 2 | 1.1 | 1 | 1 | 0.5 | -0.6 | -10.5 | 9.4 |
| Coronary episode, ischemic | 0 | 0 | 0 | 5 | 2 | 1 | 1 | -8.9 | 10.9 |
| Deep infection at the operative site | 0 | 0 | 0 | 3 | 2 | 1 | 1 | -8.9 | 10.9 |

**Table 16: Specific Serious Adverse Events in Superion® ISS IDE up to 24 months (mITT cohort)**

| | Superion® (I) (N=190) | | | X-STOP® IPD® (C) (N=201) | | | I vs C[1] | | |
|---|---|---|---|---|---|---|---|---|---|
| **Adverse Event Type** | **No. of Events** | **No. of Pts.** | **% of Pts.** | **No. of Events** | **No. of Pts.** | **% of Pts.** | **Diff** | **LB** | **UB** |
| Deep vein thrombosis | 1 | 1 | 0.5 | 1 | 1 | 0.5 | 0 | -9.9 | 9.9 |
| Device Dislodgement | 0 | 0 | 0 | 2 | 2 | 1 | 1 | -8.9 | 10.9 |
| Device Migration | 1 | 1 | 0.5 | 4 | 3 | 1.5 | 1 | -8.9 | 10.9 |
| Device Subsidence | 1 | 1 | 0.5 | 0 | 0 | 0 | -0.5 | -10.4 | 9.4 |
| Dizziness | 2 | 2 | 1.1 | 0 | 0 | 0 | -1.1 | -11 | 8.9 |
| Dural leaks | 6 | 6 | 3.2 | 2 | 2 | 1 | -2.2 | -12 | 7.8 |
| Dyspnea | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Edema | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Fever | 0 | 0 | 0 | 2 | 2 | 1 | 1 | -8.9 | 10.9 |
| Gastrointestinal | 4 | 4 | 2.1 | 3 | 3 | 1.5 | -0.6 | -10.5 | 9.3 |
| Gastrointestinal (GI) bleed | 1 | 1 | 0.5 | 1 | 1 | 0.5 | 0 | -9.9 | 9.9 |
| Genitourinary | 8 | 8 | 4.2 | 4 | 4 | 2 | -2.2 | -12.1 | 7.7 |
| Hematoma | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Infection* | 2 | 2 | 1.1 | 1 | 1 | 0.5 | -0.6 | -10.5 | 9.4 |
| Musculoskeletal** | 13 | 12 | 6.3 | 24 | 21 | 10.4 | 4.1 | -5.8 | 14 |
| Myocardial infarction | 5 | 5 | 2.6 | 3 | 3 | 1.5 | -1.1 | -11 | 8.8 |
| Nausea | 0 | 0 | 0 | 2 | 2 | 1 | 1 | -8.9 | 10.9 |
| Neurological disorder | 3 | 3 | 1.6 | 3 | 3 | 1.5 | -0.1 | -10 | 9.8 |
| Other*** | 5 | 5 | 2.6 | 3 | 2 | 1 | -1.6 | -11.5 | 8.3 |
| Pain - Back | 8 | 8 | 4.2 | 13 | 13 | 6.5 | 2.3 | -7.7 | 12.1 |
| Pain - Buttock | 1 | 1 | 0.5 | 0 | 0 | 0 | -0.5 | -10.4 | 9.4 |
| Pain - Buttock & Groin | 3 | 3 | 1.6 | 2 | 2 | 1 | -0.6 | -10.5 | 9.3 |
| Pain - Hip | 1 | 1 | 0.5 | 0 | 0 | 0 | -0.5 | -10.4 | 9.4 |
| Pain - Leg | 13 | 12 | 6.3 | 11 | 10 | 5 | -1.3 | -11.3 | 8.6 |
| Peripheral Vascular Disorder | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Pneumonia | 4 | 3 | 1.6 | 2 | 2 | 1 | -0.6 | -10.5 | 9.3 |
| Presence of osteophyte formation associated with severe disc or facet degeneration | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Pulmonary edema | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Pulmonary embolism | 1 | 1 | 0.5 | 0 | 0 | 0 | -0.5 | -10.4 | 9.4 |
| Renal failure | 3 | 3 | 1.6 | 1 | 1 | 0.5 | -1.1 | -11 | 8.8 |
| Respiratory disorder | 2 | 2 | 1.1 | 1 | 1 | 0.5 | -0.6 | -10.5 | 9.4 |
| Respiratory distress | 2 | 2 | 1.1 | 0 | 0 | 0 | -1.1 | -11 | 8.9 |
| Respiratory infection | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Sensory loss | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Soft tissue damage | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Spinal stenosis symptoms at index level | 21 | 20 | 10.5 | 16 | 15 | 7.5 | -3.1 | -13 | 6.9 |
| spinous process fracture | 11 | 10 | 5.3 | 5 | 5 | 2.5 | -2.8 | -12.7 | 7.2 |
| stroke | 1 | 1 | 0.5 | 0 | 0 | 0 | -0.5 | -10.4 | 9.4 |
| Transient ischemic attack (TIA) | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Urinary tract infection | 0 | 0 | 0 | 2 | 2 | 1 | 1 | -8.9 | 10.9 |
| Vertebral compression fracture | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Wound dehiscence or delayed healing | 0 | 0 | 0 | 1 | 1 | 0.5 | 0.5 | -9.4 | 10.4 |
| Wound drainage | 1 | 1 | 0.5 | 0 | 0 | 0 | -0.5 | -10.4 | 9.4 |

[1] Exact 95% confidence interval for the group difference.
*Infection AEs are defined as: including superficial infections and seroma at the surgical site, as well as infections at remote sites (e.g., sinus or throat infection)
**Musculoskeletal AEs are defined as: including weakness, cramping, joint pain, joint surgery or replacement, and other disorders in non-lumbar spinal tissues
***Other adverse events includes events not fitting a specific existing adverse event category, including insomnia, psychological disorder, weight loss, general weakness, ganglion cyst, and drug withdrawal.

Device- or Procedure-Related Serious Adverse Events

In regards to serious adverse events which were device- or procedure-related, X-STOP® IPD® patients exhibited a slightly higher rate of serious adverse events that were device- or procedure-related (X-STOP® IPD®: 9.5% (19/201), Superion® ISS: 8.4% (16/190)). These device- or procedure-related serious adverse events primarily occur the day of surgery through Month 3 postoperatively.

**Table 17: Counts and Percentages of Serious Device or Procedure Related Adverse Events in Superion® ISS IDE up to 24 months (mITT cohort)**

| | Superion® (I) (N=190) | | | X-STOP® (C) (N=201) | | |
|---|---|---|---|---|---|---|
| **Adverse Event Type** | **No. of Events** | **No. of Pts.** | **% of Pts.** | **No. of Events** | **No. of Pts.** | **% of Pts.** |
| Coronary episode, ischemic | 0 | 0 | 0.0 | 4 | 1 | 0.5 |
| Deep infection at the operative site | 0 | 0 | 0.0 | 3 | 2 | 1.0 |
| Device dislodgement | 0 | 0 | 0.0 | 2 | 2 | 1.0 |
| Device migration | 1 | 1 | 0.5 | 2 | 2 | 1.0 |
| Device subsidence | 1 | 1 | 0.5 | 0 | 0 | 0.0 |
| Dural leaks | 3 | 3 | 1.6 | 0 | 0 | 0.0 |
| Genitourinary | 1 | 1 | 0.5 | 2 | 2 | 1.0 |
| Hematoma | 0 | 0 | 0.0 | 1 | 1 | 0.5 |
| Infection* | 1 | 1 | 0.5 | 0 | 0 | 0.0 |
| Nausea | 0 | 0 | 0.0 | 1 | 1 | 0.5 |
| Pain – Back | 1 | 1 | 0.5 | 0 | 0 | 0.0 |
| Pain – Leg | 1 | 1 | 0.5 | 0 | 0 | 0.0 |
| Respiratory disorder | 0 | 0 | 0.0 | 1 | 1 | 0.5 |
| Spinal stenosis symptoms at index level | 0 | 0 | 0.0 | 4 | 4 | 2.0 |
| Spinous process fracture | 11 | 10 | 5.3 | 5 | 5 | 2.5 |

*Infection AEs are defined as: including superficial infections and seroma at the surgical site, as well as infections at remote sites (e.g., sinus or throat infection)

Overall Conclusions from Review of Adverse Events

The overall adverse event rates of the Superion® ISS and X-STOP® IPD® cohorts subjects were similar, but there were differences in the types of adverse events. While the devices each had different associated adverse event rates associated with individual types of events (e.g., spinous process fracture or migration/dislodgement), the balance of these events, either severe or non-severe, and overall adverse event rate, were not preferential to one device or another. More specifically, Superion® ISS subjects experienced more device-related adverse events; as

compared with X-STOP® IPD® subjects who numerically experienced more procedure-related adverse events, although the differences were similar between the two groups. The data presented demonstrates a reasonable assurance of the safety of the Superion® ISS device compared to an approved device (X-STOP® IPD®) for the same intended patient population of moderate degenerative lumbar spinal stenosis.

**Subsequent Surgical Interventions**

A time course listing of subsequent surgical interventions is provided in Table 18 (Superion® ISS) and Table 19 (X-STOP® IPD®). In the modified intent-to-treat patient population (mITT) through 24 months (as part of the primary endpoint), there were a total of 38 reoperations or revisions in the Superion® ISS group (38/190, 20.0%) compared with 29 reoperations or revisions in the X-STOP® IPD® group (29/201, 14.4%). Reoperations and revisions in subjects prior to 24 months of treatment were considered to be failures in the primary endpoint.

In the modified intent-to-treat patient population (mITT) through the last available follow-up (included time points past 24 months) there were a total of 49 reoperations or revisions in the Superion® ISS group (49/190, 25.8%) compared with 44 reoperations or revisions in the X-STOP® IPD® group (44/201, 21.9%). The majority of reoperations and revisions were performed for pain adverse events (either back pain or leg pain, or combined back and leg pain). Similar numbers of subjects had decompression and device removal (Superion® ISS [13.7% (26/190)]; X-STOP® IPD® [11.4% (23/201)]), device removal and fusion (Superion® ISS [6.8% (13/190)]; X-STOP® IPD®[6.5% (13/201)]) and device removal (Superion® ISS [0.5% (1/190)]; X-STOP® IPD® [1.0% (2/201)]) between the 2 groups.

A higher percentage of Superion® ISS subjects had supplemental decompression (Superion® ISS [2.1% (4/190)]; X-STOP® IPD® [0.0% (0/201)]). Two (2) X-STOP® IPD® subjects had an intraoperative complication preventing implantation (1.0% - 2/201), compared with one (1) Superion® ISS patient (0.5% - 1/190). The primary reason for reoperation or revision in both Superion® ISS and X-STOP® IPD® subjects was related to continued pain.

**Table 18: Reoperation and Revision Events in the Superion® ISS Arm – (mITT) Population**

| Superion® ISS, n=190 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Reoperation or Revision Type*** | **Event Time Course (months)** | | | | | | | | **Total (events)** | **Reasons** |
| | **<1.5** | **1.5-3** | **3-6** | **6-12** | **12-24** | **24-36** | **36-48** | **48-60** | | |
| Decompression and Device Removal | - | 3 (1.6%) | 4 (2.1%) | 8 (4.2%) | 4 (2.1%) | 7 (3.7%) | - | - | 26 (13.7%) | 20 leg and/or low back pain, 2 bone-related fracture, 2 neurological decline, 1 device deployment issue, 1 facet cyst |
| Device Removal and Fusion | 1 (0.5%) | - | - | 4 (2.1%) | 5 (2.6%) | 2 (1.1%) | 1 (0.5%) | - | 13 (6.8%) | 9 leg and/or low back pain, 2 bone-related fracture, 1 neurological decline, 1 unknown |
| Device Removal | - | - | - | 1 (0.5%) | - | - | - | - | 1 (0.5%) | 1 leg and/or low back pain |
| Fusion (no device removal) | - | - | - | 1 (0.5%) | 1 (0.5%) | 1 (0.5%) | - | - | 3 (1.6%) | 2 leg and/or low back pain, 1 synovial cyst |
| Supplemental Decompression | - | - | 2 (1.1%) | 1 (0.5%) | 1 (0.5%) | - | - | - | 4 (2.1%) | 3 leg and/or low back pain, 1 synovial cyst |
| I&D and Device Removal | 1 (0.5%) | - | - | - | - | - | - | - | 1 (0.5%) | 1 dural tear |
| Intraoperative Failure | 1 (0.5%) | - | - | - | - | - | - | - | 1 (0.5%) | 1 dural tear |
| Subtotal Events | 3 (1.6%) | 3 (1.6%) | 6 (3.2%) | 15 (7.9%) | 11 (5.8%) | 10 (5.3%) | 1 (0.5%) | - | 49 (25.8%) | |

*Single patients may be listed in more than one category

**Table 19: Reoperation and Revision Events in the X-STOP® IPD® Arm - (mITT) Population**

| X-STOP® IPD®, n=201 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Reoperation or Revision Type*** | **Event Time Course (months)** | | | | | | | | **Total (events)** | **Reasons** |
| | **<1.5** | **1.5-3** | **3-6** | **6-12** | **12-24** | **24-36** | **36-48** | **48-60** | | |
| Decompression and Device Removal | 1 (0.5%) | 1 (0.5%) | 3 (1.5%) | 3 (1.5%) | 8 (4.0%) | 4 (2.0%) | 2 (1.0%) | 1 (0.5%) | 23 (11.5%) | 18 leg and/or low back pain, 3 device dislodgement, 1 neurological decline, 1 herniated disc |
| Device Removal and Fusion | - | - | - | 1 (0.5%) | 5 (2.5%) | 5 (2.5%) | 2 (1.0%) | - | 13 (6.5%) | 12 leg and/or low back pain, 1 bone-related fracture |
| Device Removal | - | - | - | 1 (0.5%) | - | 1 (0.5%) | - | - | 2 (1.0%) | 1 leg and/or low back pain, 1 bone-related fracture |
| Device Replacement | - | 1 (0.5%) | - | 1 (0.5%) | - | - | - | - | 2 (1.0%) | 2 leg and/or low back pain |
| Intraoperative Failure | 2 (1.0%) | - | - | - | - | - | - | - | 2 (1.0%) | 2 bone-related fracture |
| Irrigation and Debridement | 2 (1.0%) | - | - | - | - | - | - | - | 2 (1.0%) | 2 deep infection |
| Subtotal Events | 5 (2.5%) | 2 (1.0%) | 3 (1.5%) | 6 (4.0%) | 13 (6.5%) | 10 (5.0%) | 4 (2.0%) | 1 (0.5%) | 44 (21.9%) | |

*Single patients may be listed in more than one category

**Additional Treatments (Epidurals, Rhizotomies and Spinal Cord Stimulators)**

Following index surgery, 25 of the 190 (13.2%) Superion® ISS mITT subjects received an epidural steroid injection or nerve block at the level(s) of surgery prior to Month 24. In contrast, 33 of the 201 (16.4%) X-STOP® IPD® mITT subjects received an epidural steroid injection or nerve block at the level(s) of surgery prior to Month 24. All subjects who received an epidural steroid injection or nerve block at the level(s) of surgery prior to Month 24 were considered study failures.

Following index surgery, 0 of the 190 (0.0%) Superion® ISS mITT subjects received a rhizotomy at the level(s) of surgery prior to Month 24. One (1) of the 201 (0.5%) X-STOP® IPD® mITT subjects received a rhizotomy and was therefore considered a study failure. No subject in either group received a spinal cord stimulator at the level(s) of surgery through 24 months.

As shown in Table 20, in the immediate post-operative period (up to Week 6), 142 of the 190 (74.7%) Superion® ISS mITT subjects were treated with narcotics. 155 of the 201 (77.1%) X-STOP® IPD® mITT subjects were treated with narcotics during the immediate post-operative period. Narcotic use declined following the immediate post-operative period with 64 of the 190 (33.6%) Superion® ISS mITT subjects using narcotics during the Week 6 through Month 24 time period. Similarly, 61 of the 201 (30.3%) X-STOP® IPD® mITT subjects were treated with narcotics during the Week 6 through Month 24 period. At all time-points, narcotic use was increased in subjects with pre-existing orthopedic or musculoskeletal comorbidities. Narcotic use was not a study failure criterion.

**Table 20: Narcotic Use**

| | Superion® ISS | X-STOP® IPD® |
|---|---|---|
| Immediate Post-Operative Period (up to Week 6) | 74.7% (142/190) | 77.1% (155/201) |
| Week 6 to Month 24 | 33.6% (64/190) | 30.3% (61/201) |

**Surgery and Hospitalization Data**

The operative details from the IDE subjects are shown in Table 21 and Table 22. The Superion ISS was implanted via a minimally-invasive or “mini-open” approach, compared to X-STOP® IPD® which was implanted via an open approach. As expected, Table 21 shows that mean blood loss was numerically greater with the X-STOP® IPD® device, likely due to the surgical approach. Operative time, however, was numerically greater in the Superion® ISS group.

**Table 21: Perioperative Results from Superion® ISS IDE (mean ± SD)**

| Operative Detail | Superion® ISS | X-STOP® IPD® |
|---|---|---|
| | (n=190) | (n=200) |
| Blood Loss (cc) | 13.5 ± 15.9 | 38.7 ± 43.8 |
| Hospital Length of Stay (days) | 1.80 ± 1.5 | 1.90 ± 1.5 |
| Operative Time (min) | 56.3 ± 26.8 | 47.2 ± 18.8 |

Repair of the supraspinous ligament was performed in approximately half of the Superion® ISS group. This procedure was not performed in any of the X-STOP® IPD® group. As shown in Table 22, additional procedures which could be interpreted as decompression procedures (e.g., facet debulking, osteophyte removal, soft tissue removal), were performed in 11 levels in 9 Superion® ISS subjects and 16 levels in 12 X-STOP® IPD® subjects.

**Table 22: Operative Variables from the Superion® ISS Clinical Trial (mITT cohort)**

| | Superion® ISS | | X-STOP® IPD® | |
|---|---|---|---|---|
| | **n** | **%** | **n** | **%** |
| **Number of Subjects Treated** | 189 | | 199 | |
| **Subjects Attempted / Not Implanted** | 1 | 8.4 | 2 | 3.7 |
| **Number of Levels Treated** | n | % | n | % |
| 1 | 99 | 52.4 | 99 | 49.7 |
| 2 | 90 | 47.6 | 100 | 50.3 |
| **One Level Treated** | **n** | **%** | **n** | **%** |
| L1-L2 | 1 | 1.0 | 0 | 0.0 |
| L2-L3 | 0 | 0.0 | 5 | 5.1 |
| L3-L4 | 7 | 7.1 | 9 | 9.1 |
| L4-L5 | 91 | 91.9 | 85 | 85.9 |
| **Two Levels Treated** | **n** | **%** | **n** | **%** |
| L1-L2/L2-L3 | 2 | 2.2 | 1 | 1.0 |
| L2-L3/L3-L4 | 8 | 8.9 | 7 | 7.0 |
| L2-L3/L4-L5 | 0 | 0.0 | 1 | 1.0 |
| L3-L4/L4-L5 | 80 | 88.9 | 91 | 91.0 |
| L4-L5/L5-S1 | 0 | 0.0 | 0 | 0.0 |
| **Anesthesia Type (all patients)** | **n** | **%** | **n** | **%** |
| General | 156 | 82.1 | 179 | 89.1 |
| Conscious IV Sedation | 25 | 13.2 | 18 | 9.0 |
| Local | 14 | 7.4 | 11 | 5.5 |
| **Surgical Approach (as treated patients by level)** | **n** | **%** | **n** | **%** |
| Percutaneous | 131 | 46.8 | 0 | 0.0 |
| Mini-Open | 149 | 53.2 | 0 | 0.0 |
| Open | 0 | 0.0 | 299 | 100.00 |
| **Device Size (as treated patients by level)** | **n** | **%** | **n** | **%** |
| 6 mm (X-STOP® IPD® only) | N/A | N/A | 2 | 0.7 |
| 8 mm | 2 | 0.7 | 9 | 3.0 |
| 10 mm | 36 | 12.9 | 71 | 23.8 |
| 12 mm | 95 | 33.9 | 131 | 43.8 |
| 14 mm | 117 | 41.8 | 79 | 26.4 |
| 16 mm (Superion®) | 30 | 10.7 | 7 | 2.3 |
| **Supraspinous Ligament sutured? (AT by level)** | **n** | **%** | **n** | **%** |
| Yes | 130 | 46.4 | N/A | N/A |
| No | 150 | 53.6 | N/A | N/A |

**Table 22: Operative Variables from the Superion® ISS Clinical Trial (mITT cohort)**

| | Superion® ISS | | X-STOP® IPD® | |
|---|---|---|---|---|
| | **n** | **%** | **n** | **%** |
| **Additional Procedure (as treated patients by level)** | **n** | **%** | **n** | **%** |
| Any additional procedures | 11 | 3.9 | 16 | 5.4 |
| Facet(s) debulking | 0 | 0.0 | 2 | 0.7 |
| Osteophyte removal | 3 | 1.1 | 3 | 1.0 |
| Soft tissue removal | 6 | 2.1 | 13 | 4.4 |
| Laminectomy / wide decompression | 0 | 0.0 | 1 | 0.3 |
| Other | 2 | 0.7 | 1 | 0.3 |

**Radiographic Data Potentially Related to Safety**

Radiographic observations were reported in the Superion® ISS IDE based on independent radiographic review of all radiographs. The overall incidence of radiographic observations is presented in Table 23.

Following index surgery through 24 months, 31 of the 190 (16.3%) Superion® ISS mITT subjects had a spinous process fracture identified by the radiographic core lab. In contrast, 17 of the 201 (8.5%) X-STOP® IPD® mITT subjects had a spinous process fracture through 24 months. By 24 months, healed fractures were noted (as determined by independent radiographic review) in 10 of the 31 Superion® ISS subjects (32.3%) and 7 of the X-STOP® IPD® subjects (41.2%). In addition, 24 of the 201 (11.9%) X-STOP® IPD® subjects had a device dislodgement or migration, as reported by independent radiographic assessment. These results are outlined in Table 23. In contrast, none of the Superion® ISS subjects exhibited device dislodgement or migration, using the same assessment standards. In contrast to the X-STOP® IPD®, once placed, the Superion® ISS appeared to retain its postoperative position between the spinous processes.

**Table 23: Subjects with Radiographic Observations in the Superion® IDE**

| Radiographic Observation | Superion® ISS (n=190) | | X-STOP® IPD® (n=201) | |
|---|---|---|---|---|
| | **N** | **%** | **n** | **%** |
| Spinous Process Fracture (any time) | 31 | 16.3% | 17 | 8.5% |
| Spinous Process Fracture (non-healed at 24 months) | 21 | 11.1% | 10 | 5.0% |
| Device Migration (>5mm) | 0 | 0.0% | 13 | 8.0% |
| Device Dislodgement | 0 | 0.0% | 20 | 10.0% |
| Any Radiographic Observation (any time) | 31 | 16.3% | 34* | 16.9% |
| Any Radiographic Observation (24 months) | 21 | 11.1% | 28 | 13.9% |

*Significant overlap was present in X-STOP® IPD® subjects having spinous process fractures, device migration, and device dislodgement.

It should be noted that the study demonstrated a discrepancy between spinous process fractures as determined by the investigators (investigational group - 13; control group - 10), by the radiographic core lab (investigational group - 31; control group - 17), and by the CEC (investigational group - 24; control group - 14) as shown below in Table 24. The results from independent radiographic review were used in the final Clinical Composite Success (CCS)

analysis and are also shown in Table 24 below. The applicant has explained the discrepancy between site reported observations, observations by the CEC, and observations by the radiographic core lab by stating that the radiographic core lab was equipped with more sensitive imaging equipment and some of the fractures were asymptomatic. The applicant has provided an analysis of ZCQ, ODI, and VAS (Leg and Back) scores at 24 months in support of this statement (see Table 28 below). The core laboratory determined that 21 investigational and 10 control fractures remained unhealed at 24 months.

**Table 24: Fracture Identification and Reporting in the Superion® IDE**

| Number of Spinous Process Fractures According to Reporting Method | Training Cohort | | Superion® ISS mITT Cohort | | X-STOP® IPD® mITT Cohort | |
|---|---|---|---|---|---|---|
| | Events | Subjects | Events | Subjects | Events | Subjects |
| **Adverse Events** | | | | | | |
| Site Reported* | 0 | 0 | 13 | 11 | 10 | 9 |
| CEC Adjudicated** | 3 | 3 | 24 | 22 | 14 | 13 |
| Independent Radiographic Review | 6 | 6 | 31 | 31 | 17 | 17 |
| Non-Healed Fractures (M24)*** | 2 | 2 | 21 | 21 | 10 | 10 |

*Site reported fractures are those adverse events originally placed in the "spinous process fracture" category by the investigators.
**Note that the CEC had access to the results of the independent radiographic review as reported by the Radiology Core Laboratory and re-categorized several adverse events as spinous process fractures.
***Incidences of non-healed fractures at 24 months post index procedure as determined by the Radiology Core Laboratory.

Spinous process fractures observed via independent radiographic review were further characterized by the timing of fracture diagnosis on imaging studies. The time course of spinous process fractures in both treatment groups is shown in Table 25. As demonstrated in Table 25 below, the majority of spinous process fractures in both treatment groups were observed within 6 weeks of device implantation. In addition, 4/31 (12.9%) of Superion® ISS subjects and 1/17 (5.9%) X-STOP® IPD® subjects with fractures had an observation of fracture in the immediate post-operative x-ray.

**Table 25: Time Course of Spinous Process Fractures in Superion® ISS & X-STOP® IPD® Patients**

| | Post-op | Week 6 | Month 3 | Month 6 | Month 12 | Month 18 | Month 24 | Total |
|---|---|---|---|---|---|---|---|---|
| Superion® ISS | 4 | 23 | 3 | - | 1 | - | - | 31 |
| X-STOP® IPD® | 1 | 13 | 2 | 1 | - | - | - | 17 |
| Superion® ISS | 30/31 (96.7%) btw 0-3 months | | | 1/31 (3.2%) btw 6-24 months | | | | |
| X-STOP® IPD® | 16/17 (94.1%) btw 0-3 months | | | 1/17 (5.8%) btw 6-24 months | | | | |

Table 26 and Table 27 provide additional details regarding the characteristics of the spinous process fractures. The majority of fractures in the Superion® ISS group were located in continuity with the device, while those in the X-STOP® IPD® group were located anterior to the device. Specifically, in the Superion® ISS group, a majority of the fractures (80.6%) present were coincident or in contact with the device, while in the X-STOP® IPD® group, a majority of the fractures (70.6%) were present anterior to the location of the device. Healing (Table 26) was observed at 24 months at a higher rate in fractures that were anterior to the device (Superion® ISS [50.0% (2/4)]; X-STOP® IPD® [50.0% (6/12)]) compared with those fractures coincident with the device (Superion® ISS [28.0% (7/25)]; X-STOP® IPD® [20.0% (1/5)]).

**Table 26: Fracture Healing by Location**

| Device | Coincident with Device | | | Anterior to Device | | |
|---|---|---|---|---|---|---|
| | n | % of Fractures | % Healed by 24M | n | % of Fractures | % Healed by 24M |
| Superion® ISS[1] | 25 | 80.6% | 28.0% (7/25) | 4 | 12.9% | 50.0% (2/4) |
| X-STOP® IPD® | 5 | 29.4% | 20.0% (1/5) | 12 | 70.6% | 50.0% (6/12) |

[1] Location of spinous process fracture information was not available for 2 Superion® ISS subjects with fractures

The majority of fractures in both Superion® ISS [83.9% (26/31)] and X-STOP® IPD® [88.2% (15/17)] groups were displaced fractures (Table 27). A displaced fracture was defined by the applicant as no contact between the fragment and the remaining vertebra with at least a 2mm wide gap at some point along the fracture gap. However, the applicant notes that healing of the displaced fractures was observed in a subset of patients. Healing of displaced spinous process fractures was noted in 23.1% (6/26) of Superion® ISS subjects and 40.0% (6/15) of X-STOP® IPD® subjects.

**Table 27: Fracture Healing in Subjects with Displaced and Non-displaced Fractures**

| Device | Displaced Fractures | | | Non-Displaced Fractures | | |
|---|---|---|---|---|---|---|
| | n | % of Fractures | % Healed by 24M | n | % of Fractures | % Healed by 24M |
| Superion® ISS[1] | 26 | 83.9% | 23.1% (6/26) | 3 | 9.6% | 100.0% (3/3) |
| X-STOP® IPD® | 15 | 88.2% | 40.0% (6/15) | 2 | 11.8% | 50.0% (1/2) |

[1] Displacement of spinous process fracture information was not available for 2 Superion® ISS subjects with fractures

Clinical outcomes were also correlated with the presence of spinous process fractures identified by the independent radiographic core lab, as reported in Table 28 below. When reviewing the possible clinical sequelae of spinous process fractures, there were no notable differences demonstrated in ZCQ, ODI, VAS Back pain, VAS Leg pain, and SF-12 in either the Superion® ISS or X-STOP® IPD® groups, as compared to patients in each group that were not diagnosed with a spinous process fracture. These results are shown in Table 28 below.

**Table 28: Clinical Outcome Measurements Stratified by Presence or Absence of Spinous Process Fracture at Any Time Point, 24 Months (mITT cohort)**

| 24 Month Clinical Outcomes | Superion® ISS | | X-STOP® IPD® | |
|---|---|---|---|---|
| | Fracture | No Fracture | Fracture[1] | No Fracture |
| **Pain** | | | | |
| VAS Back: ≥20mm decrease | 78.3% (18/23) | 64.8% (70/108) | 46.2% (6/13) | 70.8% (85/120) |
| VAS Leg (Worse): ≥20mm decrease | 73.9% (17/23) | 75.9% (82/108) | 69.2% (9/13) | 78.3% (94/120) |

| 24 Month Clinical Outcomes | Superion® ISS | | X-STOP® IPD® | |
|---|---|---|---|---|
| | Fracture | No Fracture | Fracture[1] | No Fracture |
| **Back & Stenosis-Related Outcomes** | | | | |
| ZCQ Physical Function: ≥0.5 point decrease | 73.9% (17/23) | 72.2% (78/108) | 76.9% (10/13) | 80.8% (97/120) |
| ZCQ Symptom Severity: ≥0.5 point decrease | 78.3% (18/23) | 76.9% (83/108) | 69.2% (9/13) | 81.7% (98/120) |
| ZCQ Patient Satisfaction ≤2.5 points | 73.9% (17/23) | 86.1% (93/108) | 84.6% (11/13) | 92.5% (111/120) |
| ODI: ≥15 point decrease | 65.2% (15/23) | 63.0% (68/108) | 61.5% (8/13) | 67.5% (81/120) |

[1]Subjects in the fracture group for X-STOP® include those subjects who had an incidence of both spinous process fracture and migration and/or dislodgement.

Additional treatments were also assessed for subjects with and without spinous process fractures (Table 29). Superion® ISS subjects and X-STOP® IPD® subjects presenting with spinous process fractures had lower re-operation and epidural injection rates compared to subjects without fractures. These data demonstrate that subjects observed to have a spinous process fracture by the independent radiographic lab required an additional treatment at a lower rate than study subjects without spinous fractures. These results, coupled with the clinical outcomes presented in Table 28, suggest that some of these spinous process fractures may have been asymptomatic.

**Table 29: Additional Treatments Stratified by Presence or Absence of Spinous Process Fracture at Any Time Point, 24 Months**

| Treatment Type | Superion® ISS | | X-STOP® IPD® | |
|---|---|---|---|---|
| | Fracture | No Fracture | Fracture | No Fracture |
| Reoperation or Revision | 12.9% (4/31) | 21.4% (34/159) | 11.8% (2/17) | 14.7% (27/184) |
| Epidural Steroid Injection or Nerve Root Block | 12.9% (4/31) | 13.2% (21/159) | 17.6% (3/17) | 16.3% (30/184) |
| **Overall Additional Treatment*** | **19.4% (6/31)** | **27.7% (44/159)** | **23.5% (4/17)** | **27.7% (51/184)** |

*Subjects could have both a reoperation and injection during follow-up.

## Neurologic Status Outcomes

Neurologic success was defined as maintenance or improvement in neurological status as assessed by motor, sensory and deep tendon reflex examination. The rate of neurologic failures was similar for both Superion® ISS and X-STOP® IPD® groups. The Superion® ISS patient population had seven (7) patients (3.7%) that developed new or worsening persistent motor or sensory neurologic assessments at 24 months, while the X-STOP® IPD® population had five (5) failures (2.5%) as shown in Table 30 below. The applicant also provided an analysis of ZCQ scores at 24 months for these patients. Only one Superion® ISS patient that was a neurologic failure was also a ZCQ failure.

**Table 30: Neurological Outcome Failures in the Superion® IDE Trial (mITT Patient Population)**

| Type of Neurological Failure | Superion® ISS | | X-STOP® IPD® | |
|---|---|---|---|---|
| | n | % | n | % |
| Motor Failure | 3 | 1.6 | 3 | 1.5 |
| Sensory Failure | 3 | 1.6 | 1 | 0.5 |
| Motor & Sensory Failure | 1 | 0.5 | 1 | 0.5 |

2. Effectiveness Results

The analysis of effectiveness was based on the 391 evaluable subjects at the 24-month time point. Key effectiveness outcomes are presented in Tables 31 to 37.

### Primary Effectiveness Analysis

The primary composite endpoint, termed Composite Clinical Success (CCS), was developed to measure the safety and effectiveness of the Superion® ISS when compared to X-STOP® IPD® for the treatment of moderate degenerative lumbar spinal stenosis. This primary composite success measurement at 24 months included measurements of clinical efficacy (ZCQ Success), absence of subsequent treatments (e.g., epidurals, rhizotomy, and spinal cord stimulators), neurological success, safety (absence of device revision or removal), and absence of implant or procedure-related complications (absence of dislodgement, migration, spinous process fracture, or serious device-related adverse events).

As demonstrated in Table 31, non-inferiority of Superion® ISS was established in the primary effectiveness cohort with a Bayesian Posterior Probability > 0.958 (as described in the Statistical Analysis Plan), in the mITT cohort that included all subjects with an anesthesia start time in the Superion® ISS IDE. Further, the demonstration of non-inferiority in the Per Protocol cohort provides confirmation of the non-inferiority result of the Superion® ISS IDE and demonstrates the robustness of the overall statistical determination.

**Table 31: Composite Clinical Success in Superion® ISS IDE at 24 months**

| | Number and Percentage Achieving Month 24 Overall Success | | | | | | Posterior Probability of Non-Inferiority |
|---|---|---|---|---|---|---|---|
| | Superion® ISS | | | X-STOP® IPD® | | | |
| Analysis Cohort | N | n | % | N | n | % | |
| mITT[1] | 183 | 95 | 52.7% | 187 | 93 | 50.2% | 0.9927 |
| Per Protocol | 173 | 92 | 53.1% | 178 | 88 | 49.4% | 0.9944 |

[1]As described in the statistical analysis plan, missing data for the posterior probability were handled using Bayesian multiple imputation methodologies. The %'s, as well as the posterior probability reported for the Bayesian multiple imputation (MI) are based on the mean over 5000 multiple imputations. The (SD's) over multiple imputations for these estimates were 52.7% (0.6%), 50.2% (0.9%), and 0.9927 (0.4%), respectively. The reported N and n values for this row reflect only the numbers of patients with complete Month 24 CCS. All

190 Superion® ISS and 201 X-STOP® IPD® patients were included in the primary analysis using Bayesian multiple imputation.

Table 32 shows the success rates for each of the individual components of the CCS for the mITT patient population at 24 months. As seen in Table 32, the Superion® ISS demonstrates greater than 80% success in each individual sub-component of the CCS.

**Table 32: Primary Endpoint Component Success (mITT Patient Population)**

| | **Component Success** | |
|---|---|---|
| | **Superion® ISS** | **X-STOP® IPD®** |
| **Clinical Success (2/3 ZCQ Domains)** | 81.7% (107/131) | 87.2% (116/133) |
| **No Re-operations & Revisions** | 80.0% (152/190) | 86.6% (174/201) |
| **No Major Related Complications** | 86.3% (164/190) | 82.6% (166/201) |
| **No Confounding Additional Treatments** | 86.8% (165/190) | 83.1% (167/201) |

Table 33 lists the specific elements of the individual component results of the CCS at 24 months, resulting in an overall success rate of 51.9% for Superion® ISS and 49.7% for X-STOP® IPD® in the "completers" population.

**Table 33: Superion® ISS and X-STOP® IPD® mITT Analysis Set - Descriptive Comparisons of the Percentages of Subjects Achieving CCS Component Success**

| | Number and Percentage Meeting Criteria | | | | | |
|---|---|---|---|---|---|---|
| | Superion® ISS | | | X-STOP® IPD® | | |
| | N | n | % | N | n | % |
| **(1) ZCQ Responder (at least two of three ZCQ domains)** | **131** | **107** | **81.7** | **133** | **116** | **87.2** |
| Improvement in physical function by ≥ 0.5 points | 131 | 95 | 72.5 | 133 | 107 | 80.5 |
| Improvement in symptom severity by ≥ 0.5 points | 131 | 101 | 77.1 | 133 | 107 | 80.5 |
| Mean satisfaction ≤ 2.5 points (1=very sat., 2=somewhat sat., 3=somewhat dis, 4=very dis.) | 131 | 110 | 84.0 | 133 | 122 | 91.7 |
| **(2) No re-operations, revisions, removals or supplemental fixation at the index level(s) (Up to Day 730)** | **190** | **152** | **80.0** | **201** | **174** | **86.6** |
| **(3) No major device- or procedure-related complications defined as:** | **190** | **164** | **86.3** | **201** | **166** | **82.6** |
| Failure from dislodgement or migration at any time | 190 | 190 | 100.0 | 201 | 177 | 88.1 |
| New or persistent worsened neurological deficit at the index level | 150 | 143 | 95.3 | 157 | 152 | 96.8 |
| Spinous process fractures at the index level(s) | 190 | 169 | 88.9 | 201 | 191 | 95.0 |
| Deep infection at the operative site requiring hospitalization, surgical draining, or IV antibiotics | 190 | 190 | 100.0 | 201 | 199 | 99.0 |
| Death or other permanent disability attributed to the device | 190 | 190 | 100.0 | 201 | 201 | 100.0 |
| **(4) No clinically significant confounding treatments:** | **190** | **165** | **86.8** | **201** | **167** | **83.1** |
| No epidural injections or nerve block procedures to treat spinal stenosis symptoms at the index level(s) at any time | 190 | 165 | 86.8 | 201 | 168 | 83.6 |
| No spinal cord stimulators or rhizotomies | 190 | 190 | 100.0 | 201 | 200 | 99.5 |
| **Composite Clinical Success** | **183** | **95** | **51.9** | **187** | **93** | **49.7** |

Zurich Claudication Questionnaire

For the components of ZCQ, both treatments improved symptoms; however, the Superion® ISS device demonstrated slightly less improvement compared to the X-STOP® IPD®. Immediate relief of clinical symptoms was seen in the three ZCQ domains with improvement maintained through 24 months. These findings were not nominally significant.

Reoperations, Removals, Revisions, or Supplemental Fixation

For the component of "no re-operations, removals, revisions, or supplemental fixation at the index level(s)," in the modified intent-to-treat patient population, through 24 months (as part of the primary endpoint), there were a total of 38 reoperations or revisions in the Superion® ISS group (38/190, 20.0%) compared with 29 reoperations or revisions in the X-STOP® IPD® group (29/201, 14.4%).

Beyond 24 months, there were a total of 49 reoperations or revisions in the Superion® ISS group (49/190, 25.8%) compared with 44 reoperations or revisions in the X-STOP® IPD® group (44/201, 21.9%) through the last available follow-up, which included time points past 24 months for many patients. Reoperations and revisions in patients prior to day 730 of treatment were considered to be failures in the primary endpoint although there was an increased number of reoperations and revisions in the X-STOP® IPD® arm, vs. the Superion® ISS arm, at time points after 2 years.

Implant-and Procedure-Related Complications
For the component of dislodgement, migration or deformation, 24 of the 201 (11.9%) X-STOP® IPD® mITT subjects had a device dislodgement or migration, and none of the Superion® ISS subjects experienced this type of event. In terms of spinous process fractures that were considered CCS failures, 21 of the 190 (11.1%) Superion® ISS mITT subjects had a spinous process fracture that did not heal by Month 24. In contrast, 10 of the 201 (5.0%) X-STOP® IPD® mITT subjects had a spinous process fracture that did not heal by the 24-month time point.

The rate of neurologic failures was similar for both Superion® ISS and X-STOP® IPD® groups. The Superion® ISS patient population had seven (7) failures (3.7%) that had new or worsening persistent motor or sensory neurologic assessments, while the X-STOP® IPD® population had five (5) failures (2.5%) of these criteria.

Clinically Significant Confounding Treatments
Following index surgery, 0 of the 190 (0.0%) Superion® ISS mITT subjects received a rhizotomy at the level(s) of surgery prior to Month 24. In contrast, 1 of the 201 (0.5%) X-STOP® IPD® mITT subjects received a rhizotomy and was therefore considered a study failure. No subject in either group received a spinal cord stimulator at the level(s) of surgery prior to Month 24. Following index surgery, 25 of the 190 (13.2%) Superion® ISS mITT subjects received an epidural steroid injection or nerve block at the level(s) of surgery prior to month 24 and were considered study failures as a result. In contrast, 33 of the 201 (16.4%) X-STOP® IPD® mITT subjects received an epidural steroid injection or nerve block at the level(s) of surgery prior to Month 24.

Additional Stratified Outcomes
As the device was indicated for one- or two-level treatments, additional analyses were performed stratifying CCS results by level implanted and number of levels. Non-inferiority of the Superion® ISS device was also demonstrated comparing the results of one- and two-level procedures.

**Secondary Effectiveness Analysis**

The secondary endpoints included ODI, VAS (Back and Leg), SF-12 Short Form Survey (Physical Function and Mental Health), and an applicant-derived patient satisfaction survey (VertiFlex® Patient Satisfaction Survey).

Analysis of secondary clinical endpoints demonstrated similar trends in both the Superion® ISS and X-STOP® IPD® cohorts (Table 34). In general, the Superion® ISS demonstrated improvement in pain and function as measured with ODI, and less pain as measured through

VAS. The similarities in clinical endpoint outcomes between groups further demonstrate the similar effectiveness of the Superion® ISS device to the control X-STOP® IPD® device. Even when investigating each demographic population, no substantial trends could be found that would demonstrate greater effectiveness of one device over the other.

**Table 34: Superion® ISS and X-STOP® IPD® Control mITT Analysis Set- Secondary Endpoint Successes at 24 Months**

|  | Number and Percentage Meeting Criteria | | | | | |
|---|---|---|---|---|---|---|
|  | Superion® ISS | | | X-STOP® IPD® | | |
|  | N | n | % | N | n | % |
| Improvement of at least 15 pts in ODI | 131 | 83 | 63.4 | 133 | 89 | 66.9 |
| Improvement of at least 20mm on leg pain (worst) VAS | 131 | 99 | 75.6 | 133 | 103 | 77.4 |
| Improvement of at least 20mm on back pain VAS | 131 | 88 | 67.2 | 133 | 91 | 68.4 |
| Maintenance or improvement of SF-12 PCS | 128 | 103 | 80.5 | 133 | 119 | 89.5 |
| Maintenance or improvement of SF-12 MCS | 128 | 77 | 60.2 | 133 | 89 | 66.9 |

ODI mean scores demonstrated an improvement in ODI of at least 15 points in both the Superion® ISS and X-STOP® IPD® by 3 months. This improvement was maintained through 24 months. Improvement in mean VAS Back pain score was demonstrated at 6 weeks. Similarly mean VAS leg (worse) scores also improved by 3 months and maintenance of this improvement was maintained through 24 months. These improvements in pain and function are considered clinically meaningful. In particular, the improvement in leg pain may be significant to patients and their treating physicians as this symptom is a component of intermittent neurogenic claudication. The data does not, however, demonstrate that this improvement in pain and function is maintained with motion and walking.

As shown in Table 35 and Table 36 below, both the SF-12 Physical Component Summary scores and Mental Health Component Summary scores increased by 3 months and improvement was maintained through 24 months.

**Table 35: Time Course of Percentage of Subjects Maintaining or Improving SF-12 Physical Function Component (mITT Patient Population)**

|  | Number and Percentage Meeting Criteria | | | | | |
|---|---|---|---|---|---|---|
|  | Superion® | | | X-STOP® | | |
|  | N | n | % | N | N | % |
| Week 6 | 180 | 143 | 79.4% | 193 | 163 | 84.5% |
| Month 3 | 169 | 140 | 82.8% | 180 | 155 | 86.1% |
| Month 6 | 164 | 131 | 79.9% | 177 | 153 | 86.4% |
| Month 12 | 143 | 121 | 84.6% | 161 | 141 | 87.6% |
| Month 18 | 130 | 110 | 84.6% | 137 | 124 | 90.5% |
| Month 24 | 128 | 103 | 80.5% | 133 | 119 | 89.5% |

**Table 36: Time Course of Percentage of Subjects Maintaining or Improving SF-12 Mental Health Component (mITT Patient Population)**

| | Number and Percentage Meeting Criteria | | | | | |
|---|---|---|---|---|---|---|
| | Superion | | | X-STOP | | |
| | N | n | % | N | N | % |
| Week 6 | 180 | 102 | 56.7% | 193 | 134 | 69.4% |
| Month 3 | 169 | 101 | 59.8% | 180 | 120 | 66.7% |
| Month 6 | 164 | 89 | 54.3% | 177 | 116 | 65.5% |
| Month 12 | 143 | 86 | 60.1% | 161 | 108 | 67.1% |
| Month 18 | 130 | 68 | 52.3% | 137 | 96 | 70.1% |
| Month 24 | 128 | 77 | 60.2% | 133 | 89 | 66.9% |

Patient satisfaction was measured using a questionnaire (Table 37). At 24 months, 86.2% of subjects in the Superion® ISS group and 88.5% of subjects in the X-STOP® IPD® group were "Satisfied" or "Somewhat Satisfied." Also, 82.9% of Superion® ISS patients vs. 84.1% of X-STOP® IPD® patients answered "Definitely Yes" or "Probably Yes" to whether they would have the same treatment again.

**Table 37: Patient Satisfaction at Month 24 by Treatment Group - mITT Analysis Set**

| | Superion® ISS | | X-STOP® IPD® | |
|---|---|---|---|---|
| **How satisfied were you with your treatment?** | **n** | **%** | **n** | **%** |
| Satisfied | 114 | 75.0 | 123 | 78.3 |
| Somewhat Satisfied | 17 | 11.2 | 16 | 10.2 |
| Somewhat Dissatisfied | 0 | 0.0 | 0 | 0.0 |
| Dissatisfied | 21 | 13.8 | 18 | 11.5 |
| | | | | |
| **Would you have the same treatment again?** | **n** | **%** | **n** | **%** |
| Definitely yes | 96 | 63.2 | 108 | 68.8 |
| Probably yes | 30 | 19.7 | 24 | 15.3 |
| Probably no | 14 | 9.2 | 16 | 10.2 |
| Definitely no | 12 | 7.9 | 9 | 5.7 |

Overall, there was a trend toward slightly better effectiveness outcomes for the X-STOP® IPD® in the secondary endpoints at 24 months; but the results remained comparable between the two groups.

## Radiographic Analysis

Additional Radiographic Assessments

The additional radiographic effectiveness assessments measured by the radiographic core lab were:

- Range of Motion
- Translation
- Disc Angle
- Anterior Disc Height
- Posterior Disc Height
- Spinous Process Distance
- Foraminal Height
- Spondylolisthesis Progression

Range of Motion

The applicant presented data regarding the range of motion (ROM) arc over time. The quantitative ROM data is presented below in Table 38. The ranges of motion between the 2 study arms are comparable. There is minimal change in ROM over time in either treatment group, and the applicant characterizes the data as maintenance of motion. The applicant states that the investigational device functions by extension blockage; however, data separating flexion from extension was not captured in the study, thus the data is not clear in determining if this was achieved.

**Table 38: Flexion Extension - Rotation (F to E) (deg), Superion® and X-STOP® mITT Analysis Sets**

| | Superion® ISS | | | X-STOP® IPD® | | |
|---|---|---|---|---|---|---|
| | At level(s) of Implant (per level) | | | | | |
| | N | Mean | SD | N | Mean | SD |
| Pre-Op | 274 | 4.41 | 3.47 | 288 | 4.60 | 3.39 |
| Month 24 | 216 | 3.37 | 3.08 | 222 | 3.78 | 3.11 |

Translation

The applicant presented data regarding the translational motion (flexion to extension) over time. The quantitative translational motion data is presented below in Table 39. The ranges of motion between the 2 study arms are comparable. There is minimal change in translational motion over time in either treatment group, and the applicant characterizes the data as maintenance of motion. Data separating flexion from extension was not captured in the study.

**Table 39: Translation (F to E) (mm), Superion® and X-STOP® mITT Analysis Sets**

| | Superion® ISS | | | X-STOP® IPD® | | |
|---|---|---|---|---|---|---|
| | At level(s) of Implant (per level) | | | | | |
| | N | Mean | SD | N | Mean | SD |
| Pre-Op | 270 | 1.00 | 0.87 | 288 | 1.05 | 0.90 |
| Month 24 | 215 | 0.98 | 0.90 | 220 | 1.02 | 0.97 |

Disc Angle

In terms of disc angle, the changes from the pre-operative disc angle measurements are nominally significant at every time point from post-operative through 24 months, as shown in Table 40. At every time point, the changes were smaller in the Superion® ISS group. This is consistent with other radiographic data that suggest the X-STOP® IPD® devices are designed with an oval shape; thereby affecting distraction. The applicant states that the radiographic data suggests the larger distraction caused by the X-STOP® IPD® devices reduces the disc angle. In other words, the natural lordosis present at the pre-operative evaluation decreases when the spinous process distance increases.

**Table 40: Static Alignment Disc Angle (deg) - Superion® ISS and X-STOP® IPD mITT Analysis Sets**

| | Superion® ISS | | | | | | X-STOP® IPD® | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | At level(s) of Implant (per level) | | | | | | | | | | | |
| | N | Mean | SD | Med | Min | Max | N | Mean | SD | Med | Min | Max |
| Pre-Op | 279 | 9.23 | 4.59 | 9.3 | -4.7 | 21.8 | 296 | 9.5 | 4.32 | 9.3 | -2.9 | 21.4 |
| Post-Op | 270 | 5.09 | 4.25 | 5.1 | -5.5 | 19.1 | 289 | 4.41 | 3.92 | 4.1 | -5.9 | 14.3 |
| Week 6 | 269 | 8.1 | 4.44 | 8.3 | -3.8 | 19.6 | 293 | 6.96 | 4.52 | 6.7 | -6.2 | 20.7 |
| Month 3 | 251 | 8.18 | 4.46 | 8.3 | -4.4 | 19 | 287 | 7.45 | 4.48 | 7.3 | -5.3 | 21.2 |
| Month 6 | 257 | 8.57 | 4.47 | 8.9 | -6.4 | 19.7 | 279 | 7.67 | 4.42 | 7.3 | -4.8 | 20.9 |
| Month 12 | 242 | 8.68 | 4.46 | 8.9 | -8.4 | 20.7 | 266 | 7.75 | 4.58 | 7.8 | -4.2 | 21.4 |
| Month 18 | 221 | 8.6 | 4.57 | 8.8 | -5.4 | 20.2 | 243 | 7.89 | 4.6 | 7.9 | -4.8 | 21.3 |
| Month 24 | 218 | 8.39 | 4.54 | 8.4 | -4.9 | 19.6 | 222 | 7.8 | 4.68 | 7.6 | -5.1 | 20.7 |

Anterior Disc Height

The applicant presented data regarding the anterior disc height over time. The quantitative anterior disc height data is presented below in Table 41. Anterior disc height changes from the pre-operative measurements at the index level are nominally different at 6 weeks through 18 months in both treatment groups. At each time point, the X-STOP® IPD® group had a larger decrease in anterior disc height.

**Table 41: Anterior Disc Height (mm) - Superion® ISS and X-STOP® IPD mITT Analysis Sets**

| | Superion® ISS | | | | | | X-STOP® IPD® | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | At level(s) of Implant (per level) | | | | | | | | | | | |
| | N | Mean | SD | Med | Min | Max | N | Mean | SD | Med | Min | Max |
| Pre-Op | 275 | 10.6 | 3.23 | 10.9 | 1.1 | 19.8 | 296 | 10.6 | 3.04 | 11 | 2.7 | 18.1 |
| Post-Op | 266 | 9.7 | 3.09 | 9.9 | 1.8 | 19.4 | 287 | 9.5 | 2.9 | 9.8 | 1.4 | 16 |
| Week 6 | 267 | 10.2 | 3.17 | 10.3 | 1.6 | 18.5 | 293 | 9.8 | 3.1 | 10 | 0.8 | 17.2 |
| Month 3 | 249 | 10.1 | 3.15 | 10.2 | 1.6 | 18.4 | 285 | 9.9 | 3.13 | 10.3 | 0.4 | 17.3 |
| Month 6 | 256 | 10.1 | 3.12 | 10.4 | 0.7 | 18 | 277 | 9.9 | 3.14 | 10.1 | 0.6 | 17.5 |
| Month 12 | 241 | 9.9 | 3.15 | 10.2 | 0.1 | 16.4 | 264 | 9.8 | 3.19 | 10.2 | 0.1 | 16.4 |
| Month 18 | 220 | 9.8 | 3.21 | 10 | 0.7 | 16.9 | 241 | 9.7 | 3.3 | 10 | 0 | 16 |
| Month 24 | 217 | 9.5 | 3.26 | 9.7 | 0.5 | 16.6 | 220 | 9.6 | 3.28 | 10 | 0 | 16.2 |

Posterior Disc Height

The applicant presented data regarding the posterior disc height over time. The quantitative posterior disc height data is presented below in Table 42 Posterior disc height increases following surgery in both treatment groups.  However, there is a decrease in posterior disc height over time compared to the post-operative measurements, with the decrease more pronounced in the Superion® ISS group. At 24 months, the mean posterior disc height is lower than the pre-operative measurements.

**Table 42: Posterior Disc Height (mm) - Superion® ISS and X-STOP® IPD mITT Analysis Sets**

| | Superion® ISS | | | | | | X-STOP® IPD | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | At level(s) of Implant (per level) | | | | | | | | | | | |
| | N | Mean | SD | Med | Min | Max | N | Mean | SD | Med | Min | Max |
| Pre-Op | 275 | 5 | 1.68 | 4.9 | 1.1 | 9.5 | 296 | 4.9 | 1.74 | 4.9 | 0.5 | 10.2 |
| Post-Op | 266 | 6.6 | 2.06 | 6.5 | 1.6 | 12.7 | 287 | 6.8 | 2 | 6.9 | 1.4 | 12.3 |
| Week 6 | 267 | 5.3 | 1.84 | 5.2 | 1 | 11 | 293 | 5.5 | 1.8 | 5.6 | 1.2 | 10.2 |
| Month 3 | 249 | 5.1 | 1.78 | 5 | 1.1 | 10.7 | 285 | 5.3 | 1.76 | 5.4 | 1.2 | 10.2 |
| Month 6 | 256 | 4.9 | 1.75 | 4.9 | 1.1 | 9.9 | 277 | 5.2 | 1.75 | 5.3 | 0.8 | 10.4 |
| Month 12 | 241 | 4.7 | 1.77 | 4.6 | 0.7 | 9.4 | 264 | 5 | 1.78 | 5.2 | 0.7 | 10 |
| Month 18 | 220 | 4.6 | 1.78 | 4.5 | 0.4 | 9.1 | 241 | 4.9 | 1.73 | 5.1 | 0.7 | 9.3 |
| Month 24 | 217 | 4.5 | 1.78 | 4.5 | 0.4 | 9.1 | 220 | 4.8 | 1.79 | 4.8 | 0.6 | 10.4 |

Spinous Process Distance

In regards to spinous process distance, there are no statistically significant differences between the Superion® ISS and X-STOP® IPD® groups as shown below in Table 43. In both groups, there is an immediate increase in the post-op measurements, followed by a slight decrease that can be attributed to patient mobility and device settling. At 24 months, the spinous process distance is greater than the pre-operative condition for both groups.

**Table 43: Spinous Process Distance (mm) - Superion® ISS and X-STOP® IPD mITT Analysis Sets**

| | Superion® ISS | | | | | | X-STOP® IPD | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | At level(s) of Implant (per level) | | | | | | | | | | | |
| | N | Mean | SD | Med | Min | Max | N | Mean | SD | Med | Min | Max |
| Pre-Op | 176 | 45.3 | 7.5 | 44.7 | 29.9 | 67.8 | 190 | 45.1 | 7.1 | 45 | 30.7 | 66.6 |
| Post-Op | 146 | 51.1 | 7 | 50.9 | 35.8 | 67.6 | 149 | 51.9 | 7 | 51.9 | 34.3 | 70.6 |
| Week 6 | 116 | 48.7 | 6.9 | 49.2 | 31.9 | 64.3 | 154 | 48.7 | 6.7 | 48.1 | 34 | 67 |
| Month 3 | 104 | 48.5 | 6.7 | 48.7 | 33.8 | 62.8 | 145 | 47.8 | 6.7 | 47.4 | 33.7 | 67.4 |
| Month 6 | 111 | 47.9 | 6.8 | 48.1 | 34.1 | 63 | 137 | 47.8 | 6.7 | 47.1 | 34.4 | 67.5 |
| Month 12 | 100 | 47.2 | 6.9 | 46.4 | 33.7 | 62.8 | 128 | 48 | 7 | 47.2 | 34.4 | 68 |
| Month 18 | 89 | 47.6 | 7.2 | 47.7 | 33.9 | 62.8 | 118 | 47.5 | 7 | 47 | 33.9 | 68.1 |
| Month 24 | 82 | 47.2 | 6.9 | 46.1 | 33.8 | 62.2 | 104 | 48 | 6.5 | 47.2 | 35.6 | 64.4 |

Foraminal Height

The applicant presented data regarding the foraminal height over time. The quantitative foraminal height data is presented below in Table 44. Foraminal height increases following surgery in both treatment groups. However, there is a decrease in foraminal height over time compared to the post-operative measurements, with the decrease more pronounced in the Superion® ISS group. At 24 months, the mean foraminal height is nominally lower than the pre-operative measurements in the Superion® ISS group.

**Table 44: Foraminal Height (mm) - Superion® ISS and X-STOP® IPD mITT Analysis Sets**

| | Superion® ISS | | | | | | X-STOP® IPD® | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | At level(s) of Implant (per level) | | | | | | | | | | | |
| | N | Mean | SD | Med | Min | Max | N | Mean | SD | Med | Min | Max |
| Pre-Op | 275 | 16.6 | 2.8 | 16.7 | 9.8 | 24.9 | 294 | 16.6 | 2.7 | 16.6 | 9.3 | 27.8 |
| Post-Op | 266 | 18.5 | 3.2 | 18.8 | 9.2 | 27.6 | 287 | 18.9 | 2.9 | 18.8 | 10.7 | 29.5 |
| Week 6 | 267 | 17 | 2.9 | 17.1 | 9.4 | 25.9 | 293 | 17.5 | 2.8 | 17.4 | 9.5 | 27.6 |
| Month 3 | 249 | 16.8 | 2.8 | 16.9 | 9.6 | 25.9 | 285 | 17.2 | 2.8 | 17.2 | 9.4 | 27.5 |
| Month 6 | 256 | 16.7 | 2.8 | 16.9 | 9.2 | 25.5 | 277 | 17.1 | 2.7 | 17.1 | 11 | 27.5 |
| Month 12 | 241 | 16.4 | 2.8 | 16.8 | 8.9 | 25.2 | 264 | 16.9 | 2.7 | 16.9 | 10.8 | 27.3 |
| Month 18 | 220 | 16.4 | 2.9 | 16.4 | 9 | 25.2 | 241 | 16.8 | 2.8 | 16.7 | 8.9 | 26.9 |
| Month 24 | 217 | 16.3 | 2.9 | 16.5 | 7.9 | 25.4 | 220 | 16.6 | 2.9 | 16.6 | 8.9 | 27 |

Spondylolisthesis Progression

For spondylolisthesis progression, there were no notable differences between Superion® ISS and X-STOP® IPD® at the index levels as shown in Table 45. In all cases, spondylolisthesis was slightly decreased. The values suggest spondylolisthesis measurements were maintained from pre-op to month 24. These results are expected since the devices are not intended to reduce the presence of spondylolisthesis. The data also demonstrate the investigational and control devices do not encourage greater spondylolisthesis.

**Table 45: Spondylolisthesis (mm) - Superion® ISS and X-STOP® IPD mITT Analysis Sets**

| | Superion® ISS | | | | | | X-STOP® IPD ® | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | At level(s) of Implant (per level) | | | | | | | | | | | |
| | N | Mean | SD | Med | Min | Max | N | Mean | SD | Med | Min | Max |
| Pre-Op | 275 | -0.4 | 3.14 | 0.4 | -10.2 | 5.7 | 296 | -0.2 | 3 | 0.5 | -9.1 | 5.7 |
| Post-Op | 266 | -0.45 | 2.77 | 0.2 | -9.4 | 4.7 | 287 | -0.24 | 2.8 | 0.3 | -8.6 | 5.5 |
| Week 6 | 267 | -0.58 | 3.16 | 0.2 | -9.7 | 5.5 | 293 | -0.46 | 3.08 | 0.3 | -9.4 | 5.7 |
| Month 3 | 249 | -0.58 | 3.2 | 0.2 | -9.8 | 5.5 | 285 | -0.39 | 3.08 | 0.4 | -9.5 | 5.8 |
| Month 6 | 256 | -0.58 | 3.2 | 0.1 | -9.8 | 4.8 | 277 | -0.45 | 3.08 | 0.3 | -11 | 5.9 |
| Month 12 | 241 | -0.58 | 3.22 | 0 | -10.2 | 5.2 | 264 | -0.4 | 3.11 | 0.4 | -11.7 | 6.2 |
| Month 18 | 220 | -0.58 | 3.21 | 0.2 | -10.4 | 6.8 | 241 | -0.51 | 3.05 | 0.3 | -12.3 | 5.4 |
| Month 24 | 217 | -0.66 | 3.22 | 0.1 | -10.3 | 4.6 | 220 | -0.51 | 3.05 | 0.2 | -9.5 | 6.1 |

**Longer Term Clinical Results (36 Months)**

The applicant provided an analysis of their 36-month data using the same parameters as the primary composite endpoint (CCS). For subjects theoretically due for 36 month follow-up, the Superion® ISS cohort had a follow-up rate of 90.2% and the X-STOP® IPD® cohort had a follow-up rate of 91.4%. Table 46 shows the CCS results at 36 months, as well as the success rates of the individual sub-components of the CCS. At 36 months, the Superion® ISS success rate (52.5%) remains comparable to the X-STOP® IPD® (38.0%). Table 47 presents VAS, ZCQ and ODI secondary endpoint outcomes at 36 months for both treatment cohorts. While these analyses were not pre-specified, the results suggest that the Superion® ISS remains comparable to the X-STOP® IPD® for these clinical outcomes at 36 months as well.

**Table 46: Superion® ISS and X-STOP® IPD® mITT Analysis Set - Descriptive Comparisons of the Percentages of Subjects Achieving CCS Component Success at 36 Months***

| | Number and Percentage Meeting Criteria | | | | | |
|---|---|---|---|---|---|---|
| | Superion® ISS | | | X-STOP® IPD® | | |
| | N | n | % | N | n | % |
| (1) ZCQ Responder (at least two of three ZCQ domains) | 81 | 71 | 87.7 | 75 | 63 | 84.0 |
| (2) No re-operations, revisions, removals or supplemental fixation at the index level(s) | 138 | 112 | 81.2 | 148 | 118 | 79.7 |
| (3) No major device- or procedure-related complications | 138 | 125 | 90.6 | 148 | 126 | 85.1 |
| (4) No clinically significant confounding treatments | 138 | 120 | 87.0 | 148 | 118 | 79.7 |
| **Composite Clinical Success** | **120** | **63** | **52.5** | **129** | **49** | **38.0** |

*Outcomes based on all data available 7/7/14

**Table 47: Clinical Primary and Secondary Outcomes at 36 Months**

| 36 Month Clinical Outcomes* | Superion® ISS | X-STOP® IPD® |
|---|---|---|
| **Pain** | | |
| VAS Back: ≥20mm decrease | 76.8% (63/82) | 69.7% (53/76) |
| VAS Leg (Worse): ≥20mm decrease | 84.1% (69/82) | 69.7% (53/76) |
| **Back & Stenosis-Related Outcomes** | | |
| ZCQ Physical Function: ≥0.5 point decrease | 80.5% (66/82) | 77.9% (60/77) |
| ZCQ Symptom Severity: ≥0.5 point decrease | 82.9% (68/82) | 75.3% (58/77) |
| ZCQ Patient Satisfaction: ≤2.5 points | 91.5% (75/82) | 88.3% (68/77) |
| ODI: ≥15 point decrease | 69.5% (57/82) | 71.4% (55/77) |

*Outcomes based on all data available 7/7/14

3. Subgroup Analyses

A number of other exploratory analyses were performed to determine if various baseline pre-existing spinal conditions or surgical effects had an effect on poolability, treatment success, and Superion® ISS safety and effectiveness. In addition, several exploratory analyses were performed

on subjects who were observed to have spinous process fractures at any time point based upon independent radiographic review.

These exploratory analyses included migrations/dislodgements, level poolability, stenosis locations, smoking status, presence or absence of spondylolisthesis, supraspinous ligament repair, spinous process fractures, instrumentation sets, anesthesia types, learning curves, device sizes, comorbidity analyses, and presence or absence of bone-implant interface changes.

The exploratory analyses suggest that subjects treated with the Superion® ISS exhibit comparable clinical outcomes regardless of pre-existing conditions, such as 1- or 2-level disease, various types of stenosis, up to Grade I spondylolisthesis, and smoking status. In addition, intra-operative details, such as supraspinous ligament repair and instrumentation set versions, do not appear to have an effect on the clinical outcomes produced following implantation with the Superion® ISS. Furthermore, the presence of radiographic findings, such as spinous process fractures and bone-implant interface changes, did not affect the clinical outcomes observed with the Superion® ISS.

There were no pre-specified analyses related to weight, age, or gender. Post-hoc analyses were performed for weight, age, and gender, and there were no notable differences between groups.

### A. Financial Disclosure

The Financial Disclosure by Clinical Investigators regulation (21 CFR 54) requires applicants who submit a marketing application to include certain information concerning the compensation to, and financial interests and arrangement of, any clinical investigator conducting clinical studies covered by the regulation. The pivotal clinical study included 33 Investigators of which none were full-time or part-time employees of the applicant and 1 had disclosable financial interests/arrangements as defined in 21 CFR 54.2(a), (b), (c) and (f) and described below:

- Compensation to the investigator for conducting the study where the value could be influenced by the outcome of the study: none
- Significant payment of other sorts: 1
- Proprietary interest in the product tested held by the investigator: none
- Significant equity interest held by investigator in applicant of covered study: 1

The applicant has adequately disclosed the financial interest/arrangements with clinical investigators. Statistical analyses were conducted by FDA to determine whether the financial interests/arrangements had any impact on the clinical study outcome. The information provided does not raise any questions about the reliability of the data.

## XI. PANEL MEETING RECOMMENDATION AND FDA'S POST-PANEL ACTION

### A. Panel Meeting Recommendation

At an advisory meeting held on February 20, 2015, the Orthopaedic and Rehabilitation Devices Panel voted 5-1 (2 abstentions) that there is reasonable assurance the device is safe, 5-1 (2 abstentions) that there is reasonable assurance that the device is effective, and 4-2 (2 abstentions) that the benefits of the device do outweigh the risks in subjects who meet the criteria specified in the proposed indication. The 24-hour Panel Summary is located at the following link: *http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/MedicalDevices/MedicalDevicesAdvisoryCommittee/OrthopaedicandRehabilitationDevicesPanel/UCM435258.pdf*

### B. FDA's Post-Panel Action

Following the Panel meeting, the applicant worked with FDA to develop post-approval studies to address the outstanding issues highlighted by the Panel, namely, the need for longer-term follow-up and comparison of the Superion® ISS to decompression. The Panel also identified the potential risk of radiation posed by the use of CT scans.

The applicant has adequately addressed the outstanding issues raised by the Panel relating to comparison of the Superion® ISS to decompression at 60 months through the design of their new enrollment post-approval study. FDA agrees with the applicant's submitted five-point summary protocol plan, and has determined that the information the applicant has submitted to address the Panel's concern is acceptable.

## XII. CONCLUSIONS DRAWN FROM PRECLINICAL AND CLINICAL STUDIES

Effectiveness Conclusions

In this study, subjects were enrolled, treated, and followed up through the 24 month post-operative visit. Follow-up was satisfactory and 97.3% of the Superion® cohort and 94.9% of the control cohort had data available for analysis at the completion of the study. Assessment of effectiveness was performed using the mITT and the per protocol populations. All 190 Superion® ISS and 201 X-STOP® IPD® subjects were included in the primary analysis of the mITT cohort. Statistical analysis demonstrated that the results from all sites were poolable to determine safety and effectiveness. Analysis of patient demographic and baseline data showed the Superion® ISS and X-STOP® IPD® groups to be comparable.

To meet the primary effectiveness endpoint, individual subjects were considered a success if they 1) demonstrated improvement in two of the three domains of the ZCQ (physical function, symptom severity, and patient satisfaction); 2) experienced no re-operations or revisions; 3) experienced no device- or procedure-related complications; and 4) required no spinal cord stimulators, rhizotomies, or epidural injections.

The applicant has met the protocol specified primary composite endpoint with a posterior probability for non-inferiority of 0.9927 for the mITT and 0.9944 for the Per Protocol analysis cohorts. Note that 0.958 is the pre-specified threshold to declare statistical success. This was calculated through a Bayesian model using Bayesian imputation for the missing data, assuming

they were missing at random. The estimated overall success rates were 52.7% in the Superion® ISS group and 50.2% in the X-STOP® IPD® group.

Overall success as defined in the study protocol was comparable in both Superion® ISS and X-STOP® IPD® for both populations analyzed (mITT and Per Protocol). The results of overall success indicate that the Superion® ISS group is statistically non-inferior to the X-STOP® IPD® control group at 24 months. Although non-inferiority was demonstrated, both Superion® ISS and X-STOP® IPD® success rates were below the 65% rate used to calculate the trial sample size. To assess the impact of subjects with unknown outcomes at 24 months or other potential biases, various sensitivity analyses were conducted. Non-inferiority was demonstrated with these analyses. At every assessment time period, the percentage of Superion® ISS subjects achieving composite success was comparable to control. When considering the individual components of composite success, the ZCQ and re-operations components numerically favored the control, while complications and confounding treatments favored the Superion® device. Analysis shows that the demonstration of non-inferiority between the Superion® ISS and X-STOP® IPD® is robust to missing data.

It should be noted that 24 of the 201 (11.9%) X-STOP® IPD® mITT subjects had a device dislodgement or migration, and none of the Superion® ISS subjects experienced this type of event. In terms of spinous process fractures that were considered CCS failures, 21 of the 190 (11.1%) Superion® ISS mITT subjects had a spinous process fracture that did not heal by Month 24. In contrast, 10 of the 201 (5.0%) X-STOP® IPD® mITT subjects had a spinous process fracture that did not heal by the 24-month time point.

A worst-case analysis of all unresolved spinous process fractures being analyzed as study failures was conducted, and under these conditions, non-inferiority was still demonstrated when comparing the Superion® ISS to the X-STOP® IPD®.

In conclusion, the clinical study data indicate that, at 24 months post-operatively, the Superion® ISS has a reasonable assurance of effectiveness for the treatment of moderate degenerative lumbar spinal stenosis.


Safety Conclusions

The risks of the device are based on non-clinical laboratory as well as data collected in a clinical study conducted to support PMA approval as described above. The clinical data from the mITT population were used in the safety analysis. Data considered were adverse events, re-operations, and neurological status at 24 months. The rate of Superion® ISS subjects having at least one adverse event, or an events classified as severe, device-related or procedure-related as adjudicated by the CEC was comparable to the observed adverse event rates in the X-STOP® IPD® control group. The rate of secondary surgery for the Superion® ISS group was also similar to the X-STOP® IPD® control group at 24 months. Neurological success, defined as maintenance of improvement in neurological status at 24 months was comparable between Superion® ISS and X-STOP® IPD® groups.

The clinical study noted the presence of additional spinous process fractures in a number of subjects identified by the independent radiographic lab, and not by the investigators, in both Superion® ISS and the X-STOP® IPD® groups. There were more fractures noted in the Superion® ISS subjects than in the X-STOP® IPD® group, and two-thirds of these fractures had not healed by the evaluation at 24 months. However, based on an analysis of the primary composite endpoint, including the ZCQ, VAS, and ODI assessments, the presence of the fractures did not demonstrate clinical significance at 24 months. The long term significance of these fractures, however, is unknown.

In conclusion, the clinical study data indicate that, at 24 months post-operatively, the Superion® ISS has a reasonable assurance of safety, and is at least as safe as the X-STOP® IPD®, in regards to adverse events, re-operations and neurological status. It also demonstrates a numerically greater incidence of spinous process fractures when compared to the X-STOP® IPD® which had no clinical significance at 24 months, but the long term effects of which are unknown.

Benefit-Risk Conclusions

The probable benefits of the device are also based on data collected in a clinical study conducted to support PMA approval as described above.

Over the 24-month time period studied, the following benefits were observed with use of the Superion® ISS when compared to the X STOP® IPD® (control):

1) Improvement in neurogenic intermittent claudication symptoms as measured by the Zurich Claudication Questionnaire (ZCQ) Score at 24 months post-operatively compared to baseline (proportion of subjects achieving protocol defined ZCQ success: Superion® ISS, 81.7%; X-STOP® IPD®, 87.2%).
2) Functional improvement measured by the improvement in Oswestry Disability Index (ODI) scores at 24 months post-operatively compared to baseline (proportion of subjects achieving protocol defined ODI success: Superion® ISS, 64.3%; X-STOP® IPD®, 66.9%).
3) Maintenance or improvement in neurological status at 24 months post-operatively (proportion of subjects achieving protocol defined neurologic success: Superion® ISS, 95.3%; X-STOP® IPD®, 96.8%).
4) Despite longer operative times, less blood loss (numerically different, not statistically significant) was reported during the surgical implantation of the Superion® ISS device as compared to the control device (mean operative time: Superion® ISS, 56.2 minutes; X-STOP® IPD®, 47.2 minutes; estimated blood loss: Superion® ISS, 13.5cc; X-STOP® IPD®, 38.7cc).

Additional factors that were considered in determining probable risks and benefits for the Superion® ISS included:

1) The overall rate of adverse events with the Superion® ISS device was comparable to the control device (Superion® ISS, 94.7%; X-STOP® IPD®, 91.5%).
2) The rate of serious adverse events with the Superion® ISS device was comparable to the control device (Superion® ISS, 46.3%; X-STOP® IPD®, 45.8%).

3) The rate of serious adverse events that were either device- or procedure-related with the Superion® ISS device was comparable to the control device (Superion® ISS, 8.4%; X-STOP® IPD®, 9.5%).
4) The incidence of spinous process fractures observed with the Superion® ISS device was higher than those observed with the control device (Superion® ISS, 16.3%; X-STOP® IPD®, 8.5%; as reported by the independent radiographic reviewers), and the long-term effect of these fractures on safety and effectiveness is unclear.
5) Through 24 months, there were a total of 38 reoperations or revisions in the Superion® ISS group (38/190, 20.0%) compared with 29 reoperations or revisions in the X-STOP® IPD® group (29/201, 14.4%).

In conclusion, given the available information above, the data supports that for moderate degenerative lumbar spinal stenosis, the probable benefits of using the Superion® ISS outweigh the probable risks.

Overall Conclusions

The data in this PMA application support the reasonable assurance of safety and effectiveness of this device when used in accordance with the indications for use. Based on the clinical study results, it is reasonable to conclude that a portion of the indicated patient population will achieve clinically significant results. The clinical benefits of the use of the Superion® ISS in terms of functional improvement, reduction in pain and maintenance or improvement in neurological status outweigh the risks associated with the device and surgical procedure through 24 months follow-up when used in the indicated population and in accordance with the directions for use. In conclusion, the Superion® ISS represents a reasonable alternative to other treatment options for subjects suffering from moderate degenerative lumbar spinal stenosis.

## XIII. CDRH DECISION

CDRH issued an approval order on May 20, 2015. The final conditions of approval cited in the approval order are described below.

In addition to the Annual Report requirements, the applicant must conduct two Post-Approval Studies to provide long-term device performance and to evaluate device performance under actual conditions of use.

1. ***Extended Follow-up of Premarket Cohort.*** The "Superion® Post-Approval Clinical Evaluation and Review (SPACER)" study is described as follows:

   Based on the study plan received on May 1, 2015, the applicant must perform a 60-month post-approval study (PAS) to evaluate the longer term safety and effectiveness of the Superion® ISS as compared to the X-STOP® Interspinous Process Decompression (IPD®) System ("X-STOP® IPD®") by following all patients from the pivotal investigational device exemption (IDE) study G070118 with device survival to 24 months (137 Superion® and 144 X-STOP® randomized patients had not died or

terminally failed as of the 24 month visit) annually through 60 months at 25 study sites. Thus, the post-approval study duration is approximately 36 months as all patients have reached 24 months prior to the start of this study.

At each annual (±3 month) visit, the applicant will collect the following data: Zurich Claudication Questionnaire (ZCQ); neurological status as determined by physical exam; radiographic information; maintenance of distraction; all adverse events regardless of cause; incidence of epidural injections regardless of the cause and spinal level injected; incidence of analgesic narcotics usage; reoperations, revisions, removals or supplemental fixation at the index levels; SF-12 Short Form Health Survey, Version 2; VertiFlex® Patient Satisfaction Survey; Visual Analog Scale (VAS); Oswestry Disability Index (ODI), return to work and to activities of daily living, and rehabilitation utilization. In addition, the applicant will report information on the length of hospital stay, operative time, estimated blood loss, and type of anesthesia.

Radiographic information collected will include: standing anteroposterior and lateral lumbar radiographs, range of motion on lateral standing flexion/extension films (at implanted and adjacent level(s)), radiolucency, device displacement or migration, and radiographic observations such as incidence of total and per patient spinous process fractures or heterotopic ossification. Adverse events will be evaluated by the Medical Monitor. Data will be evaluated for safety endpoints by an independent Clinical Events Committee (CEC).

The primary hypothesis of this extended follow-up post approval study is that performance of the Superion® ISS remains clinically non-inferior to X-STOP® IPD® at 60 months post-surgery using the same non-inferiority margin ($\delta$=-0.10) as was used at 24 Months. An individual subject will be considered a success if they meet all of the following conditions at the 60-month follow-up:

Clinically significant improvement in outcomes compared to baseline, as determined by meeting the following:

- At least two of three domains of the Zurich Claudication Questionnaire (ZCQ)
    - Improvement in physical function by $\geq$ 0.5 points
    - Improvement in symptom severity by $\geq$ 0.5 points
    - "Satisfied" or "somewhat satisfied" as defined by a score of $\leq$ 2.5 points on the patient satisfaction domain
- No re-operations, revisions, removals, or supplemental fixation at the index level(s)
- No major implant-or procedure-related complications:
    - No dislodgement, migration, or deformation
    - No new or persistent worsened neurological deficit at the index level
    - No spinous process fractures
    - No deep infection, death, or other permanent device attributed disability
- No clinically significant confounding treatments:
    - No epidural injections or nerve block procedures at index level, spinal cord stimulators or rhizotomies

The secondary study objective is to demonstrate the superiority of Superion® ISS to X-STOP® IPD® in effectively treating moderately impaired LSS patients as measured by 60 months postoperative overall success rates.

FDA will expect at least 85% follow-up at the 60-month time point to provide sufficient data to evaluate safety and effectiveness as well as sensitivity analyses to address missing data.

2. ***New Enrollment Study.*** The "Superion® New Enrollment Study" is described as follows:

The applicant will recruit 358 subjects to ensure that at minimum 304 (152 per treatment group) patients will be followed through 60-months. Nine clinical visits will occur at the following intervals: screening (< 4 weeks before surgery), surgery, 6 weeks (±2 weeks), 6 months (±2 months), 12 months (±2 months), 24 months (±2 months), and annually (±4 months) thereafter through 60 months of follow-up. At each post-operative visit, the applicant will collect the following data: ZCQ; neurological status as determined by physical exam; radiographic information; all adverse events regardless of cause; incidence of epidural injections regardless of the cause and spinal level injected; incidence of analgesic narcotics usage; reoperations, revisions , removals or supplemental fixation at the index levels; Patient satisfaction Survey; VAS; ODI, return to work and to activities of daily living and rehabilitation utilization. In addition, the applicant will collect information on the length of hospital stay, operative time, estimated blood loss, and type of anesthesia.

The imaging data will be collected during screening (< 4 weeks before surgery) and during all post-operative visits via x-rays in the following positions: anteroposterior, lateral, flexion and extension. In addition, standing anteroposterior and lateral lumbar radiographs will be taken at time of discharge of index surgery. Computed tomography (CT) imaging will be captured in lieu of x-rays at 24 months for all patients, pending individual IRB approval, in the Superion® cohort. CT imaging may be performed in lieu of x-rays for Superion® patients at 60 months per surgeon discretion. CT imaging will be utilized to observe spinous process fractures.

- The primary objective of this study is to demonstrate that the composite clinical success (CCS) of Superion® device performance will be non-inferior ($\delta$=-0.125) to decompression at 60-months. The CCS is defined as following:
  - A clinically significant improvement in at least two of the three domains of the ZCQ
  - No re-operations, revisions, removals, or supplemental fixation at the index level(s)
  - No ≥2 injections or series of injections for the treated level, or nerve block procedures performed to treat spinal stenosis for the index level(s), or a single injection within 12 months of the 60-month endpoint.

A secondary endpoint with alternative CSS for the primary objective will also be evaluated at 60 months where CSS is defined as above with the exception of point number three where success will be defined as:

- No injections or series of injections at any level at any time.

The applicant's manufacturing facilities have been inspected and found to be in compliance with the device Quality System (QS) regulation (21 CFR 820).

## XIV. APPROVAL SPECIFICATIONS

Directions for Use: See device labeling
Hazards to Health from Use of the Device: See Indications, Contraindications, Warnings, Precautions, and Adverse Events in the device labeling.
Post-approval Requirements and Restrictions: See Approval Order.

Journal of Pain Research

open access to scientific and medical research

Open Access Full Text Article

ORIGINAL RESEARCH

# Superion® InterSpinous Spacer for treatment of moderate degenerative lumbar spinal stenosis: durable three-year results of a randomized controlled trial

This article was published in the following Dove Press journal:
Journal of Pain Research
3 October 2015
Number of times this article has been viewed

Vikas V Patel[1]
Pierce D Nunley[2]
Peter G Whang[3]
Thomas R Haley[4]
W Daniel Bradley[5]
Raphael P Davis[6]
Jon E Block[7]
Fred H Geisler[8]

[1]The Spine Center, University of Colorado Hospital, Denver, CO, [2]Spine Institute of Louisiana, Shreveport, LA, [3]Department of Orthopaedics and Rehabilitation, Yale University School of Medicine, New Haven, CT, [4]Performance Spine and Sports Physicians, PC, Pottstown, PA, [5]Texas Back Institute, Denton, TX, [6]Department of Neurological Surgery, Stony Brook Medicine, Stony Brook, NY, [7]Jon Block, Ph.D. San Francisco, CA, [8]McLaren Hospital, Petoskey, MI, USA

**Purpose:** This report provides the 3-year clinical outcomes from the randomized, controlled US Food and Drug Administration Investigational Device Exemption trial of the Superion® for the treatment of moderate degenerative lumbar spinal stenosis.

**Patients and methods:** The Superion® was evaluated in the treatment of subjects aged 45 years or older suffering from symptoms of intermittent neurogenic claudication, secondary to a confirmed diagnosis of moderate degenerative lumbar spinal stenosis at one or two contiguous levels from L1 to L5. Patients were treated between June 2008 and December 2011 at 31 investigational sites. Three hundred ninety-one subjects were included in the randomized study group consisting of 190 Superion® and 201 X-STOP® control subjects. The primary composite endpoint was individual patient success based on four components: improvement in two of three domains of the Zurich Claudication Questionnaire, no reoperations at the index level, no major implant/procedure-related complications, and no clinically significant confounding treatments.

**Results:** At 3 years, the proportion of subjects achieving the primary composite endpoint was greater for Superion® (63/120, 52.5%) than for X-STOP® (49/129, 38.0%) ($P$=0.023) and the corresponding success rates exceeded 80% for each of the individual components of the primary endpoint in the Superion® group (range: 81%–91%). Improvements in back and leg pain severity as well as back- and disease-specific functional outcomes were also maintained through 36 months.

**Conclusion:** The 3-year outcomes from this randomized controlled trial demonstrate durable clinical improvement consistently across all clinical outcomes for the Superion® in the treatment of patients with moderate degenerative lumbar spinal stenosis.

**Keywords:** InterSpinous Spacer, lumbar spinal stenosis, Superion®, neurogenic claudication

## Introduction

On May 20, 2015, the US Food and Drug Administration (FDA) approved the Superion® InterSpinous Spacer (ISS) (Superion®) for commercial distribution in the United States. Not requiring concomitant surgical decompression, this is the second "stand-alone" interspinous device approved by the FDA. This pivotal regulatory decision substantiates the graduation of the Superion® device from experimental to an acceptable clinical practice modality for the treatment of intermittent symptoms of neurogenic claudication secondary to moderate degenerative lumbar spinal stenosis.

Lumbar spinal stenosis is the manifestation of arthritic degeneration of the spine resulting in bony and ligamentous encroachment of the central canal and foramina

Correspondence: Jon E Block
Jon Block, Ph.D. 2210 Jackson Street, Suite 401, San Francisco, CA 94115, USA
Tel +1 415 775 7947
Email jb@drjonblock.com

© 2015 Patel et al. This work is published by Dove Medical Press Limited, and licensed under Creative Commons Attribution – Non Commercial (unported, v3.0) License. The full terms of the License are available at http://creativecommons.org/licenses/by-nc/3.0/. Non-commercial uses of the work are permitted without any further permission from Dove Medical Press Limited, provided the work is properly attributed. Permissions beyond the scope of the License are administered by Dove Medical Press Limited. Information on how to request permission may be found at: http://www.dovepress.com/permissions.php

causing classic claudicant symptoms.[1–3] These symptoms are often exacerbated during ambulation, standing, and trunk extension. It is estimated that 1.2 million individuals are diagnosed with lumbar spinal stenosis every year, with surgical hospitalizations increasing by 30% from 2000 to 2009.[4] Over 175,000 surgeries are performed to treat spinal stenosis annually, making it the number one reason for spine surgery in the elderly population.[5] In fact, stenosis is the most common indication for spine surgery in patients older than 65 years, and its prevalence is expected to rise 59% to 64 million elderly adults by the year 2025.[6]

The Superion® is designed for the treatment of symptoms of intermittent neurogenic claudication secondary to moderate degenerative lumbar spinal stenosis and is implanted by minimally invasive methods through a cannula.[7] In contrast to direct decompression procedures, such as laminectomy or laminectomy with fusion, where the soft and bony tissues compressing the neural elements are surgically removed through an open surgical exposure, the Superion® provides minimally invasive, indirect decompression of spinal nerves, and functions by serving as a spinal extension blocker to prevent compression of neural elements in extension without the removal of tissue adjacent to the nerves.

This report provides the 3-year clinical outcomes from the randomized, controlled FDA Investigational Device Exemption trial of the Superion® for the treatment of moderate spinal stenosis.[8]

# Materials and methods

## Trial overview

The study was a prospective, multi-center, randomized controlled clinical trial comparing the Superion® to a control group consisting of the X-STOP® (X-STOP®), a legally marketed alternative with similar indications for use. The study methodology including eligibility criteria, randomization methods, sample size estimates, outcome measures, and statistical analyses have been detailed previously.[9,10] Briefly, the study evaluated the use of the Superion® in the treatment of subjects aged 45 years or older suffering from moderate symptoms of intermittent neurogenic claudication, secondary to a confirmed diagnosis of moderate degenerative lumbar spinal stenosis at one or two contiguous levels from L1 to L5. Patients were treated between June 2008 and December 2011 at 31 investigational sites. Three hundred ninety-one subjects were included in the randomized study group consisting of 190 Superion® ISS and 201 X-STOP® control subjects. FDA regulatory approval was based on the 24-month outcome data in this population.

This study was approved by the Institutional Review Board at each participating site and patients provided written informed consent before any study-related procedures were performed. The trial was prospectively registered at ClinicalTrials.gov (NCT00692276).

## Approved indications for use

This device is indicated to treat skeletally mature patients suffering from pain, numbness, and/or cramping in the legs (intermittent neurogenic claudication) secondary to a diagnosis of moderate degenerative lumbar spinal stenosis, with or without Grade 1 spondylolisthesis, confirmed by X-ray, magnetic resonance imaging, and/or computed tomography evidence of thickened ligamentum flavum, narrowed lateral recess, and/or central canal or foraminal narrowing. The Superion® is indicated for those patients with impaired physical function who experience relief in flexion from symptoms of leg/buttock/groin pain, numbness, and/or cramping, with or without back pain, and who have undergone at least 6 months of nonoperative treatment. The Superion® may be implanted at one or two adjacent lumbar levels in patients in whom treatment is indicated at no more than two levels, from L1 to L5.

For this intended use, moderate degenerative lumbar spinal stenosis is defined as follows:

- A reduction of 25%–50% in the central canal and/or nerve root canal (subarticular and neuroforaminal) compared to the adjacent levels on radiographic studies, with radiographic confirmation of any one of the following:
  - Evidence of thecal sac and/or cauda equina compression
  - Evidence of nerve root impingement (displacement or compression) by either osseous or nonosseous elements
  - Evidence of hypertrophic facets with canal encroachment.
- And associated with the following clinical signs:
  - Presents with moderately impaired physical function defined as a score of ≥2.0 of the Zurich Claudication Questionnaire (ZCQ)
  - Ability to sit for 50 minutes without pain and to walk 50 feet or more.

### Primary and secondary outcomes

The primary composite endpoint of the investigation as mandated by FDA was individual patient success, which required the patient to meet all of the following criteria at 24 months:

**Table 1** Comparative 36-month success rates between Superion® and X-STOP® overall and for each primary endpoint component

| | Number and percentage meeting criteria | | | | | | *P*-value* |
|---|---|---|---|---|---|---|---|
| | Superion® ISS | | | X-STOP® | | | |
| | N | n | % | N | n | % | |
| 1) ZCQ Responder (at least two of three ZCQ domains) | 81 | 71 | 87.7 | 75 | 63 | 84.0 | 0.65 |
| 2) No reoperations, revisions, removals or supplemental fixation at the index level(s) | 138 | 112 | 81.2 | 148 | 118 | 79.7 | 0.77 |
| 3) No major device- or procedure-related complications | 138 | 125 | 90.6 | 148 | 126 | 85.1 | 0.21 |
| 4) No clinically significant confounding treatments | 138 | 120 | 87.0 | 148 | 118 | 79.7 | 0.11 |
| Composite clinical success | 120 | 63 | 52.5 | 129 | 49 | 38.0 | 0.023 |

**Note:** *Fisher's exact test, two-tailed.
**Abbreviations:** ISS, InterSpinous Spacer; ZCQ, Zurich Claudication Questionnaire.

1. Clinically significant improvement in outcomes compared to baseline, as determined by meeting the criterion for at least two of three domains of ZCQ.
   - ≥0.5 point improvement in physical function
   - ≥0.5 point improvement in symptom severity
   - Score of ≤2.5 points on patient satisfaction domain
2. No reoperations, removals, revisions, or supplemental fixation at the index level(s).
3. No major implant or procedure-related complications.
   - No dislodgement, migration, or deformation
   - No new or persistent worsened neurological deficit at the index level
   - No spinous process fractures
   - No deep infection, death, or other permanent device attributed disability
4. No clinically significant confounding treatments:
   - No epidural injections, nerve block procedures at index level, spinal cord stimulators, or rhizotomies.

Secondary outcomes included leg and back pain severity assessed on a 100 mm visual analog scale, the Oswestry Disability Index (ODI), and the number of patients that required reoperation, revision or implant removal.

### Three-year evaluation

The primary composite endpoint and all secondary outcomes were re-evaluated at the 36-month follow-up interval. In all, 90.2% and 91.4% of the Superion® and X-STOP® study subjects, respectively, were available at this interval. Statistical analysis was performed by an independent biostatistical firm who received all data for analysis directly from a study-specific electronic database. All outcomes were reported using a modified intention-to-treat population, which included all randomized patients who began anesthesia on the implant date. Minimal clinically important changes were defined as 20 mm or more improvement in pain scores and a 15% point or more improvement in ODI. Frequency distributions were compared between groups using Fisher's exact test, two-tailed.

## Results

All subject background characteristics and operative details for the originally randomized inception cohort have been published previously.[9] Based on achieving the a priori specified 24-month primary endpoint, the two devices were demonstrated to be statistically noninferior as per the initial trial hypothesis, satisfying the FDA regulatory requirements for approval.

At 36 months, the proportion of subjects achieving the primary composite endpoint was greater for Superion® (63/120, 52.5%) than for X-STOP® (49/129, 38.0%) (*P*=0.023) (Table 1). The subjects implanted with the Superion® showed no degradation in clinical success compared to the 24-month endpoint analysis (53%), whereas

**Table 2** Comparative 36 Month Success Rates between Superion® and X-STOP® for Primary and Secondary Clinical Outcomes

| 36-month clinical outcomes | Superion® ISS | X-STOP® | *P*-value* |
|---|---|---|---|
| **Pain** | | | |
| VAS back: ≥20 mm decrease | 76.8% (63/82) | 69.7% (53/76) | 0.37 |
| VAS leg (worse): ≥20 mm decrease | 84.1% (69/82) | 69.7% (53/76) | 0.037 |
| **Back and stenosis-related outcomes** | | | |
| ZCQ physical function: ≥0.5 point decrease | 80.5% (66/82) | 77.9% (60/77) | 0.70 |
| ZCQ symptom severity: ≥0.5 point decrease | 82.9% (68/82) | 75.3% (58/77) | 0.25 |
| ZCQ patient satisfaction: ≤2.5 points | 91.5% (75/82) | 88.3% (68/77) | 0.60 |
| ODI: ≥15 point decrease | 69.5% (57/82) | 71.4% (55/77) | 0.86 |

**Note:** *Fisher's exact test, two-tailed.
**Abbreviations:** ISS, InterSpinous Spacer; ODI, Oswestry Disability Index; VAS, visual analog scale; ZCQ, Zurich Claudication Questionnaire.

**Figure 1** Time course of results for each sub-domain of the ZCQ.
**Notes:** (**A**) Symptom severity. (**B**) Physical function, and (**C**) Patient satisfaction.
**Abbreviations:** Postop, postoperative; ZCQ, Zurich Claudication Questionnaire.

**Figure 2** Time course of results for pain severity.
**Notes:** (**A**) Back pain. (**B**) Leg pain.
**Abbreviations:** VAS, visual analog scale; Postop, postoperative.

X-STOP® subjects showed a modest degradation over the same timeframe (50%). As shown in Table 1, the corresponding 36-month success rates exceeded 80% for each of the individual components of the primary endpoint in the Superion® group. Specifically, the success rates were 88%, 81%, 91%, and 87% for improvement in two of three domains of the ZCQ, no reoperations at the index level, no major implant/procedure-related complications, and no clinically significant confounding treatments, respectively.

Table 2 provides the 36-month success rates for pain severity as well as back- and disease-specific outcomes based on the minimal clinically important difference criteria for each variable. Five of six comparisons qualitatively favored treatment with the Superion® device; however, only the leg pain results achieved statistical significance. Inspection of the line graphs for each outcome captures both the durability of the Superion® results and the modest degradation in X-STOP® results between 24 and 36 months for the ZCQ (Figure 1) as well as for back and leg pain severity (Figure 2) and back function (Figure 3).

Comparing the 24-month data with the 36-month data, there was a higher increase in X-STOP® reoperations, revisions, and removals (n=15 out of 44 total) compared to the Superion® device (n=11 out of 49 total).

## Discussion

With its recent regulatory approval, the Superion® becomes the only "stand-alone" interspinous device on the US market available to patients for the treatment of moderate spinal stenosis. While the X-STOP® received FDA regulatory approval in 2005, the manufacturer (Medtronic, Inc., Minneapolis, MN, USA) recently (2015) elected voluntarily to cease sale and distribution of the implant. This leaves the Superion® as



**Figure 3** Time course of results for ODI.
**Abbreviations:** ODI, Oswestry Disability Index; Postop, postoperative.

the de facto clinical option for physicians and their patients seeking a minimally invasive alternative to laminectomy for claudicant symptoms refractory to conservative care.

Importantly, the Superion® implantation procedure does not cause substantial alterations or disruptions to the spinal anatomy which likely reduces the complexity of future surgical options in the event that revision becomes necessary to address progressive degenerative changes and/or reemergence of symptoms. If device removal is required, the implant can be removed via the same minimally invasive access as the original implantation procedure. This suggests that the Superion® device may be considered a reasonable "first line" option in the continuum of care for the treatment of moderate lumbar spinal stenosis.

The durable clinical results achieved with the Superion® in the current study are further reflected in a low conversion rate to surgical decompression of only 14% (26/190) at 3 years. This finding may have a profound effect on the health economics and societal costs of treating the increasing number of patients suffering from spinal stenosis. Indeed, approximately 40% of patients treated conservatively to alleviate early signs of spinal stenosis ultimately require decompression surgery within 10 years due to persistently worsening symptoms.[11] Use of an InterSpinous Spacer at the appropriate juncture in the continuum of care may obviate the need for decompression surgery in the majority of patients carefully selected in accordance with the approved indications for use.

## Conclusion

The 3-year outcomes from this randomized controlled trial demonstrate durable clinical improvement consistently across all clinical outcomes for the Superion® in the treatment of patients with moderate spinal stenosis. At this follow-up interval, a success rate in excess of 80% was maintained in all the four components of the primary endpoint.

## Acknowledgment

The authors wish to thank Greg Maislin for data management support and for conducting all statistical analyses. Financial support for this work was provided by VertiFlex, Inc. (San Clemente, CA, USA).

## Author contributions

All authors contributed to the study design, conception, and execution as well as data interpretation, drafting of the manuscript, and provided critical revision of the manuscript for intellectual content. All authors read and provided final approval of the version to be published. All authors agree to be accountable for all aspects of the work in ensuring that questions related to the accuracy and integrity of any part of the work are appropriately investigated and resolved.

## Disclosure

JB is an independent advisor to VertiFlex. The authors report no other conflicts of interest in this work.

## References

1. Atlas SJ, Delitto A. Spinal stenosis: surgical versus nonsurgical treatment. *Clin Orthop Relat Res*. 2006;443:198–207.
2. Ciol MA, Deyo RA, Howell E, Kreif S. An assessment of surgery for spinal stenosis: time trends, geographic variations, complications, and reoperations. *J Am Geriatr Soc*. 1996;44(3):285–290.
3. Katz JN, Harris MB. Clinical practice. Lumbar spinal stenosis. *N Engl J Med*. 2008;358(8):818–825.
4. Skolasky RL, Maggard AM, Thorpe RJ Jr, Wegener ST, Riley LH 3rd. United States hospital admissions for lumbar spinal stenosis: racial and ethnic differences, 2000 through 2009. *Spine (Phila Pa 1976)*. 2013;38(26):2272–2278.
5. Deyo RA, Mirza SK, Martin BI, Kreuter W, Goodman DC, Jarvik JG. Trends, major medical complications, and charges associated with surgery for lumbar spinal stenosis in older adults. *JAMA*. 2010;303(13):1259–1265.
6. Deyo RA. Treatment of lumbar spinal stenosis: a balancing act. *Spine J*. 2010;10(7):625–627.
7. Loguidice V, Bini W, Shabat S, Miller LE, Block JE. Rationale, design and clinical performance of the Superion(R) Interspinous Spacer: a minimally invasive implant for treatment of lumbar spinal stenosis. *Expert Rev Med Devices*. 2011;8(4):419–426.
8. Miller LE, Block JE. Interspinous spacer implant in patients with lumbar spinal stenosis: preliminary results of a multicenter, randomized, controlled trial. *Pain Res Treat*. 2012;2012:823509.
9. Patel VV, Whang PG, Haley TR, et al. Superion interspinous process spacer for intermittent neurogenic claudication secondary to moderate lumbar spinal stenosis: two-year results from a randomized controlled FDA-IDE pivotal trial. *Spine (Phila Pa 1976)*. 2015;40(5):275–282.
10. Patel VV, Whang PG, Haley TR, et al. Two-year clinical outcomes of a multicenter randomized controlled trial comparing two interspinous spacers for treatment of moderate lumbar spinal stenosis. *BMC Musculoskelet Disord*. 2014;15:221.
11. Atlas SJ, Keller RB, Wu YA, Deyo RA, Singer DE. Long-term outcomes of surgical and nonsurgical management of lumbar spinal stenosis: 8 to 10 year results from the maine lumbar spine study. *Spine (Phila Pa 1976)*. 2005;30(8):936–943.

Journal of Pain Research Dovepress

**Publish your work in this journal**

The Journal of Pain Research is an international, peer-reviewed, open access, online journal that welcomes laboratory and clinical findings in the fields of pain research and the prevention and management of pain. Original research, reviews, symposium reports, hypothesis formation and commentaries are all considered for publication. The manuscript management system is completely online and includes a very quick and fair peer-review system, which is all easy to use. Visit http://www.dovepress.com/testimonials.php to read real quotes from published authors.

**Submit your manuscript here:** http://www.dovepress.com/journal-of-pain-research-journal


SPINE Volume 40, Number 5, pp 275-282
©2015, Wolters Kluwer Health, Inc. All rights reserved.

RANDOMIZED TRIAL

OPEN

# Superion Interspinous Process Spacer for Intermittent Neurogenic Claudication Secondary to Moderate Lumbar Spinal Stenosis

*Two-Year Results From a Randomized Controlled FDA-IDE Pivotal Trial*

Vikas V. Patel, MD,* Peter G. Whang, MD,† Thomas R. Haley, DO,‡ W. Daniel Bradley, MD,§ Pierce D. Nunley, MD,¶ Raphael P. Davis, MD,‖ Larry E. Miller, PhD,**†† Jon E. Block, PhD,†† and Fred H. Geisler, MD, PhD‡‡

**Study Design.** Prospective, multicenter, randomized, controlled, investigational device exemption noninferiority trial.

**Objective.** To determine 2-year outcomes in patients with intermittent neurogenic claudication secondary to moderate lumbar spinal stenosis (LSS) who were treated with the Superion interspinous process spacer.

**Summary of Background Data.** Interspinous spacers are a less-invasive treatment alternative compared with surgical decompression for patients with LSS unresponsive to conservative care. High-quality comparative data with these devices are lacking.

**Methods.** Patients presenting with intermittent neurogenic claudication secondary to moderate LSS who failed at least 6 months of nonsurgical management were randomly allocated to treatment with the Superion spacer or a control spacer (X-Stop) and followed for 2 years.

**Results.** A total of 391 randomized patients were implanted with Superion (n = 190) or control (n = 201) spacers at 29 sites in the United States between August 2008 and December 2011. Implants were successfully implanted in 99.5% of patients with Superion and 99.0% of control patients. The primary composite endpoint of this study was met, which demonstrated that the Superion spacer was noninferior to the X-Stop spacer. Leg pain, the predominant patient complaint, decreased in severity by 70% during 2 years in each group. Most (77%) patients achieved leg pain clinical success (improvement ≥20 mm) at 2 years. Back pain clinical success (improvement ≥20 mm) was 68%, with no differences between groups. Oswestry Disability Index clinical success (≥15% point improvement) was achieved in 65% of patients. The rates of complications and reoperations were similar between groups.

**Conclusion.** The Superion interspinous process spacer relieves symptoms of intermittent neurogenic claudication secondary to moderate LSS in the majority of patients through 2 years.

**Key words:** implant, indirect decompression, intermittent neurogenic claudication, interspinous process spacer, lumbar spinal stenosis, randomized controlled trial, Superion.

**Level of Evidence:** 2

**Spine 2015;40:275–282**

From the *University of Colorado Hospital, Denver, CO; †Department of Orthopaedic and Rehabilitation, Yale University School of Medicine, New Haven, CT; ‡Performance Spine and Sports Physicians, P.C., Pottstown, PA; §Texas Back Institute, Denton, TX; ¶Spine Institute of Louisiana, Shreveport, LA; ‖Stony Brook University, Stony Brook, NY; **Miller Scientific Consulting, Inc., Asheville, NC; ††The Jon Block Group, San Francisco, CA; and ‡‡McLaren Hospital, Petoskey, MI.

Acknowledgment date: October 10, 2014. Revision date: November 3, 2014. Acceptance date: December 3, 2014.

The device(s)/drug(s) that is/are the subject of this manuscript is/are being evaluated as part of an ongoing FDA-approved investigational protocol (IDE) or corresponding national protocol for [state the intended use on a separate page and attach].: Superion Interspinous Process Spacer for Intermittent Neurogenic Claudication Secondary to Moderate Lumbar Spinal Stenosis.

VertiFlex Inc. San Clemente, CA, funds were received in support of this work.

Relevant financial activities outside the submitted work: consultancy, grants pending, payment for lectures, royalties, payment for development of educational presentations, other, board membership, travel accommodations, stock.

This is an open-access article distributed under the terms of the Creative Commons Attribution-NonCommercial-NoDerivitives 3.0 License, where it is permissible to download and share the work provided it is properly cited. The work cannot be changed in any way or used commercially.

Address correspondence and reprint requests to Larry E. Miller, PhD, Miller Scientific Consulting, Inc., 1854 Hendersonville Rd, # 231, Asheville, NC 28803; E-mail: larry@millerscientific.com

DOI: 10.1097/BRS.0000000000000735

Lumbar spinal stenosis (LSS) with intermittent neurogenic claudication represents a challenging therapeutic dilemma. Interspinous process spacers are a less-invasive alternative to surgical decompression in patients who have failed nonsurgical management. The mechanism of action is thought to be distraction of the spinous processes and/or limiting extension of the lumbar spine, which lessens the mechanically induced stenosis associated with lumbar extension, thus relieving claudicatory symptoms. In 2005, the X-Stop Interspinous Process Decompression System (Medtronic Inc., Minneapolis, MN) became the first Food and Drug Administration (FDA)-approved interspinous process spacer for treatment of neurogenic claudication secondary to LSS.[1] Since

Exh C - Page 140

Copyright © 2015 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

then, no other interspinous process spacers have received FDA approval. The Superion InterSpinous Spacer (Vertiflex Inc., San Clemente, CA) was designed to be implanted between contiguous spinous processes *via* a less-invasive approach compared with the X-Stop spacer. The purpose of this randomized controlled trial was to compare 2-year outcomes in patients with intermittent neurogenic claudication secondary to moderate LSS who were treated with the Superion spacer or a control spacer (X-Stop).

**Figure 1.** The Superion InterSpinous Spacer in spine model.

## MATERIALS AND METHODS

### Ethics

This was a prospective, multicenter, randomized, controlled investigational device exemption trial approved by the United States FDA. This study was approved by the institutional review board at each participating site and patients provided written informed consent before any study-related procedures were performed. The trial was prospectively registered at ClinicalTrials.gov (NCT00692276).

### Patients

Patients presenting with neurogenic intermittent claudication symptoms were screened for study eligibility. Eligible patients were at least 45 years of age and reported symptoms of intermittent neurogenic claudication secondary to a confirmed diagnosis of LSS at 1 or 2 contiguous levels from L1 to L5, despite at least 6 months of nonsurgical management. Key study inclusion and exclusion criteria are provided in Table, Supplemental Digital Content 1 available at http://links.lww.com/BRS/A948.

### Procedures

Pretreatment evaluations included a physical and neurological examination, medical history, and assessment for study eligibility based on predefined inclusion/exclusion criteria. Radiographical assessments included radiographs (standing anteroposterior, lateral lumbar, flexion/extension lateral lumbar) and magnetic resonance images or computed tomographic scans of the lumbar spine.

The Superion interspinous process spacer (Figures 1, 2) is a titanium implant delivered through a cannula and deployed between the spinous processes of the involved vertebral levels. The device consists of an implant body and 2 cam lobes that rotate during deployment to encompass the lateral aspects of the superior and inferior spinous processes. Device sizes range from 8 to 16 mm, with each size corresponding to the magnitude of desired distraction between the 2 spinous processes (Figure 3). Comprehensive descriptions of the Superion[2] and X-Stop[3] interspinous process spacers and operative technique have been previously reported.

### Outcomes

Subjects were followed through hospital discharge and returned for visits at 6 weeks and 3, 6, 12, 18, and 24 months. A physical and neurological assessment was performed at all follow-up visits; neurological success was defined by freedom from new or worsening motor or sensory function. Radiographical evaluations included standing anteroposterior, lateral, and flexion/extension lateral lumbar radiographs. The primary endpoint of this study was a composite treatment success outcome at the 2-year follow-up visit, defined as: (1) clinically significant improvement in at least 2 of 3 Zurich Claudication Questionnaire (ZCQ)[4] domain scores compared with baseline (physical function $\geq$0.5-point decrease, symptom severity $\geq$0.5-point decrease, patient satisfaction score $<$2.5), (2) freedom from reoperation, revision, removal, or supplemental fixation at the index level, (3) freedom from epidural steroid injection or nerve block at the index level within 12 weeks of the 2-year visit, (4) freedom from rhizotomy or spinal cord stimulator at any level, and (5) freedom from major implant or procedure-related complications. Secondary outcomes included leg and back pain severity assessed on a 100-mm visual analogue scale, Oswestry Disability Index (version 2),[5] patient satisfaction questions rated on a 5-point Likert scale ranging from very satisfied to very dissatisfied, radiographical evaluations, and adverse events classified by seriousness and relationship to the device and/or procedure.

### Hypotheses

The primary hypothesis was that the composite treatment success outcome at 2 years in patients treated with Superion would be noninferior to that of patients treated with X-Stop. A noninferiority margin of 10% was determined

**Figure 2. A**, A/P and **B**, lateral radiographical image showing a properly placed Superion InterSpinous Spacer. A/P indicates anteroposterior, VAS, visual analogue scale; SD, standard deviation.

Copyright © 2015 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

A
L
UPR
Moderate stenosis at level L4–L5. Note reduced disc height in extension.
B
L
Superion® Spacer at level L4–L5. Note increased disc height in extension vs. preoperative

**Figure 3. A**, Preoperative lateral view of moderate stenosis at L4–L5. **B**, Lateral extension at 6 months postoperative in patient treated with Superion.

to be a clinically nonsignificant difference. Using a Bayesian approach, noninferiority would be claimed if the posterior probability of the null hypothesis was 95.8% or more, a value that was selected to ensure that the type I error remained less than 0.05.

### Sample Size

A prospectively defined Bayesian adaptive sample size approach was used, which specified a total evaluable sample size ranging from 250 to 350 patients. An interim analysis was scheduled when patient accrual reached 250, 300, and 350. At each interim period, patient enrollment was either scheduled to stop if trial success was determined (posterior probability of the null hypothesis ≥95.8%) or continue to the next planned interim analysis, up to a maximum of 350 patients.

### Randomization and Blinding

Patients were randomly allocated (1:1) to implant with Superion or X-Stop interspinous spacers and stratified by sex and number of index levels at each site. A web-based electronic data capture system was used to obtain treatment assignment before each patient was enrolled. Treatments were not concealed to investigators, outcome assessors, or trial participants.

### Data Quality

This clinical trial was conducted per Good Clinical Practice guidance. Prior to commencing any study activity at any site, each investigator was trained in Good Clinical Practice, the study protocol, and the surgical technique for both interspinous process spacers. Data were regularly monitored by the sponsor and an independent contract research organization. Electronic data capture was handled by an independent firm (MedNet Solutions, Minnetonka, MN). A core radiographical laboratory (Medical Metrics Inc., Houston, TX) independently reviewed radiographs for evidence of spinous process fracture, and device disassembly, dislodgement, or migration.

### Statistical Methods

Statistical analysis was performed by independent biostatisticians, who received all data for analysis directly from the electronic database. All outcomes were reported using a modified intent-to-treat population, which included all randomized patients who began anesthesia on the implant date. Continuous data were reported as mean ± standard deviation and categorical data were reported as frequencies and percentages. Comparisons of baseline characteristics were performed with independent samples *t* test, the Wilcoxon signed rank test, or Fisher exact test, as appropriate. Longitudinal changes in clinical outcomes between groups were assessed with unpaired *t* tests. Minimal clinically important changes in symptom severity were defined as 20 -mm or more improvement in pain scores[6,7] and a 15%-point or more improvement in Oswestry Disability Index.[6,8] The Kaplan-Meier method and log-rank tests were used to analyze freedom from reoperation through 2 years. The primary endpoint was assessed using a Bayesian approach that specified a posterior probability of the null hypothesis at 95.8% or more. Details of the Bayesian methodology were specified in a separate statistical analysis plan.

## RESULTS

### Participant Flow and Accountability

A total of 440 patients were randomized at 29 sites between August 2008 and December 2011 (Figure, Supplemental Digital Content 2 available at http://links.lww.com/BRS/A948). A total of 49 patients (Superion 28, control 21) were discontinued before treatment, most commonly due to withdrawal of informed consent. Ultimately, 391 were implanted with Superion (n = 190) or control (n = 201) spacers. During the 2-year follow-up period, 111 patients (Superion 54, control 57) were withdrawn from the study due to a protocol-defined secondary intervention, including device explant, revision surgery at the index level without explant, rhizotomy, rehospitalization for deep infection, or lumbar injection at the index

Exh C - Page 142
Copyright © 2015 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

**TABLE 1. Baseline Patient Characteristics**

| Variable | Superion (n = 190) | X-Stop (n = 201) |
|---|---|---|
| Demographics | | |
| Age, yr | 67 ± 9 (47–88) | 66 ± 10 (46–89) |
| Male sex, n (%) | 110 (58) | 129 (64) |
| Body mass index, kg/m$^2$ | 30 ± 5 (16–40) | 30 ± 5 (20–40) |
| Medical history* | | |
| Spine, n (%) | 170 (90) | 178 (89) |
| Musculoskeletal, n (%) | 151 (80) | 163 (81) |
| Cardiovascular, n (%) | 148 (78) | 150 (75) |
| Gastrointestinal, n (%) | 109 (57) | 123 (61) |
| Tobacco history, n (%) | 101 (53) | 100 (50) |
| Genitourinary, n (%) | 99 (52) | 101 (50) |
| Endocrine/metabolic, n (%) | 80 (42) | 101 (50) |
| Allergy, n (%) | 80 (42) | 75 (37) |
| Neurological, n (%) | 69 (36) | 66 (33) |
| Respiratory, n (%) | 47 (25) | 59 (29) |
| Psychiatric, n (%) | 47 (25) | 49 (24) |
| Dermatological, n (%) | 36 (19) | 36 (18) |
| Symptoms | | |
| Oswestry Disability Index | 39 ± 13 (9–74) | 40 ± 12 (7–80) |
| Back VAS | 55 ± 28 (0–93) | 55 ± 27 (0–100) |
| Leg VAS† | 67 ± 24 (0–100) | 68 ± 24 (0–95) |
| ZCQ Physical Function | 2.6 ± 0.4 (1.6–3.6) | 2.7 ± 0.4 (1.8–3.8) |
| ZCQ Symptom Severity | 3.3 ± 0.6 (1.6–5.0) | 3.4 ± 0.6 (2.0–5.0) |

*Continuous data reported as mean ± standard deviation (minimum–maximum).*

**Variables reported with frequency more than 10% in either group.*

*†Leg with highest pain severity used for calculation.*

*ZCQ indicates Zurich Claudication Questionnaire; VAS, visual analogue scale; SD, standard deviation.*

**TABLE 2. Operative Details**

| Variable | Superion (n = 189) | X-Stop (n = 199) |
|---|---|---|
| Anesthesia type, n (%) | | |
| General | 156 (82.1) | 179 (89.1) |
| Conscious sedation | 25 (13.2) | 18 (9.0) |
| Local | 14 (7.4) | 11 (5.5) |
| Surgical approach, n (%)* | | |
| Open | 0 | 299 (100) |
| Miniopen | 149 (53.2) | 0 |
| Percutaneous | 131 (46.8) | 0 |
| Device size, n (%), mm | | |
| 6 | NA | 2 (0.7) |
| 8 | 2 (0.7) | 9 (3.0) |
| 10 | 36 (12.9) | 71 (23.8) |
| 12 | 95 (33.9) | 131 (43.8) |
| 14 | 117 (41.8) | 79 (26.4) |
| 16 | 30 (10.7) | 7 (2.3) |
| No. of treated levels, n (%) | | |
| 1 | 99 (52.4) | 99 (49.7) |
| 2 | 90 (47.6) | 100 (50.3) |
| Concomitant procedures, n (%) | 11 (3.9) | 16 (5.4) |
| Soft-tissue removal | 6 (2.1) | 13 (4.4) |
| Osteophyte removal | 3 (1.1) | 3 (1.0) |
| Facet debulking | 0 | 2 (0.7) |
| Laminectomy | 0 | 1 (0.3) |
| Other | 2 (0.7) | 1 (0.3) |
| Operative time, min† | 52 (12–193) | 43 (10–110) |
| Blood loss, mL† | 5 (0–100) | 25 (0–300) |
| Hospital stay, d† | 1 (1–11) | 2 (1–10) |

**Levels treated. †Median (minimum–maximum), NA indicates not available; ZCQ, Zurich Claudication Questionnaire.*

level. Of the remaining patients, follow-up visit compliance was excellent (Superion 96.7%, control 94.7%).

### Subject Characteristics

Baseline patient characteristics, including demographics, medical history, and symptom severity, were comparable between groups (Table 1). Only one baseline characteristic (ZCQ Physical Function) was statistically different between groups although this was not deemed a clinically important difference. Baseline radiographical findings are shown in Table, Supplemental Digital Content 3 available at http://links.lww.com/BRS/A948. Spinal stenosis was most frequently identified at L3–L4 or L4–L5. The incidence of low-grade spondylolisthesis was 32% at L4–L5, 9% at L3–L4, 1% at L2–L3, and 0% at L1–L2.

### Operative Details

Interspinous process spacer implant success was 99.5% with Superion and 99.0% with control. Approximately 50% of patients were implanted at 1-level (typically L4–L5) and 50% at 2 levels (typically L3–L4/L4–L5). An important distinction between devices is that the X-Stop requires an open surgical

Copyright © 2015 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

approach, whereas access is gained percutaneously (47%) or with a miniopen incision (53%) with the Superion spacer (Table 2). Blood loss (median: 5 *vs*. 25 mL, $P < 0.001$) and hospital stay (median: 1 *vs*. 2 days, $P < 0.05$) favored patients treated with Superion.

## Primary Endpoint: Composite Treatment Success Outcome

Using a Bayesian approach, the posterior probability that the composite treatment success outcome through 2 years with Superion was no less than the 10% noninferiority margin compared with X-Stop was 0.993. This posterior probability exceeded the *a priori* criterion of 0.958, providing evidence that Superion is clinically noninferior to X-Stop. A number of sensitivity analyses were performed that corroborated the findings of the primary analysis. A tipping point analysis confirmed that the Bayesian posterior probability exceeded 0.958 in 92% of simulations.

**Figure 5.** Changes in back pain severity during 2 years. VAS indicates visual analogue scale; SD, standard deviation.

## Patient-Reported Symptoms

Leg pain severity decreased by 70% in both the Superion and control groups, with mean values of 20 ± 30 and 20 ± 26 at 2 years, respectively (Figure 4). At 2 years, leg pain clinical success was 76% with Superion and 77% with control. Back pain severity decreased by 65% in the Superion group and 69% with the control spacer, with mean values of 20 ± 26 and 18 ± 23 at 2 years, respectively (Figure 5). At 2 years, back pain clinical success was comparable (Superion 67%, control 68%, $P = 0.90$). Back-specific disability improved 51% with the Superion and 55% with the control spacer, with mean values of 20 ± 18 and 18 ± 15 at 2 years, respectively (Figure 6). At 2 years, Oswestry Disability Index clinical success was 63% with Superion and 67% with control ($P = 0.61$). ZCQ subdomain scores through 2 years were comparable between groups (Figure, Supplemental Digital Content 4 available at http://links.lww.com/BRS/A948). For symptom severity, mean improvement was 1.15 for Superion and 1.28 points for the control spacer. For physical function, mean improvement was 0.89 points for Superion and 1.09 points for control. At 2 years, mean ZCQ Patient Satisfaction scores were also comparable (Superion, 1.66; control, 1.52). Overall, patient-reported outcomes at 2 years were comparable in patients with and without spondylolisthesis (Table 3) and in patients with central *versus* lateral stenosis (Table 4).

## Patient Satisfaction

The percentage of patients who were "satisfied" or "somewhat satisfied" with their treatment at 2 years was 86% with Superion and 89% with control. Similarly, 83% and 84% of patients, respectively, reported that they would "definitely" or "probably" undergo the same treatment again.

## Radiographical Findings

There were no instances of device component fracture, disassembly, or collapse in either group as reported by independent radiographical assessment. Device dislodgement or

**Figure 4.** Changes in leg pain severity during 2 years. VAS indicates visual analogue scale; SD, standard deviation.

**Figure 6.** Changes in ODI during 2 years. ODI indicates Oswestry Disability Index; SD, standard deviation.

Exh C - Page 144
Copyright © 2015 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

**TABLE 3. Clinical Success Rates at 2 yr: Grade I Spondylolisthesis *vs.* no Spondylolisthesis**

| | Grade I Spondylolisthesis | | No Spondylolisthesis | |
|---|---|---|---|---|
| **Variable** | **Superion (n = 50)** | **X-Stop (n = 62)** | **Superion (n = 81)** | **X-Stop (n = 71)** |
| Leg pain severity | 74 | 76 | 77 | 79 |
| Back pain severity | 74 | 66 | 63 | 70 |
| Oswestry Disability Index | 64 | 65 | 63 | 69 |
| ZCQ Physical Function | 72 | 81 | 73 | 80 |
| ZCQ Symptom Severity | 80 | 79 | 75 | 82 |
| ZCQ Patient Satisfaction | 88 | 94 | 82 | 90 |

*Values are percentages of patients achieving clinical success threshold for each outcome.*
*ZCQ indicates Zurich Claudication Questionnaire.*

migration was identified in 0% of patients with Superion and 11.9% of control patients. At 2 years, the incidence of nonhealed spinous process fracture was 11.1% with Superion and 5.0% with the control spacer; healed spinous process fracture incidence was 5.3% with Superion and 3.5% in the control group. Approximately, 80% of spinous process fractures were identified by the 6-week follow-up visit in each group. Spinous process fractures were largely asymptomatic and had no influence on clinical effectiveness of either device.

### Reoperations

There were a total of 44 (23.2%) reoperations or revisions in the Superion group compared with 38 (18.9%) in the control group ($P$ = 0.32). Similar rates of decompression and device removal (11.6% Superion *vs.* 9.5% control, $P$ = 0.51) and device removal and fusion (6.8% Superion *vs.* 5.5% control, $P$ = 0.68) were observed. Comparing Superion to control, the frequency of other interventions was 0.5% *versus* 1.0% for device removal, 2.1% *versus* 0% for supplemental decompression, and 0.5% *versus* 1.0% for intraoperative complication preventing implantation. No patient was treated with a spinal cord stimulator at the index level and only 1 patient (control) received rhizotomy. During the 2-year follow-up period, 13.2% of patients with Superion and 16.4% of control patients received an epidural steroid injection or nerve block at the level(s) of surgery ($P$ = 0.40). The Kaplan-Meier estimate of freedom from reoperation, revision, or epidural injection through 2 years was 72% (Figure 7). The main reasons for reoperation in each group were inadequate pain relief or return of symptoms.

### Adverse Events

The incidence of adverse events was similar between the groups (Table 5). The incidence of serious adverse events classified as device or procedure-related was 8.4% with Superion and 9.5% with control ($P$ = 0.86). Through 2 years, 6 (3.2%) deaths were reported in the Superion group and 5 (2.5%) in the control group ($P$ = 0.77). No device- or procedure-related deaths were reported during follow-up. The rate of neurological complications was similar for both Superion (3.7%) and control (2.5%) groups.

## DISCUSSION

The results of this randomized controlled trial demonstrate that the Superion interspinous process spacer provides

**TABLE 4. Clinical Success Rates at 2 yrs: Central *vs.* Lateral Stenosis**

| | Central Stenosis | | Lateral Stenosis | |
|---|---|---|---|---|
| **Variable** | **Superion (n = 43)** | **X-Stop (n = 34)** | **Superion (n = 12)** | **X-Stop (n = 11)** |
| Leg pain severity | 74 | 88 | 75 | 64 |
| Back pain severity | 74 | 79 | 42 | 55 |
| Oswestry Disability Index | 70 | 68 | 75 | 64 |
| ZCQ Physical Function | 74 | 82 | 75 | 73 |
| ZCQ Symptom Severity | 84 | 82 | 67 | 64 |
| ZCQ Patient Satisfaction | 86 | 91 | 83 | 91 |

*Values are percentages of patients achieving clinical success threshold for each outcome. Patients presenting with central and lateral stenosis not included in analyses.*
*ZCQ indicates Zurich Claudication Questionnaire.*

Copyright © 2015 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.



**Figure 7.** Freedom from reoperation, reintervention, and epidural through 2 years.

clinically meaningful relief of intermittent claudication symptoms due to LSS through 2 years. Furthermore, patient outcomes were comparable with those observed with the X-Stop, an FDA-approved interspinous spacer. The primary endpoint of this clinical trial was met, demonstrating noninferiority of the Superion spacer compared with the X-Stop spacer.

Despite the similarities in mechanism of action as well as clinical and radiographical outcomes, there are distinct differences in device design and surgical placement technique between these spacers that warrant further discussion. Both devices are inserted through a posterior incision and require initial distraction. However, the X-Stop requires much greater surgical exposure whereas the Superion device uses a minimally invasive approach, such that the device is inserted through a cannula about the size of a dime placed between adjacent spinous processes and, therefore, requires no surgical dissection of the spinal musculature. We attribute the smaller blood loss and shorter hospital stay associated with Superion to these procedural differences. The minimally invasive nature of the Superion spacer is also advantageous compared with the larger incision required for the control spacer in patients who later require secondary surgery because larger exposures generate scar tissue, making future reoperations more difficult.

In addition to the operative benefits, there are also biomechanical characteristics that may favor the Superion device. On the basis of the radiographical data, there were a significant number of dislodgements and migrations with the X-Stop device whereas none were observed in the Superion group. These events may occur because the open procedure results in greater disruption of anatomic structures, which may lead to a greater propensity for the X-Stop to dislodge or migrate. In addition, the slender wings of the X-Stop device may provide less stability between the spinous processes. The patients with dislodgements in the X-Stop group not only exhibited greater pain and loss of function, but also required a higher rate of additional surgical procedures.

In this study, the core laboratory also identified spinous process fractures in both groups. Most fractures were asymptomatic and the adverse event rate associated with spinous process fractures was not significantly higher than in patients without fractures. The long-term significance of these fractures is unknown; however, radiographical follow-up suggests healing is common. Potentially, spinous process fracture risk can be lowered by bone density screening to identify individuals with osteoporosis, exclusion of patients with high-grade spondylolisthesis deformities, accurate device sizing, proper patient positioning, and avoidance of overdistraction of the interspinous space.[9]

Data from this investigation as well as from previous studies suggest that the midterm treatment effectiveness of interspinous spacers is at least comparable with that of open decompression surgery. Leg pain, which is the primary complaint in this patient population, decreased by approximately 70% during 2 years in this study. According to published literature, leg pain severity generally decreases by 43% to 69% after laminectomy.[10–17] Furthermore, interspinous spacers are appealing to patients because of the less-invasive nature of this procedure relative to surgical decompression. For example, in the Spine Patient Outcomes Research Trial trial,[18] procedural outcomes included blood loss more than 300 mL, procedure time more than 2 hours, and hospitalization more than 3 days. In contrast, interspinous spacers result in minimal blood loss (5–25 mL) with reductions in procedure time and hospital stay of approximately 50%. Regardless, proper patient selection, meticulous surgical technique, and familiarity with relevant anatomy are prerequisites for favorable outcomes with interspinous process spacers.

Despite the strengths of this study that include a randomized design with rigorous study entry criteria and excellent patient follow-up rates using validated outcome measures, there were several limitations. The long-term durability of interspinous

**TABLE 5. Adverse Events Through 2 Years**

| Variable | Superion (n = 190) | X-Stop (n = 201) | *P* |
|---|---|---|---|
| Any adverse event, n (%) | 180 (94.7) | 184 (91.5) | 0.24 |
| Back pain | 49 (25.8) | 61 (30.3) | |
| Leg pain | 33 (17.4) | 45 (22.4) | |
| LSS symptoms at index level | 26 (13.7) | 28 (13.9) | |
| Spinous process fracture | 23 (12.1) | 13 (6.5) | |
| Buttock/groin pain | 19 (10.0) | 12 (6.0) | |
| Any serious adverse event, n (%) | 88 (46.3) | 92 (45.8) | 0.92 |
| LSS symptoms at index level | 16 (8.4) | 13 (6.5) | |
| Leg pain | 11 (5.8) | 10 (5.0) | |
| Spinous process fracture | 10 (5.3) | 5 (2.5) | |
| Back pain | 8 (4.2) | 13 (6.5) | |

*Adverse events reported with frequency more than 5% in either group.*
*LSS indicates lumbar spinal stenosis.*

Copyright © 2015 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

process spacers is currently unknown and requires further investigation. In addition, the generalizability of these findings may only be applicable to patients with radiographically confirmed moderate LSS with no more than low-grade spondylolisthesis deformities. The finding that patients with a spinous process fracture yielded similar long-term clinical results to patients without a spinous process fracture brings into question the mechanisms of mechanical action of these devices. Finally, a comparison of interspinous process spacers with nonsurgical treatment or surgical decompression was not performed so this randomized study provides no information on these interesting questions.

## CONCLUSION

The Superion and X-Stop interspinous process spacers both relieve symptoms of intermittent neurogenic claudication secondary to moderate LSS. In addition, the safety profiles of these devices were comparable. The Superion device may represent a reasonable treatment option for this patient population.

### ➢ Key Points

- ❑ A total of 391 patients with moderate LSS who failed at least 6 months of nonsurgical management were treated with the Superion (n = 190) or a control (n = 201) interspinous process spacer as part of a multicenter, randomized, controlled trial.
- ❑ During 2 years, the implantation of an interspinous spacer resulted in a 70% reduction in leg pain severity with high patient satisfaction.
- ❑ The Superion interspinous process spacer relieves symptoms of intermittent neurogenic claudication secondary to moderate LSS in the majority of patients through 2 years.

Supplemental digital content is available for this article. Direct URL citations appearing in the printed text are provided in the HTML and PDF version of this article on the journal's web site (www.spinejournal.com).

## References

1. Chiu JC. Interspinous process decompression (IPD) system (X-Stop) for the treatment of lumbar spinal stenosis. *Surg Technol Int* 2006;15:265–75.
2. Loguidice V, Bini W, Shabat S, et al. Rationale, design and clinical performance of the Superion(R) Interspinous Spacer: a minimally invasive implant for treatment of lumbar spinal stenosis. *Expert Rev Med Devices* 2011;8:419–26.
3. Yi X, McPherson B. Application of X STOP device in the treatment of lumbar spinal stenosis. *Pain Physician* 2010;13:E327–36.
4. Siddiqui M, Smith FW, Wardlaw D. One-year results of X Stop interspinous implant for the treatment of lumbar spinal stenosis. *Spine (Phila Pa 1976)* 2007;32:1345–8.
5. Fairbank JC, Pynsent PB. The Oswestry Disability Index. *Spine (Phila Pa 1976)* 2000;25:2940–52; discussion 52.
6. Ostelo RW, Deyo RA, Stratford P, et al. Interpreting change scores for pain and functional status in low back pain: towards international consensus regarding minimal important change. *Spine (Phila Pa 1976)* 2008;33:90–4.
7. Hagg O, Fritzell P, Nordwall A. The clinical importance of changes in outcome scores after treatment for chronic low back pain. *Eur Spine J* 2003;12:12–20.
8. Zigler J, Delamarter R, Spivak JM, et al. Results of the prospective, randomized, multicenter Food and Drug Administration investigational device exemption study of the ProDisc-L total disc replacement *versus* circumferential fusion for the treatment of 1-level degenerative disc disease. *Spine (Phila Pa 1976)* 2007;32:1155–62; discussion 63.
9. Kim DH, Shanti N, Tantorski ME, et al. Association between degenerative spondylolisthesis and spinous process fracture after interspinous process spacer surgery. *Spine J* 2012;12:466–72.
10. Jakola AS, Sorlie A, Gulati S, et al. Clinical outcomes and safety assessment in elderly patients undergoing decompressive laminectomy for lumbar spinal stenosis: a prospective study. *BMC Surg* 2010;10:34.
11. Haro H, Maekawa S, Hamada Y. Prospective analysis of clinical evaluation and self-assessment by patients after decompression surgery for degenerative lumbar canal stenosis. *Spine J* 2008;8:380–4.
12. Sigmundsson FG, Kang XP, Jonsson B, et al. Prognostic factors in lumbar spinal stenosis surgery. *Acta Orthop* 2012;83:536–42.
13. Malmivaara A, Slatis P, Heliovaara M, et al. Surgical or nonoperative treatment for lumbar spinal stenosis? A randomized controlled trial. *Spine (Phila Pa 1976)* 2007;32:1–8.
14. Rosen DS, O'Toole JE, Eichholz KM, et al. Minimally invasive lumbar spinal decompression in the elderly: outcomes of 50 patients aged 75 years and older. *Neurosurgery* 2007;60:503–9; discussion 9–10.
15. Stromqvist BH, Berg S, Gerdhem P, et al. X-Stop *versus* decompressive surgery for lumbar neurogenic intermittent claudication: randomized controlled trial with 2-Year Follow-up. *Spine (Phila Pa 1976)* 2013;38:1436–42.
16. Richter A, Schutz C, Hauck M, et al. Does an interspinous device (Coflex) improve the outcome of decompressive surgery in lumbar spinal stenosis? One-year follow up of a prospective case control study of 60 patients. *Eur Spine J* 2010;19:283–9.
17. Davis RJ, Errico TJ, Bae H, et al. Decompression and coflex interlaminar stabilization compared with decompression and instrumented spinal fusion for spinal stenosis and low-grade degenerative spondylolisthesis: two-year results from the prospective, randomized, multicenter, food and drug administration investigational device exemption trial. *Spine (Phila Pa 1976)* 2013;38:1529–39.
18. Weinstein JN, Tosteson TD, Lurie JD, et al. Surgical *versus* nonsurgical therapy for lumbar spinal stenosis. *N Engl J Med* 2008;358:794–810.

Copyright © 2015 Wolters Kluwer Health, Inc. Unauthorized reproduction of this article is prohibited.

ORIGINAL ARTICLE

# The MIST Guidelines: The Lumbar Spinal Stenosis Consensus Group Guidelines for Minimally Invasive Spine Treatment

Timothy R. Deer, MD[1]; Jay S. Grider, DO, PhD, MBA[2]; Jason E. Pope, MD[3]; Steven Falowski, MD[4]; Tim J. Lamer, MD[5]; Aaron Calodney, MD[6]; David A. Provenzano, MD[7]; Dawood Sayed, MD[8]; Eric Lee, MD, MA[9]; Sayed E. Wahezi, MD[10]; Chong Kim, MD[1]; Corey Hunter, MD[11]; Mayank Gupta, MD[12]; Rasmin Benyamin, MD[13,14]; Bohdan Chopko, MD[15]; Didier Demesmin, MD[16]; Sudhir Diwan, MD[17]; Christopher Gharibo, MD[18]; Leo Kapural, MD, PhD[19]; David Kloth, MD[20]; Brian D. Klagges, MD[21]; Michael Harned, MD[22]; Tom Simopoulos, MD[23]; Tory McJunkin, MD[24]; Jonathan D. Carlson, MD[25]; Richard W. Rosenquist, MD[26]; Timothy R. Lubenow, MD[27]; Nagy Mekhail, MD, PhD[28]

*[1]Center for Pain Relief, Charleston, West Virginia; [2]UKHealthCare Pain Services, Department of Anesthesiology, University of Kentucky College of Medicine, Lexington, Kentucky; [3]Evolve Restorative Clinic, Santa Rosa, California; [4]Functional Neurosurgery, St. Lukes University Health Network, Bethlehem, Pennsylvania; [5]Division of Pain Medicine, Department of Anesthesiology, Mayo Clinic, Rochester, Minnesota; [6]Texas Spine and Joint Hospital, Tyler, Texas; [7]Pain Diagnostics and Interventional Care, Sewickley, Pennsylvania; [8]University of Kansas Medical Center, Kansas City, Kansas; [9]Summit Pain Alliance, Sonoma, California; [10]Montefiore Medical Center, SUNY-Buffalo, Buffalo, New York; [11]Ainsworth Institute of Pain Management, New York, New York; [12]Anesthesiology and Pain Medicine, HCA Midwest Health, Overland Park, Kansas; [13]Millennium Pain Center, Bloomington, Illinois; [14]College of Medicine, University of Illinois, Urbana-Champaign, Illinois; [15]Stanford Health Care, Henderson, Nevada; [16]Rutgers Robert Wood Johnson Medical School, Department of Pain Medicine, Saint Peter's University Hospital, New Brunswick, New Jersey; [17]Manhattan Spine and Pain Medicine, Lenox Hill Hospital, New York, New York; [18]Pain Medicine and Orthopedics, NYU Langone Hospitals Center, New York, New York; [19]Carolina's Pain Institute at Brookstown, Wake Forest Baptist Health, Winston-Salem, North Carolina; [20]Department of Anesthesiology, Danbury Hospital, Danbury, Connecticut; [21]Anesthesiology and Pain Medicine, Amoskeag Anesthesiology, Manchester, New Hampshire; [22]Department of Anesthesiology, University of Kentucky, Lexington, Kentucky; [23]Department of Anesthesiology, Critical Care and Pain Medicine, Beth Israel Deaconess Medical Center, Harvard Medical School, Boston, Massachusetts; [24]Pain Doctor Inc., Phoenix, Arizona; [25]Arizona Pain, Midwestern Medical School, Glendale, Arizona; [26]Pain Management, Cleveland Clinic, Cleveland, Ohio; [27]Rush*

Case 3:21-cv-01298-MMA-BLM Document 12-2 Filed 12/30/21 PageID.478 Page 132 of 239

*University Medical Center, Chicago, Illinois; [28]Evidence-Based Pain Management Research and Education, Cleveland Clinic, Cleveland, Ohio, U.S.A*

**Abstract**

*Background:* Lumbar spinal stenosis (LSS) can lead to compression of neural elements and manifest as low back and leg pain. LSS has traditionally been treated with a variety of conservative (pain medications, physical therapy, epidural spinal injections) and invasive (surgical decompression) options. Recently, several minimally invasive procedures have expanded the treatment options.

*Methods:* The Lumbar Spinal Stenosis Consensus Group convened to evaluate the peer-reviewed literature as the basis for making minimally invasive spine treatment (MIST) recommendations. Eleven consensus points were clearly defined with evidence strength, recommendation grade, and consensus level using U.S. Preventive Services Task Force criteria. The Consensus Group also created a treatment algorithm. Literature searches yielded 9 studies (2 randomized controlled trials [RCTs]; 7 observational studies, 4 prospective and 3 retrospective) of minimally invasive spine treatments, and 1 RCT for spacers.

*Results:* The LSS treatment choice is dependent on the degree of stenosis; spinal or anatomic level; architecture of the stenosis; severity of the symptoms; failed, past, less invasive treatments; previous fusions or other open surgical approaches; and patient comorbidities. There is Level I evidence for percutaneous image-guided lumbar decompression as superior to lumbar epidural steroid injection, and 1 RCT supported spacer use in a noninferiority study comparing 2 spacer products currently available.

*Conclusions:* MISTs should be used in a judicious and algorithmic fashion to treat LSS, based on the evidence of efficacy and safety in the peer-reviewed literature. The MIST Consensus Group recommend that these procedures be used in a multimodal fashion as part of an evidence-based decision algorithm. ■

**Key Words:** lumbar spinal stenosis, minimally invasive spine treatment, percutaneous image-guided lumbar decompression, systematic literature review, epidural injection, interspinous spacer

Address correspondence and reprint requests to: Timothy R. Deer, MD, Center for Pain Relief, 400 Court St, Ste 100, Charleston, WV 25301, U.S.A. E-mail: doctdeer@aol.com.

Submitted: June 4, 2018; Revised October 11, 2018; Revision accepted: October 18, 2018

DOI. 10.1111/papr.12744

© 2018 World Institute of Pain, 1530-7085/18/$15.00

*Pain Practice, Volume ••, Issue •, 2018 ••–••*

## INTRODUCTION

### Creation of the Guideline Development Group

Open surgical treatment of lumbar spinal stenosis (LSS) has been an established practice for decades, and recently several minimally invasive treatment options have expanded the available clinical treatment options. Most significantly, these minimally invasive options are supported by prospective, randomized trials. However, proper patient selection for these new treatment options is essential to success, as it is with other surgical and pain care treatments. Recognizing these issues, several cross-disciplinary leaders in the interventional spine community, representing many surgical and pain societies, have formed a consensus group to evaluate the current state of LSS diagnosis and treatment, and to make recommendations to guide clinical practice in this emerging area.

Using the Institute of Medicine (IOM) clinical practice guidelines for 2011, a group of nationally recognized spine experts was convened and charged with creating clinical practice guidelines for minimally invasive spinal treatment (MIST).[1] Within the IOM framework, the workflow included these steps: identify the workgroup and establish the charge; identify and reconcile conflicts of interest; identify and evaluate the evidence; and make recommendations based on that evidence. For topics and practice areas where the evidence base was still emerging, clinical consensus, based on the available best practice experience, was created. Each consensus point was clearly defined, with evidence strength, recommendation grade, and consensus level provided. Consensus areas were clearly delineated as recommendations based on consensus, whereas recommendations based on the literature cite supporting studies.

### Defining Workflow, Evidence Ranking, Recommendations, and Consensus

The development of consensus guidance has been performed previously, with recent works published by the Polyanalgesic Consensus Conference and the Neuromodulation Appropriateness Consensus Committee. Those committees used the U.S. Preventive Services Task

Force (USPSTF) criteria for evidence level and degree of recommendation, along with the strength of consensus.[2] Given the early state of the literature regarding clinical use of minimally invasive LSS treatment, the goal of this article was to fill gaps in knowledge with expert consensus for this rapidly expanding clinical practice. The literature base for noninjection treatments is relatively small, and the USPSTF criteria provide a basic and straightforward method of communicating the state of the literature to the reader (ie, based on randomized controlled trial [RCT] evidence, case control evidence, or consensus opinion). The USPSTF evaluation of proper study design in this context uses Jadad criteria[3] for evaluating randomization, drop-out rate, withdrawal rate, and reasoning and blinding methods. As the literature base grows and matures, more robust grading criteria can be applied. USPSTF criteria for evidence levels (Table 1), meaning of recommendation degrees (Table 2), and strength of consensus (Table 3) appear with the consensus points in this publication. The MIST working group also conducted systematic literature searches, which prioritized RCTs, and served as the evidence base for the recommendations and discussions that follow.

## LUMBAR SPINAL STENOSIS

The North American Spine Society (NASS) clinical guideline development group has defined LSS as condition and symptom constellations that arise from decreased canal space within the lumbar spinal column (NASS consensus).[4] Although LSS may be congenital in nature, as well as degenerative, most guidelines focus on developmental LSS, and the NASS guidelines are no exception. When LSS becomes symptomatic, it causes a spectrum of clinical syndromes characterized by neurogenic claudication, and ranging from buttock and leg pain (frequent), to fatigue or "heaviness in the legs," to significant neurologic compromise (rare). The NASS guidelines suggest that significant neurologic compromise, while rare, is not necessarily correlated with severity of stenosis based on radiographic imaging. Obviously, the time course of the development of the stenosis is critical: typically, the faster the onset, the more pronounced the clinical presentation. These current MIST guidelines are not inclusive of subjects with significant neurologic compromise requiring urgent or emergent evaluation for surgical decompression, and are intended for the segment of patients who are seeking elective LSS treatment.

**Table 1. Hierarchy of Studies by the Type of Design (U.S. Preventive Services Task Force)[2]**

| Evidence Level | Study Type |
|---|---|
| I | At least 1 controlled and randomized clinical trial, properly designed |
| II-1 | Well-designed, controlled, nonrandomized clinical trials |
| II-2 | Cohort or case studies and well-designed controls, preferably multicenter |
| II-3 | Multiple series compared over time, with or without intervention, and surprising results in noncontrolled experiences |
| III | Clinical experience-based opinions, descriptive studies, clinical observations, or reports of expert committees |

**Table 2. Meaning of Recommendation Degrees (U.S. Preventive Services Task Force)[2]**

| Degree of Recommendation | Meaning |
|---|---|
| A | Extremely recommendable (good evidence that the measure is effective and that benefits outweigh the harms) |
| B | Recommendable (at least moderate evidence that the measure is effective and that benefits exceed harms) |
| C | Neither recommendable nor inadvisable (at least moderate evidence that the measure is effective, but benefits are similar to harms and a general recommendation cannot be justified) |
| D | Inadvisable (at least moderate evidence that the measure is ineffective or that the harms exceed the benefits) |
| I | Insufficient, low-quality, or contradictory evidence; the balance between benefit and harms cannot be determined |

**Table 3. Strength of Consensus**

| Strength of Consensus | Definition* |
|---|---|
| Strong | >80% consensus |
| Moderate | 50% to 79% consensus |
| Weak | <49% consensus |

*Quorum defined as 80% of participants available for vote.

### History and Physical Findings

The most consistent findings of symptomatic spinal stenosis occur with older individuals who have little to no pain at rest while sitting or when lying recumbent. However, upon standing and/or soon after ambulating, the individual experiences back, buttock, and/or leg pain that is progressive in nature, and possibly has a neuropathic component (tingling and numbness) as well

as an aching component (mechanical and ischemic but nonvascular). Patients may also describe a sense of heaviness in the back and/or lower extremities. These symptoms appear at various times but typically present within a few minutes to 15 minutes of ambulating. Symptoms may limit activities of daily living (ADLs) and are referred to as neurogenic claudication. Symptoms typically resolve immediately or within a short time after sitting or lying down. If patients' pain is not worsened by ambulation, they have a low likelihood of spinal stenosis as their primary cause of discomfort.[5–7] Likewise, there are subjects who have neurogenic claudication as a component of their pain but also have superimposed radicular pain or mechanical back pain from other anatomical sources. Although spinal stenosis may contribute to these clinical presentations, this would represent a mixed clinical picture and would not be classic spinal stenosis based on history. A history of extension-based pain relieved by flexion seems to be consistent throughout the literature. In many evaluations, the physical examination more often than not reveals normal reflexes, sensation, and motor strength while sitting and lying. The history is usually far more sensitive in determining the presence of LSS than the physical examination and imaging studies, although both are necessary to ensure that comorbidities are evaluated and diagnosed.

The use of questionnaires for identification and evaluation of LSS has previously been graded as having insufficient evidence in support of or against the practice, and physical examination tests have also been graded as having low specificity for identifying LSS.[5–7]

### Current Nonsurgical Treatment Options: Treatment Continuum

For decades the mainstays of nonsurgical treatment for LSS included physical therapy, spinal manipulation, exercise, and stretching (Figure 1). Medical management consisted of nonsteroidal anti-inflammatory drugs (NSAIDs), anticonvulsants, antidepressants for neuropathic pain, and opioids. Traditional interventional treatment consisted of interlaminar lumbar epidural steroid injections (ESIs) and transforaminal ESIs. Although these strategies can reduce pain significantly, they often have the limitation of short-term duration of benefit (1 to 6 months). Historically, the next step is to consider open decompressive surgery, often with spinal fusion, when the simple interventions fail. A large gap existed in the treatment algorithm with

regard to duration of effectiveness and degree of invasiveness between conservative nonsurgical treatment and surgical treatment options. In the past decade, several image-guided percutaneous interventions were introduced that have now potentially expanded the algorithm of conservative, minimally invasive surgical treatment options.[8,9]

> **CONSENSUS POINT 1**
>
> The LSS treatment choice is dependent on the degree, level, and architecture of the stenosis; severity of the symptoms; failed, past, less invasive treatments; and patient comorbidities (Level I-I, Grade A, Consensus strong).

### Diagnosis of Lumbar Spinal Stenosis by Radiologic Imaging

LSS is regarded as narrowing of the central canal, foramen, or lateral recess of the lumbar spine[10] (Figure 2). Figure 2 demonstrates the anatomic positioning of the various categories of LSS relative to the bony structures of the spinal vertebrae, suggesting a visual framework of central and lateral recess, and foraminal and extraforaminal stenosis as outlined in Figure 3. Symptoms consistent with LSS include pain in the buttocks and numbness and weakness in the lower extremities exacerbated by prolonged standing or walking. This presentation must then be correlated with radiographic evidence of spinal narrowing and neural compression (Figure 4).[11] Spinal narrowing that is not



**Figure 1.** Graphic representation of level of invasiveness vs. length of efficacy of nonsurgical treatment options. LESI, lateral epidural spinal injection; NSAIDs, nonsteroidal anti-inflammatory drugs; PILD, percutaneous image-guided lumbar decompression; PT, physical therapy; RF, radiofrequency; TFESI, transforaminal epidural spinal injection.

congenital can arise from ligamentum flavum (LF) thickening, disc disease, osteoarthritic facet hypertrophy, or a combination of all 3[12] (see Figure 4). In settings when the diagnosis of LSS appears to correlate with patient symptoms and objective imaging, diagnosis of LSS would seem to be straightforward. Unfortunately, despite the fact that stenosis is defined as narrowing of the spinal space with resulting compression, the exact radiographic definition of LSS remains unclear and, in fact, there is no exact radiologic definition of LSS.[11]

There are many reasons for uncertainty in the radiographic diagnosis of LSS. There are abundant proposed grading systems, but unfortunately, no single system has proven superior, creating inconsistencies in the literature.[13,14] There are measurable, quantitative criteria, but more commonly, qualitative criteria are used, leading to inconsistent inter-reader agreement.[15] Another complication to reaching the elusive diagnosis of LSS is that multiple imaging modalities are employed. Currently, MRI, computed tomography (CT), and CT myelography are all used in the diagnosis.[13] There is broad consensus that MRI is the best study to yield soft-tissue contrast and is the most commonly used modality.[16] CT and CT myelography can be utilized when there are contraindications to MRI or accurate bony anatomy is indicated.[13] Unfortunately, the values among imaging modalities and measurement type will vary. Plain radiographs are of limited value except to demonstrate alignment of the vertebral bodies.[17]

The NASS defines LSS as "a condition in which there is diminished space available for the neural and vascular elements in the lumbar spine secondary to degenerative changes in the spinal canal."[4] The question then becomes which radiographic findings and measurements translate into meaningful clinical information. In the 2012 Delphi survey sponsored by the Lumbar Spinal Stenosis Outcome Study Working Group Zurich, a group of radiologists considered to be musculoskeletal experts developed criteria felt to be the most important in describing LSS.[11] Five of the 6 criteria felt to be most relevant to describing LSS were qualitative in nature. These included disc protrusion/extrusion/sequestration, perineural intraforaminal fat, hypertrophic facet joint degeneration, absent fluid around the cauda equina, and hypertrophic LF.[11] Although there was broad agreement among the experts on which qualitative criteria were important, there was no consensus on the most important parameter of the 5.







**Figure 2.** Radiologic criteria for the diagnosis of lumbar spinal stenosis. Axial T2-weighted magnetic resonance images show lumbar spinal stenosis at different locations in different patients. A, Central spinal canal stenosis (arrow). B, Neuroforaminal stenosis (arrow). C, Right lateral recess stenosis (arrow). Reprinted from Andreisek G, Imhof M, Wertli M, et al. A systematic review of semiquantitative and qualitative radiologic criteria for the diagnosis of lumbar spinal stenosis. *Am J Roentgenol.* 2013;201: W735–W746.[12] Reprinted with permission of the *American Journal of Roentgenology.*

Figure 3. Lumbar vertebrae: illustration of anatomical spaces. A, The extraforaminal space is lateral to the neuroforamen. B, The foramen is created by the roof and floor of the adjacent pedicles. C, The lateral recess begins laterally at the pedicle and covers the area medially to the start of the central canal. D, The central canal encompasses the area between the lateral recess and is bound anteriorly by the vertebral body or disc and posteriorly by the vertebral arch. Courtesy of T. Dolan, Department of Academic Multimedia, University of Kentucky, Lexington, Kentucky, U.S.A.

Figure 4. MRI with multiple causes of spinal stenosis. A, Ligamentum flavum hypertrophy. B, Disc herniation and ligamentum flavum hypertrophy. C, Retrolisthesis with disc extrusion.

In this same study, only 1 quantitative measurement, anteroposterior (AP) diameter of the osseous spinal canal, was consistently rated as important by the panel experts.[11] In this particular study, a cutoff value of less than 11 mm in AP diameter at the L3–4 disc level resulted in the diagnosis of central canal stenosis. Three additional quantitative parameters are worth mentioning, given the paucity of quantitative measurements, but did not reach the statistical median score of 9 needed to be included in panel recommendations: cross-section of the dural sac of <100 mm$^2$, midsagittal diameter of the dural sac of <12 mm, and diameter of the foramen of <3 mm.

As discussed previously, hypertrophy of the LF is considered to be important, both as a cause of LSS and in the reporting of radiographic finding. LF thickening occurs more frequently at the L3–4 and L4–5 lumbar segments, more so than at L5–S1. The LF is typically measured perpendicular to the border of the lamina corresponding to the intervertebral disc (Figure 5).[18,19] It has been proposed that the upper limit of normal for LF thickness is <4 mm; however, in a recent study by Abbas et al.[18] comparing patients known to have LSS to patients without LSS symptoms, there was wide variation in LF thickness. They noted that even in patients who did not have symptoms of LSS, LF thickness could exceed 4 mm. Of interest, in patients with spondylolisthesis, thinner LF was noted compared with patients without spondylolisthesis.[18] This was felt to be related to the forces applied to the LF, creating stretch, and therefore thinning the ligament as the vertebral body moves anterior relative to the adjacent vertebra.

A large systematic review attempted to address the lack of quantitative criteria for the diagnosis of LSS.[20] The investigators evaluated the 10 most common quantitative parameters applied to LSS, regardless of reference to central, lateral, or foraminal stenosis. The 2 most commonly reported quantitative values were the AP diameter of the osseous spinal canal (Figure 6) and the cross-sectional area of the dural sac (Figure 7). The most common cutoff point for central canal stenosis in the AP diameter was 10 mm; however, some authors



**Figure 5.** Ligamentum flavum thickness measurement (AP). The thickness of the ligamentum flavum is measured perpendicular to the border of the lamina corresponding to the intervertebral disc. Reprinted from Abbas et al. (2010)[18] under Open Access, Creative Commons terms and conditions.

went as low as 7 mm and some as high 13 mm. The cross-sectional cutoff was fairly consistent in defining stenosis at <100 $mm^2$. [20]

In 2013, Andreisek et al. performed a systematic review evaluating semiquantitative and qualitative criteria for LSS.[12] Semiquantitative criteria differ from the quantitative criteria set out in Steurer et al.[20] in that the semiquantitative criteria are inherently subjective. Despite this subjectivity, as noted previously, radiologists use these types of criteria more frequently than quantitative radiologic parameters.[12] The panel set defining criteria for central and lateral LSS with standardization that was both reproducible and usable in clinical practice (Table 4).

**CONSENSUS POINT 2**

There are poor correlations between severity of spinal stenosis radiographically and clinical presentation (Grade I, Level II, Consensus strong).

**Figure 6.** Middle lumbar spine. The black arrow indicates the anteroposterior diameter of the osseous spinal canal. Reprinted from Steurer et al. (2011)[20] under Open Access, Creative Commons terms and conditions.

**Figure 7.** Lumbar spine at the level of L1. Cross-sectional area of the spinal canal is indicated by the white hatched area. Reprinted from Steurer et al. (2011)[20] under Open Access, Creative Commons terms and conditions.

**CONSENSUS POINT 3**

When possible, an interpretation of the MRIs by the treating physician performing either a direct or indirect surgical decompressive procedure is critical to improve success, avoid failure, and improve safety (Grade C, Level II, Consensus strong).

## Radiology Reports

Physicians treating patients whose complaints are compatible with symptomatic LSS and present with neurogenic claudication initially rely on information from the radiologic imaging report. First, is stenosis present? Second, if present where is the location? Finally, which anatomic structure—bone, ligament, or disc—is causing the stenosis?[11] In 2014, a consensus conference of 15 international experts convened to define minimum standards of what should be included in a radiologic report for patients with suspected LSS.[21] A total of 27 radiologic parameters and criteria were reviewed by the panel. Five key radiologic criteria were chosen as a minimum standard in clinical reporting. In choosing these specific measures, the experts felt there was reproducibility, findings present in a majority of patients, report comprehension by the referring physicians, criteria that accounted for anatomic variability, and a relationship between symptoms and outcome. Interestingly, all 5 radiologic criteria were qualitative in nature, with the panel citing poor evidence correlating quantitative criteria and patient symptoms or outcomes (Table 5).

The panelists did agree upon 5 quantitative parameters that, while too time consuming to obtain or too difficult to measure in clinical practice, should be used in research studies to help standardize findings. These conclusions were based on measures that were reproducible, would create a discriminating threshold to discern LSS from not LSS, facilitate measurement, account for variation in anatomy, and correlate clinical presentation and outcomes[21] (Table 6).

**Table 4. Stenosis Classification Criteria: Compression Ratio in Relation to Normal Size[12]**

| | Central (Spinal Compression) | Lateral (Compression of Lateral Recess) |
|---|---|---|
| Mild | <1/3 | <1/3 |
| Moderate | 1/3 to 2/3 | 1/3 to 2/3 |
| Severe | >2/3 | >2/3 |

**Table 5. Qualitative Radiologic Criteria for Stenosis**

| Central Stenosis | Lateral Stenosis | Foraminal Stenosis |
|---|---|---|
| Central zone compromise<br>Relationship between fluid around the cauda equina | Lateral recess nerve compression | Foraminal nerve root impingement*<br>Foraminal zone compromise |

*As there are many descriptions of foraminal nerve root impingement, the grading system by Pfirrmann et al. was recommended.[22]

**Table 6. Quantitative Radiologic Criteria for Stenosis**

| Central Stenosis | Lateral Stenosis | Foraminal Stenosis |
|---|---|---|
| Anteroposterior diameter of dural/thecal sac (<10 mm)<br>Thecal sac area compression in % of normal midsagittal diameter<br>Cross-sectional area of dural tube/sac* | Lateral recess height (<2 mm)<br>Lateral recess depth (<2 to 3 mm) | None found |

*The authors suggest that the cross-sectional area of the dural sac should be considered the most important parameter to document.

Like many other modalities in medicine, neuroimaging is a tool for the physician who must correlate the patient's subjective symptoms with objective information to arrive at a clinical diagnosis and develop a treatment plan, with the intent to achieve treatment success. With such a wide-ranging set of radiographic criteria, both quantitative and qualitative, and significant variability within those parameters, imaging, while important, must still be correlated with the patient's clinical presentation.

**CONSENSUS POINT 4**

Symptomatic lumbar spinal stenosis is a diagnosis that requires both radiographic evidence and presence of neurogenic claudication symptoms (Grade B, Level I, Consensus strong).

## Diagnosis of Spinal Stenosis by Physical Examination

The diagnosis of LSS presents an interesting challenge for physicians. As previously noted, LSS can be defined by radiologic findings, but these are often not specific and cannot be used alone to guide treatment.[23] LSS can be entirely asymptomatic.[23,24] Alternatively, it can present with neurogenic claudication in the case of central canal stenosis, radicular pain in the case of foraminal or lateral recess stenosis, or as a combination.[25,26] Physical examination findings may differ among these groups. As the accurate diagnosis of clinically significant LSS has implications for treatment decisions, the history and physical examination are of critical importance.

The initial examination of the patient with suspected spinal stenosis begins with a visual examination of the lumbar spine.[27] The curvature of the spine should be noted, along with any scoliotic deformity or aberration of the normal thoracic kyphosis or lumbar lordosis.

Patients with LSS are often noted to have loss of normal lumbar lordosis, and they may sit and walk in a forward-flexed position.[28] Superficial examination of the skin with any evidence of infection or skin abnormalities should be noted, as should evidence of scarring indicative of previous surgery.

Neurologic examination of the LSS patient while at rest may appear normal. A straight leg raising test, the results of which are characteristically positive in patients with disc herniation and radiculopathy, is typically absent in patients with LSS.[29] Weakness in an L5 distribution (extensor hallucis longus) is the most common motor finding. Asymmetrical reflexes at the knee or ankle may also be seen. Symmetrically diminished or absent reflexes, particularly at the ankle, are more likely age-related.[30] Other abnormalities on examination may be secondary to lateral recess or foraminal stenosis.[31]

Vascular examination, to help distinguish between vascular and neurogenic claudication, should include palpation of distal pulses and assessment of distal skin temperature and appearance. If symptoms refer to the buttock, hip, or groin, a brief assessment of the hips is warranted to rule out intrinsic hip pathology. Testing hip range of motion with flexion, abduction, and external rotation; a hip scour test; as well as palpating the gluteal tendon insertion onto the greater trochanter can be helpful. Assessment for possible confounding diagnoses of sacroiliac and/or facet joint pathology should also be done by the clinician.

In LSS, the hallmark finding is the presence of neurogenic claudication. It is useful to recreate this finding during the physical examination. Prolonged extension may recreate and exacerbate the patient's symptoms. The stoop test, during which a patient is asked to walk with exaggerated lumbar extension until symptoms of neurogenic claudication are noted, can be performed.[32] If leaning forward or sitting relieves the symptoms, neurogenic claudication secondary to LSS is suspected. Similarly, having patients stand during the examination will very likely recreate their symptoms, and the standing intolerance time should be noted.

Clearly, surgical indications for spinal stenosis are similar for other spinal pathologies requiring surgery, with a mindful eye on cauda equina syndrome: weakness, numbness around the groin representing saddle paresthesia, or bladder or bowel dysfunction. Advanced imaging is warranted in these circumstances.

The differential diagnosis of LSS is made difficult by a number of factors. The symptom of pain with walking can be caused by a number of different disease processes, particularly in the elderly population with degenerative disease and multiple other comorbidities.[26] It is critically important to differentiate neurogenic claudication from vascular claudication.[29] Therefore, popliteal and pedal pulses should be checked by palpation and ankle-brachial index if necessary. If co-existent disease is suspected, further angiographic imaging is warranted. As in all patients presenting with lumbar pain, evaluation should rule out tumor, infection, or compression fracture.[30]

### Comorbidities and Disease Recognition

Lumbar spinal stenosis refers to the potential compression of the neural structures.[33] Compression of nerve roots may be due to congenital (developmental) or acquired factors such as spondylolisthesis, degenerative disc, LF hypertrophy, or osteoarthritis.[34] Associated symptoms may include motor weakness, heaviness of the limbs, numbness, or paresthesia.

Typically, patients with LSS are more than 50 years old and often have chronic back pain with a recent onset of radicular symptoms (buttock, thigh, or calves).[7] This patient group has difficulty with prolonged standing and walking that results from increased lumbar lordosis, a narrowing spinal canal, and foraminal narrowing and nerve compression. Patients experience relief of symptoms with a flexed posture that reduces lumbar lordosis and decreases canal and foraminal narrowing. A helpful historic symptom is a positive "shopping cart sign."[35] Patients with symptomatic neurogenic claudication will lean over a shopping cart while grocery shopping to minimize lumbar lordosis and reduce compression on the cauda equina and nerve roots. Depending on the level of neural compression, there may be motor and sensory deficits, including paresthesia that may present as "heavy legs" and numbness. The diagnosis of neurogenic claudication may be distinguished from vascular claudication in that vascular claudication occurs with walking only and is not dependent on position changes to increase lumbar stenosis (Table 7).[33] Dyck and Doyle described the use of the Van Gelderen bicycle test to distinguish between vascogenic and neurogenic claudication.[36] In this test, vascular claudication is reproduced, whereas neurogenic claudication is not. Vascular claudication is usually related to atherosclerotic occlusive disease with narrowed arterial vessels. Early symptoms occur in the calves followed by the thighs and buttocks. The cramping in the legs is relieved with rest or by hanging the legs over

the side of the bed, which is thought to improve gravitational blood flow to the legs.[37] Vascular claudication presents with absent or diminished peripheral pulses. Ankle to brachial blood pressure measures may present a ratio of <1, suggestive of atherosclerotic occlusive disease and vascular claudication. A complete vascular workup is suggested in this patient group.

The resting physical examination is usually unremarkable, but in advanced cases neurologic examination may reveal sensory or motor deficits. There may be signs of forward flexion of the spine, loss of lumbar lordosis, and wide-based gait. The wide-based gait is a reaction to symptomatic loss of sensation and motor weakness.[7] Leg weakness may be elicited by lumbar extension. Weakness in legs is often characterized by reduced strength of the extensor hallucis longus, patchy areas of hypoesthesia, and absent deep-tendon reflexes. Results of the straight leg raising test are negative and distal pulses are present.

The differential diagnoses in patients with spinal stenosis includes disc disease, spondylolisthesis, sacroiliitis, and facet syndrome.[33] Many times, these conditions co-exist and complicate the definitive diagnosis. Discogenic disease may present variously if related to a herniated disc, annular tear, or internal disc derangement. Internal disc derangement or herniation may follow significant trauma or inciting event, such as a sudden lifting event, fall, or awkward twisting motion.[38] Most patients complain of deep-seated axial back pain that is aggravated with bending, lifting, and axial loading. There may be associated weakness and numbness down the leg. A heaviness or cramping sensation is present in the buttocks and legs. Patients describe

difficulty arising or going to a sitting position. On examination, there may be point tenderness of the lumbar spine and paraspinal muscles. Flexion-extension, rotation, and lateral bending of the spine is usually painful. If herniation is present, especially with foraminal extension, pain is reproduced with straight leg raise and femoral stretch testing. In internal disc disruption and annular tear, no nerve root signs may be present. Mechanical compression with herniated disc may present with motor weakness, sensory loss, and reflex changes.

Spondylolisthesis is the displacement of a vertebral body in relation to adjacent vertebral segments, which may lead to nerve root compression.[35] This can be suggestive of an unstable spine, and flexion and extension films are critical to determine the degree of instability. When the spondylolisthesis is greater than grade 2, surgical decompression and instrumentation may be needed to stabilize the spine, and indirect decompression by spacer or percutaneous image-guided lumbar decompression (PILD) is not indicated. Facet cysts or edema in the facet joints, as demonstrated on a T2-weighted MRI, may also suggest instability.

Other structures such as sacroiliac and facet joints may present with referred pain patterns. These patterns are nondermatomal and follow sclerotomes.[33] The pain is described as dull, deep, and poorly localized in comparison to dermatomal pain. The pathogenesis of referred pain is associated with central sensitization phenomenon.[39] An example of this is seen when hypertonic saline is injected into facet joints, resulting in the classic referred pain pattern in the back, buttocks, or legs.[40] Facet joint pain is typically in the back with referral to the groin, lateral thigh, and/or posterior proximal legs to the knees. It is important to note that most patients with LSS may also have hypertrophy of the facet joints or disc bulging and can have pain related to comorbid pathologies. The pain of facet joint disease is aggravated with extension and rotation. Diagnostic facet or medial branch blocks can be done to determine if facet joints are involved with the patient's pain.

In similar fashion, pain referred from the sacroiliac joint may be in the back, buttocks, or groin. Patients complain of pain on palpation and when recumbent over the symptomatic sacroiliac joint.[41] On examination, a positive Patrick's or Gaenslen's test result is noted. Provocative and diagnostic sacroiliac joint injection can be done to determine if the sacroiliac joint is involved with a patient's pain. Patients with hip joint pain frequently present with pain radiating to the groin,

**Table 7. Neurogenic vs. Vascular Claudication**

|  | Neurogenic | Vascular |
|---|---|---|
| Pulses | Present | Absent or diminished peripheral pulses |
| Palliative maneuvers | Bending over or sitting | Stop walking |
| Provocative maneuvers | Going downhill (increased lumbar lordosis) | Going uphill (increased metabolic demand) |
| Van Gelderen bicycle test | No leg pain | Leg pain |
| Wide-based gait | Present | Absent |
| Romberg sign | Present | Absent |
| Shopping cart sign | Present | Absent |
| Neurologic examinations | Diminished S1 and L4 reflexes | Absent |
|  | Weakness on muscles (extensor hallucis longus) | Absent |
|  | Sensory changes in vibration or touch | Absent |

and from the anterior thigh to the knee, which can mimic an L4 radiculopathy. In many cases, patients present with both hip and spine disorders, confounding the diagnosis. Hip-spine syndrome exists when pathologic changes in the hip lead to flexion contracture and compensatory lumbar hyperlordosis, resulting in nerve root compression and sciatica. Diagnostic hip joint injections may help to determine the painful structure.

**CONSENSUS POINT 5**

Neurogenic claudication needs to be differentiated from other claudication sources (Grade A, Level II-2, Consensus strong).

### Stenosis Characterization

For the purpose of this recommendation, it is important to characterize LSS as symptomatic or asymptomatic, the architecture and the degree of spinal stenosis, and the number of levels involved (Table 8). This allows for the development of an algorithm supportive of patient characteristics.

## ALGORITHM FOR CANDIDACY OF INTERVENTIONAL TREATMENTS

The proposed algorithm serves as a guide to help clinicians improve treatment selection for patients diagnosed with symptomatic LSS (Figure 8). It is imperative to consider some important aspects of the algorithm.

- First, assessment for instability is critical when determining candidacy for minimally invasive surgical options (beyond injection-based treatment). This is accomplished by examination of flexion and extension films when instability is suspected, along with the presence of significant spondylolisthesis. If it is unclear if instability exists, flexion/extension films represent a low-cost/low-risk means of evaluation for any spondylolisthesis. Facet joint hypertrophy with fluid collection or facet cyst formation may also suggest instability. Patients deemed unstable with a grade 2 spondylolisthesis or greater are not candidates for minimally invasive indirect decompression with an interspinous spacer (ISS).
- Second, direct decompression (PILD) should be considered if instability exists and patients are not candidates for open surgery and/or fusion, with the presence of LF hypertrophy. These are represented as the dashed green lines within the algorithm.
- Third, for those patients with central stenosis and multifactorial causes for the development of spinal stenosis (facet hypertrophy contributing to central stenosis, disc bulge, without significant ligament flavum hypertrophy), indirect decompression methods are preferred. For patients with predominant lateral recess stenosis, indirect decompression methods are preferred.

## THERAPIES TO CONSIDER FOR THE TREATMENT ALGORITHM

### Pharmacologic Options

There is limited peer-reviewed literature describing the treatment of symptomatic LSS with NSAIDs. Neuropathic pain medications can be helpful in improving the standing and walking intolerance for patients with symptomatic LSS. A study of the use of pregabalin in 104 patients with intermittent neurogenic claudication unresponsive to NSAIDs for at least a month demonstrated an improvement in VAS and Japanese Orthopedic Association Back Pain Evaluation Questionnaire scores at 6 weeks' follow-up.[42] It should be noted that the side effect profile of central nervous system (CNS) active drugs can be difficult to tolerate in many patients in the LSS age group.

**Table 8. Characterization of Lumbar Spinal Stenosis**

| Clinically Relevant History | Symptomatic | Asymptomatic | | | |
|---|---|---|---|---|---|
| Stenosis type | Central | Lateral stenosis | Foraminal stenosis | | |
| Stenosis level | L1–2 | L2–3 | L3–4 | L4–5 | L5–S1 |
| Number of levels | <2 | >2 | | | |
| Degree of instability | Spondylolisthesis > grade 1 | Flexion/extension > 3 mm translation/and or 5 degree angulation in flexion/extension | Cobb angle > 10 | Osteopenia or osteoporosis | |
| Architecture of stenosis | Ligamentum flavum hypertrophy | Facet hypertrophy | Disc bulge/protrusion | | |



**Figure 8.** Algorithm for interventional treatments of lumbar spinal stenosis. Blue lines, specific components to larger diagnosis; green lines, affirmative; dashed green lines, instability exists and patients are not candidates for open surgery and/or fusion, with the presence of ligamentum flavum hypertrophy; red lines, negative; dashed red lines, instability exists and patients are not candidates for open surgery and/or fusion, without the presence of ligamentum flavum hypertrophy. *Instability in algorithms defined as spondylolisthesis greater than grade 2.

Lubelski et al. [43] demonstrated, in a retrospective review of over 1,300 patients, that the prediction of quality-of-life (QOL) improvements in patients with LSS treated with membrane-stabilizing agents (MSAs) is associated with 4 categories: need for surgery within 1 year of initiation, time of surgery after initiation, improvement in QOL based on the EuroQol 5 dimensions questionnaire (EQ-5D) QOL index, and improvement in EQ-5D score. They concluded that MSAs improved QOL for those with LSS, and the greatest improvement would be for patients who had worse QOL before treatment, were less depressed, had greater median income, and were married.

Nonoperative treatments for spinal stenosis with neurogenic claudication were recently evaluated in a Cochrane Database review.[44] From the 8,635 citations aggregated and evaluated, 56 full-text articles were evaluated and 21 trials were included, encompassing 1,851 individuals. There was low-quality evidence for opioids, no better than placebo or paracetamol. Reviewers also highlighted the low quality of evidence for prostaglandin inhibitors, and the very low quality of evidence for treatment with gabapentin and methylcobalamin for improving walking distance.

**CONSENSUS POINT 6**

There is low-quality evidence for using NSAIDs, neuropathic pain medications (MSAs), and opioids as monotherapy in the treatment of spinal stenosis. These therapies should be employed judiciously, balancing the patient's individual risks and benefits (Grade D, Level I, Consensus strong).

## Nonpharmacologic Options

***The Utility of Back Braces for the Treatment of Spinal Stenosis.*** Conservative measures for the treatment of LSS include rehabilitation with a focus on a flexion-based or neutral-positioned program with spinal stabilization. Back braces, particularly lumbar or lumbosacral corsets, have proven to be efficacious in providing adequate relief of symptoms and lumbar support throughout the rehabilitation process.

In 2001, a comparative study was done to evaluate the effectiveness of wearing a lumbosacral corset in symptomatic degenerative LSS.[45] The patients ($n$ = 21) who participated in the study were evaluated for walking distance and pain score (VAS) with and without wearing the corsets. The study showed statistically significant functional improvement in walking distance and a reduction in VAS score with the use of lumbosacral corsets.

In 2009, Levendoglu et al. investigated the quantitative effects of lumbar corsets used in LSS on walking time.[46] Patients with LSS walked on a treadmill while wearing or not wearing various lumbar corsets. Symptom initiation time (SIT) and total walking time (TWT) were recorded. SIT and TWT were significantly longer for the patients with the corsets compared to those without.

Spinal orthoses provide stability, pain relief, normal spinal alignment, and balance.[47] The aim of physical therapy for patients with LSS is to strengthen abdominal and back muscles, preserve motion in the spine, and improve overall fitness. Corsets or braces can help ease this pain, thereby optimizing rehabilitation outcomes. Previous research indicates orthoses may weaken postural muscles, recommending that they be worn for a few hours per day.[48] However, a meta-analysis published in 2017 demonstrated no negative effect by the continuous use of lumbosacral orthoses for 1 to 6 months.[49]

**CONSENSUS POINT 7**

There is little evidence supporting the use of axial bracing for the treatment of neurogenic claudication and spinal stenosis. If instability is suspected, bracing may be helpful in the treatment of neurogenic claudication related to spinal segmental motion (Grade C, Level II, Consensus moderate).

***Injection Therapies.*** Following noninvasive treatments in the care continuum, it is common practice for a variety of image-guided injective therapies to be prescribed. There are several decades of experience with the application of injective treatments for spinal stenosis; however, the practice has recently become a subject of some debate.[50,51] Several leading interventional pain societies have pointed out limitations of these studies with regard to the positive outcomes of several RCTs.[52] Despite this controversy, several RCTs using injective therapies for LSS exist to guide expert opinion.

Manchikanti et al. evaluated the efficacy of caudal epidural injections in 100 subjects with LSS.[53] The outcome measures were a numerical rating scale (NRS), Oswestry Disability Index (ODI), and opioid intake. Response was determined as 50% pain relief at 3 weeks postprocedure. The treatment groups evaluated lidocaine vs. lidocaine with steroid in a double-blinded clinical setting without placebo control. In this study, 54% of subjects receiving lidocaine and 62% of subjects receiving lidocaine and steroid met endpoint criteria at 3 weeks following the injections. The investigators suggested that local anesthetic injections could be of benefit while avoiding the detrimental effects of repeat steroid application.

Likewise, Manchikanti and colleagues found similar results when the same study design was used to evaluate the effects of interlaminar epidural injections for LSS comparing local anesthetic to local anesthetic plus steroid.[54] In this double-blind clinical-setting RCT of 120 subjects, 72% of local anesthetic and 74% of local anesthetic plus steroid subjects met criteria of 50% pain relief. Lee et al.[55] compared interlaminar epidural injections to bilateral transforaminal injections in 99 subjects randomly assigned to the route of delivery receiving local anesthetic and steroid. The outcome measures of NRS, Patient Satisfaction Index, and Roland 5-point pain score suggested both techniques provided significant relief in the 2-week to 4-month study period (1 to 3 injections), with bilateral transforaminal injections resulting in a significantly greater decrease in Roland 5-point pain scores. There was no placebo control group.

Smaller scale studies evaluating ESIs include the study by Koc et al.,[56] who assigned subjects to either physical therapy, interlaminar ESI, or control. At 6 months the ESI group demonstrated pain scores that were improved vs. control and equivalent vs. physical therapy. Likewise, Wilson-MacDonald et al.[57] compared epidural injection of bupivacaine and methylprednisolone to sham procedure defined as intramuscular injection of bupivacaine and methylprednisolone. There was a small positive difference in outcomes favoring ESI. In one of the first studies to address the question, Fukusaki et al.[58] compared epidural saline to mepivacaine alone and mepivacaine and steroid in 53 subjects receiving 1 to 3 injections during the study period. The steroid group demonstrated superior results to saline or mepivacaine alone, and all treatment effects had waned by the end of

the 3-month study period. Keeping in mind that the Fukusaki et al. study was performed in 1998 and was among the first to evaluate injective therapy, much less LSS, the length of effect of injective therapy was not well established at the time, and the finding that the treatment effect may be 3 months or less was relatively new information. The investigators concluded that epidural injections were not a long-term treatment.

Two RCTs have evaluated transforaminal approaches applied to LSS: the aforementioned Lee et al. study[55] comparing interlaminar ESI to transforaminal ESI (TFESI) and a 2011 study by Nam and Park.[59] Nam and Park evaluated the effect of transforaminal injection of local anesthetic alone to local anesthetic and steroid (0.5% lidocaine and 20 mg of triamcinolone). Outcome measures were the VAS and ODI. The local anesthetic and steroid group had significantly greater improvement in the outcome measures, though both groups demonstrated improvement. There was no placebo group in the study.

Friedly et al. compared lidocaine to lidocaine and glucocorticoid injection (interlaminar and transforaminal were both allowed in the study design per physician preference, as was the selection of the steroid).[51] In this 400-subject RCT, addition of glucocorticoid offered minimal benefit over local anesthetic alone in the treatment of LSS. There was no placebo group in the study.

It is clearly acknowledged that facet hypertrophy contributes to the pathology of LSS. Given that there is clearly a component of extension-based mechanical pain in patients with LSS, and given the similarities on physical examination with axial low back pain of facet joint origin, relatively little work has been done evaluating the responsiveness of LSS symptomatology with regard to the potential role of facet interventions in LSS. A recent feasibility study by Hwang et al. evaluated lumbar facet interventions as an alternative to epidural application of medication for LSS.[60] This preliminary study reported a 50% reduction of symptoms in a population with documented central canal stenosis. Building on this feasibility study, Shim and colleagues reported in a cross-over design study that facet interventions appear to be similar to ESI in reduction of symptoms of LSS.[61] This study should also be considered as preliminary data, however, due to significant design flaws, such as poor documentation of length of relief and lack of differentiation between radicular pain and neurogenic claudication.

Although the literature suggests that facet interventions for LSS may have limited utility, 1 recent study

suggested that radiofrequency (RF) ablation may have utility in treating pain in patients with radiographic evidence of central and lateral spinal stenosis.[62] In this study of 127 subjects, preselected by a radiologist with musculoskeletal expertise and having confirmed evidence of central and lateral stenosis, there was a positive correlation of treatment success with RF ablation, but interestingly not with lumbar medial branch blocks. This outcome, while interesting, creates a diagnostic dilemma: How do you screen candidates for a treatment that may have success when the diagnostic tool does not identify possible candidates accurately? The investigators pointed out that although facet hypertrophy certainly has a role in the creation of LSS from an anatomic standpoint, many facet interventions have been marginally successful in treating this component of the syndrome. Given these seemingly paradoxical findings, further clarification is clearly warranted. To our knowledge, there are no studies addressing lumbar RF ablation in subjects with LSS as the primary focus of the study.

In addition to the studies comparing medications (local anesthetic with/without steroid) or type of injection (ESI vs. TFESI) with regard to efficacy for LSS, there are at least 2 studies comparing lumbar ESIs to PILD.[63,64] In both studies it is the premise of the study design that lumbar epidural spinal injection (LESI) is the de facto gold standard of treatment of LSS prior to surgical intervention for patients who have exhausted more conservative therapies. In these RCTs, LESI did demonstrate efficacy consistent with the outcomes of other RCTs mentioned earlier. Although the Brown[63] and mild® Decompression Alternative to Open Surgery (MiDAS)[64] studies were not designed to directly evaluate the effectiveness of LESI for LSS, they do independently confirm the outcomes of short-to-intermediate improvement in pain control and function consistent with previous studies. Since the primary outcome was not to evaluate ESI as a treatment, these findings theoretically confirm the efficacy of ESI without bias, as the design of the trial was to evaluate the effectiveness of PILD.

There have been several systematic reviews evaluating the efficacy of injection therapy for symptomatic LSS.[65–68] These all suggest a short- to intermediate-term benefit for the symptomatic treatment of LSS. A recent editorial suggested that the role of ESIs should be reconsidered based on glucocorticoid risk profiles noted from several sources.[68] In the editorial accompanying the Friedly et al. paper, the author suggested

that the role of ESI treatment in general should be reevaluated, while certainly suggesting that the role of glucocorticoid injection should be seriously reevaluated in the treatment algorithm.[69] While caution with transforaminal injections is certainly warranted, the statement by Andersson does ignore the data in the Friedly et al. paper in which both treatment groups saw improvement, albeit with more side effects in the steroid group.[51,69] In keeping with the data presented previously, the other systematic reviews demonstrated consistent short- to intermediate-term improvement of symptomatic LSS treated with ESI. These systematic reviews support the benefit of caudal and interlaminar injections (local anesthetic only and local anesthetic with steroid) as well as transforaminal injections of local anesthetic with or without steroid.[65–68] In the most recent systematic review, caudal/interlaminar injections received a Level 2 recommendation and transformational injection received a Level 3 recommendation for LSS symptomatology.[52]

Although it is reasonable to repeat ESI when patients have sustained pain relief and then develop recurrent pain, it is important to understand that some payer guidelines (including Medicare) now stipulate that patients should have a minimum of 3 months of pain relief and then develop recurrent pain of a similar nature before it is reasonable to proceed with additional injection therapy (Appendix S1). For patients exhibiting shorter-term relief of less than 3 months, one should not proceed with further injection therapy but rather continue down the treatment algorithm to one of the treatment options directed at decompression.

Lumbar facet interventions as treatment for LSS likely have not been vigorously investigated, as these treatments have been considered theoretically to have little benefit in the treatment of neurogenic claudication associated with central canal stenosis and/or lateral recess stenosis. Recent preliminary publications suggest this may be an area of increased study.[60,61]

**CONSENSUS POINT 8**

There is ample evidence to support the use of minimally invasive treatment strategies for the management of symptomatic lumbar spinal stenosis. Depending on the duration and extent of relief, these minimally invasive options can be repeated or continued to more surgical treatment solutions (Grade B, Level II-2, Consensus strong).

**CONSENSUS POINT 9**

When performing spinal interventional treatments, it is imperative to follow the described anticoagulation recommendations and to ensure that detection of injury can occur by either maintaining a reactive patient or the use of appropriate neurological monitoring (Grade A, Level II-2, Consensus strong).

### Percutaneous Image-Guided Lumbar Decompression

PILD, as defined by the Centers for Medicare and Medicaid Services (CMS), involves noninvasive techniques to debulk the posterior elements of the spine (lamina and LF) using instrumentation in an image-guided (CT or fluoroscopy) fashion, with the assistance of contrast media to evaluate the effects of treatment on the compressed area via an epidurogram.[70] Currently, there are 2 percutaneous disposable devices in the marketplace for lumbar decompression: Totalis (Vertiflex Spine, Caralsbad, CA, U.S.A.) and mild® (Minimally Invasive Lumbar Decompression, Vertos Medical, Aliso Viejo, CA, U.S.A.). mild® is the only image-guided technique meeting the CMS definition of PILD, and as such PILD will refer to mild® for the purposes of this section. Totalis is not currently commercially available and is not included in this algorithmic discussion of available patient options.

PILD by definition treats LSS secondary to LF hypertrophy. LF hypertrophy in the studies performed to date has been defined as ligamentum thickness of >2.5 mm on MRI evaluation. While other anatomic elements beyond LF hypertrophy (facet hypertrophy, disc encroachment into the spinal canal) can clearly contribute to LSS, PILD is not designed to address these pathologies, although in clinical settings the overall reduction of spinal canal pressure from debulking the ligament has been shown to treat multifactorial etiologies. Although PILD is indicated for patients with central stenosis due to LF hypertrophy and neurogenic claudication as the presenting complaint, it is not intended to debulk lateral foramen or primary bony abnormalities. Interestingly, a majority of patients treated in the MiDAS Evidence-based Neurogenic Claudication Outcomes Research (ENCORE) study[8,64] did have comorbid foraminal stenosis, facet hypertrophy, or disc bulging, and these were actually a positive

predictor of success with a percutaneous decompression. Thus, these comorbid findings should not be considered as a contraindication to using this procedure. Levels L3–4, L4–5, and L2–3 are most commonly associated with LSS, and a recent study evaluating the incidence of LSS secondary to LF hypertrophy suggested that the L3–4 and L4–5 spinal levels most commonly developed ligamentous-based stenosis.[71]

There are 7 prospective studies and 4 retrospective studies evaluating the safety and effectiveness of PILD. The earliest work by Deer and Kapural first described the technique of PILD and evaluated the safety of the procedure involving 90 subjects in 2010.[72] Publication of this prospective trial was quickly followed by a second 2010 prospective publication by Chopko and Caraway[73] demonstrating clinical improvement as measured by the VAS, ODI, Zurich Claudication Questionnaire (ZCQ), and 12-Item Short Form (SF-12) Health Survey. In this study, 78 subjects were prospectively enrolled to undergo PILD by 1 of 14 American spine specialists in a multicenter study. Inclusion criteria were MRI evidence of LF thickness of >2.5 mm, canal sectional area of ≤100 mm$^2$, anterior spondylolisthesis of ≤5.0 mm, and ability to ambulate at least 10 feet before being limited by pain. In keeping with the Deer and Kapural initial study, no device-related complications were noted, and there was statistically significant improvement across all outcome measures at 6 weeks. Later in 2010, Lingreen and Grider published a 2-site retrospective evaluation of 42 consecutive patients,[74] also without any device- or procedure-related complications noted. In this study, VAS scores at 6 weeks were reduced by 40%, with 86% of patients reporting satisfaction with the results. Interestingly, even those subjects not experiencing efficacy from the procedure felt that the minimally invasive nature of PILD made it a viable option for the treatment of LSS prior to considering open surgical decompression.

Subsequently, between 2011 and 2013, several studies were published continuing to demonstrate the safety and efficacy of PILD. Chopko published a prospective single-site study with 14 subjects followed over 23 weeks that demonstrated 53% improvement in pain scores.[75] This was followed by a case series by Wong following 17 subjects over 1 year and demonstrating improvements in VAS and ODI similar to those in previous reports.[76] The Wong study also served as a detailed procedure description. Similar to the study by Wong, Mekhail and colleagues followed 58 subjects at 11 clinical sites retrospectively for 1 year, demonstrating VAS, ODI, ZCQ, and SF-12 score improvement.[77] Finally, Basu reported similar results in 27 subjects in a prospective study evaluating ODI, VAS, and ZCQ scores and patient satisfaction.[78] Taken together, these results established a track record of safety and began to demonstrate the likely effectiveness of PILD at least in the first year following decompression. Limitations of the body of literature to that point are as follows: (1) only 1 study that was not industry sponsored, and (2) lack of a comparator group.

In 2012, Brown published the first RCT involving PILD.[63] In this double-blinded study, 38 subjects were randomized to either PILD or LESI and followed for 12 weeks. Outcome measures were the ODI, ZCQ, and VAS. Similar inclusion criteria were utilized to those described for the initial Deer and Kapural studies. The ZCQ results demonstrated higher patient satisfaction with PILD vs. LESI and sustained improvement for PILD through the 12-week duration of the study.

In 2016, the 6-month and 12-month results of the MiDAS ENCORE study were published.[8,64] In this study, 302 subjects were randomized to PILD or LESI and followed for 1 year. Medication management for the 2 groups was similar, as were the other patient demographics. Subjects in the PILD group were treated initially with PILD and followed for 1 year, while subjects in the LESI group could receive up to 4 treatments per year with image-guided LESI using 80 mg of depo-methylprednisolone acetate or triamcinolone acetonide (49 mg for diabetic subjects). Patients could not receive transforaminal injections, participated in neuromodulation trials (spinal cord stimulation or intrathecal drug delivery), or undergo surgery. Outcome measures were the ODI, numeric pain rating scale, and ZCQ and were evaluated using validated minimally important change measures. The PILD group had a 58% responder rate compared to 27% for the LESI group ($P < 0.001$), with a primary safety endpoint demonstrating no difference between PILD and LESI. These results suggested that PILD was superior to LESI with no difference in safety, while subjects also experienced a durable outcome with PILD over 1 year compared with LESI. Limitations of this study and conclusions reached by the investigators included criticisms that the study was industry sponsored, that LESI and PILD were not comparable treatments, as the former is accepted as having a relatively short-term effect while the latter is designed

to be a longer lasting treatment, and lack of patient blinding. Defense of the study acknowledges the contemporary reality that LESI represents the only widely accepted nonmedical/surgical treatment for symptomatic LSS and may be performed as many as 4 times a year, and that the study was specifically requested by CMS to satisfy reimbursement requirements. Subsequently, 2-year data have been presented that demonstrate the durability of relief in patients treated with the minimally invasive lumbar decompression (MILD) procedure (results currently in press).

A single-site prospective study was performed to determine the safety and efficacy of the MILD procedure at 6 months.[78] Twenty-seven consecutive patients were identified and enrolled in the prospective study, with outcomes measures of the VAS, ODI, and ZCQ. All patients had LF > 2.5 mm, with previous failure of conservative therapy. Success was defined as: a reduction in VAS score of 2 or more points, improvement of 15 or more points on the ODI, no procedure-related complications, and did not require reoperation. A total of 44 levels were decompressed in 27 patients. Ten patients underwent a 1-level decompression, 17 underwent decompression at 2 levels. Most procedures were at L3–4, followed by L4–5. Mean LF thickness was 4.5 mm. Mean VAS score at baseline was 9.1 and improved to 3.9 at 6 months postprocedure (2-tailed *t*-test, $P < 0.0001$). This represents a 57.1% improvement in pain on average. Eighty-eight percent of the patients fulfilled the criteria of improvement of at least 2 points in the VAS score (or >30% improvement compared to baseline pain). Without the complete data set, the number of patients with at least 50% improvement (the standard for other pain care therapies) could not be determined. The ODI baseline mean score was 55.1, with improvement to a mean value of 31.1, an improvement of 24 points (2-tailed *t*-test, $P < 0.0004$), while the ZCQ score was 1.86 at 6 months (2-tailed *t*-test, $P < 0.001$). This single-center, prospective, nonrandomized, noncontrolled observational study showed both efficacy and safety.

Taken *in toto* the adverse events in the RCTs and the observational studies that comment on safety note 1 procedural hemorrhage that abated with application of Gelfoam (Pfizer, New York, NY, U.S.A.). No other incidents of hemorrhage, dural tear, or neurologic deficit were noted. Mekhail et al. compared rates of complication with PILD to those of open decompressive surgery.[77] Their 0% incidence of complications in the PILD group stands in contrast to the surgical complication rate. The interested reader is directed to that article.

**CONSENSUS POINT 10**

Based on the systematic review of the available literature for PILD (Table 9), the consensus committee has determined that there is sufficient support to warrant Level I evidence using the USPSTF criteria. The 2 comparative prospective studies that led to reimbursement approval by the CMS are both Level I (USPSTF criteria). All RCT evidence compares PILD to lumbar ESI and not to open decompression (Grade A, Level I, Consensus strong).

### Interspinous Spacers for Indirect Lumbar Decompression

Interspinous spacers were developed as a less invasive strategy to avoid many of the risks of traditional laminectomy and eliminate the complication of postlaminectomy syndrome. The basic premise of these devices is to limit, or even block, extension at specific levels of the spine, thus minimizing the physiologic effects of acquired spinal degeneration. This “extension blocking” effect results in tightening of the hypertrophic LF and prevents it from buckling into the spinal canal. This helps to maintain a bigger central spinal and neuroforaminal canal. The concept of interspinous process devices for the treatment of LSS began in the 1950s, at which time metal plugs were inserted between the spinous processes.[80,81] The therapeutic goal of the current generation of ISS devices is to produce slight lumbar flexion at the treated level(s), thus maximizing the potential space in the spinal canal, while allowing the untreated levels to move freely.

An inherent advantage of ISS over other minimally invasive treatments discussed in this review is its versatility to potentially improve stenosis at both the central and neuroforaminal canals. Moreover, ISS use is reversible—in the event the procedure provides insufficient relief, the device can be removed with little consequence and no bearing on the patient’s ability to proceed with a surgical decompression.

Although a variety of spacer-platforms have been utilized (past and present), this section will focus on the primary, stand-alone ISS on the market, the Superion® Indirect Decompression System (S-IDS) by Vertiflex, Inc.

**Table 9. Systematic Review of PILD Literature**

| Study | Study Type | Details | U.S. Preventative Services Task Force Rating[2] |
|---|---|---|---|
| MiDAS (Benyamin et al., 2016; Staats & Benyamin, 2016)[8,64] | RCT | MILD vs. LESI with follow-up at 6 months, 1 and 2 years (in press) for the MILD arm Outcome measures: VAS, ODI, ZCQ, SF-12 | Level I |
| Brown (2012)[63] | RCT | 21 subjects randomized to MILD and 17 to LESI with VAS, ODI, and ZCQ and followed at 6 and 12 weeks. Improved satisfaction at 6 and 12 weeks for PILD vs. LESI; PILD also demonstrated improved pain and function scores vs. LESI in the 12-week period. | Level I |
| Deer et al. (2012)[79] | Observational, prospective | 46 subjects with LSS followed prospectively at 12 weeks, 6 months, and 1 year following PILD Outcome measures: VAS, ODI, ZCQ | |
| Chopko & Caraway (2010)[73] | Observational, prospective | 78 patients followed prospectively Outcome measures: VAS, ODI, ZCQ, SF-12 | |
| Mekhail et al. (2012)[77] | Observational, retrospective | 58 subjects with LSS followed retrospectively at 11 U.S. sites Outcome measures: VAS, ODI, ZCQ, SF-12 Results: Significant decrease in pain; physical function significantly improved by all measures | |
| Basu (2012)[78] | Observational, prospective | 27 subjects with LSS enrolled in single site Outcome measures: ODI, ZCQ, VAS at baseline and 6 months | |
| Chopko (2011)[75] | Observational, prospective | 14 subjects with LSS receiving MILD Outcome measures: VAS, ODI Results: Significantly improved VAS while ODI failed to improve | |
| Lingreen & Grider (2010)[74] | Observational, retrospective | 42 subjects with LSS at 2 U.S. centers Outcome measures: VAS, patient self-reported improvement to stand and ambulate for >15 minutes pre- and post-procedure. 40% reduction in pain with 86% subjects suggesting they would recommend the PILD procedure. | |
| Wong (2012)[76] | Observational, retrospective | 17 subjects with LSS receiving PILD Outcome measures: ODI, VAS followed 1 year Results: 70% reduction in VAS and significant improvement in ODI at 1 year | |

LESI, lumbar epidural steroid injection; LSS, lumbar spinal stenosis; MiDAS, mild® Decompression Alternative to Open Surgery; MILD, minimally invasive lumbar decompression; ODI, Oswestry Disability Index; PILD, percutaneous image-guided lumbar decompression; RCT, randomized controlled trial; SF-12, Short Form 12 Health Survey; ZCQ, Zurich Claudication Questionnaire.

(Carlsbad, CA, U.S.A.). Prior to the S-IDS, the X-STOP® interspinous spacer (X-ISS) decompression system by Medtronic (Minneapolis, MN, U.S.A.) was the most commonly utilized ISS in the United States. The device was approved for use by the U.S. Food and Drug Administration (FDA) in 2005; however, Medtronic ultimately discontinued distribution in 2015 citing minimal long-term benefit and a relatively high rate of complications, which included dislodgement of the device.[82] Later that year, the S-IDS was approved by the FDA. The device was intended to rectify the deficiencies of the X-ISS (ie, device movement) and introduce a percutaneous implantation technique that could be utilized by interventional spine specialists.

The S-IDS is an H-shaped, 1-piece implant composed of titanium alloy as opposed to the X-ISS, which was a 2-piece implant composed of polyetheretherketone (PEEK) polymer. The X-ISS required an open implantation through an incision approximately 1-inch in length (per level), whereby the 2 components would be assembled at the level of the spine. In contrast, the S-IDS is delivered percutaneously, as a single piece, through a cannula, using a series of dilators to open tissues leading to the intralaminar opening. The S-IDS has superior and inferior cam lobes that rotate during deployment, so as to capture the superior and inferior spinous processes, respectively (Figure 9). The S-IDS is indicated to treat skeletally mature patients with intermittent neurogenic claudication secondary to a diagnosis of moderate degenerative LSS, with or without Grade 1 spondylolisthesis, confirmed by imaging, with evidence of thickened LF, narrowed lateral recess, and/or central canal or foraminal narrowing. The S-IDS may be implanted at 1 or 2 adjacent lumbar levels in patients in whom treatment is indicated at no more than 2 levels, from L1 to L5.[83,84]

***Literature Review of Interspinous Spacers.*** The sentinel article establishing the efficacy of ISS for the treatment of intermittent neurogenic claudication secondary to moderate LSS was published by Zucherman et al. in *Spine* in 2005.[85] This was a multicenter, prospective, randomized trial comparing the X-ISS ($n = 100$) to nonoperative therapy ($n = 91$). At 2 years, the X-ISS

cohort improved by 45% from baseline in symptom severity score compared to 7.4% in the control group. The mean improvement in the physical function domain was 44.3% in the X-ISS cohort compared to -0.4% in the control group. Most importantly, the subjects in the X-ISS cohort had significantly better outcomes in each domain of the ZCQ. The utility of X-ISS was further supported by the publication of an observational study on 175 patients treated with this particular ISS.[86] The researchers reported clinically significant decreases in back and leg VAS scores as well as an overall reduction in VAS score. Although these publications support the utility of ISS, they failed to establish its place in the treatment algorithm compared to traditional, decompressive surgery.

In 2013, Strömqvist et al. authored perhaps the strongest publication supporting the comparability of ISS to traditional surgery.[87] The 2-year study compared the X-ISS ($n$ = 50) to surgical decompression ($n$ = 50). In addition to establishing noninferiority, the primary endpoint in this study was the ZCQ; the secondary endpoints were VAS scores, Short Form 36 (SF-36) scores, complications, and reoperations. The primary and secondary outcomes for both groups were significantly improved; with the exception of reoperation rate (laminectomy: 6%; X-ISS: 26%), the results were similar at all time points, with no statistically significant differences noted between the 2 treatments. The evidence contained in this publication is regarded as Level 1.

Patel et al. reported the 2-year data of the prospective, multicenter (29 sites), randomized controlled FDA Investigational Device Exemption (IDE) pivotal trial comparing the S-IDS ($n$ = 190) to the X-ISS ($n$ = 201), which served as the control.[84] Leg pain was the predominant complaint among the entire cohort, which decreased by 70% in both groups at 2 years. Additionally, 77% of subjects with leg pain and 68% of those with back pain reported clinically significant improvements (≥ 20 mm on the VAS) at 2 years. The study established noninferiority of the S-IDS over X-ISS (primary endpoint). Complications and/or reoperations were not statistically different between the 2 groups.

**Figure 9.** Fully deployed indirect decompression system at the L3 to L4 spinal level.

Lauryssen et al. published a review article in 2015 comparing the results of the IDE trial to a compilation of 19 published studies on the use of decompressive laminectomy for the treatment of LSS.[88] The article compared back and leg pain, ODI score, and ZCQ score between those in the IDE study treated with ISS and the published results for patients treated with laminectomy. The percentage improvements at 24 months uniformly favored those treated with ISS compared to baseline scores.

The 3-year data of the aforementioned IDE trial, published in 2015, favored the S-IDS over the X-ISS.[9] The primary endpoints of this study compared individual patient success based on the ZCQ, no reoperations at the index level, no implant/procedure-related complications, and no clinically significant confounding treatments. At 3 years, the proportion of S-IDS patients (52.5%) achieving the primary endpoints was significantly greater than that of X-ISS patients (38%; $P$ = 0.023). In 2017, the 4-year data were published by Nunley et al.[89] At 4 years, 84.3% of patients ($n$ = 89) treated with the S-IDS showed clinically significant success on at least 2 of the 3 domains of the ZCQ. Additionally, 73% of patients reported improvements in leg VAS scores over baseline and 69% in back VAS scores. At 5 years, 84% ($n$ = 88) of patients treated with the S-IDS demonstrated clinically significant success on at least 2 of the 3 domains of the ZCQ, 80% had improvements over baseline in leg pain and 65% in back pain.[90]

In the 2005 *Spine* publication, improvements (≥15% improvement) in the ODI were noted in 65% of the subjects treated with the S-IDS.[85] Improvements in ODI score were sustained at 4 and 5 years ; 62% of subjects at 4 years and 65% at 5 years showed clinically significant improvements over baseline.[89,90] It should be noted that although the literature has focused on comparing spacer devices with similar features, there has not been a direct comparison of the S-IDS to decompression methods (percutaneous or open), merely noninferiority studies of the S-IDS compared to the X-ISS.

***Potential Complications.*** The 2005 study by Zucherman et al.[85] resulted in an intraoperative or procedure-related complication rate of 7% for the X-ISS. These included respiratory distress, coronary ischemia, pulmonary edema, wound dehiscence, hematoma, and incisional pain. The device-related complication rate was 4%. These complications included malpositioned implant, implant migration, spinous process fracture, and increased pain at the implant level. In the Patel et al.[84] pivotal trial comparing the S-IDS to the X-ISS, the X-ISS was associated with a serious adverse event rate, classified as device or procedure related, of 9.5%; the rate of neurological complications was 2.5%.

In the Patel et al. IDE study,[83,84] the incidence of serious adverse events classified as device or procedure related was 8.4% with the S-IDS; a neurological complication rate of 3.5% was reported. At 2 years, the incidence of nonhealed spinous process fractures was 11.1% with the S-IDS and 5.0% with the X-ISS; healed spinous process fracture incidence was 5.3% with the S-IDS and 3.5% with the X-ISS. Approximately 80% of spinous process fractures were identified by the 6-week follow-up visit in each group. Of note, the investigators concluded that spinous process fractures were largely asymptomatic and had no influence on the clinical effectiveness of either device. The reoperation rate with the X-ISS ranged from 4.5% to 26% at 2 years.[86,87] At 3 years, the reoperation rate for the X-ISS was reportedly 20.3% compared to 18.8% for those treated with the S-IDS ($P = 0.77$).[9]

***Cost Effectiveness.*** The cost associated with ISS is comparable to that of traditional surgery ($13,950)[91]; however, when one considers the percutaneous approach of spacers vs. an open decompressive laminectomy, the minimally invasive nature of the former is understandably more attractive (to physicians and patients alike) due to the lower complication rate. Obviously, conservative care carries the lowest average cost ($10,540) and the least risk; however, evidence suggests an ISS is superior to conservative care.[85]

Parker et al. compared conservative care, ISS, and laminectomy in an effort to elucidate which was more cost effective and used quality adjusted life years (QALY).[91] A Markov model simulated cost, health outcomes, and incremental cost effectiveness of the 3 treatment modalities. Although conservative care carried the lowest overall cost, it also imparted the lowest QALY (0.06 compared to 0.26 for ISS/surgery). Despite the larger up-front cost of ISS and laminectomy, they both were found to provide superior value (cost and effectiveness) compared to conservative care. These findings suggest not only that ISS is superior to conservative care from an efficacy standpoint, but also that it is more cost effective for payers. Moreover, if ISS and laminectomy are considered equally cost effective, one must choose the less invasive therapy with the lower complication rate, which is ISS.[34]

***Systematic Review of Spacer Literature.***

**CONSENSUS POINT 11**

Based on the independent systematic review of the available literature for spacers (Table 10) placed by interventional pain physicians and interventional radiologists, the consensus committee has determined that there is sufficient support to warrant Level I evidence using the USPSTF criteria. The recommendation is based on an RCT noninferiority study of 2 spacers and not comparing spacers to open decompression (Grade B, Level I, Consensus strong).

### Surgical Decompression by Open Surgical Methods

When considering the open surgical options for LSS, the surgeon considers that spondylosis is the degenerative process that most often contributes to LSS. Clinical features that are commonly attributed to this include lower back pain, radicular leg pain, and neurogenic claudication. The treatment algorithm has been variable and relies heavily on physician preference, but as seen in this review there is the implementation of conservative measures first, which may lead to improvement in the symptoms. Surgical intervention is indicated in patients whose symptoms persist despite conservative measures and demonstrate surgically correctable pathologies.

For those patients having a primary complaint of radiculopathy, it is important to determine if an intervertebral disc herniation exists, as this is approached differently from LSS.[92] The pathology lies in a soft disc without other abnormality. Therefore, you would expect an underlying biomechanically stable spine without abnormality in the adjacent facet joints, LF. or bone. These patients are usually younger with a more acute disease course. For those who do not have resolution with time and conservative measures, a

**Table 10. Systematic Review of Spacer Literature**

| Study | Study Type | Details | U.S. Preventative Services Task Force Rating[2] |
|---|---|---|---|
| Patel et al. (2015)[84] | RCT noninferiority study, Superion vs. X-STOP | 391 subjects with LSS randomized to receive S-IDS spacer (experimental group) or X-ISS (control group) followed for 2 years. Outcome measures: VAS, ODI, ZCQ, back and leg pain<br>Results: 70% decrease in leg pain in each group, 2.0 mm or greater improvement in back and leg pain (68% and 77%, respectively), and ODI improvement all similar in both groups demonstrating noninferiority | Level I |

LSS, lumbar spinal stenosis; ODI, Oswestry disability index; RCT, randomized controlled trial; ZCQ, Zurich Claudication Questionnaire.

decompression surgery alone using a less invasive technique may be sufficient.

More definitive surgical procedures for LSS vary in their indication, adoption, and support by the evidence in peer-reviewed literature. The most well-known and accepted indication for surgical decompression is for the urgent treatment of cauda equina syndrome.[93] Beyond this indication, conservative measures are recommended first. It is generally accepted by surgeons that patients should undergo at least a 3-month period of consistent conservative measures. Beyond this, the literature supports surgical intervention with improvement in symptoms.[94,95] Surgeons also generally feel that early decompression of nerve compromise is recommended, as longer term compression may lead to chronic changes.[94]

Surgical decompression of compromised neural elements is meant to treat radicular leg pain and neurogenic claudication, and is not supported as a treatment of primary low back pain.[96,97] Biomechanical stability is an entity separate from compressed neural elements. In general, intervention with an instrumented fusion is geared toward the treatment of back pain, correction of a deformity, and improvement in fusion rates.[98] Those patients with dynamic instability,[99] degenerative scoliosis/kyphosis,[100] and spondylolisthesis[101] have indications for instrumented fusion. Intraoperatively, an extensive and wide decompression may warrant a fusion.[102] Revision surgery for patients with failed back surgery syndrome is generally performed in those with severe adjacent level disease, as well as in those with instability, and therefore may necessitate an instrumented fusion.[103]

In summary, surgical decompression is generally reserved for decompression of neural elements in those patients failing conservative measures, but who are sustaining neural compromise. Assessment of biomechanical stability is necessary, with instrumented fusion being performed for dynamic instability, degenerative scoliosis/kyphosis, spondylolisthesis, extensive and wide decompression, and revision surgery. The goal of surgery is to achieve stability and release of nerve compromise. Therefore, although instrumentation may improve the fusion rate, it does not necessarily improve recovery rate and pain control.[104]

## CONCLUSIONS

Minimally invasive spine treatments should be used in a judicious and algorithmic fashion to treat lumbar spinal stenosis, based on the evidence of efficacy and safety in the peer-reviewed literature. An obvious next step for minimally invasive spine research will be studies with head-to-head comparison of direct and indirect modalities as well as direct/indirect modalities to open decompression; this should not be misconstrued to suggest that safety data or clinical effectiveness have not been established, merely to point out the next steps for further study. The MIST Consensus Group recommend that these procedures be used in a multimodal fashion as part of an evidence-based decision algorithm.

## ACKNOWLEDGEMENT

Sarah Staples, MA, ELS, assisted with manuscript preparation.

## CONFLICTS OF INTEREST

The MIST project was organized by the West Virginia Society for Interventional Pain Physicians in association with the American Society of Pain and Neuroscience. The board of directors accepted nominations from members and chose members based on publication, research, clinical experience, and diversity. The members were asked to disclose any conflicts of interest. A

senior editor who had no relevant conflicts of interest reviewed the paper to reconcile any perceived bias before submission.


## FINANCIAL SUPPORT

This publication was supported by an unrestricted grant to the West Virginia Society of Interventional Pain Physicians (WVSIPP) from Vertos Medical for editorial assistance.


### Supporting Information

Additional supporting information may be found online in the Supporting Information section at the end of the article.

**Appendix S1.** Local Coverage Determination (LCD): Lumbar Epidural Injections (L35937).

## REFERENCES


1. Institute of Medicine. *Clinical Practice Guidelines We Can Trust*. Washington, DC: Institute of Medicine; 2011.
2. Harris RP, Helfand M, Woolf SH, et al., for the Methods Work Group, Third US Prevention Service Task Force. Current methods of the US Preventive Services Task Force: a review of the process. *Am J Prev Med*. 2001;20:21–35.
3. Jadad AR, Moore RA, Carroll D, et al. Assessing the quality of reports of randomized clinical trials: is blinding necessary? *Control Clin Trials*. 1996;17:1–12.
4. North American Spine Society. *Evidence Based Clinical Guidelines for Multidisciplinary Spine Care: Diagnosis and Treatment of Degenerative Lumbar Spinal Stenosis*. Burr Ridge, IL: North American Spine Society; 2007.
5. Konno S, Kikuchi S, Tanaka Y, et al. A diagnostic support tool for lumbar spinal stenosis: a self-administered, self-reported history questionnaire. *BMC Musculoskelet Disord*. 2007;8:102.
6. Sugioka T, Hayashino Y, Konno S, Kikuchi S, Fukuhara S. Predictive value of self-reported patient information for the identification of lumbar spinal stenosis. *Fam Pract*. 2008;25:237–244.
7. Katz JN, Dalgas M, Stucki G, et al. Degenerative lumbar spinal stenosis. Diagnostic value of the history and physical examination. *Arthritis Rheum*. 1995;38:1236–1241.
8. Benyamin RM, Staats PS, for the MiDAS ENCORE Investigators. MILD® is an effective treatment for lumbar spinal stenosis with neurogenic claudication: MiDAS ENCORE randomized controlled trial. *Pain Physician*. 2016;19:229–242.
9. Patel VV, Nunley PR, Whang PG, et al. Superion interspinous spacer for the treatment of moderate degenerative lumbar spinal stenosis: durable three-year results of a randomized controlled trial. *J Pain Res*. 2015;8:657–662.
10. Arnoldi CC, Brodsky AE, Cauchoix J, et al. Lumbar spinal stenosis and nerve root entrapment syndromes. Definition and classification. *Clin Orthop Rel Res*. 1976;115:4–5.
11. Mamisch N, Brumann M, Hodler J, Held U, Brunner F, Steurer J. Radiologic criteria for the diagnosis of spinal stenosis: results of a Delphi survey. *Radiology*. 2012;264:174–179.
12. Andreisek G, Imhof M, Wertli M, et al. A systematic review of semiquantitative and qualitative radiologic criteria for the diagnosis of lumbar spinal stenosis. *Am J Roentgenol*. 2013;201:W735–W746.
13. Andreisek G, Hodler J, Steurer J. Uncertainties in the diagnosis of lumbar spinal stenosis. *Radiology*. 2011;261:681–684.
14. Burgstaller JM, Schuffler PJ, Buhmann JM, et al. Is there an association between pain and magnetic resonance imaging parameters in patients with lumbar spinal stenosis? *Spine*. 2016;41:E1053–E1062.
15. Winklhofer S, Held U, Burgstaller JM, et al. Degenerative lumbar spinal canal stenosis: intra- and inter-reader agreement for magnetic resonance imaging parameters. *Eur Spine J*. 2017;26:353–361.
16. Malfair D, Beall DP. Imaging the degenerative diseases of the lumbar spine. *Magn Reson Imaging Clin North Am*. 2007;15:221–238.
17. Siebert E, Pruss H, Klingebiel R, Failli V, Einhaupl KM, Schwab JM. Lumbar spinal stenosis: syndrome, diagnostics and treatment. *Nat Rev Neurol*. 2009;5:392–403.
18. Abbas J, Hamoud K, Masharawi YM, et al. Ligamentum flavum thickness in normal and stenotic lumbar spines. *Spine*. 2010;35:1225–1230.
19. Park JB, Chang H, Lee JK. Quantitative analysis of transforming growth factor-beta 1 in ligamentum flavum of lumbar spinal stenosis and disc herniation. *Spine* 2001;26: E492–E495.
20. Steurer J, Roner S, Gnannt R, Hodler J. Quantitative radiologic criteria for the diagnosis of lumbar spinal stenosis: a systematic literature review. *BMC Musculoskelet Disord*. 2011;12:175.
21. Andreisek G, Deyo RA, Jarvik JG, et al. Consensus conference on core radiological parameters to describe lumbar stenosis-an initiative for structured reporting. *Eur Radiol*. 2014;24:3224–3232.
22. Pfirrmann CW, Dora C, Schmid MR, Zanetti M, Hodler J, Boos N. MR image-based grading of lumbar nerve root compromise due to disk herniation: reliability study with surgical correlation. *Radiology*. 2004;230:583–588.
23. Boden SD, Davis DO, Dina TS, Patronas NJ, Wiesel SW. Abnormal magnetic-resonance scans of the lumbar spine in asymptomatic subjects. A prospective investigation. *J Bone Joint Surg Am*. 1990;72:403–408.
24. Jensen MC, Brant-Zawadzki MN, Obuchowski N, Modic MT, Malkasian D, Ross JS. Magnetic resonance

imaging of the lumbar spine in people without back pain. *N Engl J Med*. 1994;331:69–73.

25. Binder DK, Schmidt MH, Weinstein PR. Lumbar spinal stenosis. *Semin Neurol*. 2002;22:157–166.

26. Fritz JM, Delitto A, Welch WC, Erhard RE. Lumbar spinal stenosis: A review of current concepts in evaluation, management, and outcome measurements. *Arch Phys Med Rehabil*. 1998;79:700–708.

27. Patel CK. Spinal stenosis. In: Garfin SR, Eismont FJ, Bell GR, Bono CM, Fischgrund J, eds. *Rothman-Simeone the Spine E-book*. 7th ed. Philadelphia, PA: Elsevier Health Sciences; 2017:1047–1060.

28. Truszczynska A, Drzal-Grabiec J, Plszewski M, Rapala K, Tarnowski A. Posture of patients with lumbar spinal canal stenosis. *J Back Musculoskelet Rehabil*. 2015;28:75–79.

29. Malmivaara A, Slatis P, Heliovaara M, et al. Surgical or nonoperative treatment for lumbar spinal stenosis? A randomized controlled trial *Spine*. 2007;32:1– 8.

30. Gafrin SR, Herkowitz HN, Mirkovic S. Instructional course lectures. The American Academy of Orthopaedic Surgeons—Spinal Stenosis. *J Bone Joint Surg Am*. 1999;81:572–586.

31. Ciric I, Mikhael MA, Tarkington JA, Vick NA. The lateral recess syndrome. A variant of spinal stenosis. *J Neurosurg*. 1980;53:433–443.

32. Dyck P. The stoop-test in lumbar entrapment radiculopathy. *Spine*. 1979;4:89–92.

33. Miignucci L, Bell G. Different diagnosis of sciatica. In: Herkowitz H, Garfin S, Balderson R, Eismont F, Bell G, Wiesel S, eds. *The Spine*. 4th ed. Philadelphia: W.B. Saunders Company; 1999:89–107.

34. Zaina F, Tomkins-Lane C, Carragee E, Negrini S. Surgical versus nonsurgical treatment for lumbar spinal stenosis. *Spine*. 2016;41:E857–E868.

35. Katz JN, Dalgas M, Stucki G, Lipson SJ. Diagnosis of lumbar spinal stenosis. *Rheum Dis Clin North Am*. 1994;20:471–483.

36. Dyck P, Doyle JB. “Bicycle test” of van Gelderen in diagnosis of intermittent cauda equina compression syndrome. Case report. *J Neurosurg*. 1977;46:667–670.

37. Giordano J. Vascular versus spinal disease as a cause of back and lower extremity pain. *Semin Spine Surg*. 1990;2:136–140.

38. Zdeblick T. Discogenic back pain. In: Herkowitz H, ed. *The Spine*. 4th ed. Philadelphia: W.B. Saunders; 1999:749–766.

39. Cavanaugh JM. Neural mechanisms of lumbar pain. *Spine*. 1995;20:1804–1809.

40. Dreyfuss PH, Dreyer SJ, Herring SA. Lumbar zygapophysial (facet) joint injections. *Spine*. 1995;20:2040–2047.

41. Young S, Aprill C, Laslett M. Correlation of clinical examination characteristics with three sources of chronic low back pain. *Spine J*. 2003;3:460–465.

42. Ortia S, Yamashita M, Eguchi Y. Pregabalin for refractory radicular leg pain due to lumbar spinal stenosis: a preliminary prospective study. *Pain Res Manag*. 2016;2016:5079675.

43. Lubelski D, Thompson NR, Agrawal B, et al. Prediction of quality of life improvements in patients with lumbar stenosis following use of membrane stabilizing agents. *Clin Neurol Neurosurg*. 2015;139:234–240.

44. Ammendolia C, Stuber KJ, Rok E, et al. Nonoperative treatment for lumbar spinal stenosis with neurogenic claudication. *Cochrane Database Syst Rev*. 2013;8:CD010712.

45. Prateepavanich P, Thanapipatsiri S, Santisatisakul P, et al. The effectiveness of lumbosacral corset in symptomatic degenerative lumbar spinal stenosis. *J Med Assoc Thai*. 2001;84:572–576.

46. Levendoglu F, Oguz H, Polat E, Bodur S. The effect of corset on walking time in lumbar spinal stenosis. *Turkiye Klinikleri J Med Sci*. 2009;29:1172–1177.

47. Cuccurullo S. *Physical Medicine and Rehabilitation Board Review*. New York: Demos Medical; 2004;1:276–278.

48. Harvard Health Publishing. Treating lumbar spinal stenosis. Harvard Women’s Health Watch 2008. https://www.health.harvard.edu/search?q=lumbar+spinal+stenosis (accessed April 17, 2018)

49. Takasaki H, Takahiro M. The impact of continuous use of lumbosacral orthoses on trunk motor performance: a systematic review with meta-analysis. *Spinal J*. 2017;17:889–900.

50. Bresnahan BW, Rundell SD, Dagadakis MC, et al. A systematic review to assess comparative effectiveness studies in epidural steroid injections for lumbar spinal stenosis and to estimate reimbursement amounts. *PM&R*. 2013;5:705–714.

51. Friedly JL, Comstock BA, Turner JA, et al. A randomized trial of epidural glucocorticoid injections for spinal stenosis. *N Engl J Med*. 2014;371:11–21.

52. Manchikanti L, Kay AD, Manchikanti K, Boswell M, Pampati V, Hirsch J. Efficacy of epidural injections in the treatment of lumbar central spinal stenosis: a systematic review. *Anesth Pain Med*. 2015;5:e23139.

53. Manchikanti L, Cash KA, McManus CD, Pampati V, Fellows B. Results of 2-year follow-up of a randomized, double-blind, controlled trial of fluoroscopic caudal epidural injections in central spinal stenosis. *Pain Physician*. 2012;15:371–384.

54. Manchikanti L, Cash KA, McManus CD, Damron KS, Pampati V, Falco FJE. A randomized, double-blind controlled trial of lumbar interlaminar epidural injections in central spinal stenosis: 2-year follow-up. *Int J Phys Med Rehabil*. 2014;2:179.

55. Lee JH, An JH, Lee SH. Comparison of the effectiveness of inter-laminar and bilateral transforaminal epidural steroid injections in treatment of patients with lumbosacral disc herniation and spinal stenosis. *Clin J Pain*. 2009;25:206–210.

56. Koc Z, Ozcakir S, Sivrioglu K, Gurbet A, Kucukoglu S. Effectiveness of physical therapy and epidural steroid injections in lumbar spinal stenosis. *Spine*. 2009;34:985–989.

57. Wilson-MacDonald J, Burt G, Griffin D, Glynn C. Epidural steroid injection for nerve root compression: a

randomised, controlled trial. *J Bone Joint Surg Br*. 2005;87-B:352–355.

58. Fukusaki M, Kobayashi I, Hara T, Sumikawa K. Symptoms of spinal stenosis do not improve after epidural steroid injection. *Clin J Pain*. 1998;14:148–151.

59. Nam HS, Park YB. Effects of transforaminal injection for degenerative lumbar scoliosis combined with spinal stenosis. *Ann Rehabil Med*. 2011;35:514–523.

60. Hwang SY, Lee JW, Lee GY, et al. Lumbar facet joint injection: feasibility as an alternative method in high-risk patients. *Eur Radiol*. 2013;23:3153e60.

61. Shim E, Lee J, Im T, Kang Y, et al. Facet joint injection versus epidural steroid injection for lumbar spinal stenosis: intra-individual study. *Clin Radiol*. 2017;72:96e7–96e14.

62. Stojanovic MP, Sethee J, Mohiuddin M, et al. MRI analysis of the lumbar spine: can it predict response to diagnostic and therapeutic facet procedures? *Clin J Pain*. 2010;26:110–115.

63. Brown LL. A double-blind, randomized, prospective study of epidural steroid injection vs. the mild® procedure in patients with symptomatic lumbar spinal stenosis. *Pain Pract*. 2012;12:333–341.

64. Staats PS, Benyamin RM. MiDAS ENCORE: randomized controlled clinical trial report of 6-month results. *Pain Physician*. 2016;19:25–38.

65. Ammendolia C, Stuber K, de Bruin LK, et al. Nonoperative treatment of lumbar spinal stenosis with neurogenic claudication: a systematic review. *Spine*. 2012;37:E609–E616.

66. Parr AT, Manchikanti L, Hameed H, et al. Caudal epidural injections in the management of chronic low back pain: a systematic appraisal of the literature. *Pain Physician*. 2012;15:E159–E198.

67. Manchikanti L, Buenaventura RM, Manchikanti KN, et al. Effectiveness of therapeutic lumbar transforaminal epidural steroid injections in managing lumbar spinal pain. *Pain Physician*. 2012;15:E199–E245.

68. Benyamin RM, Manchikanti L, Parr AT, et al. The effectiveness of lumbar interlaminar epidural injections in managing chronic low back and lower extremity pain. *Pain Physician*. 2012;15:E363–E404.

69. Andersson GB. Epidural glucocorticoid injections in patients with lumbar spinal stenosis. *N Engl J Med*. 2014;371:75–76.

70. Centers for Medicare & Medicaid Services. Percutaneous Image-guided Lumbar Decompression for Lumbar Spinal Stenosis. https://www.cms.gov/Medicare/Coverage/Coverage-with-Evidence-Development/PILD.html (accessed April 20, 2018).

71. Sakai Y, Ito S, Hida T, Ito K, Harada A, Watanabe K. Clinical outcome of lumbar spinal stenosis based on new classification according to hypertrophied ligamentum flavum. *J Orthop Sci*. 2017;22:27–33.

72. Deer TR, Kapural L. New image-guided ultra-minimally invasive lumbar decompression method: the mild procedure. *Pain Physician*. 2010;13:35–41.

73. Chopko B, Caraway DL. MiDAS I (mild Decompression Alternative to Open Surgery): a preliminary report of a prospective, multi-center clinical study. *Pain Physician*. 2010;13:369–378.

74. Lingreen R, Grider JS. Retrospective review of patient self-reported improvement and post-procedure findings for mild (minimally invasive lumbar decompression). *Pain Physician*. 2010;13:555–560.

75. Chopko BW. A novel method for treatment of lumbar spinal stenosis in high-risk surgical candidates: pilot study experience with percutaneous remodeling of ligamentum flavum and lamina. *J Neurosurg Spine*. 2011;14:46–50.

76. Wong WH. mild Interlaminar decompression for the treatment of lumbar spinal stenosis: procedure description and case series with 1-year follow-up. *Clin J Pain*. 2012;28:534–538.

77. Mekhail N, Vallejo R, Coleman MH, Benyamin RM. Long-term results of percutaneous lumbar decompression mild® for spinal stenosis. *Pain Pract*. 2012;12:184–193.

78. Basu S. Mild Study: Single-site prospective IRB study. *Clin J Pain*. 2012;28:254–258.

79. Deer TR, Kim CK, Bowman RG 2nd, Ranson MT, Yee BS. Study of percutaneous lumbar decompression and treatment algorithm for patients suffering from neurogenic claudication. *Pain Physician*. 2012;15:451–460.

80. Bono CM, Vaccaro AR. Interspinous process devices in the lumbar spine. *J Spinal Disord Tech*. 2007;20:255–261.

81. Gala RJ, Russo GS. Interspinous implants to treat spinal stenosis. *Curr Rev Musculoskelet Med*. 2017;10:182–188.

82. Gazzeri R, Galarza M, Alfieri A. Controversies about interspinous process devices in the treatment of degenerative lumbar spine diseases: past, present, and future. *Biomed Res Int*. 2014;2014:975052.

83. U.S. Food and Drug Administration. Vertiflex® Superion® Inter-Spinous Spacer. PMA No P140004. http://www.accessdata.fda.gov/cdrh_docs/pdf14/P140004b.pdf. (accessed May 18, 2018)

84. Patel VV, Whang PG, Haley TR, et al. Superion interspinous process spacer for intermittent neurogenic claudication secondary to moderate lumbar spinal stenosis: two-year results from a randomized controlled FDA-IDE pivotal trial. *Spine*. 2015;40:275–282.

85. Zucherman JF, Hsu KY, Hartjen CA. A multicenter, prospective, randomized trial evaluating the X STOP interspinous process decompression system for the treatment of neurogenic intermittent claudication: two-year follow-up results. *Spine*. 2005;30:1351–1358.

86. Kuchta J, Sobottke R, Eysel P, Simons P. Two-year results of interspinous spacer (X-Stop) implantation in 175 patients with neurologic intermittent claudication due to lumbar spinal stenosis. *Eur Spine J*. 2009;18:823–829.

87. Strömqvist BH, Berg S, Gerdhem P, et al. X-Stop versus decompressive surgery for lumbar neurogenic intermittent claudication. *Spine*. 2013;38:1436–1442.

Case 3:21-cv-01298-MMA-BLM Document 12-2 Filed 12/30/21 PageID.501 Page 155 of 239

88. Lauryssen C, Jackson RJ, Baron JF, et al. Stand-alone interspinous spacer versus decompressive laminectomy for the treatment of lumbar spinal stenosis. *Expert Rev Med Devices*. 2015;12:763–769.

89. Nunley PD, Patel VV, Orndorff DG, et al. Superion interspinous spacer treatment of moderate spinal stenosis: 4-year results. *World Neurosurg*. 2017;104:279–283.

90. Nunley PD, Patel VV, Orndorff DG. Five-year durability of stand-alone interspinous process decompression for lumbar spinal stenosis. *Clin Interv Aging*. 2017;12:1409–1417.

91. Parker SL, Anderson LH, Nelson T, Patel VV. Cost-effectiveness of three treatment strategies for lumbar spinal stenosis: Conservative care, laminectomy, and the Superion interspinous spacer. *Int J Spine Surg*. 2015;9:28.

92. Ivanov I, Milenkovic Z, Stefanovic I, Babic M. Lumbar spinal stenosis. Symptomatology and methods of treatment. *Srpi Arh Celok Kekars*. 1998;126:450–456.

93. Gautschi OP, Cadosch D, Hildebrandt G. Emergency scenario: cauda equina syndrome: assessment and management. *Praxis*. 2008;97:305–312.

94. Peul WC, van Houwelingen HC, van den Hout WB, et al. Surgery versus prolonged conservative treatment for sciatica. *N Engl J Med*. 2007;356:2245–2256.

95. Weinstein JN, Tosteson TD, Lurie JD, et al. Surgical versus nonsurgical therapy for lumbar spinal stenosis. *N Engl J Med*. 2008;358:794–810.

96. Lee JY, Whang PG, Lee JY, Phillips FM, Patel AA. Lumbar spinal stenosis. *Instr Course Lect*. 2013;62:383–396.

97. Mayer HM. Discogenic low back pain and degenerative lumbar spinal stenosis—how appropriate is surgical treatment? *Schmerz*. 2001;15:484–491.

98. Resnick DK, Choudhri TF, Dailey AT, et al. Guidelines for the performance of fusion procedures for degenerative disease of the lumbar spine. Part 9: fusion in patients with stenosis and spondylolisthesis. *J Neurosurg Spine*. 2005;2:679–685.

99. Carreon LY, Glassman SD, Howard J. Fusion and nonsurgical treatment for symptomatic lumbar degenerative disease: a systematic review of Oswestry Disability Index and MOS Short Form-36 outcomes. *Spine J*. 2008;8:747–755.

100. Kotwal S, Pumberger M, Hughes A, Girardi F. Degenerative scoliosis: a review. *HSS J*. 2011;7:257–264.

101. Hu SS, Tribus CB, Diab M, Ghanayem AJ. Spondylolisthesis and spondylolysis. *J Bone Joint Surg Am*. 2008;90:656–671.

102. Knaub MA, Won DS, McGuire R, Herkowitz HN. Lumbar spinal stenosis: indications for arthrodesis and spinal instrumentation. *Instr Course Lect*. 2005;54:313–319.

103. Chrobok J, Vrba I, Stetkarova I. Selection of surgical procedures for treatment of failed back surgery syndrome (FBSS). *Chir Narzadow Ruchu Ortop Pol*. 2005;70:147–153.

104. Gibson JN, Waddell G. Surgery for degenerative lumbar spondylosis. *Cochrane Database Syst Rev*. 2005;4:CD001352.

**From:** Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
**Sent:** Friday, August 16, 2019 12:31 PM
**To:** James Pistorino; Debbie Parrish; Greer, Leslie B CIV DHA CLAIMS (USA)
**Subject:** Final Instructions DHA Task No. 19-01

All:

This email is to confirm receipt of Mr. Pistorino's submission. I will address any issues or objections to the documents at the hearing. Please be advised that today is my last day in the office, as I will be hearing cases in California next week. I may not have access to email. Any additional documents should be provided to me on the day of the hearing. Although I may be unavailable, please serve the opposing party with any additional documents or witness information in advance of the hearing, so that we may deal with any objections or other issues efficiently.

If either party needs to reach me before the hearing, please contact Mr. Adam Stein, the DOHA Hearing Office Administrator, at 703.696.8915.

I look forward to your presentations.

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals
Fax: 703.696.1831

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Wednesday, August 14, 2019 7:06 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Debbie Parrish <debbie@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Subject: [Non-DoD Source] RE: Notice of Hearing DHA Task No. 19-01

Dear Judge Noel,

Pursuant to this Notice/Order, attached, please find a pre-hearing statement as well as a number of exhibits to go with it.

Please let me know if you have any questions, comments, or difficulty receiving this transmission.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Wednesday, August 7, 2019 1:26 PM
To: James Pistorino <james@dparrishlaw.com>; Debbie Parrish <debbie@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>

Subject: Notice of Hearing DHA Task No. 19-01

All:

Please see the attached Notice of Hearing, containing the date, time, and location of the hearing. The notice also includes additional information pertinent to logistics and the submission of evidence. The DOHA Hearing Office will also issue this notice as required by office procedures. The purpose of this notice is to give the parties as much time as possible to comply with the evidentiary deadlines set forth in the notice.

Do not hesitate to contact me if you have any questions.

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals
Fax: 703.696.1831

**From:** Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
**Sent:** Friday, August 30, 2019 9:43 AM
**To:** Noel, Nichole L CIV (US)
**Cc:** James Pistorino; Debbie Parrish
**Subject:** DHA Task No. 19-01, Maddern Agency Closing Statement (UNCLASSIFIED//FOUO)
**Attachments:** AH190164 HRG Maddern Agency Closing Statement.pdf

CLASSIFICATION: UNCLASSIFIED//FOR OFFICIAL USE ONLY

Judge Noel:

Attached please find the Agency's closing statement in the above-referenced matter. Please feel free to reach out if you have further questions or had difficulty opening the file.

Leslie Greer

Leslie B. Greer, Esq.
Attorney-Advisor
Appeals, Hearing & Claims Collection
Office of General Counsel | Defense Health Agency
16401 E. Centretech Parkway | Aurora, Colorado 80011
Phone: (303) 676-3786 | Fax: (303) 676-3616

This communication may contain material protected under the umbrella of the attorney-client or attorney work-product privilege. It is not to be released outside of the office of the intended recipient(s) without the written consent of the Defense Health Agency Office of General Counsel. If you are not the intended recipient (or have received this e-mail in error) please notify the sender immediately and destroy this e-mail. Any unauthorized copying, disclosure or distribution of the contents of this e-mail is strictly prohibited.

CLASSIFICATION: UNCLASSIFIED//FOR OFFICIAL USE ONLY

**BEFORE THE DIRECTOR**
**DEFENSE HEALTH AGENCY**
**UNITED STATES DEPARTMENT OF DEFENSE**

| | |
|---|---|
| **Appeal of** | **) Defense Health Agency** |
| | **)** |
| | **)** |
| | **) AGENCY CLOSING STATEMENT** |
| | **)** |
| **Beneficiary: Ronald Maddern,** | **)** |
| **A TRICARE for Life Beneficiary** | **) Formal Review No. AH190164** |

## I. Introduction

This closing statement is submitted in response to a hearing held August 22, 2019, in which the above-named beneficiary ("the Beneficiary"), the Beneficiary's wife, and the non-network provider of care, Michael Verdolin, MD, testified. The Beneficiary appealed the denial of TRICARE® cost-sharing of a Vertiflex Superion Interlaminar/Interspinous Process Stabilization Device (or Superion Interspinous Spacer®) and related services provided to treat lumbar spinal stenosis on August 8 and November 9, 2017 ("the Disputed Care"). The Agency incorporates by reference, all exhibits previously entered into evidence

The TRICARE Program is a federal statutory entitlement program for active duty uniformed services members, retirees, and their dependents, which authorizes the Secretary of Defense to provide a uniform program of medical benefits. 10 U.S.C. §§ 1071 and 1073(b). The TRICARE Program is administered and implemented through 32 C.F.R. Part 199. 10 U.S.C. § 1073(a).

The Defense Health Agency (DHA)[1] appeal and hearing process is authorized by Title 32, Code of Federal Regulations (C.F.R.), Part 199. The appealing party has the burden to establish, by substantial evidence, an entitlement under law and 32 C.F.R. Part 199 to the authorization of TRICARE benefits, and must produce reasonably sufficient or prima facie evidence to rebut a presumption in favor of TMA. 32 C.F.R. § 199.10(a)(3).

TRICARE may only cost-share medically necessary supplies and services. 10 U.S.C. § 1079(a)(13) and 32 C.F.R. § 199.4(a). TRICARE regulations and program policies restrict benefits to those drugs, devices, treatments, or procedures for which the safety and efficacy have

---

[1] The Defense Health Agency (DHA), formerly the TRICARE Management Activity (TMA), and previously known as the Office of the Civilian Health and Medical Program of the Uniformed Services (OCHAMPUS), no longer uses the acronyms, "TMA," "OCHAMPUS," and "CHAMPUS." However, most regulatory and policy instruments still contain the OCHAMPUS and CHAMPUS acronyms. For the purposes of this matter, when authorities and other documentation are quoted, any reference to "OCHAMPUS" or "TMA" is synonymous with "DHA" and any reference to "CHAMPUS" is synonymous with "TRICARE."

been proven to be comparable or superior to conventional therapies. 32 C.F.R. § 199.4(g)(15) and TPM, Chapter 1, Section 2.1. Any drug, device, medical treatment, or procedure for which the safety and efficacy have not been established is unproven and is excluded from coverage. 32 C.F.R. § 199.4(g)(15) and TPM, Chapter 1, Section 2.1. The evidence standard TRICARE uses to determine whether it considers a drug, device, medical treatment or procedure as proven is found at 32 C.F.R. § 199.4(g)(15).

While United States Food and Drug Administration ("FDA") approval is a necessary precondition to cost-sharing a medical device, this approval, alone, is not sufficient to conclude the device is proven. TRICARE Policy Manual ("TPM"), Chapter 8, Section 5.1, Paragraph 2.2. Likewise, the policies of Medicare and private insurers alone are not sufficient to conclude the device is proven and the private insurer policies are not reliable evidence as defined. TPM, Chapter 1, Section 2.1, Paragraph 7.0.

Matters concerning relatively new medical procedures and treatment regimens are referred to the DHA Medical Benefits and Reimbursement Section (MB&RS). MB&RS is responsible for ensuring all medical benefits considered for cost-sharing under TRICARE are supported by scientific, peer reviewed literature, and within the constraints of the law and regulation. These responsibilities include promulgating policy interpretations and maintaining continuous regulatory and policy updates based on congressional mandate and the current standards of medical care. TPM, Chapter 1, Section 1.1, Paragraph 2.0. Interspinous spacer devices, like the Superion device, are expressly excluded from coverage. TPM, Chapter 4, Section 6.1, Paragraph 5.9 and 5.13.

**Successful surgery does not equate to "proven" status; surgery likely proceeded on a mistaken assumption TRICARE would pay because Medicare did.**

The testimony of the Beneficiary and his wife was largely anecdotal: he described for the Hearing Officer the intractable pain he experienced prior to receiving the Superion device. The Beneficiary's medical history, typeset and included as an exhibit to this hearing, reflects a near-lifetime of treatments from the VA and from Military Treatment Facilities. (Exhibit 6, Page 74) When care within the Military Health System offered no reprieve, the Beneficiary was referred to a private practice, civilian physician, whose care finally offered relief. The Beneficiary testified he felt betrayed by the TRICARE program for not approving cost-sharing for this pain relieving surgery, and on appeal, asked that an exception be made in his case.

Dr. Verdolin's clinical notes from March 26, 2018 reflect a fundamental misunderstanding of how TRICARE works as a secondary payor to Medicare:

> "Since he has secondary coverage by law, his insurance needs to cover what Medicare covers. I will assist him in his appeal to TRICARE which should cover the secondary portion."
>
> (Exhibit 6, Page 73).

A successful surgery is not proof of the Superion device's proven status. TRICARE is a program of medical benefits provided by the U.S. Government under public law to specified categories of individuals who are qualified for these benefits by virtue of their relationship to one of the seven Uniformed Services. 32 C.F.R. Part 199.1 (d). Although similar in structure in many of its aspects, TRICARE is not an insurance program in that it does not involve a contract guaranteeing the indemnification of an insured party against a specified loss in return for a premium paid. *Id.* Further, TRICARE is not subject to those state regulatory bodies or agencies that control the insurance business generally. *Id.* The funds used by TRICARE are appropriated funds furnished by the Congress through the annual appropriation acts for the Department of Defense and the Department of Health and Human Services. These funds are further disbursed by agents of the government under contracts negotiated by the Director, Defense Health Agency, or a designee, under the provisions of the Federal Acquisition Regulation (FAR). 32 C.F.R. Part 199.1 (e).

**The Expert's fallback surgery was "the gold standard."**

An appealing party, to demonstrate care is proven, must point to well-controlled studies (e.g., randomized controlled trials that compare the care under review to the standard means of treatment or diagnosis). In this case, the standard care to be compared is surgical laminectomy. TRICARE would have paid for a laminectomy. TPM Chapter 4, §6.1. The articles of medical literature offered as proof of the Superion device's proven status concede this point by characterizing laminectomy as the "gold standard" for the condition under review. *See* P. D. Nunley, et. al., *Superion Interspinous Spacer Treatment of Moderate Spinal Stenosis: Four Year Results*, 104 World Neurosurgery 279 – 283, at 279 (2017). Dr. Verdolin offered his opinions and criticisms of these articles and the Agency's policy underlying the cost-sharing denial for the Superion device. Had the Superion surgery not worked for the Beneficiary, notwithstanding his testimony the Beneficiary was not an ideal candidate for it, Dr. Verdolin's own clinical records reflect laminectomy would have been offered as an alternative (Exhibit 6, page 55).

**The X-STOP also had FDA premarket approval.**

Dr. Verdolin offered the Hearing Officer his opinion on the medical literature previously offered as exhibits, noting the Superion device's FDA 2015 premarket approval, Medicare's payment for a portion of the surgery, and the results of medical trials and other studies, some made possible with financial support from the Superion manufacturer, Vertiflex, Inc.

The X-Stop device, the interspinous device listed by name in the applicable TRICARE policy by Medtronic Sofamor Danek, Inc., was given FDA Premarket Approval in 2006. The first listed recall of the X-Stop device was issued in 2008, less than two years on the market. The device was pulled altogether by a successor to Medtronic in 2015. Dr. Verdolin's emphasis on the FDA's premarket approval evinces nothing more than a mandated, but ministerial, approval for a device falling under the FDA's jurisdiction. The FDA's approval was based on similar criteria requiring study and peer reviewed results of those studies. This approval makes the device itself no more or less proven by TRICARE's standards; FDA approval is but a condition precedent to consideration for ultimate cost-sharing approval by TRICARE.

The X-Stop device remained on the market for approximately 9 years prior to its removal. The Superion device had received its premarket approval in 2015, and the Beneficiary's surgeries were in 2017. The time the Superion device spent on the market prior to the Beneficiary's surgery is significantly less than the time spent by its predecessor. By the end of its Medical Benefit Determination (MBD), the Agency stated additional medical trials were still ongoing and the device required further study. By that MBD, the Agency contends approximately two years beyond premarket approval is not enough to consider the Superion device "proven" according to TRICARE standards.

**The Agency acted within its discretion to deny cost-sharing coverage.**

The reliable evidence standard is law; the topmost signature on the Medical Benefit Determination that belies the Agency's position on the Superion device is from the Director, Defense Health Agency. The Agency has an articulated, well-researched, longstanding reason why it excludes the Superion device (and others like it) from cost-sharing coverage—something well within its discretion, as mandated by federal law and regulations. That the Beneficiary proceeded with surgery under the assumption that "secondary insurance" would pay is a mistaken understanding of how the Military Health System pays for civilian care. Meeting the Military standard of medical necessity is a high burden. Nothing proffered prior to the August 22, 2019, hearing, nor any testimony offered by the Beneficiary, his wife, or the Beneficiary's surgeon have presented anything to cause the Agency to change its mind with respect to the Vertiflex Superion device.

Respectfully submitted August 30, 2019,

/s/ Leslie. B. Greer, Esq.

Leslie B. Greer, Esq.
Attorney-Advisor
Appeals, Hearings & Claims Collection Division
Defense Health Agency-Office of General Counsel
16401 E. Centretech Pkwy., 2nd Floor
Aurora, CO 80011

**From:** Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
**Sent:** Wednesday, September 4, 2019 10:04 AM
**To:** James Pistorino; Greer, Leslie B CIV DHA CLAIMS (USA)
**Subject:** Opening Statement 19-01.docx
**Attachments:** Opening Statement 19-01.docx

All:

Please see the attached Opening Statement from the hearing on August 22, 2019. If either party has any corrections, please forward them to me by Friday, September 13, 2019. Also, I have received DHA's closing statement and was able to open the file without incident.

Please contact me if you have any questions.

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals
Fax: 703.696.1831



**DEPARTMENT OF DEFENSE**
**DEFENSE OFFICE OF HEARINGS AND APPEALS**
**PO BOX 3627**
**ARLINGTON, VIRGINIA 22203**

| | |
|---|---|
| **Appeal of** | |
| **Ronald E. Maddern** | **Formal Review No. AH190164** |
| **A TRICARE for Life Beneficiary** | |
| | **TASK ORDER NO. 19-01** |
| **ISSUE: 233, Unproven Care** | |

## Opening Statement

### Role and Authority of Hearing Officer

Pursuant to 32 CFR 199.10, I have been appointed by the Department of Defense to act as a Hearing Officer in this matter. It is my duty to conduct a *de novo* fair and impartial administrative hearing, to find facts, make recommendations, and ensure the record is fully developed. This process will permit TRICARE to make a decision on the benefit claim at issue, which involves a determination whether the claim is factually supported and in compliance with law and regulations.

### Procedural History

The procedural history of this matter is briefly summarized in DHA's Statement of Position, at Exhibit 21. Copies of the hearing exhibit file were sent to the Appellant and DOHA on April 15, 2019. I contacted the parties and they mutually agreed that the hearing today met their requirements. I issued a Notice of Hearing on August 1, 2019, by e-mail scheduling the hearing for August 22, 2019, at 1:30 p.m. (PST).

### Issue Presented

This issue to be determined at this hearing is:

Whether the Vertiflex Superion Interlaminar/Interspinous Process Stabilization Device (Superion Interspinous Spacer) procedure provided to the Beneficiary was medically necessary, appropriate, or otherwise met TRICARE criteria as a proven procedure.

It is DHA's position that the Vertiflex Superion procedure is neither safe nor effective, nor otherwise meets the TRICARE criteria as a proven procedure.

**Purpose of Hearing and Rights of the Parties**

The purpose of this hearing is to give the appealing party the opportunity to state his reasons for disagreement with DHA's position. The appellee also has the opportunity to present additional evidence and argument in support of their position. The appellant has the right to present all available, relevant evidence, to include pertinent documents affecting the issues, as well as oral or written testimony on the beneficiary's behalf. Witnesses may testify provided they have a direct connection to the case. The appellant has the right to question any witnesses, including expert witnesses, who testify at the hearing. The appellant also has the right to examine the evidence and object to the inclusion of any document in the record. Should appellant present documentation during this hearing, appellee will be given an opportunity to respond.

**Formality and the Federal Rule of Evidence**

This hearing is formal and governed by general administrative law principles. It is to be non-adversarial in nature and strict court rules are not applicable, except that irrelevant and unduly repetitious evidence will not be accepted.

**The Record**

A transcript will be made of this hearing and will become part of the official hearing record, together with the documents admitted into evidence.

**Obligation for truthful testimony**

Although, I do not have statutory authority to administer an oath at this proceeding, all participants are obligated to tell the truth. Accordingly, all statements made at this hearing will be made under affirmation and subject to penalty under Title 18, Sections 287 and 1001 of the United States Code. These statutes make it a federal offense to knowingly make a false claim against the United States or to knowingly make any false statement or misrepresentation to any department or agency of United States punishable by up to five years in prison and a fine.

**Hearing Procedures**

At this time, I will enter the Hearing Exhibit File and subsequent correspondence into the record, as follows: The documents in TRICARE Hearing Exhibit File will be admitted as 1 through 22, as identified on the exhibit index. All other documents will be identified as followed:

**Exhibit 23:** Notice of Hearing, dated August 1, 2019;

**Exhibit 24:** Beneficiary's Additional Evidentiary Submission

**Exhibit 24-1:** Curriculum Vitae of Dr. Michael Verdolin;

**Exhibit 24-2:** Food and Drug Administration, Pre-market Approval PMP P140004 for Superion, dated June 3, 2015;

**Exhibit 24-3:** V. Patel, et al., "Superion Interspinous Process Spacer for Intermittent Neurogenic Claudication Secondary to Moderate Lumbar Stenosis," Spine 49(5): 2015 275-82;

**Exhibit 24-4:** V. Patel, et al., "Superion Interspinous Process Spacer for Treatment of Moderate Degenerative Lumbar Spinal Stenosis," Journal of Pain Research, 8, 2015 657-62;

**Exhibit 24-5:** P. Nunley, et al., "Superion Interspinous Spacer Treatment of Moderate Spinal Stenosis: 4-Year Results," World Neurosurgery, 104: 2017 279-83;

**Exhibit 24-6:** P. Nunley, et al., "Five-year Durability of Stand-Alone Interspinous Process Decompression for Lumbar Spinal Stenosis," Clinical Intervention in Aging, September 2017: 12 1409-1417;

**Exhibit 24-7:** P. Nunley, et al., "Interspinous Process Decompression Is Associated with a Reduction in Opioid Analgesia in Patients with Lumbar Spinal Stenosis," Journal of Pain Research, 2018:11 2943-2948;

**Exhibit 24-8:** J. Hartman, et al., "The Use of Vertiflex Interspinous Space Device in Patients With Lumbar Spinal Stenosis and Concurrent Medical Comorbities," Cureus, August 12, 2019; and

**Exhibit 24-9:** T. Teer, et al. "The MIST guidelines: The Lumbar Stenosis Consensus Study Group Guidelines for Minimally Invasive Spine Treatment," Pain Pract. 2019, 18L250-274.

**Exhibit 25:** E-mail Correspondence Related to Scheduling and Procedural Matters

**Exhibit 26:** Hearing Officer's Opening Statement

The documents identified as Exhibits 24-2, 24-3, 24-5, 24-6, and 24-7, are also in the DHA exhibit file provided to the parties on April 15, 2019. DHA Counsel objected to the admission of Exhibits 24-8 and 24-9 as being outside the scope of time pertinent to the decision at issue. DHA Counsel also objected to the admission of Exhibit 24-9 as not meeting the TRICARE reliable evidence standard. The disposition of these objections will be addressed in the Decision.

Next, each party will have the opportunity to make an opening statement. Either party may waive their opening statement. The Appellant will go first. After the opening statements, each side will present their case-in-chief during which the presenting party has the opportunity to present documentary and then testimonial evidence. Only one person will be permitted to testify at a time. After direct and cross-examination of a witness by the parties, I may have questions. The appealing party has the burden of proof to establish by substantial evidence his entitlement under law and regulation to the authorization of TRICARE benefits. In addition to the evidence presented during their case-in-chief, each party has the right to submit additional documentary evidence as well as proposed findings of both law and fact at the end of testimony or after the hearing. If the parties choose to submit evidence after the hearing, I will set a schedule for submissions at the end of the hearing.

When the presentation of evidence is completed, each party may offer a closing argument, orally or in writing. If closing arguments are presented orally, Appellee will go first and will also have the opportunity to make any rebuttal argument, if necessary. If the parties wish to present closing arguments in writing, I will set a schedule for submissions at the end of the hearing.

**Opening Statement Review**

Each party was provided a copy of this statement by e-mail on September 4, 2019. Any corrections or additions will be noted and made on the record.

**From:** Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
**Sent:** Friday, September 6, 2019 8:14 AM
**To:** James Pistorino; Greer, Leslie B CIV DHA CLAIMS (USA)
**Subject:** Transcript DHA Task No. 19-01
**Attachments:** Attachment Block Notification

All:

Please see an electronic copy of the hearing transcript. The password is the Beneficiary's last name spelled in lower case letters. Please let me know if you are unable to open the file.

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals
Fax: 703.696.1831

**From:** Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
**Sent:** Friday, September 6, 2019 10:28 AM
**To:** Deborah Maddern
**Cc:** James Pistorino; Greer, Leslie B CIV DHA CLAIMS (USA)
**Subject:** RE: [Non-DoD Source] Tricare4Life Dispute for Implant

Mrs. Maddern:

Unfortunately, I am unable to offer any assistance with the Scripps Mercy billing issue. The collection issue between you and the hospital does not fall under my jurisdiction. Also, because I am not your lawyer, it would be inappropriate for me to offer any advice on how you should proceed. I plan to issue a decision in this case before the end of November, at the latest, given my current case load.

I am sorry that I could not be of more assistance to you.

Sincerely,

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals
Fax: 703.696.1831

-----Original Message-----
From: Deborah Maddern <1rdmaddern@gmail.com>
Sent: Friday, September 6, 2019 11:59 AM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Subject: [Non-DoD Source] Tricare4Life Dispute for Implant

Your Honor, this is in reference to the hearing on August 22, 2019 in San Diego. We need some assistance with the letter we received in the mail right after our hearing. We have been getting this bill for $4756.80 from the Scripps Mercy Surgery Center where Ronald went for his implant surgery, since early in 2018. We were told by DHA that if we started paying on it, we might not get reimbursed. So we decided to wait and kept on telling the Surgery Center not to send it to the collection agency. The Surgery Center kept on saying that Tricare4Life kept on denying it. We had started proceedings to get a hearing in Feb 2018, we did not realize it would take so long to get a hearing and we had no help at the time. We learned about having a lawyer from Parrish Law Office in April of 2019. We called James Pistorino and he said to tell the collection agency this is a disputed insurance claim. He told us this area was not his expertise, and that is why we are reaching out to you for some assistance. Somehow he did not mention this at the hearing. The copy of a couple of the bills should be in our file.

Your Honor, please acknowledge this and let us know what your decision is.

Thankyou

Ronald and Deborah Maddern

410 South 1st Street Space 100

El Cajon, CA 92019-4726

(619) 838-2136

1rdmaddern@gmail.com

| | |
|---|---|
| **From:** | James Pistorino <IMCEAEX-_O=S14_OU=EXCHANGE+20ADMINISTRATIVE+20GROUP+20+28FYDIBOHF23SPDLT+29_CN=RECIPIENTS_CN=D9AFAA2CF4164E8F957F428CB7570ED0-JAMES+40DPARRISHLAW+2ECO@namprd22.prod.outlook.com> |
| **Sent:** | Friday, September 13, 2019 2:15 PM |
| **To:** | Noel, Nichole Ms. DoD OGC; Greer, Leslie B CIV DHA CLAIMS (USA) |
| **Cc:** | Debbie Parrish |
| **Subject:** | Appeal of Ronald Maddern |
| **Attachments:** | ClosingStatement.pdf |

Dear Judge Noel,

Attached, please find Mr. Maddern's closing statement.
Please let me know if there are any questions or comments or if you have any difficulty retrieving it.

Regards,
James Pistorino

Parrish Law Office
(650) 400-0043

September 13, 2019

Administrative Law Judge
Nichole Noel
Department of Defense
Defense Office of Hearings and Appeals
PO Box 3627
Arlington, VA 22203

*Re: Appeal of Ronald E. Maddern*
*A TRICARE for Life Beneficiary*
*Issue: 233, Unproven Care*
*Formal Review No. AH190164*

Dear Judge Noel,

Pursuant to the Court's Order, in addition to the prior arguments, written materials/evidence, the testimonial evidence offered during the August 22, 2019 hearing, Mr. Maddern submits the following Closing Statement.

**TriCare Policy Manual:**

TriCare's Closing Statement merits some initial response as it contains a statement that may lead the Court astray. TriCare claims that:

> Interspinous spacer devices, like the Superion device, are expressly excluded from coverage. TPM, Chapter 4, Section 6.1, Paragraph 5.9 and 5.13.

TriCare Closing Statement at 2. Respectfully, that statement is erroneous.[1]

The TriCare Policy Manuals are available at: https://manuals.health.mil/pages/DisplayManual.aspx?SeriesId=TP15 Using the options there, it is possible to navigate to the version of the manual in effect at the time Mr. Maddern had both procedures. That is Change 12, dated November 2, 2017. Chapter 4, Section 6.1, paragraph 4.1 of that version of the manual (copy attached) provides:

> Services and supplies required in the diagnosis and treatment of illness or injury involving the musculoskeletal system are covered. U.S. Food and Drug Administration (FDA) approved surgically implanted devices are also covered.

*Id.* While there is an exclusion for the X-STOP product (*see* para. 5.9), there is no exclusion for the Superion product or interspinous spacer devices (ISD) more generally.

---

[1] Unless TriCare intends to refer to only the present day and not the manuals in existence when Mr. Maddern had the procedure at issue and submitted his claim for coverage.

The language TriCare refers to did not appear until Change 40, on January 25, 2019. That is, the exclusion TriCare points to did not even exist until more than a year after Mr. Maddern had the procedure. Obviously, relying on exclusions not even present when Mr. Maddern made his claim for coverage is without basis/erroneous.

Thus, simply applying the Policy Manual in effect at the time, Mr. Maddern's treatment should be covered.

**Mr. Maddern's Claim Should Be Covered:**

Putting aside the Policy Manual and TriCare's admissions therein regarding coverage, it is clear that Mr. Maddern's treatment should be covered simply applying the regulations.

As noted in Mr. Maddern's Pre-Hearing Statement submitted on August 14, 2019, pursuant to 32 C.F.R. § 199.4(a)(1)(i), TriCare will pay for medically necessary services and supplies required to diagnose and treat an illness or injury, unless there is an exclusion or limitation. The exclusion or limitation pointed to by TriCare is set forth in 32 C.F.R. § 199.4(g)(15) for "unproven drugs, devices, and medical treatments or procedures."

**FDA Approval**

As an initial matter, of course, there is ZERO evidence in support of the idea that the Superion product is "unproven." Instead, ALL of the evidence is that the Superion product is proven safe and effective. Admitted as Tab 24, Exhibit 2 is the FDA Pre-Market Approval for the Superion product showing that the Superion product was approved by the FDA no later than June 3, 2015. Included as part of that exhibit is a 61-page "Summary of Safety and Effectiveness Data", including a host of well-controlled studies with clinically meaningful end points. While the FDA's approval of the product as safe and effective should be conclusive, in this case, that conclusion was also bolstered by the uncontradicted testimony of Dr. Verdolin. See Transcript at, *e.g.*, 72:21-23; 98:15-99:6; 104:16-105:8; 109:2-6.

**Other Papers/Studies/Authorities**

In addition to the FDA Pre-Market Approval for the Superion product, of course, Mr. Maddern offered a series of papers documenting well-controlled studies with clinically meaningful endpoints that appeared in refereed medical journals. See Tab 24, Exhibit 3 (two year study), Exhibit 4 (three year study), Exhibit 5 (four year study), Exhibit 6 (five year study). In addition to the papers themselves, Dr. Verdolin confirmed that these were all papers reporting the results of well-controlled studies with clinically meaningful endpoints that appeared in refereed journals. See Transcript at 112:7-11:24.

In addition, of course, Dr. Verdolin testified about the CPT code awarded to the Superion product, the remarkably few incidents reported in the MAUDE database, and Medicare's coverage of the Superion product. See Transcript at 105:2-8, 121:7-122:9, 127:21-182:1, 136:16-137:4, 143:5-144:9, 146:12-147:7,

**Mr. and Mrs. Maddern's Testimony**

Both Mr. and Mrs. Maddern testified about the terrible pain Mr. Maddern was experiencing as a result of his lumbar spinal stenosis and the effects that had on his mobility, ability to take care of himself, social interaction, and demeanor. Mr. Maddern had been in a wheelchair for 14 years prior to treatment with the Superion product. As a result of the treatment, both Mr. and Mrs. Maddern testified about the dramatic change in his medical condition and how that impacted nearly every aspect of his life.

Thus, to the extent that the Court considers the issue of whether the treatment was medically reasonable and necessary for Mr. Maddern, the testimony is directly relevant to that point.

**Dr. Verdolin's Testimony**

Of course, Dr. Verdolin was admitted as an expert, without objection, on all relevant issues. In addition to his vast experience, of significance, was the fact that Dr. Verdolin appeared without compensation of any kind as a matter of professional duty. See Transcript at 72:17-73:6, 103:17-104:6.

Another key component of Dr. Verdolin's testimony related to whether Mr. Maddern was even a candidate for a laminectomy/whether it would be safe to perform one on him. Dr. Verdolin's uncontradicted testimony was that, because of various conditions Mr. Maddern suffers from (Diabetes and sleep apnea), Mr. Maddern was not a candidate for a laminectomy/it would not be safe to perform one on him. See Transcript at 88:20-89:18, 99:13-21, 122:19-123:2, 129:10-16.

Finally, as Mr. Maddern has noted, the denial in this case was based solely on the allegation that the Superion product was not covered/unproven. Accordingly, whether the Superion product was medically reasonable and necessary for Mr. Maddern is not a proper inquiry. Nevertheless, to the extent the Court wishes to address that issue, Dr. Verdolin testified that it was and there was no evidence to contradict his testimony. See Transcript at 122:10-123:2.

**Response to TriCare's Closing Statement:**

One aspect of TriCare's Closing Statement was addressed above. Three other areas of TriCare's comments merit response.

**Referral to Dr. Verdolin**

TriCare says that Mr. Maddern was "referred to a private practice, civilian physician, whose care finally offered relief." TriCare Closing Statement at 2. What they mean to say is that Dr. Gregory Shue, at the Naval Medical Center, referred Mr. Maddern to Dr. Verdolin after determining that there was nothing more that Dr. Shue could do in his practice. Subsequently, Dr. Verdolin treated Mr. Maddern and tried a variety of very conservative approaches for more than a year and a half before turning to the Superion product. See Exhibit 6 at 21-55.

**Laminectomy**

TriCare's comments about laminectomy are simply wide of the mark. TriCare Closing Statement at 3. First, there is no regulatory requirement to "compare the care under review to the standard means of treatment or diagnosis." There is nothing in the statute or regulations that state that. That is a standard made from whole cloth. The only standard is whether the Superion product is proven safe and effective.

Second, in any event, as Dr. Verdolin testified, Mr. Maddern was not a candidate for a laminectomy because of other conditions he suffered from. Thus, to the extent that comparisons were even appropriate, the comparison would be to other forms of treatment that were available options for Mr. Maddern. As both Dr. Verdolin's records show and Dr. Verdolin and Mr. Maddern testified, those approaches were tried without success. It was only after those failed that Dr. Verdolin tried the Superion product to spectacular success. Dr. Verdolin's records say nothing different.

**X-STOP**

TriCare's comments on the X-STOP product illustrate the failure to maintain focus on the issue in this case and the applicable regulations. TriCare Closing Statement at 3-4. The issue in this case is whether the Superion product is covered/whether it is unproven, not whether the X-STOP product is/was. Further, Dr. Verdolin's testimony regarding the differences between the Superion product and the X-STOP product was uncontradicted. See Transcript at 92:4-12, 135:8-18, 147:8-18. In short, the Superion product is simply a different thing and works in a different way than the X-STOP product. Thus, X-STOP is irrelevant.

Moreover, TriCare's claim that FDA Premarket Approval is "nothing more than a mandated, but ministerial, approval for a device falling under FDA jurisdiction" misapprehends the nature of the FDA process. As described by the FDA itself:

> Premarket approval (PMA) is the FDA process of scientific and regulatory review to evaluate the safety and effectiveness of Class III medical devices. Class III devices are those that support or sustain human life, are of substantial importance in preventing impairment of human health, or which present a potential, unreasonable risk of illness or injury. Due to the level of risk associated with Class III devices, FDA has determined that general and special controls alone are insufficient to assure the safety and effectiveness of Class III devices. Therefore, these devices require a premarket approval (PMA) application under section 515 of the FD&C Act in order to obtain marketing approval.
>
> * * *
>
> PMA is the most stringent type of device marketing application required by FDA. The applicant must receive FDA approval of its PMA application prior to marketing the device. PMA approval is based on a *determination by FDA* that the PMA contains sufficient valid scientific evidence to assure that the device is safe and effective for its intended use(s).

See https://www.fda.gov/medical-devices/premarket-submissions/premarket-approval-pma. (emphasis added). This description is consistent with Dr. Verdolin's testimony about the nature/quality of the data submitted to the FDA for the Superion product. See Transcript at 107:8-109:1. Thus, there is nothing "ministerial" about it.

The remainder of TriCare's comments are that, using some undisclosed criteria/expertise, TriCare makes determinations of what should and should not be covered by fiat and without regard to the applicable regulations. That is an approach which has no basis in the statute or regulations.

**CONCLUSION**

The Superion product is FDA approved and the subject of multiple well-controlled, studies with clinically meaningful endpoints that appeared in referred/peer reviewed journals. Dr. Verdolin's testimony about the remarkably few issues recorded in the MAUDE database, the safety and effectiveness of Superion,

Moreover, in this case, the Superion product literally got a veteran out of a wheel chair and walking after 14 years. What more miracles does the product need to perform in order for TriCare to cover it?

For the reasons set forth above, coverage of Mr. Maddern's procedure should be approved.

Respectfully submitted,

James Pistorino

# Musculoskeletal System

Issue Date: August 26, 1985
Authority: 32 CFR 199.4(c)(2) and (c)(3)
Copyright: CPT only © 2006 American Medical Association (or such other date of publication of CPT). All Rights Reserved.
Revision: C-12, November 2, 2017

---

## 1.0 CPT PROCEDURE CODES

20005 - 20551, 20555 - 22328, 22510 - 22515, 22532 - 22856, 22858, 22859, 22861, 22864 - 27138, 27146 - 27178, 27181 - 29861, 29870 - 29913, 29999

## 2.0 HCPCS CODES

S2118, S2325

## 3.0 DESCRIPTION

The musculoskeletal system pertains to or comprises the skeleton and the muscles.

## 4.0 POLICY

**4.1** Services and supplies required in the diagnosis and treatment of illness or injury involving the musculoskeletal system are covered. U.S. Food and Drug Administration (FDA) approved surgically implanted devices are also covered.

**4.2** Effective August 25, 1997, Autologous Chondrocyte Implantation (ACI) surgery for the repair of clinically significant, symptomatic, cartilaginous defects of the femoral condyle (medial, lateral or trochlear) caused by acute or repetitive trauma is a covered procedure. The autologous cultured chondrocytes must be approved by the FDA.

**4.3** Single or multilevel anterior cervical microdiskectomy with allogeneic or autogeneic iliac crest grafting and anterior plating is covered for the treatment of cervical spondylosis.

**4.4** Percutaneous vertebroplasty (Current Procedural Terminology (CPT) procedure codes 22510-22512) and balloon kyphoplasty (CPT procedure codes 22513-22515) are covered for the treatment of painful osteolytic lesions and osteoporotic compression fractures refractory to conservative medical treatment.

**4.5** Total Ankle Replacement (TAR) (CPT procedure codes 27702 and 27703) surgery is covered if the device is FDA approved and the use is for an FDA approved indication. However, a medical necessity review is required in case of marked varus or valgus deformity.

**4.6** Core decompression of the femoral head (hip) for early (precollapse stage I or II) avascular necrosis may be considered for cost-sharing (Healthcare Common Procedure Coding System (HCPCS) code S2325).

**4.7** Single-level, cervical Total Disc Replacement (cTDR) (CPT procedure code 22856) and two-level cTDR (CPT procedure code 22858) using an FDA approved cervical artificial intervertebral disc for the treatment of cervical DDD, intractable radiculopathy, and/or myelopathy is covered if the disc is used in accordance with its FDA labeled indications.

**4.8** High Energy Extracorporeal Shock Wave Therapy (HE ESWT) for the treatment of plantar fasciitis is covered when all of the following conditions are met:

- Patients have chronic plantar fasciitis of at least six months duration;
- Patients have undergone and failed six months of appropriate conservative therapy; and
- HE ESWT is defined as Energy Flux Density (EFD) greater than 0.12 millijoules per square millimeter (mJ/mm2).

**4.9** Meniscal allograft transplant of the knee is covered.

**4.10** Hip resurfacing (CPT procedure codes 27125 and 27130, and HCPCS S2118) with an FDA approved device is proven for the treatment of Degenerative Joint Disease (DJD) of the hip in patients who are less than 65 years old and who meet all of the following criteria:

- Have chronic, persistent pain and/or disability;
- Are otherwise healthy and active;
- Have normal proximal femoral bone geometry and bone quality; and
- Would otherwise receive a conventional Total Hip Replacement (THR), but are likely to outlive a conventional THR implant system's expected life.

**4.11** Minimally Invasive Surgery (CPT procedure code 27279) for treatment of sacroiliac joint pain is proven.

**5.0 EXCLUSIONS**

**5.1** Meniscal transplant (CPT procedure code 29868) for meniscal injury is unproven.

**5.2** Ligament replacement with absorbable copolymer carbon fiber scaffold is unproven.

**5.3** Prolotherapy, joint sclerotherapy and ligamentous injections with sclerosing agents (HCPCS procedure code M0076) are unproven.

**5.4**    Trigger point injection (CPT procedure codes 20552 and 20553) for migraine headaches.

**5.5**    Total disc arthroplasty (artificial disc), anterior approach, including discectomy with end plate preparation (includes osteophytectomy for nerve root or spinal cord decompression and microdissection), three or more levels (CPT procedure code 0375T) is unproven.

**5.6**    Removal of total disc arthroplasty (artificial disc), anterior approach, cervical, each additional interspace (CPT procedure code 0095T) is unproven. Also, see Section 1.1.

**5.7**    Lumbar total disc arthroplasty (lumbar artificial intervertebral disc revision including replacement, lumbar total disc replacement) for degenerative disc disease is unproven (CPT procedure codes 22857, 22862, 0163T, 0164T, and 0165T).

**5.8**    Low Energy (LE) or radial ESWT for the treatment of plantar fasciitis is unproven. Any form of ESWT for the treatment of lateral epicondylitis is unproven.

**5.9**    XSTOP Interspinous Process Decompression System (CPT procedure codes 0171T and 0172T, HCPCS code C1821) for the treatment of neurogenic intermittent claudication secondary to lumbar spinal stenosis is unproven.

**5.10**    Femoroacetabular Impingement (FAI) open surgery, surgical dislocation (CPT procedure codes 27140 and 27179), for the treatment of hip impingement syndrome or labral tear is unproven.

**5.11**    Hip arthroscopy with debridement of articular cartilage (CPT procedure code 29862) for the treatment of FAI is unproven.

**5.12**    Hip arthroscopy with femoroplasty (CPT procedure code 29914) treatment of FAI; cam lesion is unproven.

**5.13**    Hip arthroscopy with acetabuloplasty (CPT procedure code 29915) treatment of FAI; pincer lesion is unproven.

**5.14**    Hip arthroscopy with labral repair (CPT procedure code 29916) for treatment of FAI syndrome is unproven.

**5.15**    Osteochondral allograft of the humeral head with meniscal transplant and glenoid microfracture in the treatment of shoulder pain and instability is unproven.

**5.16**    Thermal Intradiscal Procedures (TIPs) (CPT procedure codes 22526, 22527, 62287, and Healthcare Common Procedure Coding System (HCPCS) code S2348) are unproven. TIPs are also known as: Intradiscal Electrothermal Annuloplasty (IEA), Intradiscal Electrothermal Therapy (IDET), Intradiscal Thermal Annuloplasty (IDTA), Percutaneous Intradiscal Radiofrequency Thermocoagulation (PIRFT), Coblation Percutaneous Disc Decompression, Nucleoplasty (also known as Percutaneous Radiofrequency (RF) Thermomodulation or Percutaneous Plasma Diskectomy), Radiofrequency Annuloplasty (RA), Intradiscal Biacuplasty (IDB), Percutaneous (or Plasma) Disc Decompression (PDD), Targeted Disc Decompression (TDD), Cervical Intradiscal RF Lesioning.

**5.17**    Spinal manipulation under anesthesia (CPT procedure codes 00640 and 22505) for the treatment of back pain is unproven.

**5.18** Minimally Invasive Lumbar Decompression (mild®) for the treatment of Degenerative Disc Disease (DDD) and/or spinal stenosis is unproven.

**5.19** ACI surgery for the repair of patellar cartilage lesions is unproven.

**5.20** Athletic pubalgia surgery is unproven.

**6.0 EFFECTIVE DATES**

**6.1** February 6, 2006, for percutaneous vertebroplasty and balloon kyphoplasty.

**6.2** May 1, 2008, for TAR.

**6.3** May 1, 2008, for core decompression of the femoral head.

**6.4** December 24, 2012, for single-level, cTDR using an FDA approved cervical artificial intervertebral disc.

**6.5** December 2, 2013, for HE ESWT for plantar fasciitis.

**6.6** May 21, 2014, for hip resurfacing for treatment of DJD of the hip.

**6.7** May 1, 2015, for meniscal allograft transplant of the knee.

**6.8** July 27, 2015, for two-level cTDR using an FDA approved cervical artificial intervertebral disc.

**6.9** August 23, 2016, Minimally Invasive Surgery (CPT procedure code 27279) for the treatment of sacroiliac joint pain is proven.

- END -

**From:** James Pistorino <IMCEAEX-_O=S14_OU=EXCHANGE+20ADMINISTRATIVE+20GROUP+20+28FYDIBOHF23SPDLT+29_CN=RECIPIENTS_CN=D9AFAA2CF4164E8F957F428CB7570ED0-JAMES+40DPARRISHLAW+2ECO@namprd22.prod.outlook.com>
**Sent:** Thursday, June 18, 2020 9:37 AM
**To:** Noel, Nichole Ms. DoD OGC; Greer, Leslie B CIV DHA CLAIMS (USA)
**Cc:** Debbie Parrish
**Subject:** RE: Appeal of Ronald Maddern

Judge Noel,

Just following up here to make sure that this does not fall through the cracks.

Regards,
James Pistorino

-----Original Message-----
From: James Pistorino
Sent: Monday, January 13, 2020 10:19 AM
To: 'Noel, Nichole Ms. DoD OGC' <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Dear Judge Noel,

Great. Thank you for your response. We will keep an eye out for it.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, January 13, 2020 9:44 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Mr. Pistorino:

I will issue this decision before by the end of the month.

Regards,

Nichole Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>

Sent: Friday, January 10, 2020 7:25 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

I thought I would follow-up here and make sure that there was not a miscommunication.

I do not believe that we have received a decision in Mr. Maddern's case and I just wanted to make sure that it was not misdirected.

Can you let me know?

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, September 16, 2019 12:32 PM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

All:

I have received the Beneficiary's closing statement. The record in this case is closed.

Thank you,

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, September 13, 2019 5:15 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] Appeal of Ronald Maddern

Dear Judge Noel,

Attached, please find Mr. Maddern's closing statement.

Please let me know if there are any questions or comments or if you have any difficulty retrieving it.

Regards,

James Pistorino

Parrish Law Office

(650) 400-0043

3

Exh C - Page 200

**From:** James Pistorino <IMCEAEX-_O=S14_OU=EXCHANGE+20ADMINISTRATIVE+20GROUP+20+28FYDIBOHF23SPDLT+29_CN=RECIPIENTS_CN=D9AFAA2CF4164E8F957F428CB7570ED0-JAMES+40DPARRISHLAW+2ECO@namprd22.prod.outlook.com>
**Sent:** Monday, June 22, 2020 1:20 PM
**To:** Noel, Nichole Ms. DoD OGC; Greer, Leslie B CIV DHA CLAIMS (USA)
**Cc:** Debbie Parrish
**Subject:** RE: Appeal of Ronald Maddern

Dear Judge Noel,

Please let me know If a decision/recommendation of any kind has been issued.
If a decision/recommendation has issued, please let us have a copy.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, June 22, 2020 10:57 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Ms. Greer:

Are you able to provide us an update as to status of the claim in the TMA organization?

Thank you,

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Thursday, June 18, 2020 12:37 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Judge Noel,

Just following up here to make sure that this does not fall through the cracks.

Regards,
James Pistorino

-----Original Message-----
From: James Pistorino
Sent: Monday, January 13, 2020 10:19 AM
To: 'Noel, Nichole Ms. DoD OGC' <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Dear Judge Noel,

Great. Thank you for your response. We will keep an eye out for it.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, January 13, 2020 9:44 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Mr. Pistorino:

I will issue this decision before by the end of the month.

Regards,

Nichole Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, January 10, 2020 7:25 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

I thought I would follow-up here and make sure that there was not a miscommunication.

I do not believe that we have received a decision in Mr. Maddern's case and I just wanted to make sure that it was not misdirected.

Can you let me know?

Regards,
James Pistorino

-----Original Message-----

From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, September 16, 2019 12:32 PM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

All:

I have received the Beneficiary's closing statement. The record in this case is closed.

Thank you,

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, September 13, 2019 5:15 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA)
<leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] Appeal of Ronald Maddern

Dear Judge Noel,


Attached, please find Mr. Maddern's closing statement.

Please let me know if there are any questions or comments or if you have any difficulty retrieving it.



Regards,

James Pistorino



Parrish Law Office

(650) 400-0043

**Hong, Mary C.**

**From:** Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
**Sent:** Monday, June 22, 2020 1:30 PM
**To:** James Pistorino; Noel, Nichole L CIV (US)
**Cc:** Debbie Parrish
**Subject:** RE: Appeal of Ronald Maddern (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Apologies for the late response.

The Agency's decision has not yet issued. I have endeavored to get a response from our Headquarters, who issues the final decision. I did not hear back by COB today. When I receive a status update, I shall email all involved.

Leslie Greer

-----Original Message-----
From: James Pistorino [mailto:james@dparrishlaw.com]
Sent: Monday, June 22, 2020 2:20 PM
To: Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

Please let me know If a decision/recommendation of any kind has been issued.
If a decision/recommendation has issued, please let us have a copy.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, June 22, 2020 10:57 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Ms. Greer:

Are you able to provide us an update as to status of the claim in the TMA organization?

Thank you,

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Thursday, June 18, 2020 12:37 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Judge Noel,

Just following up here to make sure that this does not fall through the cracks.

Regards,
James Pistorino

-----Original Message-----
From: James Pistorino
Sent: Monday, January 13, 2020 10:19 AM
To: 'Noel, Nichole Ms. DoD OGC' <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Dear Judge Noel,

Great. Thank you for your response. We will keep an eye out for it.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, January 13, 2020 9:44 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Mr. Pistorino:

I will issue this decision before by the end of the month.

Regards,

Nichole Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, January 10, 2020 7:25 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

I thought I would follow-up here and make sure that there was not a miscommunication.

I do not believe that we have received a decision in Mr. Maddern's case and I just wanted to make sure that it was not misdirected.

Can you let me know?

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, September 16, 2019 12:32 PM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

All:

I have received the Beneficiary's closing statement. The record in this case is closed.

Thank you,

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, September 13, 2019 5:15 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] Appeal of Ronald Maddern

Dear Judge Noel,


Attached, please find Mr. Maddern's closing statement.

Please let me know if there are any questions or comments or if you have any difficulty retrieving it.


Regards,

James Pistorino

Parrish Law Office

(650) 400-0043


CLASSIFICATION: UNCLASSIFIED

**From:** James Pistorino <IMCEAEX-_O=S14_OU=EXCHANGE+20ADMINISTRATIVE+20GROUP+20+28FYDIBOHF23SPDLT+29_CN=RECIPIENTS_CN=D9AFAA2CF4164E8F957F428CB7570ED0-JAMES+40DPARRISHLAW+2ECO@namprd22.prod.outlook.com>
**Sent:** Monday, June 22, 2020 1:39 PM
**To:** Greer, Leslie B CIV DHA CONT LAW (USA); Noel, Nichole L CIV (US)
**Cc:** Debbie Parrish
**Subject:** RE: Appeal of Ronald Maddern (UNCLASSIFIED)

It sounds like some sort of decision/recommendation has issued.
Please let us know when that occurred and provide a copy.

Regards,
James Pistorino

-----Original Message-----
From: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Sent: Monday, June 22, 2020 1:30 PM
To: James Pistorino <james@dparrishlaw.com>; Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Apologies for the late response.

The Agency's decision has not yet issued. I have endeavored to get a response from our Headquarters, who issues the final decision. I did not hear back by COB today. When I receive a status update, I shall email all involved.

Leslie Greer

-----Original Message-----
From: James Pistorino [mailto:james@dparrishlaw.com]
Sent: Monday, June 22, 2020 2:20 PM
To: Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

Please let me know If a decision/recommendation of any kind has been issued.
If a decision/recommendation has issued, please let us have a copy.

Regards,
James Pistorino

-----Original Message-----

From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, June 22, 2020 10:57 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Ms. Greer:

Are you able to provide us an update as to status of the claim in the TMA organization?

Thank you,

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Thursday, June 18, 2020 12:37 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Judge Noel,

Just following up here to make sure that this does not fall through the cracks.

Regards,
James Pistorino

-----Original Message-----
From: James Pistorino
Sent: Monday, January 13, 2020 10:19 AM
To: 'Noel, Nichole Ms. DoD OGC' <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Dear Judge Noel,

Great.  Thank you for your response.  We will keep an eye out for it.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, January 13, 2020 9:44 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Mr. Pistorino:

I will issue this decision before by the end of the month.

Regards,

Nichole Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, January 10, 2020 7:25 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

I thought I would follow-up here and make sure that there was not a miscommunication.

I do not believe that we have received a decision in Mr. Maddern's case and I just wanted to make sure that it was not misdirected.

Can you let me know?

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, September 16, 2019 12:32 PM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

All:

I have received the Beneficiary's closing statement. The record in this case is closed.

Thank you,

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, September 13, 2019 5:15 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] Appeal of Ronald Maddern

Dear Judge Noel,

Attached, please find Mr. Maddern's closing statement.

Please let me know if there are any questions or comments or if you have any difficulty retrieving it.

Regards,

James Pistorino

Parrish Law Office

(650) 400-0043

CLASSIFICATION: UNCLASSIFIED

**From:** Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
**Sent:** Monday, June 22, 2020 10:57 AM
**To:** James Pistorino; Greer, Leslie B CIV DHA CLAIMS (USA)
**Cc:** Debbie Parrish
**Subject:** RE: Appeal of Ronald Maddern

Ms. Greer:

Are you able to provide us an update as to status of the claim in the TMA organization?

Thank you,

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Thursday, June 18, 2020 12:37 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Judge Noel,

Just following up here to make sure that this does not fall through the cracks.

Regards,
James Pistorino

-----Original Message-----
From: James Pistorino
Sent: Monday, January 13, 2020 10:19 AM
To: 'Noel, Nichole Ms. DoD OGC' <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Dear Judge Noel,

Great. Thank you for your response. We will keep an eye out for it.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>

Sent: Monday, January 13, 2020 9:44 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Mr. Pistorino:

I will issue this decision before by the end of the month.

Regards,

Nichole Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, January 10, 2020 7:25 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

I thought I would follow-up here and make sure that there was not a miscommunication.

I do not believe that we have received a decision in Mr. Maddern's case and I just wanted to make sure that it was not misdirected.

Can you let me know?

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, September 16, 2019 12:32 PM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

All:

I have received the Beneficiary's closing statement. The record in this case is closed.

Thank you,

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, September 13, 2019 5:15 PM

To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] Appeal of Ronald Maddern

Dear Judge Noel,

Attached, please find Mr. Maddern's closing statement.

Please let me know if there are any questions or comments or if you have any difficulty retrieving it.

Regards,

James Pistorino

Parrish Law Office

(650) 400-0043

**From:** James Pistorino <IMCEAEX-_O=S14_OU=EXCHANGE+20ADMINISTRATIVE+20GROUP+20+28FYDIBOHF23SPDLT+29_CN=RECIPIENTS_CN=D9AFAA2CF4164E8F957F428CB7570ED0-JAMES+40DPARRISHLAW+2ECO@namprd22.prod.outlook.com>
**Sent:** Tuesday, June 23, 2020 11:11 AM
**To:** Noel, Nichole Ms. DoD OGC; Greer, Leslie B CIV DHA CONT LAW (USA)
**Cc:** Debbie Parrish
**Subject:** RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Dear Judge Noel,

I am not familiar with a process where a neutral adjudicating entity takes evidence from the parties, presumably gauges the evidence/credibility, and then communicates its decision/recommendation to only one of the parties. To say the least, that idea seems problematic.

Please let me know when the decision/recommendation issued.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Tuesday, June 23, 2020 8:57 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Mr. Pistorino:

I issued a recommendation to TMA earlier this year; however, I am not the release authority. I believe that authority lies with TMA.

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Monday, June 22, 2020 4:39 PM
To: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>; Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern (UNCLASSIFIED)

It sounds like some sort of decision/recommendation has issued.
Please let us know when that occurred and provide a copy.

Regards,
James Pistorino

-----Original Message-----
From: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Sent: Monday, June 22, 2020 1:30 PM
To: James Pistorino <james@dparrishlaw.com>; Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Apologies for the late response.

The Agency's decision has not yet issued. I have endeavored to get a response from our Headquarters, who issues the final decision. I did not hear back by COB today. When I receive a status update, I shall email all involved.

Leslie Greer

-----Original Message-----
From: James Pistorino [mailto:james@dparrishlaw.com]
Sent: Monday, June 22, 2020 2:20 PM
To: Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

Please let me know If a decision/recommendation of any kind has been issued.
If a decision/recommendation has issued, please let us have a copy.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, June 22, 2020 10:57 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Ms. Greer:

Are you able to provide us an update as to status of the claim in the TMA organization?

Thank you,

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Thursday, June 18, 2020 12:37 PM

To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Judge Noel,

Just following up here to make sure that this does not fall through the cracks.

Regards,
James Pistorino

-----Original Message-----
From: James Pistorino
Sent: Monday, January 13, 2020 10:19 AM
To: 'Noel, Nichole Ms. DoD OGC' <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Dear Judge Noel,

Great. Thank you for your response. We will keep an eye out for it.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, January 13, 2020 9:44 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Mr. Pistorino:

I will issue this decision before by the end of the month.

Regards,

Nichole Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, January 10, 2020 7:25 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

I thought I would follow-up here and make sure that there was not a miscommunication.

I do not believe that we have received a decision in Mr. Maddern's case and I just wanted to make sure that it was not misdirected.

Can you let me know?

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, September 16, 2019 12:32 PM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

All:

I have received the Beneficiary's closing statement. The record in this case is closed.

Thank you,

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, September 13, 2019 5:15 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] Appeal of Ronald Maddern

Dear Judge Noel,

Attached, please find Mr. Maddern's closing statement.

Please let me know if there are any questions or comments or if you have any difficulty retrieving it.

Regards,

James Pistorino

Parrish Law Office

(650) 400-0043

CLASSIFICATION: UNCLASSIFIED

**From:** Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
**Sent:** Tuesday, June 23, 2020 11:42 AM
**To:** Greer, Leslie B CIV DHA CONT LAW (USA); James Pistorino
**Cc:** Debbie Parrish
**Subject:** RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Ms. Greer:

Thank you for this update as well as providing this explanation of the post-hearing process.

Judge Noel

-----Original Message-----
From: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Sent: Tuesday, June 23, 2020 2:40 PM
To: James Pistorino <james@dparrishlaw.com>; Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Thank you for your messages. And apologies for any misunderstanding or miscommunication. I have little visibility on cases once the record closes, but am happy to continue to request status updates from my superiors.

Judge Noel issued her recommended decision within the 60 day window allowed by the Regulation. That recommendation was received by the Agency, whose designee is, to my understanding, still working on it.

32 Code of Federal Regulations Part 199.10 outlines the Agency appeals process, and explains that the hearing officer makes a recommendation to the Agency, and the Agency takes that recommendation under advisement before issuing the final decision on the benefit-at-issue.

"At the conclusion of the hearing and after the record has been closed, the matter shall be taken under consideration by the hearing officer. Within the time frames previously set forth in this Section, the hearing officer shall submit to the Director, OCHAMPUS, or a designee, a written recommended decision containing a statement of findings and a statement of reasons based on the evidence adduced at the hearing and otherwise included in the hearing record." 32 CFR Part 199.10(d)(12).

"The recommended decision shall be reviewed by the Director, OCHAMPUS, or a designee, who shall adopt or reject the recommended decision or refer the recommended decision for review by the Assistant Secretary of Defense (Health Affairs). The Director, OCHAMPUS, or designee, normally will take action with regard to the recommended decision within 90 days of receipt of the recommended decision or receipt of the revised recommended decision following a remand order to the Hearing Officer." 32 CFR Part 199.10(e)(1).

"If the Director, OCHAMPUS, or a designee, concurs in the recommended decision, no further agency action is required and the recommended decision, as adopted by the Director, OCHAMPUS, is the final agency decision in the appeal. In the case of rejection, the Director, OCHAMPUS, or a designee, shall state the reason for disagreement with the recommended decision and the underlying facts supporting such disagreement. In these circumstances, the Director, OCHAMPUS, or a designee, may have a final decision prepared based on the record, or may remand the matter to the

Hearing Officer for appropriate action. In the latter instance, the Hearing Officer shall take appropriate action and submit a new recommended decision within 60 days of receipt of the remand order. The decision by the Director, OCHAMPUS, or a designee, concerning a case arising under the procedures of this section, shall be the final agency decision and the final decision shall be sent by certified mail to the appealing party or parties. A final agency decision under paragraph (e)(1) of this section will not be relied on, used, or cited as precedent by the Department of Defense in the administration of CHAMPUS." 32 C.F.R. Part 199.10(e)(1)(i).

As mentioned under previous email, I have yet to receive an update as to the status of the Agency's final decision. I shall notify everyone on this email chain once I do receive a response.

Leslie Greer

-----Original Message-----
From: James Pistorino [mailto:james@dparrishlaw.com]
Sent: Tuesday, June 23, 2020 12:11 PM
To: Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Dear Judge Noel,

I am not familiar with a process where a neutral adjudicating entity takes evidence from the parties, presumably gauges the evidence/credibility, and then communicates its decision/recommendation to only one of the parties. To say the least, that idea seems problematic.

Please let me know when the decision/recommendation issued.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Tuesday, June 23, 2020 8:57 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Mr. Pistorino:

I issued a recommendation to TMA earlier this year; however, I am not the release authority. I believe that authority lies with TMA.

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Monday, June 22, 2020 4:39 PM
To: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>; Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern (UNCLASSIFIED)

It sounds like some sort of decision/recommendation has issued.
Please let us know when that occurred and provide a copy.

Regards,
James Pistorino

-----Original Message-----
From: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Sent: Monday, June 22, 2020 1:30 PM
To: James Pistorino <james@dparrishlaw.com>; Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Apologies for the late response.

The Agency's decision has not yet issued. I have endeavored to get a response from our Headquarters, who issues the final decision. I did not hear back by COB today. When I receive a status update, I shall email all involved.

Leslie Greer

-----Original Message-----
From: James Pistorino [mailto:james@dparrishlaw.com]
Sent: Monday, June 22, 2020 2:20 PM
To: Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

Please let me know If a decision/recommendation of any kind has been issued.
If a decision/recommendation has issued, please let us have a copy.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, June 22, 2020 10:57 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Ms. Greer:

Are you able to provide us an update as to status of the claim in the TMA organization?

Thank you,

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Thursday, June 18, 2020 12:37 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA)
<leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Judge Noel,

Just following up here to make sure that this does not fall through the cracks.

Regards,
James Pistorino

-----Original Message-----
From: James Pistorino
Sent: Monday, January 13, 2020 10:19 AM
To: 'Noel, Nichole Ms. DoD OGC' <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA)
<leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Dear Judge Noel,

Great.  Thank you for your response.  We will keep an eye out for it.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, January 13, 2020 9:44 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Mr. Pistorino:

I will issue this decision before by the end of the month.

Regards,

Nichole Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, January 10, 2020 7:25 PM

To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA)
<leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

I thought I would follow-up here and make sure that there was not a miscommunication.

I do not believe that we have received a decision in Mr. Maddern's case and I just wanted to make sure that it was not
misdirected.

Can you let me know?

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, September 16, 2019 12:32 PM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

All:

I have received the Beneficiary's closing statement. The record in this case is closed.

Thank you,

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, September 13, 2019 5:15 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA)
<leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] Appeal of Ronald Maddern

Dear Judge Noel,


Attached, please find Mr. Maddern's closing statement.

Please let me know if there are any questions or comments or if you have any difficulty retrieving it.


Regards,

James Pistorino

Parrish Law Office

(650) 400-0043

CLASSIFICATION: UNCLASSIFIED
CLASSIFICATION: UNCLASSIFIED

**From:** James Pistorino <james@dparrishlaw.com>
**Sent:** Tuesday, May 11, 2021 11:30 AM
**To:** Greer, Leslie B CIV DHA CONT LAW (USA)
**Cc:** Debbie Parrish
**Subject:** RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Dear Ms. Greer,

I am writing to follow up on this case.

As you know, on August 22, 2019, a hearing was held in this case.
Post-hearing briefing was completed by September 2019.
As of this date, some 19 months later, no decision has issued and the Maddern's continue to be dunned for charges for which they are not responsible.
If a decision has issued, but for some reason has not been communicated to either myself or the Madderns, please let me know when that occurred and provide a copy.

As I understand it, sometime around January 2020, a recommendation from Judge Noel was forwarded to the Secretary and, apparently, yourself.
Please let me know if a copy of the recommendation was sent to you, and, if so, provide a copy to the Madderns.

Given the totally excessive delay in this case, absent a decision on their claim within 10 days, the Madderns will be filing suit in federal court seeking a writ of mandamus against the Secretary or an outright decision on the merits.
In addition, the suit will seek the production of all communications between yourself or anyone else and Judge Noel regarding this matter.
I am not aware of a process in which a neutral trier of fact communicates ex parte with one of the parties about the subject matter of the suit.

In addition, the suit will seek an award of the Maddern's attorneys fees related to this case.
Once the suit is on file, I understand that no resolution will be accepted that does not involve the payment of the attorney's fees incurred.

The Secretary has until Friday, May 21, 2021 to avoid being served.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Tuesday, June 23, 2020 11:42 AM
To: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>; James Pistorino <james@dparrishlaw.com>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Ms. Greer:

Thank you for this update as well as providing this explanation of the post-hearing process.

Judge Noel

-----Original Message-----
From: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Sent: Tuesday, June 23, 2020 2:40 PM
To: James Pistorino <james@dparrishlaw.com>; Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Thank you for your messages. And apologies for any misunderstanding or miscommunication. I have little visibility on cases once the record closes, but am happy to continue to request status updates from my superiors.

Judge Noel issued her recommended decision within the 60 day window allowed by the Regulation. That recommendation was received by the Agency, whose designee is, to my understanding, still working on it.

32 Code of Federal Regulations Part 199.10 outlines the Agency appeals process, and explains that the hearing officer makes a recommendation to the Agency, and the Agency takes that recommendation under advisement before issuing the final decision on the benefit-at-issue.

"At the conclusion of the hearing and after the record has been closed, the matter shall be taken under consideration by the hearing officer. Within the time frames previously set forth in this Section, the hearing officer shall submit to the Director, OCHAMPUS, or a designee, a written recommended decision containing a statement of findings and a statement of reasons based on the evidence adduced at the hearing and otherwise included in the hearing record." 32 CFR Part 199.10(d)(12).

"The recommended decision shall be reviewed by the Director, OCHAMPUS, or a designee, who shall adopt or reject the recommended decision or refer the recommended decision for review by the Assistant Secretary of Defense (Health Affairs). The Director, OCHAMPUS, or designee, normally will take action with regard to the recommended decision within 90 days of receipt of the recommended decision or receipt of the revised recommended decision following a remand order to the Hearing Officer." 32 CFR Part 199.10(e)(1).

"If the Director, OCHAMPUS, or a designee, concurs in the recommended decision, no further agency action is required and the recommended decision, as adopted by the Director, OCHAMPUS, is the final agency decision in the appeal. In the case of rejection, the Director, OCHAMPUS, or a designee, shall state the reason for disagreement with the recommended decision and the underlying facts supporting such disagreement. In these circumstances, the Director, OCHAMPUS, or a designee, may have a final decision prepared based on the record, or may remand the matter to the Hearing Officer for appropriate action. In the latter instance, the Hearing Officer shall take appropriate action and submit a new recommended decision within 60 days of receipt of the remand order. The decision by the Director, OCHAMPUS, or a designee, concerning a case arising under the procedures of this section, shall be the final agency decision and the final decision shall be sent by certified mail to the appealing party or parties. A final agency decision under paragraph (e)(1) of this section will not be relied on, used, or cited as precedent by the Department of Defense in the administration of CHAMPUS." 32 C.F.R. Part 199.10(e)(1)(i).

As mentioned under previous email, I have yet to receive an update as to the status of the Agency's final decision. I shall notify everyone on this email chain once I do receive a response.

Leslie Greer

-----Original Message-----
From: James Pistorino [mailto:james@dparrishlaw.com]
Sent: Tuesday, June 23, 2020 12:11 PM
To: Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Dear Judge Noel,

I am not familiar with a process where a neutral adjudicating entity takes evidence from the parties, presumably gauges the evidence/credibility, and then communicates its decision/recommendation to only one of the parties. To say the least, that idea seems problematic.

Please let me know when the decision/recommendation issued.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Tuesday, June 23, 2020 8:57 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Mr. Pistorino:

I issued a recommendation to TMA earlier this year; however, I am not the release authority. I believe that authority lies with TMA.

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Monday, June 22, 2020 4:39 PM
To: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>; Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern (UNCLASSIFIED)

It sounds like some sort of decision/recommendation has issued.
Please let us know when that occurred and provide a copy.

Regards,
James Pistorino

-----Original Message-----
From: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Sent: Monday, June 22, 2020 1:30 PM
To: James Pistorino <james@dparrishlaw.com>; Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>

Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Apologies for the late response.

The Agency's decision has not yet issued. I have endeavored to get a response from our Headquarters, who issues the final decision. I did not hear back by COB today. When I receive a status update, I shall email all involved.

Leslie Greer

-----Original Message-----
From: James Pistorino [mailto:james@dparrishlaw.com]
Sent: Monday, June 22, 2020 2:20 PM
To: Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

Please let me know If a decision/recommendation of any kind has been issued.
If a decision/recommendation has issued, please let us have a copy.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, June 22, 2020 10:57 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Ms. Greer:

Are you able to provide us an update as to status of the claim in the TMA organization?

Thank you,

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Thursday, June 18, 2020 12:37 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Judge Noel,

Just following up here to make sure that this does not fall through the cracks.

Regards,
James Pistorino

-----Original Message-----
From: James Pistorino
Sent: Monday, January 13, 2020 10:19 AM
To: 'Noel, Nichole Ms. DoD OGC' <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Dear Judge Noel,

Great. Thank you for your response. We will keep an eye out for it.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, January 13, 2020 9:44 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Mr. Pistorino:

I will issue this decision before by the end of the month.

Regards,

Nichole Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, January 10, 2020 7:25 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

I thought I would follow-up here and make sure that there was not a miscommunication.

I do not believe that we have received a decision in Mr. Maddern's case and I just wanted to make sure that it was not misdirected.

Can you let me know?

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, September 16, 2019 12:32 PM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

All:

I have received the Beneficiary's closing statement. The record in this case is closed.

Thank you,

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, September 13, 2019 5:15 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] Appeal of Ronald Maddern

Dear Judge Noel,

Attached, please find Mr. Maddern's closing statement.

Please let me know if there are any questions or comments or if you have any difficulty retrieving it.

Regards,

James Pistorino

Parrish Law Office

(650) 400-0043

CLASSIFICATION: UNCLASSIFIED

CLASSIFICATION: UNCLASSIFIED

7

Exh C - Page 232

**From:** James Pistorino <james@dparrishlaw.com>
**Sent:** Tuesday, May 11, 2021 11:33 AM
**To:** Noel, Nichole Ms. DoD OGC; Greer, Leslie B CIV DHA CONT LAW (USA)
**Cc:** Debbie Parrish
**Subject:** RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Dear Judge Noel,

I am writing to follow up on this case.

As you know, on August 22, 2019, a hearing was held in this case.
Post-hearing briefing was completed by September 2019.
As of this date, some 19 months later, no decision has issued and the Maddern's continue to be dunned for charges for which they are not responsible.
If a decision has issued, but for some reason has not been communicated to either myself or the Madderns, please let me know when that occurred and provide a copy.

As I understand it, sometime around January 2020, a recommendation was forwarded to the Secretary and, apparently, Ms. Greer.
Please let me know if a copy of the recommendation was sent to Ms. Greer, and, if so, provide a copy to the Madderns.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Tuesday, June 23, 2020 11:42 AM
To: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>; James Pistorino <james@dparrishlaw.com>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Ms. Greer:

Thank you for this update as well as providing this explanation of the post-hearing process.

Judge Noel

-----Original Message-----
From: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Sent: Tuesday, June 23, 2020 2:40 PM
To: James Pistorino <james@dparrishlaw.com>; Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Thank you for your messages. And apologies for any misunderstanding or miscommunication. I have little visibility on cases once the record closes, but am happy to continue to request status updates from my superiors.

Judge Noel issued her recommended decision within the 60 day window allowed by the Regulation. That recommendation was received by the Agency, whose designee is, to my understanding, still working on it.

32 Code of Federal Regulations Part 199.10 outlines the Agency appeals process, and explains that the hearing officer makes a recommendation to the Agency, and the Agency takes that recommendation under advisement before issuing the final decision on the benefit-at-issue.

"At the conclusion of the hearing and after the record has been closed, the matter shall be taken under consideration by the hearing officer. Within the time frames previously set forth in this Section, the hearing officer shall submit to the Director, OCHAMPUS, or a designee, a written recommended decision containing a statement of findings and a statement of reasons based on the evidence adduced at the hearing and otherwise included in the hearing record." 32 CFR Part 199.10(d)(12).

"The recommended decision shall be reviewed by the Director, OCHAMPUS, or a designee, who shall adopt or reject the recommended decision or refer the recommended decision for review by the Assistant Secretary of Defense (Health Affairs). The Director, OCHAMPUS, or designee, normally will take action with regard to the recommended decision within 90 days of receipt of the recommended decision or receipt of the revised recommended decision following a remand order to the Hearing Officer." 32 CFR Part 199.10(e)(1).

"If the Director, OCHAMPUS, or a designee, concurs in the recommended decision, no further agency action is required and the recommended decision, as adopted by the Director, OCHAMPUS, is the final agency decision in the appeal. In the case of rejection, the Director, OCHAMPUS, or a designee, shall state the reason for disagreement with the recommended decision and the underlying facts supporting such disagreement. In these circumstances, the Director, OCHAMPUS, or a designee, may have a final decision prepared based on the record, or may remand the matter to the Hearing Officer for appropriate action. In the latter instance, the Hearing Officer shall take appropriate action and submit a new recommended decision within 60 days of receipt of the remand order. The decision by the Director, OCHAMPUS, or a designee, concerning a case arising under the procedures of this section, shall be the final agency decision and the final decision shall be sent by certified mail to the appealing party or parties. A final agency decision under paragraph (e)(1) of this section will not be relied on, used, or cited as precedent by the Department of Defense in the administration of CHAMPUS." 32 C.F.R. Part 199.10(e)(1)(i).

As mentioned under previous email, I have yet to receive an update as to the status of the Agency's final decision. I shall notify everyone on this email chain once I do receive a response.

Leslie Greer

-----Original Message-----
From: James Pistorino [mailto:james@dparrishlaw.com]
Sent: Tuesday, June 23, 2020 12:11 PM
To: Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Dear Judge Noel,

I am not familiar with a process where a neutral adjudicating entity takes evidence from the parties, presumably gauges the evidence/credibility, and then communicates its decision/recommendation to only one of the parties. To say the least, that idea seems problematic.

Please let me know when the decision/recommendation issued.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Tuesday, June 23, 2020 8:57 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Mr. Pistorino:

I issued a recommendation to TMA earlier this year; however, I am not the release authority. I believe that authority lies with TMA.

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Monday, June 22, 2020 4:39 PM
To: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>; Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern (UNCLASSIFIED)

It sounds like some sort of decision/recommendation has issued.
Please let us know when that occurred and provide a copy.

Regards,
James Pistorino

-----Original Message-----
From: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Sent: Monday, June 22, 2020 1:30 PM
To: James Pistorino <james@dparrishlaw.com>; Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Apologies for the late response.

The Agency's decision has not yet issued. I have endeavored to get a response from our Headquarters, who issues the final decision. I did not hear back by COB today. When I receive a status update, I shall email all involved.

Leslie Greer

-----Original Message-----
From: James Pistorino [mailto:james@dparrishlaw.com]
Sent: Monday, June 22, 2020 2:20 PM

To: Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

Please let me know If a decision/recommendation of any kind has been issued.
If a decision/recommendation has issued, please let us have a copy.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, June 22, 2020 10:57 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Ms. Greer:

Are you able to provide us an update as to status of the claim in the TMA organization?

Thank you,

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Thursday, June 18, 2020 12:37 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Judge Noel,

Just following up here to make sure that this does not fall through the cracks.

Regards,
James Pistorino

-----Original Message-----
From: James Pistorino
Sent: Monday, January 13, 2020 10:19 AM
To: 'Noel, Nichole Ms. DoD OGC' <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Dear Judge Noel,

Great. Thank you for your response. We will keep an eye out for it.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, January 13, 2020 9:44 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Mr. Pistorino:

I will issue this decision before by the end of the month.

Regards,

Nichole Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, January 10, 2020 7:25 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

I thought I would follow-up here and make sure that there was not a miscommunication.

I do not believe that we have received a decision in Mr. Maddern's case and I just wanted to make sure that it was not misdirected.

Can you let me know?

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, September 16, 2019 12:32 PM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

All:

I have received the Beneficiary's closing statement. The record in this case is closed.

Thank you,

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, September 13, 2019 5:15 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] Appeal of Ronald Maddern

Dear Judge Noel,

Attached, please find Mr. Maddern's closing statement.

Please let me know if there are any questions or comments or if you have any difficulty retrieving it.

Regards,

James Pistorino

Parrish Law Office

(650) 400-0043

CLASSIFICATION: UNCLASSIFIED
CLASSIFICATION: UNCLASSIFIED

**From:** Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
**Sent:** Wednesday, May 19, 2021 11:46 AM
**To:** James Pistorino
**Cc:** Debra Parrish
**Subject:** RE: Appeal of Ronald Maddern (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Mr. Pistorino:

Thank you for your messages. We have been apprised of your client's intent to file suit if nothing was received by the Agency as of Friday, May 21, 2021.

A copy of the Agency's final decision shall be sent via USPS First Class mail today.

There are/will be no further questions on my part; if your client seeks further legal redress, please address future correspondence, in writing, to the Agency's Office of General Counsel in Falls Church, Virginia, the address to which, is found in the letterhead of the final decision.

Thank you,

Leslie Greer

-----Original Message-----
From: James Pistorino [mailto:james@dparrishlaw.com]
Sent: Wednesday, May 19, 2021 12:15 PM
To: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debra Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] Appeal of Ronald Maddern

Ms. Greer,

Following up on Judge Noel's note, as indicated in my message of May 11, Mr. Maddern intends to proceed with his suit absent a decision on or before Friday, May 21.

Having waited more than 19 months since briefing was completed, so far, Mr. Maddern is not content to rely on indications that a decision may issue at some point in the future if only he will wait longer.

Further, the initial denial of Mr. Maddern's claim and delay in processing Mr. Maddern's appeal has resulted in, inter alia, harm to his credit rating.

In addition, Mrs. Maddern requires medical attention at the same facility Mr. Maddern received his treatment.

However, because of the outstanding bill, the facility will not allow Mrs. Maddern to be treated there.

Please do not hesitate to contact me if you have any questions.


Regards,

James Pistorino

CLASSIFICATION: UNCLASSIFIED

**From:** Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
**Sent:** Wednesday, May 19, 2021 10:42 AM
**To:** James Pistorino
**Subject:** RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Mr. Pistorino:

I hope you and the Madderns are well and in good health.

Unfortunately, with many things over the past year, the processing of Mr. Maddern's case was delayed by the unexpected changes to work processes caused by the covid-19 virus response. I issued the recommended decision to DHA in February 2020. A copy of that recommendation was not provided to Ms. Greer. She, like you, will learn the final disposition of the case when the Director of DHA issues the final decision. Currently, the final decision is being expedited for the DHA Director's review and signature. Hopefully, the agency will issue the final decision before the end of the month.

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals
Fax: 703.696.1831

CAUTION: Information contained in this message may be protected by the attorney/client, attorney work product, deliberative process or other privileges. Do not disseminate further without approval from the Office of the DOD General Counsel. Please be advised that if you are not the intended recipient, you are prohibited from any further viewing of this e-mail and/or any attachment(s) or from making any use of this e-mail or attachment(s). If you believe you have received this e-mail in error, please notify the sender immediately and permanently delete the e-mail, any attachment(s), and all copies thereof from any drives or storage media and destroy any printouts of the e-mail or attachment(s). Additionally, the Privacy Act applies to any personal information contained herein.

FOR OFFICIAL USE ONLY

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Tuesday, May 11, 2021 2:33 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debra Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Dear Judge Noel,

I am writing to follow up on this case.

As you know, on August 22, 2019, a hearing was held in this case.
Post-hearing briefing was completed by September 2019.
As of this date, some 19 months later, no decision has issued and the Maddern's continue to be dunned for charges for which they are not responsible.
If a decision has issued, but for some reason has not been communicated to either myself or the Madderns, please let me know when that occurred and provide a copy.

As I understand it, sometime around January 2020, a recommendation was forwarded to the Secretary and, apparently, Ms. Greer.
Please let me know if a copy of the recommendation was sent to Ms. Greer, and, if so, provide a copy to the Madderns.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Tuesday, June 23, 2020 11:42 AM
To: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>; James Pistorino <james@dparrishlaw.com>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Ms. Greer:

Thank you for this update as well as providing this explanation of the post-hearing process.

Judge Noel

-----Original Message-----
From: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Sent: Tuesday, June 23, 2020 2:40 PM
To: James Pistorino <james@dparrishlaw.com>; Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Thank you for your messages. And apologies for any misunderstanding or miscommunication. I have little visibility on cases once the record closes, but am happy to continue to request status updates from my superiors.

Judge Noel issued her recommended decision within the 60 day window allowed by the Regulation. That recommendation was received by the Agency, whose designee is, to my understanding, still working on it.

32 Code of Federal Regulations Part 199.10 outlines the Agency appeals process, and explains that the hearing officer makes a recommendation to the Agency, and the Agency takes that recommendation under advisement before issuing the final decision on the benefit-at-issue.

"At the conclusion of the hearing and after the record has been closed, the matter shall be taken under consideration by the hearing officer. Within the time frames previously set forth in this Section, the hearing officer shall submit to the Director, OCHAMPUS, or a designee, a written recommended decision containing a statement of findings and a

statement of reasons based on the evidence adduced at the hearing and otherwise included in the hearing record." 32 CFR Part 199.10(d)(12).

"The recommended decision shall be reviewed by the Director, OCHAMPUS, or a designee, who shall adopt or reject the recommended decision or refer the recommended decision for review by the Assistant Secretary of Defense (Health Affairs). The Director, OCHAMPUS, or designee, normally will take action with regard to the recommended decision within 90 days of receipt of the recommended decision or receipt of the revised recommended decision following a remand order to the Hearing Officer." 32 CFR Part 199.10(e)(1).

"If the Director, OCHAMPUS, or a designee, concurs in the recommended decision, no further agency action is required and the recommended decision, as adopted by the Director, OCHAMPUS, is the final agency decision in the appeal. In the case of rejection, the Director, OCHAMPUS, or a designee, shall state the reason for disagreement with the recommended decision and the underlying facts supporting such disagreement. In these circumstances, the Director, OCHAMPUS, or a designee, may have a final decision prepared based on the record, or may remand the matter to the Hearing Officer for appropriate action. In the latter instance, the Hearing Officer shall take appropriate action and submit a new recommended decision within 60 days of receipt of the remand order. The decision by the Director, OCHAMPUS, or a designee, concerning a case arising under the procedures of this section, shall be the final agency decision and the final decision shall be sent by certified mail to the appealing party or parties. A final agency decision under paragraph (e)(1) of this section will not be relied on, used, or cited as precedent by the Department of Defense in the administration of CHAMPUS." 32 C.F.R. Part 199.10(e)(1)(i).

As mentioned under previous email, I have yet to receive an update as to the status of the Agency's final decision. I shall notify everyone on this email chain once I do receive a response.

Leslie Greer

-----Original Message-----
From: James Pistorino [mailto:james@dparrishlaw.com]
Sent: Tuesday, June 23, 2020 12:11 PM
To: Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Dear Judge Noel,

I am not familiar with a process where a neutral adjudicating entity takes evidence from the parties, presumably gauges the evidence/credibility, and then communicates its decision/recommendation to only one of the parties. To say the least, that idea seems problematic.

Please let me know when the decision/recommendation issued.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Tuesday, June 23, 2020 8:57 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Mr. Pistorino:

I issued a recommendation to TMA earlier this year; however, I am not the release authority. I believe that authority lies with TMA.

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Monday, June 22, 2020 4:39 PM
To: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>; Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern (UNCLASSIFIED)

It sounds like some sort of decision/recommendation has issued.
Please let us know when that occurred and provide a copy.

Regards,
James Pistorino

-----Original Message-----
From: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Sent: Monday, June 22, 2020 1:30 PM
To: James Pistorino <james@dparrishlaw.com>; Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Apologies for the late response.

The Agency's decision has not yet issued. I have endeavored to get a response from our Headquarters, who issues the final decision. I did not hear back by COB today. When I receive a status update, I shall email all involved.

Leslie Greer

-----Original Message-----
From: James Pistorino [mailto:james@dparrishlaw.com]
Sent: Monday, June 22, 2020 2:20 PM
To: Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

Please let me know If a decision/recommendation of any kind has been issued.
If a decision/recommendation has issued, please let us have a copy.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, June 22, 2020 10:57 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Ms. Greer:

Are you able to provide us an update as to status of the claim in the TMA organization?

Thank you,

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Thursday, June 18, 2020 12:37 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Judge Noel,

Just following up here to make sure that this does not fall through the cracks.

Regards,
James Pistorino

-----Original Message-----
From: James Pistorino
Sent: Monday, January 13, 2020 10:19 AM
To: 'Noel, Nichole Ms. DoD OGC' <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Dear Judge Noel,

Great. Thank you for your response. We will keep an eye out for it.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, January 13, 2020 9:44 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>

Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Mr. Pistorino:

I will issue this decision before by the end of the month.

Regards,

Nichole Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, January 10, 2020 7:25 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

I thought I would follow-up here and make sure that there was not a miscommunication.

I do not believe that we have received a decision in Mr. Maddern's case and I just wanted to make sure that it was not misdirected.

Can you let me know?

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, September 16, 2019 12:32 PM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

All:

I have received the Beneficiary's closing statement. The record in this case is closed.

Thank you,

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, September 13, 2019 5:15 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>

Subject: [Non-DoD Source] Appeal of Ronald Maddern

Dear Judge Noel,

Attached, please find Mr. Maddern's closing statement.

Please let me know if there are any questions or comments or if you have any difficulty retrieving it.

Regards,

James Pistorino

Parrish Law Office

(650) 400-0043

CLASSIFICATION: UNCLASSIFIED
CLASSIFICATION: UNCLASSIFIED

**From:** James Pistorino <james@dparrishlaw.com>
**Sent:** Wednesday, May 19, 2021 10:52 AM
**To:** Noel, Nichole Ms. DoD OGC
**Cc:** Greer, Leslie B CIV DHA CONT LAW (USA)
**Subject:** RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Dear Judge Noel,

Thank you for your note and the update.

Also, it is comforting to hear that the parties are in the same position with regard to the contents of the recommendation.
Somehow, Ms. Greer knew more information than I did regarding processing of the appeal and that raised a red flag for me.
While I do not know how that occurred, given that it apparently does not go to the contents of the recommendation, then I am less concerned.

The Madderns appreciate that since March 2020 things have been, shall I say, "crazy."

I hope you are doing well also.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Wednesday, May 19, 2021 10:42 AM
To: James Pistorino <james@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Mr. Pistorino:

I hope you and the Madderns are well and in good health.

Unfortunately, with many things over the past year, the processing of Mr. Maddern's case was delayed by the unexpected changes to work processes caused by the covid-19 virus response. I issued the recommended decision to DHA in February 2020. A copy of that recommendation was not provided to Ms. Greer. She, like you, will learn the final disposition of the case when the Director of DHA issues the final decision. Currently, the final decision is being expedited for the DHA Director's review and signature. Hopefully, the agency will issue the final decision before the end of the month.

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals

Fax: 703.696.1831

CAUTION: Information contained in this message may be protected by the attorney/client, attorney work product, deliberative process or other privileges. Do not disseminate further without approval from the Office of the DOD General Counsel. Please be advised that if you are not the intended recipient, you are prohibited from any further viewing of this e-mail and/or any attachment(s) or from making any use of this e-mail or attachment(s). If you believe you have received this e-mail in error, please notify the sender immediately and permanently delete the e-mail, any attachment(s), and all copies thereof from any drives or storage media and destroy any printouts of the e-mail or attachment(s). Additionally, the Privacy Act applies to any personal information contained herein.

FOR OFFICIAL USE ONLY

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Tuesday, May 11, 2021 2:33 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debra Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Dear Judge Noel,

I am writing to follow up on this case.

As you know, on August 22, 2019, a hearing was held in this case.
Post-hearing briefing was completed by September 2019.
As of this date, some 19 months later, no decision has issued and the Maddern's continue to be dunned for charges for which they are not responsible.
If a decision has issued, but for some reason has not been communicated to either myself or the Madderns, please let me know when that occurred and provide a copy.

As I understand it, sometime around January 2020, a recommendation was forwarded to the Secretary and, apparently, Ms. Greer.
Please let me know if a copy of the recommendation was sent to Ms. Greer, and, if so, provide a copy to the Madderns.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Tuesday, June 23, 2020 11:42 AM
To: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>; James Pistorino <james@dparrishlaw.com>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Ms. Greer:

Thank you for this update as well as providing this explanation of the post-hearing process.

Judge Noel

-----Original Message-----
From: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Sent: Tuesday, June 23, 2020 2:40 PM
To: James Pistorino <james@dparrishlaw.com>; Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Thank you for your messages. And apologies for any misunderstanding or miscommunication. I have little visibility on cases once the record closes, but am happy to continue to request status updates from my superiors.

Judge Noel issued her recommended decision within the 60 day window allowed by the Regulation. That recommendation was received by the Agency, whose designee is, to my understanding, still working on it.

32 Code of Federal Regulations Part 199.10 outlines the Agency appeals process, and explains that the hearing officer makes a recommendation to the Agency, and the Agency takes that recommendation under advisement before issuing the final decision on the benefit-at-issue.

"At the conclusion of the hearing and after the record has been closed, the matter shall be taken under consideration by the hearing officer. Within the time frames previously set forth in this Section, the hearing officer shall submit to the Director, OCHAMPUS, or a designee, a written recommended decision containing a statement of findings and a statement of reasons based on the evidence adduced at the hearing and otherwise included in the hearing record." 32 CFR Part 199.10(d)(12).

"The recommended decision shall be reviewed by the Director, OCHAMPUS, or a designee, who shall adopt or reject the recommended decision or refer the recommended decision for review by the Assistant Secretary of Defense (Health Affairs). The Director, OCHAMPUS, or designee, normally will take action with regard to the recommended decision within 90 days of receipt of the recommended decision or receipt of the revised recommended decision following a remand order to the Hearing Officer." 32 CFR Part 199.10(e)(1).

"If the Director, OCHAMPUS, or a designee, concurs in the recommended decision, no further agency action is required and the recommended decision, as adopted by the Director, OCHAMPUS, is the final agency decision in the appeal. In the case of rejection, the Director, OCHAMPUS, or a designee, shall state the reason for disagreement with the recommended decision and the underlying facts supporting such disagreement. In these circumstances, the Director, OCHAMPUS, or a designee, may have a final decision prepared based on the record, or may remand the matter to the Hearing Officer for appropriate action. In the latter instance, the Hearing Officer shall take appropriate action and submit a new recommended decision within 60 days of receipt of the remand order. The decision by the Director, OCHAMPUS, or a designee, concerning a case arising under the procedures of this section, shall be the final agency decision and the final decision shall be sent by certified mail to the appealing party or parties. A final agency decision under paragraph (e)(1) of this section will not be relied on, used, or cited as precedent by the Department of Defense in the administration of CHAMPUS." 32 C.F.R. Part 199.10(e)(1)(i).

As mentioned under previous email, I have yet to receive an update as to the status of the Agency's final decision. I shall notify everyone on this email chain once I do receive a response.

Leslie Greer

-----Original Message-----
From: James Pistorino [mailto:james@dparrishlaw.com]
Sent: Tuesday, June 23, 2020 12:11 PM
To: Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Dear Judge Noel,

I am not familiar with a process where a neutral adjudicating entity takes evidence from the parties, presumably gauges the evidence/credibility, and then communicates its decision/recommendation to only one of the parties. To say the least, that idea seems problematic.

Please let me know when the decision/recommendation issued.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Tuesday, June 23, 2020 8:57 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

Mr. Pistorino:

I issued a recommendation to TMA earlier this year; however, I am not the release authority. I believe that authority lies with TMA.

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Monday, June 22, 2020 4:39 PM
To: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>; Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern (UNCLASSIFIED)

It sounds like some sort of decision/recommendation has issued.
Please let us know when that occurred and provide a copy.

Regards,
James Pistorino

-----Original Message-----
From: Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Sent: Monday, June 22, 2020 1:30 PM
To: James Pistorino <james@dparrishlaw.com>; Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>

Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern (UNCLASSIFIED)

CLASSIFICATION: UNCLASSIFIED

Apologies for the late response.

The Agency's decision has not yet issued. I have endeavored to get a response from our Headquarters, who issues the final decision. I did not hear back by COB today. When I receive a status update, I shall email all involved.

Leslie Greer

-----Original Message-----
From: James Pistorino [mailto:james@dparrishlaw.com]
Sent: Monday, June 22, 2020 2:20 PM
To: Noel, Nichole L CIV (US) <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CONT LAW (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

Please let me know If a decision/recommendation of any kind has been issued.
If a decision/recommendation has issued, please let us have a copy.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, June 22, 2020 10:57 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Ms. Greer:

Are you able to provide us an update as to status of the claim in the TMA organization?

Thank you,

Nichole Noel
Administrative Judge
Defense Office of Hearings and Appeals

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Thursday, June 18, 2020 12:37 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Judge Noel,

Just following up here to make sure that this does not fall through the cracks.

Regards,
James Pistorino

-----Original Message-----
From: James Pistorino
Sent: Monday, January 13, 2020 10:19 AM
To: 'Noel, Nichole Ms. DoD OGC' <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Dear Judge Noel,

Great. Thank you for your response. We will keep an eye out for it.

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, January 13, 2020 9:44 AM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

Mr. Pistorino:

I will issue this decision before by the end of the month.

Regards,

Nichole Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, January 10, 2020 7:25 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] RE: Appeal of Ronald Maddern

Dear Judge Noel,

I thought I would follow-up here and make sure that there was not a miscommunication.

I do not believe that we have received a decision in Mr. Maddern's case and I just wanted to make sure that it was not misdirected.

Can you let me know?

Regards,
James Pistorino

-----Original Message-----
From: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>
Sent: Monday, September 16, 2019 12:32 PM
To: James Pistorino <james@dparrishlaw.com>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: RE: Appeal of Ronald Maddern

All:

I have received the Beneficiary's closing statement. The record in this case is closed.

Thank you,

Judge Noel

-----Original Message-----
From: James Pistorino <james@dparrishlaw.com>
Sent: Friday, September 13, 2019 5:15 PM
To: Noel, Nichole Ms. DoD OGC <noeln@osdgc.osd.mil>; Greer, Leslie B CIV DHA CLAIMS (USA) <leslie.b.greer.civ@mail.mil>
Cc: Debbie Parrish <debbie@dparrishlaw.com>
Subject: [Non-DoD Source] Appeal of Ronald Maddern

Dear Judge Noel,

Attached, please find Mr. Maddern's closing statement.

Please let me know if there are any questions or comments or if you have any difficulty retrieving it.

Regards,

James Pistorino

Parrish Law Office

(650) 400-0043

CLASSIFICATION: UNCLASSIFIED

CLASSIFICATION: UNCLASSIFIED

8

Exh C - Page 255

**From:** James Pistorino <james@dparrishlaw.com>
**Sent:** Wednesday, May 19, 2021 11:15 AM
**To:** Greer, Leslie B CIV DHA CONT LAW (USA)
**Cc:** Debra Parrish
**Subject:** Appeal of Ronald Maddern

Ms. Greer,

Following up on Judge Noel's note, as indicated in my message of May 11, Mr. Maddern intends to proceed with his suit absent a decision on or before Friday, May 21.
Having waited more than 19 months since briefing was completed, so far, Mr. Maddern is not content to rely on indications that a decision may issue at some point in the future if only he will wait longer.

Further, the initial denial of Mr. Maddern's claim and delay in processing Mr. Maddern's appeal has resulted in, inter alia, harm to his credit rating.
In addition, Mrs. Maddern requires medical attention at the same facility Mr. Maddern received his treatment. However, because of the outstanding bill, the facility will not allow Mrs. Maddern to be treated there.

Please do not hesitate to contact me if you have any questions.

Regards,
James Pistorino