Avraham E. Aizenman (SBN 304668)
Email: eaizenman@reedsmith.com
REED SMITH LLP
355 South Grand Avenue
Suite 2900
Los Angeles, CA  90071-1514
Telephone: +1 213 457 8000
Facsimile: +1 213 457 8080

James Pistorino (SBN 226496)
Email: james@dparrishlaw.com
Parrish Law Offices
224 Lexington Dr.
Menlo Park, CA  94025
Telephone: (650) 400-0043

Attorneys for Plaintiff
Ronald Maddern

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD MADDERN,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>LLOYD AUSTIN, in his capacity as Secretary of the United States Department of Defense,<br><br>　　　　　Defendant. | Case No. 21-cv-1298-MMA-BLM<br><br>**PLAINTIFF RONALD MADDERN'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:　June 27, 2022<br>Time:　　　　　2:30 p.m.<br>Dep't:　　　　　3-c<br>Judge: Hon. Michael M. Anello |

# Table of Contents

| | | | |
|---|---|---|---|
| I. | | BACKGROUND | 1 |
| | A. | Mr. Maddern and Lumbar Spinal Stenosis | 1 |
| | B. | Laminectomy | 1 |
| | C. | The Superion Product | 2 |
| | D. | The AMA's CPT Coding System | 4 |
| | E. | Regulations and TriCare Coverage Policies In Effect When Mr. Maddern Had the Procedures at Issue | 5 |
| | F. | Mr. Maddern's Treatment with the Superion Product | 7 |
| | G. | Procedure Before the Department | 8 |
| | H. | The Recommended and Final Decisions | 10 |
| II. | | DISCUSSION | 10 |
| | A. | Violation of 5 U.S.C. § 706(2)(E) (not supported by substantial evidence)/706(2)(A) (arbitrary and capricious) | 11 |
| | | 1. The Superion Product Is Covered/ There Is No Exclusion of the Superion Product | 11 |
| | | 2. The Superion Product is "Proven" | 12 |
| | B. | Violation of 5 U.S.C. § 557(c) | 14 |
| | C. | Plaintiff's Other Causes of Action | 15 |
| III. | | CONCLUSION | 16 |

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

# TABLE OF AUTHORITIES

**Cases**

32 C.F.R. § 199.2 .................................................................................................. 15

*Clardy v. Levi*,
  545 F.2d 1241 (9th Cir. 1976) ............................................................................ 17

*Matthews v. Eldridge*,
  424 U.S. 319 (1976) ........................................................................................... 17

*Motor Vehicle Mfrs. Assoc. of U.S. v. State Farm Mutual Automobile Inc. Co.*,
  436 U.S. 29 (1983) ............................................................................................. 13

*Snoqualmie Indian Tribe v. F.E.R.C.*,
  445 F.3d 1207 (9th Cir. 2008) ............................................................................ 13

*Won Yang Sung v. McGrath*,
  339 U.S. 33 (1950) ............................................................................................. 17

**Statutes**

10 U.S.C. § 1071 .............................................................................................. 7, 17

42 U.S.C. § 1395y .................................................................................................. 5

5 U.S.C. § 557 ...................................................................................................... 16

**Regulations**

§ 199.4(g)(15)(C) .................................................................................................... 7

32 C.F.R. § 199 ................................................................................................ 7, 14

42 C.F.R. § 411.15(o) ............................................................................................. 5

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Pursuant to FED.R.CIV.P. 56, Plaintiff Ronald Maddern moves for summary judgment.

## I. BACKGROUND

### A. Mr. Maddern and Lumbar Spinal Stenosis

After his retirement, Mr. Maddern began suffering from lumbar spinal stenosis, which can cause extreme pain, weakness, inability to walk, etc. Lumbar spinal stenosis is a narrowing of space between the vertebrae which leads to compression of the blood supply/nerves in the spinal column. Ultimately, Mr. Maddern was confined to a wheelchair where he remained for some 14 years. AR1149-52.

Mr. Maddern was in constant, extreme pain, essentially homebound, and unable to care for himself. AR1170-74. Throughout this period a variety of treatments were attempted to address Mr. Maddern's condition, including physical therapy, steroid shots, radio-ablation, and opioid patches. AR1146-49. None of these had a material effect in alleviating Mr. Maddern's condition and he remained in extreme pain and wheelchair bound.

