RANDY S. GROSSMAN
United States Attorney
GLEN F. DORGAN (SBN 160502)
Assistant U.S. Attorney
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7665
Fax: (619) 546-7751
Email: glen.dorgan@usdoj.gov

Attorneys for Defendant LLOYD AUSTIN, Secretary U.S. Dept. of Defense

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD MADDERN,<br><br>　　　　Plaintiff,<br><br>v.<br><br>LLOYD AUSTIN, in his capacity as Secretary of the United States Department of Defense,<br><br>　　　　Defendants. | Case No. 3:21-cv-01298-MMA-BLM<br><br>**REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>DATE: June 27, 2022<br>TIME: 2:30 p.m.<br>DEPT: 3-C<br>JUDGE: Hon. Michael M. Anello |

Defendant LLOYD AUSTIN, Secretary U.S. Dept. of Defense, respectfully submits the following reply brief in support of his motion for summary judgment [ECF #32-1].

### A. DHA's Decision Was Properly Based on All Available Evidence.

Plaintiff mischaracterizes the record by arguing he "presented a mountain of evidence showing that the Superion product was proven safe and effective," and Defendant "simply chose to ignore it and deny coverage" despite "literally no evidence that the Superion product is not safe and effective." Plaintiff's Opposition [ECF #38] ("Plt Opp"), 9:14-18. To the contrary, the record demonstrates that DHA acted affirmatively to collect and evaluate all available evidence regarding Superion in advance of the final decision. Those efforts included, but were not limited to, requesting a review by MB&RD to "discern[] whether [Superion] is proven and coverable under TRICARE." AR 136.

As Plaintiff admits, MB&RD is responsible for ensuring that all medical benefits considered for cost-sharing under TRICARE are supported by scientific peer reviewed literature. Defendant's SSUF [ECF #32-2], ¶ 15; *see* Plaintiff's Response [ECF #38-1], ¶ 15. As of the date of Plaintiff's claim, MB&RD had evaluated interspinous spacer devices ("IPDs") on five separate occasions and found the devices to be "unproven." AR 773, 778. Not only did those evaluations find "a lack of well-controlled studies with a surgical comparator as a factor precluding coverage," but MB&RD also raised concerns about a number of complications that could not be fully appreciated in the absence of longer-term studies. AR 778. The depth of MB&RD's analysis is perhaps best illustrated by focusing on the agency's consideration of one such complication: reoperation rates.

As of July 2018, when MB&RD issued its Medical Benefit Determination, Superion was only the latest of three IPDs that had been introduced to the market. Previously, MB&RD had evaluated the X-STOP and another IPD called "Coflex." *See* AR 775. While initial studies showed positive results for X-STOP and Coflex, "longer-term follow up was less optimistic," leaving questions about the "long-term safety of these devices." AR 773, 775. This was true *despite* FDA approval of these devices. For example, the FDA approved X-STOP in 2005 and Coflex in 2012. AR 779-780. Yet, after FDA approval, more rigorous

long-term studies showed both IPDs "had a significantly higher risk of reoperation" as compared to a laminectomy—a serious concern because "re-operated spinal patients (in general) have a lower success rate compared to first surgeries." AR 780-81.

Compared to the available research on X-STOP and Coflex, the research regarding Superion was, as of 2018, still in its infancy. While the FDA had approved Superion in 2015 after only two years of research, AR 779, 782, no studies existed that compared Superion directly to decompressive surgery. AR 780; *see* FDA Summary, AR000224 (comparing Superion to X-Stop "at 24 months post-operatively"); *see also* 2015 Patel Study, AR 312, 318-19 ("The long-term durability of interspinous process spacers is currently unknown and requires further investigation" and "a comparison of interspinous process spacers with . . . surgical decompression was not performed").

Indeed, at the time Plaintiff received his treatment, the manufacturer of Superion was actively "recruiting for an FDA-required RCT," or randomized controlled trial, for the specific purpose of "address[ing] gaps in the evidence, namely the need for longer-term follow-ups and comparison of the Superion ISS with decompression surgery." *See* Hayes Report, AR 260 (as of 2018, the RCT was not estimated to be completed until July 2022); *see also* AR 784.

