1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

11  RONALD MADDERN,

12                                    Plaintiff,

13  v.

14  LLOYD AUSTIN,

15                                    Defendant.

16

17

18

19

Case No. 21-cv-1298-MMA (BLM)

**ORDER AFFIRMING IN PART TENTATIVE RULINGS RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

[Doc. Nos. 32, 33]

20        Plaintiff Ronald Maddern ("Plaintiff") brings this action against Defendant Lloyd

21  Austin, in his official capacity as Secretary of the United States Department of Defense

22  ("Defendant") pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 706 *et*

23  *seq.* and the Due Process Clause of the Fifth Amendment of the United States

24  Constitution.  *See* Doc. No. 21 ("FAC").  On October 12, 2022, the parties appeared

25  before the Court for a hearing on their cross-motions for summary judgment.  *See* Doc.

26  Nos. 32, 33.  In anticipation of the hearing, the Court issued tentative rulings on the

27  pending motions.  *See* Doc. No. 47.  For the reasons set forth below, the Court

28  **AFFIRMS IN PART** its tentative rulings.

# I. BACKGROUND[1]

Plaintiff is a retired U.S. Army service member and beneficiary under TRICARE for Life ("TriCare") and Medicare.  *See* Doc. No. 32-1 at 6.  Generally speaking, Plaintiff challenges the Defense Health Agency's ("DHA") denial of his medical reimbursement claim.

## A.    Plaintiff's Medical History, Treatment, and Procedures

Plaintiff began suffering from back pain in 2000, and following his retirement, Plaintiff was diagnosed with lumbar spinal stenosis ("LSS").[2]  *See* Doc. No. 33-1 at 4.  Plaintiff was confined to a wheelchair for some 14 years.  *Id.*; Doc. No. 43 ("Administrative Record" or "AR") 1149–52.[3]  During this time, Plaintiff attempted a variety of treatments to address his condition, including physical therapy, steroid shots, radio-ablation, and opioid patches.  *Id.*; AR 1146–49.  Unfortunately, none of the treatments were successful.  *Id.*

On August 7, 2017, Plaintiff underwent surgery to implant a Vertiflex Superion Interspinous Process Decompression ("IPD") System (the "Superion Device") into his vertebrae ("First Surgery").  Doc. No. 38-1 ("Defendant's Separate Statement" or "DSS") No. 1.  On November 9, 2017, Plaintiff underwent a second surgery to implant another Superion Device at a different vertebrae level ("Second Surgery").  DSS No. 2.

The Superion Device received pre-market approval from the Food and Drug Administration ("FDA") prior to Plaintiff's procedures.  Doc. No. 37-1 ("Plaintiff's Separate Statement" or "PSS") No. 5.  The Superion Device is an interspinous spacer that

---

[1] These material facts are taken from the parties' separate statements of undisputed material facts, *see* Doc. No. 32-2, Doc. No. 36, and responses thereto, *see* Doc. No. 37-1, Doc. No. 38-1, as well as the administrative record, *see* Doc. No. 43.  This section includes background information that may not be material to the present motions but nevertheless included for context.  Particular material facts that are not recited in this section may be discussed *infra* where appropriate.

[2] Lumbar spinal stenosis is the narrowing of space between the vertebrae which leads to compression of the blood supply and nerves in the spinal column.  *See* Doc. No. 33-1 at 4; Doc. No. 43 at 838–39.

[3] All Administrative Record pagination citations refer to the Bates numbering.

fits between the vertebrae.  DSS No. 3.  It is used to treat LSS, and it is an alternative to a surgical laminectomy.  DSS No. 3.  The parties dispute whether a laminectomy is the "standard means of treatment" for LSS.  DSS. No. 3.  However, it is undisputed that Plaintiff's physicians believed the Superion Device Procedure was Plaintiff's safest treatment option.  PSS No. 7.

**B.      Comparison of IPDs and Laminectomy**

A laminectomy was described by Plaintiff's physician, Dr. Michael Verdolin, as an irreversible, partial amputation of the spine.  AR 1198.  The patient is required to undergo general anesthesia to have the surgery performed.  AR 1196.  An incision 3 inches tall by 2 inches wide is made in the patient's back to remove muscle and bone from the spine.  AR 1197.  The procedure is done using a variety of tools, including a chisel, a drill, and a tool Dr. Verdolin described as a "pipe wrench."  AR 1197–98.  The surgery can take anywhere from one to several hours, and typically requires an overnight stay.  AR 1199.  The procedure carries the risk of significant blood loss in addition to potential complications with general anesthesia.  AR 1198.  Dr. Verdolin estimated that the standard blood loss during a laminectomy is one pint, and often a transfusion is required.  AR 1200.

Implantation of an IPD, such as the Superion Device, is an outpatient surgery that uses only local anesthesia.  AR 1207, 1210.  A one-half inch vertical incision is made and, using x-ray technology, the decompression device is inserted into the spine.  AR 1207.  The entire procedure takes 15 minutes.  AR 1208.  There is no blood loss or damage to any bone, and the procedure is reversible.  AR 1208.  The incision is closed using two small sutures and a band-aid.  AR 1210.  The patient can go home within 15 minutes of the procedure.  AR 1210.  And the procedure does not require any follow-up care.  AR 1212.

**C.      Comparison of Plaintiff's Condition Pre- and Post-Surgery**

As noted, prior to Plaintiff's procedures he was confined to a wheelchair for roughly 14 years.  AR 1151–52.  He was in constant extreme pain, had very little

mobility, and was unable to care for himself.  AR 1149–52.  Over the years, Plaintiff had tried a variety of treatments, but none were successful.  AR 1146–49.

Just two days after the procedure Plaintiff was able to walk again.  AR 1156. Since the procedures, Plaintiff no longer needs a wheelchair.[4]  AR 1158.  He is now able to care for himself, he can enjoy activities, and his overall attitude and mental health has improved.  AR 1175–78.  Plaintiff has been able to travel and visit Big Bear, California, Yellowstone National Park in Wyoming, and Zion National Park, Utah.  AR 1157. Importantly, Plaintiff no longer needs opioid patches.  Doc. No. 33-1 at 10.  Plaintiff testified at the hearing that both his mobility and quality of life have completely changed for the better since the procedures.  AR 1156–57.

**D.   Claim for Reimbursement, Denial, and Appeal**

On August 17, 2017, Plaintiff submitted a claim to TriCare for reimbursement of the cost of the First Surgery.  DSS. No. 4.  In 2017, the TriCare Policy Manual ("TPM") contained two relevant provisions.

First, the TPM provided: "Any . . . device, . . . or procedure whose safety and efficacy has not been established is unproven and excluded from coverage."  TPM, ch. 1, sec. 2.1, ¶ 1.0;[5] AR 1318 (the "Unproven Exclusion").  To that end, the TPM and TriCare regulations provided that a device is unproven "[u]nless reliable evidence shows that [it] has been the subject of well-controlled studies of clinically meaningful endpoints, which have determined . . . its safety[] and its efficacy as compared with standard means of treatment."  32 CFR § 199.4(g)(15)(i)(C); TPM, ch. 1, sec. 2.1, ¶ 2.3.

Second, the TPM also expressly excluded "XSTOP Interspinous Process Decompression System (CPT procedure codes 0171T and 0172T, HCPCS code C1821)

---

[4] But he opts to use it to stabilize his legs occasionally, such as on very long days that include a large amount of walking.  AR 1158.
[5] All references to the TPM and other regulations and statutes are to the versions in effect at the relevant time.

for the treatment of neurogenic intermittent claudication secondary to lumbar spinal stenosis" as "unproven."  TPM, chpt. 4, sec. 6.1, ¶ 5.9 (the "X-Stop Exclusion").

Plaintiff's bill identified his procedure by Current Procedural Terminology ("CPT") code 22869 and Healthcare Common Procedure Coding System ("HCPCS") code C1821.  DSS No. 6; AR 13.

According to the DHA, CPT code 22869 is the:

> Insertion of interlaminar/interspinous process stabilization/distraction device, without open decompression or fusion, including image guidance when performed, lumbar; single level.

AR 779.  And HCPCS code C1821 is described as: "Interspinous process distraction device (implantable)."  AR 779.

Medicare reimbursed Plaintiff $9,232 for the First Surgery.  DSS No. 9.  TriCare denied Plaintiff's claim for reimbursement as to the remaining amount of $2,378 in late 2017.  DSS No 10.

On March 5, 2018, Plaintiff appealed and requested reconsideration of TriCare's denial to the Wisconsin Physicians Service ("WPS").  DSS No. 11; AR 45.  On March 12, 2018, WPS upheld the denial.  DSS No. 12; AR 47–57.  The WPS letter quoted TriCare's Unproven Exclusion, as well as the X-Stop Exclusion.  AR 48–49, 52.  The letter explained:

> Procedure code 22869, insertion of interlaminar/interspinous process stabilization/distraction device, without open decompression or fusion, including image guidance when performed, lumbar; single level denied as non-covered service. This procedure falls into the X-Stop category in that these devices are considered investigational for the stand-alone treatment of spinal stenosis and is excluded per statute or policy.