### B. Laminectomy

One non-reversible procedure to address lumbar spinal stenosis is a "laminectomy." A laminectomy involves a large incision, dissecting muscle attached to the relevant vertebrae, crushing and removing part of the vertebrae as well as drilling in the vertebrae in order to create space and thereby relieve the pressure on the nerves in the spinal column. A laminectomy is performed under general anesthesia in an operation that lasts an hour to an hour and a half, involves a stay in the ICU, significant loss of blood, and physical therapy thereafter.

In addition to its other characteristics, a laminectomy has a variety of risks from the surgery itself (including an average loss of a pint of blood) and a failure rate of more than 30% at three years. Because of the need for general anesthesia and loss of blood, a laminectomy is not safe for a group of persons. Among these are people suffering from diabetes and other conditions of the blood. A laminectomy treats only the space

between two vertebrae. However, lumbar spinal stenosis may occur between multiple vertebrae. Thus, a person suffering from lumber spinal stenosis may need multiple laminectomies to treat his/her condition.

Yet another issue with a laminectomy is that patients may need to continue with opioid treatments even after the procedure. Opioid treatments have very serious adverse effects throughout the body. AR1196-1203; AR1235-36.

**C. The Superion Product**

Given its deficiencies, an alternative to the laminectomy was developed in the form of an interspinal spacer. This is a mechanical device (like a toggle bolt) that fits through a small incision in between two vertebrae and then expands to keep the vertebrae apart. This creates spaces and, again, relieves pressure on the nerves. The Superion product is an interspinal spacer.

Compared to a laminectomy, the procedure for inserting the Superion product is much less invasive, risky, or expensive. No general anesthesia is needed and there is minimal loss of blood. Instead, a local anesthetic is applied and a half inch incision is made. Through the small incision, the product is inserted in its closed form between two vertebrae and then expanded to create space and relieve pressure. The procedure takes about 15 minutes, there is no need to stay overnight in the hospital, there is minimal blood loss, and the procedure is reversible (*i.e.*, the product could be taken out if desired). In addition to its other benefits, because there is no need for general anesthesia or significant blood loss, the procedure is safe to perform on people suffering from diabetes, for example. Further, it has been shown that there is decreased/no need for ongoing opioid treatments using the Superion product, as compared to a laminectomy. AR1207-12.

Before Mr. Maddern had the procedures at issue here, the Superion product: 1) had received FDA pre-market approval in June 2015; 2) was the subject of studies appearing in peer reviewed scientific journals showing its effectiveness at 3, 4, and 5 years after implantation; 3) had been tracked in the MAUDE database and shown

remarkably few complications, especially as compared with other procedures; and 4) was considered "medically reasonable and necessary" by Medicare and a Medicare covered benefit. AR1163; AR1214; AR1237; AR1261; 42 U.S.C. § 1395y; 42 C.F.R. § 411.15(o).

A short review of some of these will assist the Court. As described by the FDA, pre-market approval (PMA):

> PMA is the most stringent type of device marketing application required by FDA. The applicant must receive FDA approval of its PMA application prior to marketing the device. PMA approval is based on a determination by FDA that the PMA contains sufficient valid scientific evidence to assure that the device is safe and effective for its intended use(s).[1]

The FDA pre-market approval application for the Superion product was supported by some 61 pages of safety and effectiveness data, including the results of a more than 3-year clinical trial involving nearly 500 patients at 31 sites across the United States. *See* AR984-1044. As detailed above, based on the overwhelming data showing the safety and effectiveness, the FDA determined that the Superion product was safe and effective and approved to be marketed.

When a product is approved by the FDA, the manufacturer is required to continue to monitor the performance of the product through something called the Manufacturer and User Facility Device Experience (MAUDE) database.[2] Complications/experiences using the product are recorded there to build a record of how the product is working. Dr. Verdolin testified that out of more than 10,000 Superion procedures, only 12 complications/complaints were reported in the MAUDE database. AR1221.

The Superion product had been the subject of multiple well-controlled studies with clinically meaningful end-points published in refereed medical journals. In

---

[1] See https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-preparing-correct-submission/premarket-approval-pma
[2] See https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfmaude/search.cfm

– 3 –
MOTION FOR SUMMARY JUDGMENT

particular, the results of 2, 3, 4, and 5 year studies follow up studies of the Superion product were reported in a variety of medical journals. See AR1045-1073.