Still, MB&RD left no stone unturned in their effort to evaluate the safety and efficacy of the Superion device. The agency, for example, reviewed the two-, three-, and four-year Superion studies completed by Patel and Nunley—the same studies that Plaintiff now contends present a "mountain of evidence" regarding the safety and efficacy of Superion. AR 782. While MB&RD recognized the "limited applicability" of these studies "given that [the studies] compare two IPDs, as opposed to conservative treatment or laminectomy," MB&RD noted that the studies found the same high reoperation rates for Superion that were identified previously for X-STOP and Coflex. AR 782-783.

MB&RD then considered a 2017 study involving a "device similar to Superion, but not FDA approved in the United States." The study, MB&RD noted, was helpful because it provided context regarding the longevity of IPDs and the importance of long-term follow-

up in future IPD studies. AR 787. Based on that study, MB&RD found that reoperation rates were high and tended to increase over time. *Id*.

Next, given the absence of any studies of Superion that included a surgical comparator, MB&RD considered a study completed in 2018 of a non-FDA approved IPD that *did* include a surgical comparator. AR 783. That study again confirmed "the previously recorded high reoperation rates." AR 783.

Finally, MB&RD surveyed the community of experts and found a consensus that further studies were required before the safety and efficacy of the Superion device could be fully appreciated. AR 785-86; *see* 2017 ECRI Institute Report, AR 508 ("Findings need validation in longer-term, prospective controlled trials"); 2014 North America Spine Society Report, AR000649 (same).

Based on this evaluation, MB&RD concluded that "IPD concerns are systemic and not limited to one particular device or procedure" and "[q]uestions remain as to the long-term safety of these devices." AR 780.

Against this backdrop, there is simply no basis in the record for Plaintiff to suggest that his arguments regarding the safety and efficacy of Superion were "unrebutted" by the agency. *See* Plt Opp, 5:25-26, 7:3. And, to suggest that DHA's reliance on MB&RD amounts to "bootstrapping," *see id*., 9:7-9, is to ignore the weight of the medical literature cited by MB&RD. *See, e.g.,* 2018 Hayes Study, AR 257 ("There is insufficient evidence in the peer-reviewed medical literature to demonstrate the long-term safety, efficacy, and durability of the Superion ISS," as well as "a lack of evidence comparing Superion ISS to the established treatment for this condition, surgical decompression"). Plaintiff's mischaracterization of the record, therefore, should be rejected by this Court.

**B.    Plaintiff Failed to Meet His Burden of Proof at the Hearing**.

At the administrative hearing, Plaintiff had the burden to present "reliable evidence" demonstrating that the safety and efficacy of the Superion device compared favorably with laminectomies. 32 C.F.R. § 199.4(g)(15)(i)(C). The evidence Plaintiff highlights in his opposition brief demonstrates that he failed to meet this burden.

Specifically, Plaintiff's brief cites (1) FDA approval, (2) the AMA's CPT code revision; (3) Medicare policy; (4) the Patel and Nunley studies referenced above; (5) a separate Nunley study regarding opioid use among Superion patients; (6) the MIST paper; and (7) Dr. Verdolin's testimony. Plt Opp, 5:27-6:14.

Clearly, FDA approval and Medicare policy are not dispositive based on DHA's express policies. *See* Defendant's SSUF, ¶ 8 (citing TPM, Chpt. 1, Sec. 2.1, ¶ 7.0 and Chpt. 8, Sec. 5.1, ¶ 2.2). Moreover, as noted above, the FDA granted approval based on Patel's two-year study, *see* AR 782; Patel expressly noted in his study that a comparison of Superion with laminectomy "was not performed," AR 319; and, as of the date of Plaintiff's surgery, Superion's manufacturer was still working to complete an FDA-required RCT to address "gaps in the evidence," including a "comparison of the Superion ISS with decompression surgery," AR 260.