AR 55.

WPS determined that "Benefits must remain denied for this claim."  AR 56.

On April 9, 2018, Plaintiff appealed and requested formal review from the DHA's Office of General Counsel Appeals, Hearings and Claims Collection Division ("AHCC"). DSS No. 14.

During its review, AHCC submitted a request to the DHA's Medical Benefits and Reimbursement Division ("MB&RD") for a determination regarding TriCare coverage of interspinous spacer devices, including the Superion Device. DSS No. 15.

On July 31, 2018, MB&RD issued a Medical Benefit Determination finding "insufficient evidence to recommend the use of [interspinous spacer devices like Superion] for the treatment of [lumbar spinal stenosis]." DSS No. 17. Namely, the MB&RD found "that there is not sufficient reliable evidence to establish that IPDs for the treatment of neurogenic claudication and/or LSS is proven safe and effective." AR 789.

On December 7, 2018, AHCC issued a formal review decision, denying the claim and concluding that the Superion Device was "unproven in the treatment" of Plaintiff's condition, LSS. DSS No. 18. AHCC informed Plaintiff that he had a right to request a hearing pursuant to 32 C.F.R. § 199.10(d). DSS No. 18. On February 5, 2019, Plaintiff requested a hearing. DSS No. 19.

A hearing before an Administrative Law Judge ("ALJ") was held on August 22, 2019. DSS No. 20. On January 21, 2020, the ALJ issued a recommendation to the then-Acting Chief of TriCare, Dr. Kenneth Yale, that the claim remain denied. DSS No. 24; AR 1314. On May 18, 2021, the DHA issued a final decision adopting the ALJ's recommendation and denying Plaintiff's claim for reimbursement. DSS No. 25.

Plaintiff did not obtain a copy of the ALJ's recommendation until after he initiated the present action. Doc. No. 33-1 at 13.

**E.    Procedural History**

*1.    Pleadings and Discovery*

Plaintiff initiated this action on July 19, 2021. *See* Doc. No. 1. On September 27, 2021, Defendant filed an answer. *See* Doc. No. 4. In December 2021, Plaintiff filed a motion for leave to file an amended complaint, *see* Doc. No. 8, as well as a motion for

discovery, *see* Doc. No. 9.

On January 28, 2022, United States Magistrate Judge Barbara Lynn Major denied Plaintiff's motion for discovery. *See* Doc. No. 23.  Generally speaking, Plaintiff sought to open discovery with respect to communications following the hearing before the ALJ.  Plaintiff was and remains suspicious about the timing of the decision, a point discussed further *infra* section III.D.  He speculates that there were improper conversations between the ALJ and the DHA.

Judge Major denied Plaintiff's motion, reasoning that mere speculation that improper communications might exist was insufficient to demonstrate a strong showing of bad faith under the fourth exception enumerated in *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005).  *See* Doc. No. 23.  Plaintiff timely objected to Judge Major's ruling pursuant to Federal Rule of Civil Procedure 72(a).  *See* Doc. No. 25.  The Court overruled Plaintiff's objection.  *See* Doc. No. 29.  In sum, the Court found that Plaintiff's Due Process claim essentially overlapped his APA claims and therefore discovery is limited to certain exceptions.  The Court agreed with Judge Major that Plaintiff failed to meet his burden of showing that an exception existed warranting extra-record discovery.

The Court nonetheless granted Plaintiff leave to amend his Complaint, *see* Doc. No. 20, and on January 24, 2022, Plaintiff filed a First Amended Complaint, *see* FAC.

By way of his First Amended Complaint, Plaintiff brings eight causes of action against Defendant.  In Claim One, Plaintiff asks the Court to "compel agency action unlawfully withheld or unreasonably delayed" pursuant to 5 U.S.C. § 706(1).  Through Claims Two, Three, Four, and Five, Plaintiff asks the Court to reverse the DHA's decision on the grounds that it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C § 706(2)(C), "without observance of procedure required by law," 5 U.S.C § 706(2)(D), and "unsupported by substantial evidence," 5 U.S.C § 706(2)(E), respectively.  In essence, Plaintiff's first five causes of action seek review of the denial of his claim on various

statutory grounds.  Plaintiff's remaining three causes of action stem from a failure to follow APA procedure and alleged bias and improper contacts on appeal.  Specifically, Plaintiff's sixth cause of action is for violation of 5 U.S.C. § 554(d)(1) and (2) for improper *ex parte* communications and lack of a neutral decisionmaker.  Seventh, Plaintiff asserts that the review process was conducted in violation of 5 U.S.C. § 557(c).  Finally, Plaintiff contends in his eighth claim that his Fifth Amendment right to Due Process was violated when he was not given notice and an opportunity to be heard before an impartial and disinterested decision maker.

### 2.    *Motions for Summary Judgment*

On May 7, 2022, Defendant filed a motion for summary judgment, and on May 9, 2022, Plaintiff filed his cross-motion for summary judgment.  *See* Doc. Nos. 32, 33.  Both parties filed their oppositions and replies on June 13 and June 17, respectively.  *See* Doc. Nos.  37–40.  On June 22, 2022, the Court took the motions under submission.  *See* Doc. No. 41.

Upon further review of the parties' briefing and the Administrative Record, the Court determined that oral argument was appropriate and so set the matters for hearing.  *See* Doc. No. 44.  On October 12, 2022, the parties appeared before the Court for oral argument on the motions.  *See* Doc. No. 48.

## II. APPLICABLE LAW

### A.    Summary Judgment Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial burden of establishing the basis of its motion and of identifying the portions of the declarations, pleadings, and discovery that demonstrate absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party has "the burden of showing the

absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). A fact is material if it could affect the "outcome of the suit" under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *See id.*

If the moving party meets its burden, the nonmoving party must go beyond the pleadings and, by its own evidence or by citing appropriate materials in the record, show by sufficient evidence that there is a genuine dispute for trial. *See Celotex*, 477 U.S. at 324. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . .." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A "scintilla of evidence" in support of the nonmoving party's position is insufficient; rather, "there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252. Moreover, "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

Where cross motions for summary judgment are at issue, the court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006) (citations omitted). That said, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

**B.     Administrative Procedure Act Judicial Review**

The APA governs decision making by most federal agencies.  *See Cornejo-Barreto v. Seifert*, 218 F.3d 1004, 1012 (9th Cir. 2000), *overruled on other grounds*.  Central to the administrative scheme is the APA's guarantee of judicial review by federal courts of "final agency action[s] for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  The Court does not apply the Federal Rule of Civil Procedure 56 standard to review an administrative agency's final decision under the APA.  *See Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985); *see also Tolowa Nation v. United States*, 380 F. Supp. 3d 959, 962 (N.D. Cal. 2019); *Benhoff v. United States Deptt of Justice*, No. 16-cv-1095-GPC (JLB), 2017 U.S. Dist. LEXIS 30612, 2017 WL 840879, at *4 (S.D. Cal. Mar. 3, 2017) ("[T]he standard on summary judgment in a standard civil case is different than reviewing an agency decision in an APA case.").  The Ninth Circuit has clearly differentiated summary judgment in a standard civil case from summary judgment as a means for a district court to review a final agency decision:

> [The District Court] is not required to resolve any facts in a review of an administrative proceeding. Certainly, there may be issues of fact before the administrative agency. However, the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did. *De novo* factfinding by the district court is allowed only in limited circumstances that have not arisen in the present case. The appellant confuses the use of summary judgment in an original district court proceeding with the use of summary judgment where, as here, the district court is reviewing a decision of an administrative agency which is itself the finder of fact. In the former case, summary judgment is appropriate only when the court finds there are no factual issues requiring resolution by trial. In the latter case, summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.

*Occidental Eng'g Co.*, 753 F.2d at 769–70 (citations omitted).

Thus, when reviewing an agency's decision, the district court sits as an appellate body "to determine whether or not as a matter of law the evidence in the administrative

record permitted the agency to make the decision it did." *Id.* at 769.  Accordingly, the district court is "limited to review of the administrative record."  *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1436 (9th Cir. 1988) (citing *Friends of the Earth v. Hintz*, 800 F.2d 822, 828 (9th Cir. 1986)).  The Court does not focus on "some new record made initially in the reviewing court."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).  "The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."  *Animal Def. Council*, 840 F.2d at 1436 (quoting *Fla. Power & Light Co.*, 470 U.S. at 743–44).