In addition, as described below, a Category I CPT code 22869 was assigned to the procedure based on the performance of the Superion product.

**D. The AMA's CPT Coding System**

The American Medical Association has developed a coding system for use by medical professionals, especially for billing purposes. The Current Procedural Terminology (CPT) codes fall into three categories, only two of which are relevant. A Category III code is for use with new/emerging technologies, including products that are experimental/investigational. A Category III code is a five digit code followed by a "T."

A Category I code is the highest level of approval and, among other things, reflects:

1) The procedure is performed by many physicians or other qualified health care professionals across the United States;

2) The procedure or service is consistent with current medical practice; and

3) The clinical efficacy of the procedure is documented in peer reviewed literature that meets relevant requirements.[3]

Whether to assign a code and code changes are voted on by the relevant AMA committee.

In the period prior to April 2015, there were two interspinous spacer products on the market. One was the X-STOP product.[4] The other was the Superion product. The AMA had assigned interspinal spacers a CPT code of 0171T, *i.e.*, a Category III code

---

[3] See https://www.ama-assn.org/practice-management/cpt/criteria-cpt-category-i-and-category-iii-codes

[4] By contrast to the Superion product, the X-STOP product was inserted with the patient laying on their side and, of course, the X-STOP product had a different design than the Superion product. With the Superion product, the patient lies on their stomach. Accordingly, the presentation of the spine is different.

indicating that the procedure was still considered new/emerging (*i.e.*, "experimental/investigational").

The X-STOP product was withdrawn from the market by the manufacturer in April 2015, because three-year follow up studies showed an unacceptable complication rate.

In July 2016, *i.e.*, before Mr. Maddern had the procedures at issue in this case, the only interspinal spacer product on the market (the Superion product) was assigned a CPT code of 22869, *i.e.*, a Category I code indicating the procedure is performed by many physicians in the U.S., is consistent with medical practice, and the efficacy of which is supported by peer-reviewed literature.[5]

**E. Regulations and TriCare Coverage Policies In Effect When Mr. Maddern Had the Procedures at Issue**

The Tricare program exists pursuant to 10 U.S.C. § 1071 and associated regulations at 32 C.F.R. § 199. As provided there, pursuant to § 199.4(a)(1)(i), subject to exclusions, TriCare will pay for treatments that are medically reasonable and necessary to diagnose or treat an illness or injury. Pursuant to § 199.4(g)(15) devices, medical treatments, or procedures are excluded if they are unproven. Pursuant to § 199.4(g)(15)(C), devices/treatments/procedures are unproven:

> Unless reliable evidence shows that any medical treatment or procedure has been the subject of well-controlled studies of clinically meaningful endpoints, which have determined its maximum tolerated dose, its toxicity, its safety, and its efficacy as compared with standard means of treatment or diagnosis.

Further, with regard to "reliable evidence", § 199.2 provides:

> (1) As used in § 199.4(g)(15), the term reliable evidence means only:

---

[5] Both the recommended and final decisions in this case contend that a CPT "T" code (i.e., a Category III code) is retired after five years and imply that it is automatically replaced with a Category I code. See AR1301; AR1312. As shown in the relevant material from the AMA, that is not the case. Instead, in order to receive a Category I code, the strict showing of compliance with Category I criteria must be made.

– 5 –

> (i) Well controlled studies of clinically meaningful endpoints, published in refereed medical literature.
>
> (ii) Published formal technology assessments.
>
> (iii) The published reports of national professional medical associations.
>
> (iv) Published national medical policy organization positions; and
>
> (v) The published reports of national expert opinion organizations.
>
> (2) The hierarchy of reliable evidence of proven medical effectiveness, established by (1) through (5) of this paragraph, is the order of the relative weight to be given to any particular source. With respect to clinical studies, only those reports and articles containing scientifically valid data and published in the refereed medical and scientific literature shall be considered as meeting the requirements of reliable evidence. Specifically not included in the meaning of reliable evidence are reports, articles, or statements by providers or groups of providers containing only abstracts, anecdotal evidence or personal professional opinions. Also not included in the meaning of reliable evidence is the fact that a provider or a number of providers have elected to adopt a drug, device, or medical treatment or procedure as their personal treatment or procedure of choice or standard of practice.

Thus, the regulations establish a hierarchy of "reliable evidence" showing that a device/treatment/procedure is proven. The top of the hierarchy is studies in refereed medical literature.