The revised CPT code is also not probative on the issue. According to the AMA, these codes are "informational—not endorsements of procedures or devices, or opinions about the efficacy of care or product." AR 1300 (citing AMA's public webpage). Indeed, to suggest otherwise would be to gut DHA's coverage determination responsibilities in favor of complete deference to the AMA (a private lobbying organization) and to the exclusion of other medical professional organizations. *See, e.g.,* 2017 ECRI Institute Report, AR 508 ("Findings need validation in longer-term, prospective controlled trials").[1]

The Patel and Nunley studies are also immaterial, because they did not include a surgical comparator. Defendant's SSUF, ¶ 23. Moreover, these studies are suspect given the potential for bias. *See* AR 312 ("VertiFlex Inc. San Clemente, CA, funds were received in support of this work"); AR 324 (same); AR 335 (same); *see also* MB&RD Determination, AR 783; 2018 Hayes Study, AR 260 ("All of these studies were limited by methodological

---

[1] Notably, as of the date of Plaintiff's surgery, DHA was not alone in considering the Superion device to be unproven notwithstanding the change in CPT coding. The 2018 Hayes Study identifies seven private insurance companies that all considered the Superion device to be investigational and uncovered by their respective medical policies. AR 273.

4

weaknesses, potential bias, and lack of long-term follow-ups. The evidence is also limited by lack of trials that directly compare the Superion ISS with decompression surgery.").

Similarly, the Nunley study concerning opioid usage for Superion patients is immaterial. *See* AR 1073-78. Opioid usage is just one of numerous factors that must be considered in evaluating the safety and efficacy of a medical device. Moreover, contrary to Plaintiff's contention, *see* Plt Opp, 6:5-7, the study was restricted *exclusively* to Superion patients and did not include a surgical control group. AR 1074. Finally, like the other studies Plaintiff relies on, this study was financed by Superion's manufacturer. *See* AR 1077.

The MIST paper, published by a "consensus group," is simply a review and evaluation of existing medical literature. AR 1091. Like the other studies, the MIST paper does "not compar[e] spacers to open decompression." AR 1109. Additionally, when the group evaluated Superion, its conclusions were lukewarm at best. For example, the group characterized the available evidence of the safety and efficacy of the product as "Level I," the lowest tier of evidence levels under the MIST guidelines. *Id.*; *see* AR 1092 (identifying "Level 1" as "[a]t least 1 controlled and randomized clinical trial, properly designed"). And, the group ultimately gave Superion a "Grade B" recommendation, a mid-point grade that recognizes "at least moderate evidence that the measure is effective and that benefits exceed harms." AR 1109, 1092.

Finally, Plaintiff places emphasizes two aspects of Dr. Verdolin's testimony. First, he highlights Dr. Verdolin's estimate of a 60% efficacy rate for laminectomies as reported in a published "SPORT trial." *See* Plt Opp, 6:10-14. This testimony, however, is immaterial, because (1) Plaintiff did not introduce the publication of the SPORT trial in evidence to substantiate Dr. Verdolin's estimate and merely questioned Dr. Verdolin about his recollection of the study, *see* AR 1199-1203, (2) Dr. Verdolin admits the study only evaluated "laminectomy versus no treatment," and did not include an evaluation of the Superion product, AR 1199, and (3) there is no evidence or testimony explaining how "efficacy" is defined by the SPORT study, how this rate was calculated, or how the underlying study was conducted.

Second, Plaintiff argues, based on Dr. Verdolin's testimony, that Plaintiff was not a candidate for laminectomy. *See* Plt Opp, 6:15-16. Plaintiff's argument, however, misconstrues Dr. Verdolin's testimony. *See* AR 1203-05 (generally describing the risks of laminectomy for certain patients, including Plaintiff). And, in any event, Dr. Verdolin's opinion is immaterial because (1) a provider's "personal professional opinion" or "personal treatment or procedure of choice" is excluded from the definition of "reliable evidence" regarding the safety of a medical device, 32 C.F.R. § 199.2; and (2) a disqualification as a candidate for one procedure does not automatically render another procedure safe and effective. To suggest otherwise would be to improperly reduce coverage decisions to a case-by-case analysis to be determined by each beneficiary's treating physician.