Pursuant to the APA, the Court determines whether the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205–06 (9th Cir. 2004).  To fulfill its obligations, the Court must conduct a "thorough, probing, in-depth review" of the administrative record.  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency."  *Id.* at 416.

The Court reviews whether the agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983); *see also Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105 (1983).

Courts should "defer to an agency's scientific or technical expertise."  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005); *Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers*, 384 F.3d 1163, 1177–78 (9th Cir. 2004)

(when a technical question is complex and qualified scientists disagree, court must give "substantial deference" to agency's judgment) (citing *Baltimore Gas*, 462 U.S. at 103). And an agency's "interpretation of its own regulation is entitled to deference." *Akiak Native Cmty. v. U.S. EPA*, 625 F.3d 1162, 1167 (9th Cir. 2010); *but see Northwest Envtl. Defense Ctr. v. Brown*, 617 F.3d 1176, 1180 (9th Cir. 2010) (deference not afforded when "that interpretation is plainly erroneous, inconsistent with the regulation, or based on an impermissible construction of the governing statute").

**C.    The Dependents' Medical Care Act and TriCare**

In 1956, Congress established a military health care system to "create and maintain high morale in the uniformed services by providing an improved and uniform program of medical and dental care for members and certain former members of those services, and for their dependents." Dependents' Medical Care Act, Pub. L. No. 84-569; 1956 U.S.C.A.A.N., p. 1971, 10 U.S.C. § 1071 *et seq*. As the Supreme Court has noted, the Act was passed "in an effort to attract career personnel through reenlistment" and was designed "to revise and make uniform the existing law relating to medical services for military personnel." *Frontiero v. Richardson*, 411 U.S. 677, 679, 681 n.6 (1973). Pursuant to the Act, the DoD has implemented regulations for the administration of the health care program, originally the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), which became TriCare in 1995. *See* 32 C.F.R. § 199.

TriCare was established as a successor to CHAMPUS to provide a comprehensive managed health care program, including health benefits, to beneficiaries as described in 32 C.F.R. § 199.3. TriCare is administered by the federal government "through modernized managed care support contracts that include special arrangements with civilian sector health care providers." 32 C.F.R. §199.17(a)(1). WPS is one such contractor and provides administrative services for TriCare, including processing claims, preparing checks for payment to healthcare providers, and pursing recoupment of overpayments to healthcare providers providing benefits to TriCare beneficiaries. Defendant as the Secretary of Defense is responsible for administering the TriCare

program and making any decisions affecting the program.  10 U.S.C. § 1073.

TriCare is a statutory program of medical benefits that is similar to a private insurance program in many ways but is not identical.  Similar to private insurance, Defendant as the Secretary of Defense has developed the TPM, which "contains operational policy necessary to efficiently implement the Code of Federal Regulations at 32 CFR 199."[6]  The TPM expressly incorporates by reference the American Medical Association's Physicians' CPT coding "to describe the scope of services potentially allowable as a benefit, subject to explicit requirements, limitations, and exclusions, in [the TPM] or in the 32 CFR 199."[7]  With respect to medical benefits, the TPM provides that procedures "may be cost-shared only when the procedure is 'appropriate medical care" <u>and</u> is 'medically or psychologically necessary' <u>and</u> is not 'unproven' as defined in the 32 CFR 199.4(g)(15), and the procedure is not explicitly excluded in the TRICARE program."[8]

### III. DISCUSSION

On May 18, 2021, the DHA issued a final decision, completing the administrative review process under 32 CFR § 199.10, and that decision is therefore subject to judicial review under the APA.  AR 1311–14.

As noted above, Plaintiff brings eight causes of action against Defendant.  Both parties move for summary judgment.  Defendant seeks summary judgment in his favor as to all eight claims.  Plaintiff seeks judgment in his favor as to Claims 2, 4, and 7.  The Court addresses each claim in turn.

---

[6] The Court takes judicial notice of the relevant portions of the TPM not in the Administrative Record. *See* U.S. Dept. of Defense, Defense Health Agency, TRICARE Operations Manual 6010.59-M, Foreword, April 1, 2015, *available at* https://manuals.health.mil/pages/DisplayManualHtmlFile/2022-09-16/AsOf/TP15/FOREWORD.html (last visited Oct. 5, 2022).

[7] TRICARE Policy Manual 6010.60-M, ch. 1, sec. 1.1, ¶ 3.4.1.2, April 1, 2015, *available at* https://manuals.health.mil/pages/DisplayManualHtmlFile/2022-09-16/AsOf/TP15/C1S1_1.html (last visited Oct. 5, 2022).

[8] *Id.* ¶ 3.4.1.3.

**A.      Claim One: Section 706(1)**

Defendant moves for summary judgment as to Plaintiff's first cause of action brought pursuant to 5 U.S.C. § 706(1).  *See* Doc. No. 32-1 at 21.  Section 706(1) provides for a cause of action to compel agency action when the agency has failed to take a discrete action that a statute or regulation requires it to take.  *See* 5 U.S.C. § 706(1).

The United States Supreme Court's decision in *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), limits failure to act claims under § 706(1) of the APA.  Simply, a "failure to act" differs from a "denial."  *Id.* at 63.  In *Norton*, the Supreme Court equated a "denial" with the agency's act of saying no to a request.  *Id.*  By contrast, a "failure to act" constitutes "the omission of an action without formally rejecting a request," such as the "failure to promulgate a rule or take some decision by a statutory deadline."  *Id.*  The Supreme Court emphasized that "a failure to act" properly must be understood to be limited "to a *discrete* action."  *Id.* (emphasis in original).  In fact, the only actions that courts can compel agencies to take are those "legally *required*."  *Id.* (emphasis in original).

Plaintiff has not identified any action that Defendant is legally required but has failed to take and consequently, he "has not pleaded a genuine § 706(1) claim."  *Ecology Ctr., Inc. v. United States Forest Serv.*, 192 F.3d 922, 926 (9th Cir. 1999).  Even assuming Plaintiff is entitled to remand, the DHA's denial is not an omission and therefore is outside the scope of a § 706(1) claim.  Plaintiff seemingly concedes that he is not entitled to summary judgment on this claim, *see* Doc. No. 33-1 at 18, and stated that this claim is "not in play" at the hearing.  Accordingly, the Court **GRANTS** summary judgment in favor of Defendant as to Plaintiff's first cause of action brought pursuant to 5 U.S.C. § 706(1).

**B.      Claim Two: Section 706(2)(A)**

Both parties move for summary judgment as to Plaintiff second cause of action brought pursuant to § 706(2)(A).  To state a claim under § 706(2)(A), a plaintiff must allege that the agency action is "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." 5 U.S.C. § 706(2)(A).  The Court will uphold the agency action if the agency has considered the relevant data and articulated a rational connection between the facts found and the choice made.  *See State Farm*, 463 U.S. at 43.

### 1.    The DHA and ALJ Decisions

As an initial matter, it is the DHA's final decision that is subject to judicial review. "[T]he Administrative Procedure Act . . . contemplates that administrative law judges . . . act as front-line decision-makers whose decisions are subject to potential review by agency heads."  33 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 8392 (2d ed. 2022).  Because of these internal layers of review, "[t]he rule in such cases is that courts review the agency's decision (i.e., the decision of the agency head), not the decision of the ALJ or other low-level adjudicators."  *Id.*  However, the ALJ's decisions and findings "remain a part of the administrative record that courts may consider as they determine whether to uphold the agency's action."  *Id.*

A more detailed discussion of the DHA's and ALJ's decisions will be included where appropriate *infra*.  However, the following is the relevant majority of the DHA's analysis and decision:

> As noted above, the Appealing Party carries the burden of proof to establish entitlement to benefits by substantial evidence.  The Beneficiary failed to meet his burden of proof when it came to establishing entitlement to cost-sharing of the Vertiflex® Superion® interspinous process spacer procedure.  There have not been any studies directly comparing the efficacy of the Vertiflex® Superion® interspinous process spacer procedure to that of laminectomy, only studies comparing the efficacy of the X-STOP Interspinous Process Decompression System.
>
> The articles in the record establish that Vertiflex® Superion® is not inferior to the now-discontinued X-STOP device as a treatment for lumbar spinal stenosis.  This finding of non-inferiority is not sufficient to reclassify the Vertiflex® Superion® device from unproven to proven care.
>
> At the time of Beneficiary's August 2017 procedure, the TPM specially identified the X-STOP device and the associated procedure codes, 0171T, 0172T, and C1821 as excluded care.  The TPM did not specifically address the status of the Vertiflex® Superion® or the CPT code 22869.  However, this

defect is administrative, not substantive and did not create a loophole for the coverage of the Vertiflex® Superion® device or represent a change in the long-standing DHA position classifying the Vertiflex® Superion® interspinous process spacer procedure as unproven care. The TPM in effect at the time of Beneficiary's procedures made it sufficiently clear that procedures performed under the codes related to the insertion of interspinous devices were considered unproven care and would not be covered.