The TriCare Policy Manual in effect when Mr. Maddern had the last procedure was Change 12, dated November 2, 2017 (though there was no material difference between that version and the prior versions). Chapter 4, Section 6.1, paragraph 4.1 therein provided:

> Services and supplies required in the diagnosis and treatment of illness or injury involving the musculoskeletal system are covered. U.S. food and Drug Administration (FDA) approved surgically implanted devices are also covered.

*See* AR1294. Paragraph 5.9 of that same section contained an express exclusion for the X-STOP product. That paragraph stated:

> X-STOP interspinous Process Decompression System (CPT procedure codes 0171T and 0172T, HCPCS code C1821) for the treatment of neurogenic intermittent claudication secondary lumbar spinal stenosis is unproven.

*See* AR1296.  There was no exclusion of the Superion product (express or otherwise) or interspinal spacers more generally.

**F. Mr. Maddern's Treatment with the Superion Product**

Because, at least, he also suffers from diabetes, it would not have been safe to perform a laminectomy on Mr. Maddern.  AR1203-05.

On August 10, 2017, using a local anesthetic, Mr. Maddern underwent a procedure for implanting a Superion product.  A half inch incision was made, the actual procedure lasted only about 15 minutes (2-3 hours door to door) and there was minimal loss of blood.  Mr. Maddern went home immediately, was walking within two or three hours and, within two or three days, was making sustained walks without a wheelchair that he would not have been able make previously.  AR1153-60; AR1299 ("immediate improvement").

Because Mr. Maddern's doctor (Dr. Verdolin) believed that even more relief could be provided if another Superion product was inserted between other vertebrae, another procedure was performed on November 9, 2017. AR1217.

After 14 years in a wheelchair, since the procedures, Mr. Maddern has not needed the wheelchair except for the very longest days on his feet, has been able to care for himself, enjoy his daily activities and, according to his wife of nearly 50 years (Deborah), is less "crabby."  AR1175-78; AR1300 ("walk from the car, stand in the security line for entrance to the courthouse, and walk to the courtroom using a case. He no longer relies on the electric scooter for mobility").  In addition, Mr. Maddern no longer needs opioid treatments.

**G. Procedure Before the Department**

Mr. Maddern's treatments were billed using CPT code 22869, *i.e.*, a CPT code indicating that the procedure is in wide use, is consistent with current medical practice, and the efficacy of which is supported by peer reviewed literature.

Absent special permission not relevant here, Medicare does not cover items/procedures that are investigational or experimental. Further, Medicare only covers items/procedures that are "medically reasonable and necessary." Medicare covered Mr. Maddern's treatments. AR1163.

Mr. Maddern's claim for TriCare coverage was rejected throughout the appeal process on the grounds that the Superion product was "unproven," leading to a hearing before Hearing Officer Nicole Noel held on August 22, 2019.

At the hearing, both Mr. and Mrs. Maddern testified about Mr. Maddern's condition before the procedure, the procedure itself, and the dramatic improvement Mr. Maddern experienced after the procedure. Indeed, Mr. Maddern was able to walk to the courthouse and throughout the building without the use of a wheelchair, something he would not have been able to do prior to the procedures at issue.

Also at the hearing, Mr. Maddern introduced evidence/exhibits in the form of:

1) The FDA Pre-Market approval of the Superion product (including the 61-page safety and effectiveness study) (AR976-1044);

2) The results of the well-controlled studies with clinically meaningful end-points published in refereed medical journals showing the 2, 3, 4 and 5 year results of using the Superion product (AR1045-1072);

3) An article showing that the use of the Superion product led to an 85% reduction in opioid use by the patient population (AR1073-1078), including nearly halving the opioid usage rate at 24 months post-surgery as compared to a laminectomy (AR1075-76 – 13.3% vs. 23%);

4) An article describing the benefits of using the Superion product for people that have other conditions that make a laminectomy not safe/too risky, i.e.,

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

"comorbidities" and reporting the favorable results of a trial (AR1079-1089); and

5) An article by the "luminaries" in the field of pain management reviewing minimally invasive spine treatments (MIST), in particular, the Superion product and determining that there is a consensus of the experts that the Superion product has the highest level of evidence that it is beneficial for patients. AR1090-1114 (especially, AR1106-9).