While Plaintiff argues that the above-identified developments, studies, and testimony somehow amount to a "mountain of evidence," he must concede that the "mountain" he relies on provides *no* guidance whatsoever on the one critical issue for coverage—whether Superion is as safe and effective as a laminectomy. The Court, therefore, should grant summary judgment in favor of Defendant on Counts II and III.

### C. Provisions of the TPM Cannot Be Construed in Isolation.

Plaintiff argues this case is controlled by a provision in the TPM that generally states that FDA-approved devices are covered. Plt Opp, 2:15-22 (quoting TPM Chpt. 4, Sect. 6.1, para. 4.1). Yet, this provision must be interpreted consistent with other provisions of the TPM that specify that FDA market approval is merely a condition precedent to coverage, "[n]ot all FDA approved devices are covered," and any device "whose safety and efficacy has not been established is unproven and excluded from coverage." *See* Defendant's SSUF, ¶ 8 (quoting TPM Chpt. 8, Sect. 5.1, para. 2.2, TPM Chpt. 1, Sect. 2.1, ¶ 1.0).

Plaintiff improperly suggests that the Court should disregard these other provisions of the TPM simply because they are not referenced in the final decision. Plt Opp, 2:27-3:3. The authority cited by Plaintiff for this proposition—*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29 (1983)—is inapposite. In that case, the Court articulated the well-settled rule that an agency's "*post hoc* rationalizations for agency action" must be

disregarded. *Id.* at 50. DHA's reliance on TPM Chpt. 8, Sect. 5.1, however, is not *post hoc*. In a letter to Plaintiff prior to the hearing, DHA wrote to "explain the unproven care exclusion from TRICARE" and, in this context, expressly cited to TPM Chpt. 8, Sect. 5.1, para. 2.2, when it advised Plaintiff that FDA approval "is not necessarily sufficient on its own to demonstrate the care is proven." AR000708, 710. AJ Noel then referenced the provision in her recommended decision, and the final decision properly incorporated her findings and conclusions. AR001304, 1314; *see* 32 C.F.R. § 199.10(e)(1).

Moreoover, DHA was only required to provide a "brief statement" regarding its coverage denial in the final decision. 5 U.S.C. § 555(e). The agency was not required to address every fact and argument. *See, e.g., City of Colo. Springs v. Solis*, 589 F.3d 1121, 1134 (10th Cir 2009) (a denial is sufficient if it provides the "grounds of decision and the essential facts upon which the administrative decision was based"). In this case, it did far more than that, incorporating every finding of AJ Noel into the Final Decision, demonstrating a rational connection between the decision and the findings of fact. *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010).

The Court, therefore, should reject Plaintiff's sleight-of-hand attempt to read provisions of the TPM in isolation and should grant summary judgment in favor of Defendant on Counts II and III.

**D.    DHA Properly Applied the Exclusion in the TPM**.

It is undisputed that Plaintiff identified his claim by referencing HCPC Code C1821, which applies to all "interspinous process distraction devices." Defendant's SSUF ¶ 6. Because the TPM expressly excluded procedures assigned to this HCPC Code, *see* Defendant's SSUF ¶ 8 (citing TPM Chpt. 4, Sec. 6.1, para. 5.0), DHA properly applied the exclusion in this case. *See* AR001314.[2]

---

[2] Plaintiff incorrectly states that "Dr. Yale's decision was founded on the notion that there was no exclusion." Plt Opp, 4:10. To the contrary, he cited the exclusion provision at issue and concluded that the TPM "made is sufficiently clear that procedures performed under the codes related to the insertion of interspinous devices were considered unproven and would not be covered." AR 1314.

Plaintiff ignores this inconvenient fact and instead focuses on the reference to X-STOP in the exclusion provision. Plt Opp., 4:22-24. Plaintiff's interpretation of this provision would effectively obligate the agency to update its TPM every time a new product—substantially similar to an excluded product and associated with the same excluded billing code—is introduced to the market. This is the type of "loophole" that AJ Noel and the Director reasonably concluded did *not* exist. *See* AR 1305, 1314.