While the overall health of the Beneficiary is a cogent medical reason for treatment, I am constrained by statutory and regulatory authorities to adjudicate the benefit on the basis of specific criteria. In my opinion, the Hearing Officer, in the Recommended Decision, adequately stated and analyzed the issues, applicable authorities, and evidence regarding the Vertiflex® Superion® surgical procedure. The Hearing Officer's findings are support by the appeal record. I adopt and incorporate the Hearing Officer's findings into this Final Decision.

AR 1314.

And because the DHA's decision adopts and incorporates the ALJ's recommendation, *see* AR 1314, the ALJ's discussion is as follows:

The TPM, related regulations, and a recent review by MB&RD specifically exclude devices and procedures such as Vertiflex® Superion® IPD from coverage by TRICARE. Approval by the FDA and 80 percent coverage by Medicare are not controlling here. Well-established policy supports the way TRICARE determines the safety and efficacy of a device, treatment or procedure. Five times between 2007 and 2017 and again in October 2018, MB&RB determined that there is no national consensus regarding the efficacy of IPDs for the treatment of LSS and the procedure is not a proven technology as contemplated by TRICARE policies and regulations. As a result, the Direct, DHA, has issued multiple decisions denying cost-sharing for this group of devices because they have not been shown by reliable evidence to be safe and effective.

The specific exclusion from coverage of a prior version of this IPD device and procedure, along with yet another recommendation against coverage, created a rebuttable presumption against cost-sharing here. The burden to rebut that presumption and present reliable evidence to show that this procedure is safe and effective rests with Beneficiary.

At the time of Beneficiary's August and November 2017 procedures, the TPM specially identified the XSTOP device and the associated procedure

coved, 0171T, 0172T, and C1821 as excluded care.  Beneficiary is correct that the TPM did not specifically address the status of the Vertiflex® Superion® or the CPT code 22869.  However, this defect is administrative, not substantive and did not create a loophole for coverage of the Superion device or represent a change in the long-standing DHA position classifying the use of IPDs as unproven care.  The TPM in effect at the time of Beneficiary's procedures made it sufficiently clear that procedures performed under the codes related to the insertion of interspinous devices were considered unproven care and would not be covered.

In Beneficiary's case the implantation of the Vertiflex® Superion® IPD for the treatment of his LSS was a success.  Given Beneficiary's medical history, implantation of the IPD using local anesthesia was a better and safer option than undergoing general anesthesia for a laminectomy.  He is pain free and has regained mobility.  The procedures undoubtedly restored Beneficiary's quality of life and his independence.  However, this result alone does not qualify the procedure for coverage under the TRICARE program.  There have not been any studies directly comparing the efficacy of the Vertiflex® Superion® IPD to that of laminectomy, only studies comparing the efficacy of Vertiflex® Superion® IPD[ ]to the XSTOP IPD.  The articles in the record establish that Vertiflex® Superion® is not inferior to the now-discontinued XSTOP device as a treatment for LSS.  Thiis finding of non-inferiority is not sufficient to reclassify the Vertilex® Superion® device from uproven to proven care.

AR 1304–05.

2.    *Relevant TriCare and TPM Provisions*

Pursuant to 32 CFR § 199.4, TriCare will pay for medically necessary services required in the diagnosis and treatment of illness or injury, subject to exclusions.  32 CFR § 199.4(a)(1)(i).

As noted above, there are two relevant exclusions, one of which was determined to apply.  First, the Unproven Exclusion:

(i) A drug, device, or medical treatment or procedure is unproven:

. . .

(C) Unless reliable evidence shows that any medical treatment or procedure has been the subject of well-controlled studies of clinically

meaning    ful endpoints, which have determined its maximum tolerated dose, its toxicity, its safety, and its efficacy as compared with standard means of treatment or diagnosis.

32 CFR § 199.4(g)(15)(i)(C).

And the TriCare regulations provide the following defintion of "reliable evidence":

Reliable evidence.

(1) As used in § 199.4(g)(15), the term reliable evidence means only:

(i) Well controlled studies of clinically meaningful endpoints, published in refereed medical literature.

(ii) Published formal technology assessments.

(iii) The published reports of national professional medical associations.

(iv) Published national medical policy organization positions; and

(v) The published reports of national expert opinion organizations.

(2) The hierarchy of reliable evidence of proven medical effectiveness, established by (1) through (5) of this paragraph, is the order of the relative weight to be given to any particular source. With respect to clinical studies, only those reports and articles containing scientifically valid data and published in the refereed medical and scientific literature shall be considered as meeting the requirements of reliable evidence. Specifically not included in the meaning of reliable evidence are reports, articles, or statements by providers or groups of providers containing only abstracts, anecdotal evidence or personal professional opinions. Also not included in the meaning of reliable evidence is the fact that a provider or a number of providers have elected to adopt a drug, device, or medical treatment or procedure as their personal treatment or procedure of choice or standard of practice.

32 CFR § 199.2.

Further, Chapter 4 of the TPM, which relates to the musculoskeletal system, provides that "Services and supplies required in the diagnosis and treatment of illness or injury involving the musculoskeletal system are covered.  U.S. Food and Drug Administration (FDA) approved surgically implanted devices are also covered."  AR 1294.

Under paragraph 5.9 of this Chapter, the TPM sets forth the second relevant exclusion, the X-Stop Exclusion: "XSTOP Interspinous Process Decompression System (CPT procedure codes 0171T and 0172T, HCPCS code C1821) for the treatment of neurogenic intermittent claudication secondary to lumbar spinal stenosis is unproven."  AR 1296.

   *3.   Analysis*

The TPM provides that a procedure may be cost-shared only when the procedure is: (1) "appropriate medical care"; (2) "medically or psychologically necessary"; (3) not "unproven" as defined in 32 CFR § 199.4(g)(15); **and** (4) not explicitly excluded in the TPM.[9]

There appears to be no dispute that the Superion Device Procedure was "appropriate medical care" and was "medically necessary."  As such, cost-sharing turned on whether it was not unproven and not explicitly excluded.  The DHA found that the procedure was unproven.

   a.   <u>Expressly Covered</u>

Plaintiff first argues that the Superion Device is covered because it had received pre-market approval by the FDA and thus, was expressly covered under the TPM.  Doc. No. 33-1 at 14.

---

[9] TRICARE Policy Manual 6010.60-M, ch. 1, sec. 1.1, ¶ 3.4.1.3, April 1, 2015, *available at* https://manuals.health.mil/pages/DisplayManualHtmlFile/2022-09-16/AsOf/TP15/C1S1_1.html (last visited Oct. 5, 2022).

Chapter 4, section 6.1 of the TPM relates to the Musculoskeletal System.  In 2017, paragraph 4.1 provided:

> 4.1  Services and supplies required in the diagnosis and treatment of illness or injury involving the musculoskeletal system are covered.  U.S. Food and Drug Administration (FDA) approved surgically implanted devices are also covered.

TPM, ch. 4, sec. 6.1, ¶ 4.1.

Plaintiff appears to be correct: the Superion Device's FDA pre-market approval, AR 976–1044, qualifies it as an "FDA approved surgically implanted device" that is covered under paragraph 4.1.

Defendant does not argue otherwise.  Instead, Defendant contends in opposition that the provision is not to be read in isolation.  Doc. No. 37 at 7.  He asserts that paragraph 4.1 does not provide that TriCare will cover *all* FDA approved devices, and that other exclusions still apply.  *Id.*  As Defendant points out, elsewhere the TPM expressly states:

> 2.2.  Medical devices must be FDA approved or of a type not requiring premarket approval by the FDA.  Not all of these (either FDA approved or those not requiring pre-market approval) are covered.  Not all FDA approved devices are covered.  Coverage of a medical devices is subject to all other requirements of the law, rules, and policy governing TRICARE.  If the device is used for a noncovered or excluded indication, benefits may not be allowed.  For example, tinnitus masker is an FDA approved device; however, TRICARE considers this device unproven and, therefore, not a benefit.

TPM, ch. 8, sec. 5.1, ¶ 2.2

The DHA's interpretation of its own policy is entitled to deference.  *See California v. FCC*, 39 F.3d 919, 925 (9th Cir. 1994), *distinguished on other grounds by ACA Connects-America's Communs. Ass'n v. Bonta*, 24 F.4th 1233, 1244 (9th Cir. 2022).  And the DHA's interpretation in this respect does not amount to an abuse of discretion.  Accordingly, Plaintiff is not entitled to summary judgment on this basis.

b.     The X-Stop Exclusion

Plaintiff also argues that the X-Stop Exclusion does not expressly apply to and exclude the Superion Device.  Doc. No. 33-1 at 14.  Defendant argued at the hearing that it does.