In addition, Mr. Maddern presented the testimony of his doctor (Dr. Verdolin). Dr. Verdolin is renowned in the field of pain management with too many accomplishments/honors/publications to mention, including Eagle Scout, service with the Navy, Walter Reed Medical Center, and the Naval Medical Center in San Diego (*see* AR970-975; AR1180-87), and testified without compensation because of his commitment to his patients and making sure they get treatment he believes is safe and effective. AR1188-89.

Dr. Verdolin testified that Mr. Maddern was not a candidate for a laminectomy because, *e.g.*, his diabetes made one unsafe. AR1203-05; AR1299 ("contraindicates the use of general anesthesia – a requirement for other surgical interventions such as the laminectomy procedure.").

Dr. Verdloin testified that the articles referenced in Items #1-3 above reported the results of well controlled studies with clinically meaningful results and appeared in refereed scientific journals. *See* AR1228-1237. In addition, Dr. Verdolin testified as to what the articles of Items #4 and 5 disclosed (including the consensus of the experts) as regards the efficacy of the Superion product especially in the case where a laminectomy cannot be used (Item #4) as well as interspinal spacers more generally as compared to other procedures, including laminectomys. (Item #5). AR1244-46; AR1244.

In addition, Dr. Verdolin testified about the SPORT study and its conclusions on laminectomy failure rates (in the range of 60% at three years) (AR1199-1202) and the

– 9 –
MOTION FOR SUMMARY JUDGMENT

MAUDE database reports of the Superion product (12 reports out of more than 10,000 procedures). AR1221; AR1262.

The Secretary did not present any exhibits or witnesses.

Post-hearing statements were submitted and the Record closed on September 16, 2019. AR1275-1278; AR1289-1297; AR1288.

**H. The Recommended and Final Decisions**

Though the applicable regulations required Ms. Noel to issue a recommended decision within 90 days (*i.e.*, December 16, 2019), Mr. Maddern was not provided with a copy until after this suit was filed in July 2021 (*i.e.*, a year and a half late). When Mr. Maddern indicated his intention to file suit unless a decision was received within 10 days, a final decision issued in May 2021. AR1310-15.

The final decision contended that "there have not been studies *directly comparing* the efficacy of the Vertiflex Superion interspinous spacer procedure *to that of laminectomy*, only studies comparing the efficacy of the X-STOP Interspinous Process Decompression System." AR1314 (emphasis added). The final decision contended: "This finding of noninferiority is not sufficient to reclassify the Vertiflex Superion device from unproven to proven." *Id*.

The final decision conceded that the TriCare Policy Manual "did not specifically address the status of the Vertiflex Superion or the CPT code 22869." *Id.* Nevertheless, the final decision described the lack of an exclusion as follows:

> However, this defect is administrative, not substantive and did not create a loophole for coverage of the Vertiflex Superion device or represent a change in the long-standing DHA position classifying the Vertiflex Superion interspinous spacer procedure as umproven care. The TMP in effect at the time of Beneficiary's procedures made it sufficiently clear that procedures performed under the codes related to insertion of interspinous devices were considered unproven care and would not be covered.

*Id*.

## II. DISCUSSION

**A. Violation of 5 U.S.C. § 706(2)(E) (not supported by substantial evidence)/706(2)(A) (arbitrary and capricious)**

As an initial matter, in an administrative review case, "It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency." *Motor Vehicle Mfrs. Assoc. of U.S. v. State Farm Mutual Automobile Inc. Co.*, 436 U.S. 29, 50 (1983); *Snoqualmie Indian Tribe v. F.E.R.C.*, 445 F.3d 1207, 121 (9th Cir. 2008) ("An agency's decision can be upheld only on the basis of the reasoning in that decision.").

At base, the final decision in this case is founded on the ideas that: 1) there is some exclusion of the Superion product; and 2) that the Superion product is "unproven." Those contentions are not supported by substantial evidence/are arbitrary and capricious.

**1. The Superion Product Is Covered/ There Is No Exclusion of the Superion Product**

As detailed above, pursuant to Chapter 4, Section 6.1, paragraph 4.1 of the TriCare Policy Manual in effect at the time:

> Services and supplies required in the diagnosis and treatment of illness or injury involving the musculoskeletal system are covered. U.S. food and Drug Administration (FDA) approved surgically implanted devices are also covered.

Further, as evidenced by the FDA pre-market approval, the Superion product was approved by the FDA. AR984-1044. Thus, simply applying the relevant coverage policies, the Superion product was a covered TriCare benefit. At the time of Mr. Maddern's treatments, there was no exclusion for the Superion product or for interspinal spacers more generally.