Since 2007, DHA has actively and repeatedly evaluated IPDs as each product is introduced to the market, and in each instance DHA has concluded that the devices are unproven and excluded from coverage. *See* AR 778. Because DHA's interpretation of the exclusion provision in the TPM is reasonably consistent with this history—described as a "long-standing DHA position" in the final decision, AR 1314—the Court must reject Plaintiff's argument and find for Defendant on Counts II and III. *See Palomar Med. Ctr. v. Sebelius*, 693 F.3d 1151, 1160 (9th Cir. 2012) (affording "substantial deference" to an agency's interpretation of its regulations).

### E.   Count VII Fails.

Count VII of the FAC is based on an allegation that Defendant violated 5 U.S.C. § 557(c) by failing to afford Plaintiff an opportunity to review and comment on the recommended decision. FAC [ECF #21], ¶¶ 84-86. Plaintiff admits this provision only applies if a hearing is "required by statute," and he does not dispute the absence of any such requirement in TRICARE's governing statute. Plt Opp, 9:22-25. Instead, he relies on *Won Yang Sung v. McGrath*, 339 U.S. 33 (1950) and *Clardy v. Levi*, 545 F.2d 1241 (9th Cir. 1976) for the bold proposition that *all* administrative hearings involving a constitutionally-protected property interest are "required by statute." Plt Opp, 10:7-14.

As explained in detail in Defendant's brief in opposition to Plaintiff's separate motion, *Mathews v. Eldridge*, 424 U.S. 319 (1976)—not *Won Yang Sung* or *Clardy*—controls in determining whether the Fifth Amendment obligates certain due process protections in an administrative appeal process. *See* Opposition [ECF #37] 9:1-10:25. Courts applying *Mathews* recognize a distinction between the protections of the Fifth

Amendment and the formal adjudicative procedures under the APA. *See 2-Bar Ranch Limited Partnership v. United States Forest Service*, 996 F.3d 984, 995 (9th Cir. 2021). Accordingly, where, as here, the plaintiff "had an opportunity to be heard at a meaningful time and in a meaningful manner" thereby satisfying due process, courts do not require that an agency also comply with provisions of the APA that are "directly and by cross-reference . . . inapplicable." *See id.* at 994-95 (internal quotes and citations omitted). Because Section 557(c) is expressly inapplicable to these proceedings, therefore, the Court should grant summary judgment in favor of Defendant on Count VII.[3]

**F.     Plaintiff's Last-Minute Effort To Revive Count VI and VIII Must Fail**.

Counts VI and VIII allege improper *ex parte* contacts. FAC, ¶¶ 83, 89. In his separate motion for summary judgment, Plaintiff admitted that the Court's prior denial of his discovery demand rendered him "unable to make the required showing" on these claims, Motion [ECF #33-1], 16:1-3, and he repeats that admission in his opposition brief, Plt Opp, 11:21-23 ("Maddern lacks evidence to prove his claim"). Still, Plaintiff cannot resist making unsupported assertions in his opposition to Defendant's motion. *See, e.g.*, Plt Opp., 11:6-8 (arguing—without any evidence—that agency representatives engaged in improper *ex parte* communications and "colluded to conceal the communications from [Plaintiff]"). The Court should ignore these unfounded and immaterial attempts to disparage the agency and grant Defendant's motion as to Counts VI and VIII.

///
///
///
///

---

[3] Should the Court disagree, the denial of an opportunity to review and comment on the recommended decision amounts to harmless error, because Plaintiff suffered no prejudice having been afforded a full opportunity to present his case. *See* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"). Alternatively, the remedy is not, as Plaintiff suggests, an "order finding that [the] claims are covered." *See* FAC, ¶ 86. The remedy is a remand to the agency to afford Plaintiff an opportunity to comment on the recommended decision and permit the agency to issue a new final decision that considers those comments. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

**G.  Conclusion**.

Based on the foregoing, Defendant respectfully requests that the Court grant its motion for summary judgment and decide all Counts of the First Amended Complaint in Defendant's favor.

Date:  June 17, 2022

RANDY S. GROSSMAN
United States Attorney

By  /s/ *Glen F. Dorgan*
GLEN F. DORGAN
Attorneys for Defendant