To the extent the DHA found that the X-Stop Exclusion applied as a bar to Plaintiff's reimbursement claim, this may have been in error.  As noted above, the DHA found that its failure to timely update the TPM to reflect the changes in the IPD market "did not create a loophole for coverage . . . ."  AR 1314.  But it did; the fact remains that a "hole" in the TPM existed at the time of Plaintiff's claim submission regarding coverage of IPDs.

It is undisputed that the HCPCS code billed for the Superion Device, C1821, AR 13, was expressly excluded under the TPM, AR 1296.  At oral argument, the parties agreed that HCPCS code C1821 relates to the particular device, while CPT code 22689, as billed, relates to the procedure generally.  However, the X-Stop Exclusion by its plain language only applies to a device no longer available in the market and not used in Plaintiff's procedure.  The parties also agreed at the hearing that the issue before the DHA was whether both the Superion Device (HCPCS code C1821) *and* the procedure (CPT code 22869) are not "unproven."  The X-Stop Exclusion's language does not bar cost-sharing for IPDs and the associated procedures for implantation, generally.

Nonetheless, "[i]t is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself," *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 50.  The DHA did not find or otherwise hold that cost-sharing should be denied because the device and procedure were expressly excluded under the X-Stop Exclusion.  Consequently, Plaintiff is not entitled to summary judgment on this basis.

c.     DHA's Position on the Superion Device and IPDs

Although the DHA did not find the X-Stop Exclusion applicable, it relied on it, as well as prior MB&RD decisions, in support of a seemingly superfluous and incorrect finding that the DHA had a "long-standing position classifying the Vertiflex® Superion®

interspinous process spacer procedure as unproven care." AR 1314.  In particular, the ALJ concluded:

> Further, MB&RD recommended for the sixth time since 2007, and for the same reasons, that the Vertiflex® Superion® IPD should not be covered, because it is unproven and presented concerns about safety and durability.

AR 1304.  And the DHA echoed this finding, explaining that the discrepancy between the X-Stop and Superion Device coding

> is administrative, not substantive and did not create a loophole for the coverage of the Vertiflex® Superion® device or represent a change in the long-standing DHA position classifying the Vertiflex® Superion® interspinous process spacer procedure as unproven care.  The TPM in effect at the time of Beneficiary's procedures made it sufficiently clear that procedures performed under the codes related to the insertion of interspinous devices were considered unproven care and would not be covered.

AR 1314.

The conclusion that the DHA had a long-standing position on the Superion Device, specifically, is not supported by the record.  The Superion Device's CPT code 22869 is not specifically listed in the X-Stop Exclusion, notwithstanding the fact that the code 22869 appears to fall within the applicable CPT codes identified in Chapter 4.  AR 1294 (identifying the relevant "CPT Procedure Codes" as including "22864 – 27138").  Moreover, while the Superion Device and X-Stop may be in the same class of devices, AR 1304, the evidence in the record clearly demonstrates that the X-Stop and Superion devices are not the same in terms of function, manufacturer, or efficacy.  *See, e.g.*, AR 1051.

More importantly, MB&RD *did not* conclude in 2018 "for the sixth time since 2007" that the Superion Device was unproven.  MB&RD did not take a "position" on the proven status of the Superion Device, specifically, until its October 2018 review. MB&RD may have reviewed other IPDs, or IPDs generally, for proven classification five

times prior to Plaintiff's First Surgery: March 2007, April 2011, October 2014, January 2016, and September 2017.  However, the record reflects, and the ALJ found, that none of those prior reviews included the Superion Device.  AR 778.  To then find that the DHA had a "long-standing" position on, and that the MB&RD for the sixth time found against coverage for, a particular device that had only been in the market for two years and never the subject of the MB&RD's review, was in error.

As Plaintiff points out, it is hard to discern why the ALJ and DHA discussed a device and exclusion admittedly not applicable to such great length.  One can only presume it was to close the loophole its own failure to timely update the TPM created.  Nonetheless, this error appears to be harmless.

The Ninth Circuit has explained that "when reviewing agency action under the APA, we must take 'due account' of the harmless error rule." *Cal. Wilderness Coal. v. United States DOE*, 631 F.3d 1072, 1090 (9th Cir. 2011) (quoting *Paulsen v. Daniels*, 413 F.3d 999, 1006 (9th Cir. 2005)).  Any findings related to the DHA's position on the Superion Device and the X-Stop Exclusion do not appear to impact the analysis or outcome that Plaintiff failed to meet his burden of demonstrating that the Superion Device was not unproven.  As such, Plaintiff is not entitled to summary judgment on this basis.

### d.    The Unproven Exclusion

The DHA ultimately determined that Plaintiff did not meet his burden of demonstrating that the Superion Device was not unproven.  Therefore, the Court must determine whether the DHA abused its discretion in this respect.

To reiterate, in conjunction with the Unproven Exclusion, the relevant TriCare regulation provides that a device/procedure is unproven "unless reliable evidence shows that any medical treatment or procedure has been the subject of well-controlled studies of clinically meaningful endpoints, which have determined . . . its safety[] and its efficacy as compared with standard means of treatment or diagnosis," 32 CFR § 199.4(g)(15)(i)(C), and the regulations provide a "hierarchy" of reliable evidence, *see id.* § 199.2.

Plaintiff contends that he put forth sufficient reliable evidence demonstrating that the procedure is not unproven.  First, he points to the FDA pre-market approval of the Superion Device, which includes a 61-page safety and effectiveness study.  AR 976–1044.  He also put forth the results of the well-controlled studies with clinically meaningful endpoints published in refereed medical journals showing the 2-, 3-, 4-, and 5-year results of using the Superion Device.  AR 1045–72.  He offered an article showing that the use of the Superion Device led to an 85% reduction in opioid use by the patient population, AR 1073–78, including nearly halving the opioid usage rate at 24 months post-surgery as compared to a laminectomy (13.3% vs. 23%), AR 1075–76.  Dr. Verdolin testified that all three reported the results of well controlled studies with clinically meaningful results and appeared in refereed scientific journals and therefore meet the highest level of "reliable evidence."  *See* AR 1228–37.  Plaintiff also produced an article describing the benefits of using the Superion Device for people that have other conditions that make a laminectomy not safe or too risky, *i.e.*, "comorbidities," and reporting the favorable results of a trial.  AR 1079–89.  Plaintiff offered an article by, as Dr. Verdolin testified, AR 1244, the "luminaries" in the field of pain management reviewing minimally invasive spine treatments ("MIST"), for example, the Superion Device, and determining that there is a consensus of the experts that the Superion Device has the highest level of evidence that it is beneficial for patients.[10]  AR 1090–1114.  Finally, Dr. Verdolin testified about a SPORT study and its conclusions on laminectomy failure rates (in the range of 60% at three years), AR 1199–1202, and the MAUDE database reports of the Superion product (12 reports out of more than 10,000 procedures).[11]  AR 1221, 1262.

---

[10] The ALJ rejected this evidence as not meeting TriCare's definition of "reliable evidence."  AR 1303.
[11] The Sport Study is a "large multicenter Spine Patient Outcome Research (SPORT) trial of LSS.  AR 1075.  The Sport Study "looked at laminectomy versus no treatment."  AR 1199.  The SPORT Study itself is not in the administrative record.
    The MAUDE database is a manufacturer database that collects and compiles reports of complications with devices.  AR 1221.

Plaintiff may be correct that he put forth reliable evidence demonstrating that the Superion Device is safe and effective.[12]  However, the Superion Device's safety and efficacy is not the dispositive issue under the regulation, but its safety and efficacy as compared to the standard means of treatment.

The question then is: what is "the standard means of treatment"?  Neither the DHA nor the ALJ stated as much.  Nonetheless, the DHA found that "[t]here have not been any studies directly comparing the efficacy of the Vertiflex® Superion® interspinous process spacer procedure to that of laminectomy, only studies comparing the efficacy of the X-STOP Interspinous Process Decompression System."  AR 1314.  Accordingly, the DHA concluded that the evidence was "insufficient to reclassify the Vertiflex® Superion® device from unproven to proven care."  *Id.*

It is undisputed that Plaintiff did not present reliable evidence, as that term is defined, comparing the Superion Device's safety and efficacy to that of a laminectomy.[13]  And it is clear that the DHA upheld the denial of cost-sharing based upon Plaintiff's failure to put forth "reliable evidence" comparing the safety and efficacy of the Superion Device to the laminectomy.  However, this conclusion necessarily rests on the unstated and unexplained pivotal finding that the laminectomy is the standard means of treatment.

Plaintiff's position is and was that because he was not a candidate for a laminectomy, it was not the standard means of treatment for him.  Plaintiff has comorbidities, AR 1204, and as a result, Dr. Verdolin testified that a laminectomy was not a safe option for Plaintiff, AR 1215.  Dr. Verdolin also testified, and the record reflects, that Plaintiff falls within a larger class of persons with contraindications—underlying conditions that result in the laminectomy being an unsafe treatment option due

---

[12] The Court must "defer to an agency's scientific or technical expertise."  *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005).