The exclusion that existed in paragraph 5.9, only excluded the X-STOP product and also did not exclude interspinal spacers more generally. Indeed, it is difficult to understand why the Secretary engages in so much discussion of the X-STOP product

– 11 –

when it is undisputed that the X-STOP product and the Superion product are two different products made by two different manufacturers. AR1263.

The final decision in this case contends that the lack of an exclusion was a "defect" and a "loophole" and that there was a "long standing DHA position classifying the Vertiflex Superion product as unproven care." Literally, no evidence has ever been offered for any of those conclusions. If such evidence exists, where is it, and why did the Secretary not submit it during the hearing? Where is the evidence that the actual coverage policies of TriCare are "defective" and have "loopholes"? Where is the evidence that there was a "long standing DHA policy classifying the Vertiflex product as unproven care"? No such evidence exists and these contentions are simply fabricated.

Given the complete lack of evidence in support of these contentions, the conclusions are not supported by substantial evidence/are arbitrary and capricious.

The only evidence in this case is that the Superion product is FDA approved and therefore falls within the coverage provisions of, at least, Chapter 4, Section 6.1, paragraph 4.1 of the TriCare Policy Manual in effect at the time.

**2.     The Superion Product is "Proven"**

Turning to the contention that the Superion product is "unproven", as an initial matter, the dispute revolves around the phrase "compared with standard means of treatment" in § 199.4(g)(15)(C) and "reliable evidence."

It is undisputed that, because of other medical conditions, a laminectomy could not be performed on Mr. Maddern and that the other forms of treatment had proven ineffective. Thus, for Mr. Maddern, the only comparison available was between no treatment and the Superion product. As between no treatment and the Superion product, every study showed dramatic improvement with the Superion product. Indeed, the efficacy of the Superion product was demonstrated dramatically in Mr. Maddern's case when, shortly after the procedure, he was able to walk after 14 years in a wheelchair.

With respect to the hierarchy of 32 C.F.R. § 199.2 and "reliable evidence," Mr. Maddern presented the highest level evidence when he presented the publications showing the 2, 3, 4, and 5 year studies as reported in refereed medical journals. *See* AR1045-1072.

Depending on how an FDA' pre-market approval, AMA' CPT Category I code assignment, and Medicare' coverage for the Superion product are considered, Mr. Maddern also presented evidence meeting "reliable evidence" factors § 199.2(1)(iii) (report of national professional medical organizations), (iv) (national medical policy organization positions); and (v) (reports of national expert opinion organizations). Likewise, the MIST report (AR1090-1114) would qualify under any or all of those subsections.

The *only* evidence in this case is that the Superion product was proven safe and effective and no countervailing evidence was presented.

The final decision's demand for an article comparing a laminectomy to the Superion product simply misses the point. Given that a laminectomy was not an option, a laminectomy was not an alternative or a "standard treatment" that the Superion product could be compared to. Indeed, this was the whole point of the "comorbidities" article. *See* AR1179-89. For Mr. Maddern, in effect, the comparison was between remaining in a wheelchair in extreme pain (even using opioids) or walking with the Superion product.

While it is not a proper comparison given the options with Mr. Maddern, the MIST report actually discussed a study comparing interspinal spacers to laminectomys. See AR1108 ("The article compared back and leg pain, ODI score, an ZCQ score between those in the IDE study treated with [interspinal spacer] and the published results for patients treated with laminectomy. The percentage improvements at 24 months uniformly favored those treated with [interspinal spacer] compared to baseline scores."). Further, Dr. Verdolin testified that the SPORT study showed efficacy in the range of 60% at three years for a laminectomy. AR1202-03. By comparison, the three

year study of the Superion product showed efficacy of between 81 and 91%. AR1053. Indeed, at five years, the Superion product demonstrated 84% efficacy. AR1064.

Thus, using the "reliable evidence" standard articulated in § 199.2, Mr. Maddern showed that the Superion product was "proven."

The final decision's contention that the Superion product is "unproven" is not supported by substantial evidence/is arbitrary and capricious.