[13] Plaintiff contended at the hearing that the MIST study does compare the Superion Device to the laminectomy.  However, as Defendant explained, the study was an aggregate study with no surgical comparators.  And as mentioned in footnote 10, the ALJ rejected this study as not meeting TriCare's definition of "reliable evidence."

to the nature of the procedure and risks.  AR 1205.  Thus, Plaintiff continues to take issue with the DHA's use of the laminectomy as the standard means of treatment for LSS.  *See* Doc. No. 33-1 at 15.

The DHA's analysis is devoid of mention of this evidence or argument.  More importantly, as noted above, the decision nowhere explicitly states that the laminectomy is the "standard means of treatment."  Surely, that finding is implied.  AR 1314 ("There have not been any studies directly comparing the efficacy of the Vertiflex® Superion® interspinous process spacer procedure *to that of laminectomy . . .*) (emphasis added).  But given the evidence and arguments, the DHA was required to make such a finding and explain its reasoning.  To that end, it would appear that by neglecting Plaintiff's evidence and argument on this point, the DHA "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43—whether a laminectomy is the standard means of treatment for an entire class of persons who cannot safely have the procedure performed.

The Ninth Circuit has explained that while courts may "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 44 (1983) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)), courts may not "infer an agency's reasoning from mere silence."  *Pacific Coast Fed'n of Fisherman's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005).  "The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given."  *State Farm*, 463 U.S. at 4 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).  The DHA simply did not supply a reasoning for imputing "laminectomy" into the regulation, which calls for a comparison as to the "standard means of treatment," and the Court will not supply its reasoning here.

It is also relevant that the TriCare regulations require that each of the ALJ's findings in the recommended decision "be supported by substantial evidence that is

defined as such evidence a reasonable mind can accept as adequate to support a conclusion." 32 CFR § 199.10(d)(12).  The ALJ similarly did not state that the laminectomy is the standard means of treatment, nonetheless did it explain what substantial evidence existed to support that finding.  The only relevant mention of "laminectomy" is that "[t]raditional operative treatment usually involves a laminectomy." AR 1299.  The ALJ expressly identified the dispositive issue presented as "[w]hether the Vertiflex® Superion® IPD, provided to [Plaintiff] in August 2017, has been proven safe, effective, and comparable to standard treatment for his diagnosis."  AR 1303.  But the ALJ then merely summarily concluded that "[t]here have not been any studies directly comparing the efficacy of the Vertiflex® Superion® IPD to that of laminectomy, only studies comparing the efficacy of Vertiflex® Superion® IPD[ ]to the XSTOP IPD," AR 1305.

As the Supreme Court explained in *Burlington Truck Lines v. United States*, 371 U.S. 156 (1962), and later reiterated in *State Farm*, where Congress delegates administrative action, agencies must make findings and provide an analysis to "justify the choice made" and indicate the basis on which the agency exercised its expert discretion. *State Farm*, 463 U.S. at 48 (quoting *Burlington Truck Lines*, 371 U.S. at 167).  This requirement serves as a "practical limit[]" on agency discretion.  *Id.*

Neither the ALJ nor the DHA expressly stated that the laminectomy is the standard means of treatment for LSS.  Nor did they explain or otherwise provide a rationale for this implicit finding.  In the face of Plaintiff's evidence and argument that the laminectomy is not the standard means of treatment for him and a larger class of persons who have contraindications, the DHA's failure to consider or address this "important aspect of the problem" amounts to an abuse of discretion.  For this reason, the Court cannot uphold the DHA's decision, and the matter must be remanded to the DHA for further consideration.  *See, e.g.*, *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate

the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."). Consequently, the Court **GRANTS** summary judgment in Plaintiff's favor as to his second cause of action brought pursuant to 5 U.S.C. § 706(2)(A).

## C.    Claim Three: Section 706(2)(C)

To state a claim under § 706(2)(C), a plaintiff must allege that the agency action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Courts must assess a § 706(2)(C) challenge using the two-part test laid out in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). First, if the intent of Congress is clear, the Court must give effect to that intent. *Id.* at 842–43. Second, if the Court determines Congress has not directly addressed the precise question at issue, the Court must assess whether the agency's answer is based on "a permissible construction of the statute." *Id.* at 843.

Plaintiff does not explain how, or offer evidence demonstrating that, any action taken by Defendant was in excess of statutory jurisdiction, authority, or limitations. Although Plaintiff did not expressly abandon this claim at the hearing, he conceded it was cumulative of his other claims. Doc. No. 33-1 at 18. Consequently, the Court **GRANTS** summary judgment in Defendant's favor as to Plaintiff's third cause of action brought pursuant to 5 U.S.C. § 706(2)(C).

## D.    Claim Four: Section 706(2)(D)

Plaintiff's fourth cause of action is for violation of 5 U.S.C. § 706(2)(D). Under the APA, a reviewing court may "hold unlawful and set aside agency action, findings, and conclusions" that is "without observance of procedure required by law," 5 U.S.C. § 706(2)(D). Unlike substantive challenges, "review of an agency's procedural compliance is exacting, yet limited." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006).

It would appear that a § 706(2)(D) claim is limited to agency rulemaking. The Ninth Circuit has explained that under § 706(2)(D), the reviewing court is to determine

"the adequacy of *the agency's notice and comment procedure* . . . ." *Id.* (internal citation and quotation marks omitted) (emphasis added). Further, the Ninth Circuit's discussion of the statute in *California v. Azar*, 911 F.3d 558 (9th Cir. 2018), suggests that claims brought pursuant to § 706(2)(D) are limited to this extent. *See id.* at 575. In *Azar*, the Ninth Circuit stated:

> The APA requires that, prior to promulgating rules, an agency must issue a general notice of proposed rulemaking, 5 U.S.C. § 553(b), and 'give interested persons an opportunity to participate in the rule making through submission of written data, views or arguments,' *id.* § 553(c). *A court must set aside rules made 'without observance of [this] procedure.' Id.* § 706(2)(D).

*Id.* (alteration in original) (emphasis added).

Accordingly, it appears that claims brought pursuant to § 706(2)(D) are limited to procedural deficiencies in the rulemaking process, *see* 5 U.S.C. § 553, which is inapplicable to the facts in this case.

Assuming Plaintiff may bring a claim for failure to observe the required procedures, procedural irregularities do not automatically invalidate an agency's decision. "[I]n claiming that agency action should be set aside for procedural irregularity under 5 U.S.C. § 706(2)(D), it is [Plaintiff's] burden to show that prejudice has resulted." *Center for Auto Safety v. Tiemann*, 414 F. Supp. 215, 226 (D.D.C. 1976). "Procedural irregularities are not per se prejudicial; each case must be determined on its individual facts and, if the errors are deemed to be minor and insubstantial, the administrative order should be enforced notwithstanding." *N.L.R.B. v. Seine & Line Fishermen's Union of San Pedro*, 374 F.2d 974, 981 (9th Cir. 1967).

"A procedural right must generally be understood as 'substantial' . . . when the regulation is intended to confer a procedural protection on the party invoking it. The Supreme Court has recognized the distinction between regulations 'intended primarily to confer important procedural benefits upon individuals' and regulations 'adopted for the orderly transaction of business before [the agency].'" *Wilson v. Comm'r of Social*

*Security*, 378 F.3d 541, 546–47 (6th Cir. 2004) (alteration in original) (quoting *American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 538–39 (1970)).  In the latter case, "an agency has the discretion 'to relax or modify its procedural rules' and such action 'is not reviewable except upon a showing of substantial prejudice to the complaining party.'"  *Id.* (quoting *American Farm Lines*, 397 U.S. at 539).  When a District Court reviews agency action for procedural error, it "is limited to a determination of whether the agency substantially complied with its statutory and regulatory procedures."  *Briggs v. Dalton,* 939 F. Supp. 753, 760 (D. Haw. 1996) (quoting *Toohey v. Nitze*, 429 F.2d 1332, 1334 (9th Cir.1970)).

So far as the Court can surmise, there were two procedural irregularities in Plaintiff's administrative review.[14]

### 1.   *Procedural Irregularities*

Plaintiff's hearing was held on August 22, 2019.  DSS No. 20.  According to Plaintiff, the ALJ was required to issue a recommended decision within 90 days—December 16, 2019.  *See* Doc. No. 33-1 at 13.