## B. Violation of 5 U.S.C. § 557(c)

The requirements of 5 U.S.C. § 557 apply to hearings required by § 556, which, in turn, applies to hearings required by §§ 553 or 554. *See* 5 U.S.C. §§ 557(a); 556(a). Pursuant to 5 U.S.C. § 557(c):

> Before a recommended, initial, or tentative decision, or a decision on agency review of a decision of subordinate employees, the parties are entitled to a reasonable opportunity to submit for consideration of the employees participating in the decisions … (2) exceptions to the decisions or recommended decisions of subordinate employees or to tentative agency decisions.

In the Amended Complaint, Maddern alleged that, through the filing of the Complaint, Maddern was not provided a copy of the recommended decision, a reasonable opportunity to submit exceptions to the recommended decision, and that neither the recommended decision nor final decision complied with the requirements to include all findings and conclusions, the reasons or basis therefore, on all the material issues of fact, law, or discretion, or an appropriate rule, order, relief, or denial thereof. *See* Amended Complaint, Dkt. #21 at ¶ 85.

The Secretary's Answer admits that Maddern was not provided with a copy of the recommended decision or an opportunity to submit exceptions but otherwise denies the allegations. *See* Answer to Amended Complaint, Dkt #24 at ¶ 85. In particular, the Secretary denies that § 557 applies to the process at issue.

It is undisputed that Mr. Maddern was not provided with a copy of the recommended decision until after this case was filed. Thus, the only issue the Court

– 14 –

need resolve is whether § 554 (and, therefore, §§ 556 and 557) applies to TriCare cases (10 U.S.C. § 1071). As set forth by the Ninth Circuit, "Hearings compelled by reason of the due process Fifth Amendment requirement are treated for purposes of 5 U.S.C. § 554 as required 'by statute.'" *Clardy v. Levi*, 545 F.2d 1241, 1244 (9th Cir. 1976) (*citing Won Yang Sung v. McGrath*, 339 U.S. 33 (1950)). Maddern has a property interest in continued receipt of Government benefits that is protected by the Fifth Amendment due process protections. *See, e.g., Matthews v. Eldridge*, 424 U.S. 319, 332 (1976).

"This Court has consistently held that some form of hearing is required before an individual is finally deprived of a property interest. … The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id*. at 333 (cleaned up). Thus, § 554 applies to TriCare cases and the Secretary violated § 557 when he failed/refused to provide a copy of the recommended decision and/or provide Maddern with an opportunity to submit exceptions.

Indeed, the whole point of submitting exceptions is illustrated in this case. Ms. Noel's recommended decision is premised (apparently) on the idea that the Superior product is the same as a different product (the X-STOP) product and that, therefore, there is a "specific exclusion" from coverage. *See* AR1305 ("specific exclusion from coverage of a prior version of this IPD device"). Had Mr. Maddern seen the recommended decision, he could have submitted exceptions which may have prevented Dr. Yale from making the same mistakes in the final decision.

The Secretary violated § 557(c) by not providing a copy of the recommended decision to Mr. Maddern and allowing Mr. Maddern a reasonable opportunity to submit exceptions.

**C. Plaintiff's Other Causes of Action**

Plaintiff's other causes of action fall into two groups: 1) causes of action which are cumulative of the those addressed above; and 2) Plaintiff's claim of a Due Process violation. With respect to the cumulative causes of action, because they end up being cumulative, there is no point in burdening the Court with deciding them.

– 15 –
MOTION FOR SUMMARY JUDGMENT

With respect to the alleged Due Process violation, given the Court's refusal to allow discovery of the admitted *ex parte* contacts between Ms. Greer and the decision maker, Plaintiffs are unable to make the required showing.

After more than a year delay, somehow, the decision maker was informed of the need to deliver a decision within 10 days or face suit. The decision maker then did so, adopting the frivolous "defect" and "loophole" theory of Ms. Noel. In addition, Mr. Greer and Ms. Noel concealed their communications from Plaintiff's counsel. At a minimum, none of this has the appearance of impartiality/neutral decision makers.

### III.   CONCLUSION

Mr. Maddern's motion for summary judgment should be granted.

DATED:  May 9, 2022                    Respectfully submitted,

REED SMITH LLP

By: s/ Avraham E. Aizenman
Avraham E. Aizenman
Attorneys for Plaintiff, Ronald Maddern
Email:   eaizenman@reedsmith.com

By: s/ James C. Pistorino
James C. Pistorino
Attorneys for Plaintiff, Ronald Maddern
Email:   james@dparrishlaw.com

*Attorneys for Plaintiff*