Title 32 of the Code of Federal Regulations, section 199.10 sets forth TriCare's appeal and hearing procedures.  Relevantly, § 199.10(d) provides the procedures required for hearings such as Plaintiff's.  In general:

> 2) Hearing process. A hearing is an administrative proceeding in which facts relevant to the appealable issue(s) in the case are presented and evaluated in relation to applicable law, regulation, policies, and guidelines in effect at the time the care in dispute was provided or requested; at the time of the initial determination, formal review determination, or hearing decision involving a provider request for approval under CHAMPUS as an authorized provider; or at the time of the act or event which is the basis for the imposition of sanctions under this part. A hearing, except for an appeal involving a provider sanction,

---

[14] To the extent Plaintiff challenges the DHA's failure to provide Plaintiff with a copy of the recommended decision and the opportunity to object to it as a procedural irregularity, Plaintiff conceded at the hearing that this claim is cumulative of and subsumed by his seventh cause of action.

generally shall be conducted as a nonadversary, administrative proceeding. However, an authorized party to any hearing, including CHAMPUS, may submit additional evidence or testimony relevant to the appealable issue(s) and may appoint a representative, including legal counsel, to participate in the hearing process.

32 C.F.R. § 199.10(d)(2).

Subsection (d)(3) provides that "except as otherwise provided in this Section," an ALJ will be appointed within 60 days of receipt of the request for hearing. 199.10(d)(3)(i).

According to the record, Plaintiff submitted his hearing request on February 5, 2019. AR 859. Further, it appears that an ALJ was not assigned until sometime between April 3, 2019, *see* AR 867, and July 9, 2019, *see* AR 868. The 60-day deadline would have been April 6, 2019.

Further, the ALJ "normally shall have 60 days from the date of written notice of assignment to review the file, schedule and hold the hearing, and issue a recommended decision to the Director . . . ." 32 CFR § 199.10(d)(3)(ii). The ALJ shall have an additional 30 days "if, at the close of the hearing, any party to the hearing requests that the record remain open for submission of additional information," (d)(3)(iv), as it appears was the case here.

Plaintiff acknowledged at the hearing that the ALJ's deadline to submit a recommended decision did not begin to run until after the record was closed, on September 16, 2019. AR 1288. Plaintiff appears to be correct, then, that the ALJ was required to issue a recommended decision by December 16, 2019. Yet the ALJ's recommended decision is dated January 31, 2020. AR 1298.

Further, the DHA was required to issue a final decision 90 days thereafter—March 16, 2020. 32 CFR § 199.10(e)(1). However, the DHA's final decision is dated May 18, 2021, and it was sent to Plaintiff on May 20, 2021. AR 1314–15. That amounts to a delay of more than one year.

2.    *Analysis*

It is unclear if the DHA substantially complied with its own regulatory procedures. It is undisputed that there were timing irregularities.  But presumably, much of the other procedure was met.  For example, Plaintiff does not challenge any part of the substantive hearing procedures.  Regardless, it appears that the timing regulations would be better described as "adopted for the orderly transaction of business" rather than providing any procedural benefit to Plaintiff, such as substantive hearing procedure would.  Moreover, Plaintiff has not shown any prejudice.  Importantly, this was a hearing regarding cost-sharing reimbursement and not seeking any prospective benefits or coverage.

Consequently, regardless of whether § 706(2)(D) is applicable, Plaintiff fails to demonstrate or otherwise raise a question of fact[15] as to whether the particular regulations provided him with a procedural benefit, and whether the DHA's failure to comply with those regulations prejudiced him.  Therefore, the Court **GRANTS** summary judgment in Defendant's favor as to Plaintiff's fourth cause of action brought pursuant to 5 U.S.C. § 706(2)(D).

## E.    Claim Five: Section 706(2)(E)

Plaintiff's fifth cause of action is pursuant to 5 U.S.C. § 706(2)(E).  The APA provides in § 706(2)(E) that a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute."  5 U.S.C. § 706(2)(E).  Consequently, "[r]eview under the substantial-evidence test is authorized only when the agency action is taken pursuant to a rulemaking provision of the Administrative Procedure Act itself, or when the agency is based on a public adjudicatory hearing."  *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 414 (1971) (first citing 5 U.S.C. § 553, and then citing *id.*

---

[15] The Court applies the traditional summary judgment standard as Plaintiff does not challenge the DHA's final decision by way of this claim.

§§ 556, 557).  TriCare appeal hearings, such as Plaintiff's, are not public hearings.  *See* 32 CFR § 199.10(d)(11)(i) ("Because of the personal nature of the matters to be considered, hearings normally shall be closed to the public.").

As will be discussed in further detail below, there is a question of whether Plaintiff's hearing falls within the reach of § 557 (by way of § 554).  However, the Court need not delve into this issue.  The Ninth Circuit has repeatedly stated that the substantial evidence standard under § 706(2)(E) only applies in "formal agency proceedings," *see, e.g.*, *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1072 (9th Cir. 2015), and no one suggests that Plaintiff's benefits appeal hearing before the ALJ was a formal agency proceeding as contemplated by § 706(2)(E).  More importantly, however, "'as a practical matter, the arbitrary and capricious standard incorporates the substantial evidence test,' and we use that test for review of agency factfinding in informal proceedings as well." *Id.* (quoting *Ursack Inc. v. Sierra Interagency Black Bear Grp.*, 639 F.3d 949, 958 n.4 (9th Cir. 2011)).  Accordingly, assuming § 706(2)(E) applies, it is duplicative of Plaintiff's second cause of action.  The Court therefore **GRANTS** summary judgment in Defendant's favor as to Plaintiff's fifth cause of action brought pursuant to 5 U.S.C. § 706(2)(E).

**F.     Claim Six: Section 554(d)(1) and (2)**

Plaintiff's sixth cause of action is for violation of 5 U.S.C. § 554(d)(1) and (2).  Pursuant to section 554(d),

> (d) The employee who presides at the reception of evidence pursuant to section 556 of this title [5 USCS § 556] shall make the recommended decision or initial decision required by section 557 of this title [5 USCS § 557], unless he becomes unavailable to the agency. Except to the extent required for the disposition of ex parte matters as authorized by law, such an employee may not--
>
> > (1) consult a person or party on a fact in issue, unless on notice and opportunity for all parties to participate; or

(2) be responsible to or subject to the supervision or direction of an employee or agent engaged in the performance of investigative or prosecuting functions for an agency.

An employee or agent engaged in the performance of investigative or prosecuting functions for an agency in a case may not, in that or a factually related case, participate or advise in the decision, recommended decision, or agency review pursuant to section 557 of this title [5 USCS § 557], except as witness or counsel in public proceedings. This subsection does not apply--

    (A) in determining applications for initial licenses;

    (B) to proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers; or

    (C) to the agency or a member or members of the body comprising the agency.

5 U.S.C. § 554(d).

Plaintiff has not put forth any evidence that either the ALJ or any employee performing prosecutorial or investigative functions improperly communicated, consulted, participated in, or advised anyone throughout the appeal process.[16]  Plaintiff does not seek summary judgment as to this claim and concedes that he has no evidence of any improper communications between the ALJ and the DHA's attorney, Ms. Greer.  *See* Doc. No. 33-1 at 19.  And at the hearing, he acknowledged that this claim was no longer in play.  Similar to and as noted above, there is an issue of whether § 554 applies at all.  But regardless of whether § 554 applies, Defendant is entitled to summary judgment on this record.  Accordingly, the Court **GRANTS** summary judgment in Defendant's favor as to Plaintiff's sixth cause of action brought pursuant to 5 U.S.C. § 554(d).

---

[16] Similar to Claim Five, the Court applies the traditional summary judgment standard to Claim Six, as Plaintiff does not challenge the DHA's final decision by way of this claim.

**G.     Claim Seven: Section 557(c)**

In Claim 7, Plaintiff alleges that Defendant violation § 557(c).  Section 557(c) of the APA provides,

(c) Before a recommended, initial, or tentative decision, or a decision on agency review of the decision of subordinate employees, the parties are entitled to a reasonable opportunity to submit for the consideration of the employees participating in the decisions—

(1) proposed findings and conclusions; or

(2) exceptions to the decisions or recommended decisions of subordinate employees or to tentative agency decisions; and

(3) supporting reasons for the exceptions or proposed findings or conclusions.

5 U.S.C. § 557(c).

It is undisputed that Plaintiff did not receive a copy of the recommended decision until this litigation began.  Doc. No. 33-1 at 13.  Consequently, he did not have an opportunity to object or submit exceptions to the ALJ's recommended decision before the DHA adopted it and issued its final decision, and this would appear to be a violation of § 557(c).

However, by its own terms, § 557 only applies "when a hearing is required to be conducted in accordance with section 556 of this title."  5 U.S.C. § 557(c).  Section 556 sets forth the procedure for "hearings required by section 553 or 554 of this title."  *Id.* § 556.  Section 553 relates to administrative rule making, 5 U.S.C. § 553, and § 554, while entitled "Adjudications," only applies to "adjudication[s] required by statute to be determined on the record after opportunity for an agency hearing," 5 U.S.C. § 554(a).

10 U.S.C. § 1071 *et seq.* does not set forth any requirement for an adjudicatory hearing, a point Plaintiff concedes.  Instead, Plaintiff argues that he had "a property interest in continued receipt of Government benefits that is protected by the Fifth

Amendment due process protections." Doc. No. 33-1 at 18.[17]  Essentially, Plaintiff argues that although no statute mandates a hearing, the APA's procedures apply because his constitutional Due Process right to a hearing equates to a hearing "required by statute."

"Section 554 'generally applies where an administrative hearing is required by statute or the Constitution.'" *2-Bar Ranch Ltd. P'ship v. United States Forest Serv.*, 996 F.3d 984, 994 (9th Cir. 2021) (quoting *Aageson Grain & Cattle v. U.S. Dep't of Agric.*, 500 F.3d 1038, 1044 (9th Cir. 2007)).  In *2-Bar Ranch*, the Ninth Circuit rejected the same argument Plaintiff advances here: that when regulated parties have a due process right to an administrative hearing, the agency must observe the APA's formal adjudication procedures.  *Id.*  As the Ninth Circuit explained, the balancing test the Supreme Court identified in *Mathews v. Eldridge*, 424 U.S. 319 (1976), is "the standard for determining whether certain challenged administrative procedures comply with the requirements of due process."  *Id.* (quoting *Collord v. DOI*, 154 F.3d 933, 937 (9th Cir. 1998) (internal quotation marks omitted)).

The cases Plaintiff relies on either predate *Mathews* or are inapplicable because, similar to the situation in *2-Bar Ranch*, the TriCare regulations do not mimic the APA's procedure.  Importantly, the TriCare regulations provide that the recommended decision is to be provided to the DHA and not the appealing party.  32 CFR § 199.10(d)(12).  Consequently, the TriCare regulations do not provide that a beneficiary be given a recommended decision and the opportunity to be heard on it prior to issuance of a final decision.  This is in direct contrast to § 557(c) of the APA, which provides:

> Before a recommended, initial, or tentative decision, or a decision on agency review of the decision of subordinate employees, the parties are entitled to a reasonable opportunity to submit for the consideration of the employees participating in the decisions—

---

[17] The parties agree that Plaintiff has a protected property interest in receipt of his government benefits. *See* Doc. Nos. 37 at 13, 38 at 14.

(1) proposed findings and conclusions; or

(2) exceptions to the decisions or recommended decisions of subordinate employees or to tentative agency decisions; and

(3) supporting reasons for the exceptions or proposed findings or conclusions.

5 U.S.C. § 557(c).

For that reason, as was the case in *2-Bar Ranch*, it is undisputed that Plaintiff's appeal process did not comply with the APA, namely § 557(c), and as will be explained below, due process does not require that it do so.

As the *2-Bar Ranch* court and others have explained, whether a person's property interest and corresponding Fifth Amendment procedural due process protections trigger and thus require conformity with the APA's procedures turns on an analysis of the factors set forth in *Mathews*. Pursuant to *Mathews*, whether the APA's procedural protections are required depends on a balancing of three factors: (1) the gravity of the private interest affected; (2) the risk of erroneous deprivation under the current procedure, and the probable value, if any, of additional procedural safeguards; and (3) the interest of the government, including the burdens of additional or substitute procedures. *Mathews*, 424 U.S. at 335.

Here, Plaintiff's appeal was for reimbursement, not a prospective request for relief or coverage. Moreover, as one district court noted, "as reimbursement is not based upon financial need, the gravity of the private interest is minimal in comparison to welfare and disability cases." *Nat'l Ass'n of Psychiatric Treatment Ctrs. for Children v. Mendez*, 857 F. Supp. 85, 95 (D.D.C. 1994) (citing *Mathews*, 424 U.S. at 340). Further, the government has an interest in the conservation of administrative resources. *Id.* at 348. Requiring a fourth level of review by way of accepting objections to recommended decisions would undoubtedly place an additional burden on the DHA. Consequently, the first and third *Mathews* factors weigh against application of the APA's procedures.

Importantly, the second factor also weighs against Plaintiff's position.  With respect to this factor, the Court looks to the process Plaintiff was given, evaluates the likelihood of mistake, and considers the value of application of § 557(c) as an additional safeguard.  *See Buckingham v. Sec'y of the USDA*, 603 F.3d 1073, 1082 (9th Cir. 2010).

"The base requirement of the Due Process Clause is that a person deprived of property be given an opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 984 (9th Cir. 1998) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  That said, procedural due process does not require that the notice and opportunity to be heard occur *before* the deprivation.  *See Parratt v. Taylor*, 451 U.S. 527, 540 (1981), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).  It can take place through a combination of pre- and post-deprivation procedures, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547–48 (1985), or be satisfied with post-deprivation process alone, *Brewster*, 149 F.3d at 984.

It is clear that the DHA provided Plaintiff with ample post-deprivation procedures.  The DHA provides three levels of administrative review and Plaintiff took advantage of every level.  *See* 32 CFR § 199.10(a)(8).  Following the initial denial, he appealed and requested reconsideration from WPS pursuant to 32 CFR § 199.10(b).  AR 45.  After WPS upheld the denial, he requested a formal review from the DHA pursuant to § 199.10(c).  AR 829.  Following that adverse decision, Plaintiff requested and was granted a hearing in accordance with § 199.10(d)(1).  At the hearing, Plaintiff was represented by counsel, *id.* § 199.10(d)(4), and he put forth evidence in the form of exhibits and testimony, *id.* § 199.10(d)(11)(v), (vii).  Moreover, Plaintiff was given the opportunity to, and did, submit a post-hearing "closing statement" on the matter pursuant to § 199.10(d)(11)(viii).  AR 1289.

It is unclear how, absent more procedures, an error is likely to occur between the recommended and final decision.  It is also unclear what additional value would be derived if Plaintiff had been afforded the opportunity to submit "exceptions to the . . .

recommended decision[],'" 5 U.S.C. § 557(c), prior to the DHA's issuance of a final decision.  Nonetheless, any room for error is slim and any potential value would not carry much weight.[18]  Plaintiff was afforded plenty of opportunities to be heard—no less than three times, to be sure—and the failure to provide him with a fourth opportunity by way of excepting to the recommended decision did not deprive him of the opportunity to be heard at a meaningful time and in a meaningful manner.  *See Brewster*, 149 F.3d at 984.  Consequently, the second *Mathews* factor weighs against application of § 557(c).

In sum, an analysis of the *Mathews* factors reveals that the TriCare regulations are not constitutionally deficient in the due process sense, and therefore Plaintiff had no constitutionally protected right to be heard in between the recommended and final decisions as the APA demands under § 557(c).  As such, his hearing was not required by statute or the Constitution to be conducted in accordance with the APA.  Thus, consistent with *2-Bar Ranch*, Plaintiff's hearing does not fall within the reach of § 554 and consequently, he cannot maintain a cause of action pursuant to § 557.  Accordingly, the Court **GRANTS** summary judgment in Defendant's favor as to Plaintiff's seventh cause of action brought pursuant to 5 U.S.C. § 557(c).

**H.    Claim Eight: Due Process**

Plaintiff's eighth cause of action is for violation of his Fifth Amendment right to Due Process.  Namely, Plaintiff contends that he was deprived of his right to an impartial and disinterested decisionmaker.  *See* FAC ¶ 88.

As noted, the parties agree that Plaintiff has a protected property interest in continued receipt of his TriCare benefits.  However, Plaintiff does not seek summary judgment on this claim and concedes he has no evidence in support of it.  *See* Doc.

---

[18] This, notwithstanding the Court's conclusion above that Defendant's final decision amounted to an abuse of discretion.  The Court takes no position on to whether the DHA's implicit finding that the laminectomy was the standard means of treatment was in error.  Instead, the Court merely finds that Defendant's failure to make such a finding and explain its reasoning warrants remand.

No. 33-1 at 19.  Accordingly, the Court **GRANTS** summary judgment in Defendant's favor as to Plaintiff's eighth cause of action alleging a Due Process violation.

## IV. CONCLUSION

For the foregoing reasons, the Court **AFFIRMS IN PART** its tentative rulings.  In particular, the Court **GRANTS** summary judgment in Defendant's favor as to Claims 1, 3, 4, 5, 6, 7, and 8.  The Court **GRANTS** summary judgment in Plaintiff's favor as to his second cause of action brought pursuant to 5 U.S.C. § 706(2)(A).  Consequently, the Court **REMANDS** this matter to the DHA for further consideration of Plaintiff's entitlement to cost-sharing not inconsistent with this Order.

**IT IS SO ORDERED**.

Dated:  October 20, 2022

HON. MICHAEL M. ANELLO
United States District Judge